| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, | x : : : |
| Plaintiff, | : Civil Number _____ |
| v. | : |
| | : **JURY TRIAL DEMANDED** |
| TYCO INTERNATIONAL, LTD., TYCO ELECTRONICS LTD., COVIDIEN LTD., L. DENNIS KOZLOWSKI, MARK H. SWARTZ, FRANK E. WALSH, JR., and PRICEWATERHOUSECOOPERS LLP | : : : : : : |
| Defendants. | : |
| | x |

**COMPLAINT**

**ENTWISTLE & CAPPUCCI LLP**
Andrew J. Entwistle (AE-6513)
Johnston de F. Whitman, Jr.
Richard W. Gonnello
30 Columbia Turnpike
P.O. Box 95
Florham Park, NJ 07932
Tel:    (973) 236-0666
Fax:    (973) 236-9565

# TABLE OF CONTENTS

I.    ALLEGATIONS PURSUANT TO LOCAL CIVIL RULE 10.1 ...................................... 1

II.   INTRODUCTION ............................................................................................................ 1

III.  JURISDICTION AND VENUE .................................................................................... 2

IV.   PARTIES ........................................................................................................................ 3

      A.    Plaintiff ................................................................................................................ 3

      B.    Tyco Defendants .................................................................................................. 4

      C.    PricewaterhouseCoopers LLP.............................................................................. 7

V.    DEFENDANTS' WRONGFUL COURSE OF CONDUCT ............................................ 7

      A.    Material Omitted Information Concerning the Falsification of Tyco's
            Financial Reporting, Reported Acquisition Costs, and the Purported
            Success of Its Acquisition Strategy...................................................................... 9

            1.    Tyco's Materially False and Misleading Financial Statements and
                  Financial Disclosures ................................................................................ 15

                  a.    Tyco's Admission That It Issued Materially False and
                        Misleading Financial Statements During the Relevant
                        Period .............................................................................................. 17

                  b.    Tyco's Improper Failure To Disclose Material Related
                        Party Transactions........................................................................... 26

                        i.     Undisclosed Extraordinary Related Party
                               Compensation ..................................................................... 27

                        ii.    Undisclosed Related Party Loans ...................................... 28

                  c.    Tyco's False and Misleading Accounting for Acquired
                        Companies and Improper Manipulation of Accounting
                        Reserves .......................................................................................... 30

                  d.    Tyco's Improper Failure To Timely Record Impaired
                        Goodwill .......................................................................................... 39

                  e.    Tyco's Improper Recognition of Excess Reimbursements
                        From Independent Dealers............................................................... 41

                  f.    Violations of SEC Regulations ....................................................... 44

i

2.      Tyco's Failure To Disclose Numerous Acquisitions During the Relevant Period ........................................................... 45

3.      Tyco's Withholding of Documents From the SEC During Its 1999-2000 Inquiry ..................................................................... 46

4.      Breakdown of Tyco's Internal Controls ..................................... 47

5.      PwC's Participation in the Fraud and Its Scienter ..................... 50

B.     Material Omitted Information Concerning Looting of the Company by Its Senior Executives Who Were Conducting Tyco as a Criminal Enterprise .......... 63

1.      Relocation Programs ................................................................ 66

     a.     L. Dennis Kozlowski ................................................... 66

     b.     Mark H. Swartz ........................................................... 67

     c.     Other Executive Officers ............................................. 68

2.      The "TyCom Bonus" Misappropriation ..................................... 69

3.      The "ADT Automotive Bonus" Misappropriations ..................... 71

4.      Key Employee Loan Program .................................................... 72

     a.     L. Dennis Kozlowski ................................................... 73

     b.     Mark H. Swartz ........................................................... 74

5.      Attempted Unauthorized Credits to Key Employee Loan Accounts ........ 75

6.      Self-Dealing Transactions and Other Misuses of Corporate Trust ........... 76

     a.     Kozlowski Evidence Tampering ................................... 76

     b.     Kozlowski Fraudulent New York Home Purchase ...... 76

     c.     Concealed, Fraudulent Overpayment to Kozlowski for New Hampshire Property ................................................. 77

     d.     Kozlowski Non-Legitimate Business Expenses ........... 77

     e.     Kozlowski Charitable Contributions for Personal Benefit .......... 77

     f.     Walsh Payment ............................................................ 78

     g.     Swartz Breach of Nominee Agreement ....................... 80

|  |  | h. | Swartz Personal Expense Reimbursement | 80 |

h.    Swartz Personal Expense Reimbursement ................................... 80

i.    Compensation Committee Deceptions .......................................... 80

j.    Other Undisclosed Transactions Between Tyco and Its Directors ....................................................................................... 81

7.    Kozlowski and Swartz Engage in Short Swing Trading ...................... 82

VI.    THE DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD ................................. 82

A.    Materially False and Misleading Statements Throughout the Relevant Period That Acquisitions Will Be Immediately "Positive" or "Accretive" .......... 82

B.    1999 Materially False and Misleading Statements and Omissions ..................... 87

1.    The 1999 10-K Filed on December 13, 1999 .......................................... 88

a.    Tyco's "Strategy" ......................................................................... 88

b.    Tyco's Manipulation of Purchase Accounting Reserves ............. 89

c.    Tyco's Operating Results ............................................................. 90

d.    Management Remuneration .......................................................... 92

2.    The 1999 10-K/A Filed on 1/28/00 .......................................................... 93

3.    The 1999 10-K/A Filed on 6/26/00 .......................................................... 94

a.    Tyco's Operating Results ............................................................. 96

4.    12/21/99 S-8 .............................................................................................. 97

5.    12/21/99 S-4 (and Related S-4/A and Prospectus) ................................... 97

6.    1999 Annual Report to Shareholders ....................................................... 99

C.    2000 Materially False and Misleading Statements and Omissions ................... 102

1.    1/18/00 Conference Call ......................................................................... 102

2.    1/20/00 8-K .............................................................................................. 103

3.    1/28/00 S-8 .............................................................................................. 104

4.    2/11/00 10-Q for Quarter Ended 12/31/99 .............................................. 104

|  |  | a. | Tyco's Operating Results | 104 |
|  |  | b. | Tyco's Charges and Reserves | 105 |
| 5. | 3/1/00 Proxy Statement for 2000 Annual meeting | | | 107 |
|  |  | a. | Management Remuneration | 107 |
|  |  | b. | Key Employee Loan Program | 110 |
|  |  | c. | Allegations of Misconduct Against Tyco | 111 |
| 6. | 4/18/00 Earnings Announcement | | | 111 |
| 7. | 4/18/00 Conference Call | | | 112 |
| 8. | 5/15/00 10-Q for Quarter Ended 3/31/00 | | | 114 |
|  |  | a. | Tvco's Operating Results | 114 |
|  |  | b. | Tyco's Charges and Reserves | 115 |
| 9. | 6/26/00 10-Q/A Filed for Quarter Ended 12/31/99 | | | 116 |
|  |  | a. | Tyco's Operating Results | 118 |
|  |  | b. | Tyco's Charges and Reserves | 119 |
| 10. | 6/26/00 10-Q/A filed for Quarter Ended 3/31/00 | | | 120 |
|  |  | a. | Tyco's Operating Results | 121 |
|  |  | b. | Tyco's Charges and Reserves | 123 |
| 11. | 6/28/00 Conference Call | | | 125 |
| 12. | 7/12/00 S-4 (and Related S-4/A and Prospectus) | | | 126 |
| 13. | 7/13/00 Press Release | | | 128 |
| 14. | 7/19/00 Earnings Announcement | | | 129 |
| 15. | 7/19/00 Conference Call | | | 130 |
| 16. | 7/24/00 S-4 (and related S-4/A, Prospectuses, and Post-Effective Amendment) | | | 131 |
| 17. | 12/15/00 Prospectus | | | 136 |
| 18. | 8/14/00 10-Q for Quarter Ended 6/30/00 | | | 137 |

a. Tyco's Operating Results............................................................ 137

b. Tyco's Charges and Reserves ................................................... 138

19. 8/18/00 S-3 (and Related Prospectus).................................................... 139

20. 8/18/00 S-3 ............................................................................................ 141

21. 8/18/00 S-3 (and Related Prospectus and Prospectus Supplements)...... 142

22. 10/18/00 Press Release ........................................................................... 145

23. 10/18/00 S-4 (and Related S-4/A's)........................................................ 146

24. 10/23/00 S-8 ........................................................................................... 150

25. 10/24/00 Earnings Announcement........................................................... 151

26. 10/24/00 Conference Call ....................................................................... 151

27. 11/9/00 S-3 (and Related S-3/A and Prospectus) ................................... 153

28. 11/14/00 Conference Call ....................................................................... 157

29. 12/4/00 Simplex Acquisition .................................................................. 158

30. 12/8/00 S-3 (and Related S-3/A and Prospectus) ................................... 158

31. The 2000 10-K Filed on 12/21/00............................................................ 162

a. Tyco's "Strategy".................................................................... 163

b. Tyco's Manipulation of Purchase Accounting Reserves ........... 163

c. Tyco's Operating Results......................................................... 164

d. Management Remuneration and Related Transactions............... 165

32. 12/29/00 Lucent Acquisition Closes........................................................ 166

33. 2000 Annual Report to Shareholders....................................................... 166

D. 2001 Materially False and Misleading Statements and Omissions .................... 171

1. 1/17/01 Press Release .............................................................................. 171

2. 1/17/01 Conference Call .......................................................................... 172

3. 2001 Proxy Statement ............................................................................. 172

|        |        | a. | Management Remuneration ........................................................ 172 |
|        |        | b. | Key Employee Loan Program .................................................... 175 |
| 4.     | 1/31/01 S-8 ........................................................................... 176 |
| 5.     | 2/13/01 10-Q for Quarter Ended 12/31/00................................ 176 |
|        |        | a. | Tyco's Operating Results......................................................... 176 |
|        |        | b. | Tyco's Reserves ...................................................................... 177 |
| 6.     | 2/23/01 S-4 (and Related S-4/A and Prospectus) ................................ 178 |
| 7.     | 3/13/01 Conference Call ................................................................ 180 |
| 8.     | 3/16/01 S-3 (and related Prospectus)........................................... 181 |
| 9.     | 3/29/01 S-4 (and Related S-8).................................................... 182 |
| 10.    | 4/18/01 Press Release ................................................................... 187 |
| 11.    | 4/18/01 Conference Call ............................................................... 188 |
| 12.    | 5/11/01 10-Q for Quarter Ended 3/31/01 .................................. 189 |
|        |        | a. | Tyco's Operating Results......................................................... 189 |
|        |        | b. | Tyco's Reserves ...................................................................... 190 |
| 13.    | 5/30/01 Conference Call ............................................................... 191 |
| 14.    | 7/18/01 Earnings Announcement.................................................. 192 |
| 15.    | 7/18/01 Conference Call ............................................................... 193 |
| 16.    | 7/24/01 S-3 ................................................................................ 193 |
| 17.    | 8/3/01 Conference Call ................................................................ 194 |
| 18.    | 8/13/01 10-Q for Quarter Ended 6/30/01 .................................. 195 |
|        |        | a. | Tyco's Operating Results......................................................... 195 |
|        |        | b. | Tyco's Reserves ...................................................................... 196 |
| 19.    | 8/24/01 S-4 (and Related S-4/A and Prospectus) ................................ 197 |
| 20.    | 8/28/01 S-3 (and Related Prospectus and Supplemental Prospectus)..... 199 |

21.    9/11/01 Conference Call ............................................................... 201

22.    10/18/01 Press Release ............................................................... 202

23.    10/18/01 Conference Call ............................................................ 203

24.    10/23/01 S-4 (and Related S-4/A and Prospectus) ............................... 203

25.    11/15/01 Conference Call ............................................................ 206

26.    12/28/01 10-K for Fiscal Year-ended 9/30/01 ..................................... 206

        a.    Tyco's "Strategy" ........................................................... 207

        b.    Tyco's Operating Results .................................................. 207

        c.    Management Remuneration ............................................... 209

27.    2001 Annual Report to Shareholders ............................................... 210

E.    2002 Materially False and Misleading Statements and Omissions .................. 212

1.    1/8/02 S-4 (and Related S4/A) ...................................................... 212

2.    1/15/02 Press Release ................................................................ 214

3.    1/15/02 Conference Call ............................................................. 215

4.    1/22/02 Conference Call ............................................................. 218

5.    1/28/02 Proxy Statement ............................................................. 221

        a.    Management Remuneration ............................................... 221

        b.    Key Employee Loan Program ............................................ 223

6.    1/31/02 Analyst Report .............................................................. 226

7.    2/4/02 Press Release ................................................................. 228

8.    2/6/02 Conference Call .............................................................. 229

9.    2/11/02 Disclosures .................................................................. 232

10.    2/13/02 Conference Call ............................................................ 232

11.    2/14/02 10-Q .......................................................................... 233

        a.    Tyco's Operating Results .................................................. 233

|  |  | b. | Tyco's Reserves | 234 |
|  | 12. |  | 2/22/02 Boston Globe Article | 235 |
|  | 13. |  | 2/26/02 Conference Call | 236 |
|  | 14. |  | 2/28/02 New York Times Article | 237 |
|  | 15. |  | 3/5/02 Conference Call | 238 |
|  | 16. |  | 3/10/02 Sun Sentinel Article | 239 |
|  | 17. |  | 3/12/02 Conference Call | 239 |
|  | 18. |  | 3/19/02 Conference Call and Wall Street Journal Article | 240 |
|  | 19. |  | 4/2/02 Conference Call | 241 |
|  | 20. |  | 4/3/02 Analyst Report | 242 |
|  | 21. |  | 4/25/02 Press Release | 242 |
|  | 22. |  | 4/25/02 Conference Call | 243 |
|  | 23. |  | 4/30/02 Conference Call | 245 |
|  | 24. |  | 5/15/02 10-Q for the Quarter Ended 3/31/02 | 246 |
|  |  | a. | Tyco's Operating Results | 246 |
|  |  | b. | Tyco's Reserves | 248 |
|  | 25. |  | 5/16/02 Conference Call | 249 |
|  | 26. |  | Announcements of Criminal Investigations | 250 |
| VII. |  |  | POST-RELEVANT PERIOD EVENTS | 255 |
| VIII. |  |  | ADDITIONAL SCIENTER ALLEGATIONS | 261 |
|  | A. |  | Insider Selling During the Relevant Period | 261 |
|  | B. |  | Tyco's $40 Billion in Public Stock Offerings During the Relevant Period | 265 |
| IX. |  |  | INAPPLICABILITY OF STATUTORY SAFE HARBOR | 265 |
| X. |  |  | PLAINTIFF'S RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS | 266 |
| XI. |  |  | LOSS CAUSATION | 267 |

XII.    APPROPRIATENESS OF GROUP PLEADING AS TO THE INDIVIDUAL DEFENDANTS ................................................................................. 269

XIII.   THE INDIVIDUAL DEFENDANTS' CONTROL OVER TYCO ............................... 270

XIV.   THE INDIVIDUAL DEFENDANTS' USE OF ANALYSTS AS A CONDUIT TO DISSEMINATE FALSE AND MISLEADING INFORMATION ABOUT TYCO ....................................................................................................... 272

XV.    NEW JERSEY RICO ALLEGATIONS ........................................................ 274

    A.    Tyco Defendants' Pattern of Racketeering Conduct ........................... 274

        1.    Theft and Violations of Chapter 20 of Title 2C of the New Jersey Statutes ................................................................. 274

        2.    Fraudulent Practices and Violations of Chapter 21 of Title 2C of the New Jersey Statutes ......................................... 276

        3.    Use of Tyco to Further and Promote Criminal Objects ......... 277

        4.    Securities Violations ................................................... 277

        5.    Mail and Wire Fraud ................................................. 278

    B.    Tyco Defendants' Violations of the New Jersey RICO Act ............... 279

    C.    Plaintiff's Injuries Arising From Tyco Defendants' Violations of the New Jersey RICO Act .............................................................. 281

XVI.   CAUSES OF ACTION .............................................................................. 281

    COUNT I  (Against Tyco, Kozlowski, Swartz, Walsh, and PwC for Violation of Section 10(b) of the 1934 Act and Rule 10b-5) .................................... 281

    COUNT II (Against Kozlowski, Swartz, and Walsh for Violation of Section 20(a) of the 1934 Act) ........................................................................... 285

    COUNT III (Against Kozlowski, Swartz, and Walsh for Violation of Section 20A of the 1934 Act) ........................................................................... 286

    COUNT IV (Against All Defendants for Violation of Section 11 of the 1933 Act) ..... 287

    COUNT V (Against Tyco, Kozlowski, Swartz, And Walsh For Violation Of Section 12(a)(2) of the 1933 Act) ....................................................... 290

    COUNT VI (Against Kozlowski, Swartz, and Walsh for Violation of Section 15 of the 1933 Act) ........................................................................... 291

COUNT VII (Against Tyco for Violations of N.J.S.A. 2C;41-2(a)) ............................ 292

COUNT VIII (Against Tyco for Vicarious Liability in Violation of N.J.S.A. 2C:41-2(a)) ................................................................................................ 293

COUNT IX (Against Tyco for Liability Under N.J.S.A. 2C:41-2(b)) ........................... 298

COUNT X (Against Tyco And The Individual Defendants As An Association In Fact for Violations Of N.J. S.A. 2C:41-2(b)) ..................................................... 299

COUNT XI (Against The Individual Defendants for Liability Under N.J.S.A. 2C:41-2(b)) .................................................................................................. 299

COUNT XII (Against Tyco for Vicarious Liability Under N.J.S.A. 2C:41-2(b)).......... 300

COUNT XIII (Against The Individual Defendants for Liability Under N.J.S.A. 2C:41-2(c)).................................................................................................. 301

COUNT XIV (Against All Tyco Defendants for Liability Under N.J.S.A. 2C:41-2(c))................................................................................................... 302

COUNT XV (Against All Tyco Defendants As An Association In Fact for Liability Under N.J.S.A. 2C:41-2(c)) ................................................................ 302

COUNT XVI (Against Tyco for Vicarious Liability Under N.J.S.A. 2C:41-2(c)) ........ 303

COUNT XVII (Against All Defendants for Violations Of N.J.S.A. 2C:41-2(d)) .......... 304

XVII. PRAYER FOR RELIEF ............................................................................... 305

XVIII. JURY TRIAL DEMANDED ......................................................................... 306

XIX. VERIFICATION AND CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2 ..................................................................................................... 306

# I. ALLEGATIONS PURSUANT TO LOCAL CIVIL RULE 10.1

1. The name and address of the parties are as follows: (i) Plaintiff Public Employees' Retirement Association of Colorado ("Colorado PERA"), 1300 Logan Street, Denver, Colorado 80203; (ii) Defendant Tyco International Ltd. ("Tyco" or the "Company"), 90 Pitts Bay Road, Second Floor, Pembroke, HM 08, Bermuda; (iii) Defendant Tyco Electronics Ltd., Chesney House, Second Floor, 96 Pitts Bay Road, Pembroke HM 08, Bermuda; (iv) Defendant Covidien Ltd., 90 Pitts Bay Road, Second Floor, Pembroke, HM 08, Bermuda; (v) Defendant Covidien (U.S.), 15 Hampshire Street, Mansfield, MA 02048; (vi) Defendant L. Dennis Kozlowski, Mid-State Correctional Facility (Inmate No. 05A4820), RR 291, Marcy, New York 13403; (vii) Mark H. Swartz, Oneida Correctional Facility, 6100 School Road, Rome, New York, 13440, Inmate No. 05A4823; (viii) Defendant Frank E. Walsh, Jr., 2 Morgan Court, Morristown, New Jersey 07960; and (ix) PricewaterhouseCoopers LLP ("PwC"), 300 Madison Avenue, 24th Floor, New York, New York 10017.

# II. INTRODUCTION

2. Plaintiff, by its attorneys, makes the following allegations upon information and belief (except as to allegations specifically pertaining to plaintiff and its counsel that are based on personal knowledge) based upon the investigation conducted by and under the supervision of plaintiff's counsel, which included reviewing and analyzing information and financial data relating to the "Relevant Period" (December 13, 1999 through June 7, 2002), concerning Tyco and obtained from numerous public and proprietary sources (such as LEXIS NEXIS, Dow Jones, and Bloomberg), including filings with the Securities and Exchange Commission (the "SEC"), publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services. Plaintiff's investigation included reviewing the

pleadings filed by the parties in <u>In re Tyco International, Ltd. Sec. Litig.</u>, MDL Docket No. 02-1335-PB (D. N.H.); <u>Franklin Mutual Advisors, LLC, et al. v. Tyco Int'l Ltd., et al.</u>, Case No. 07-CV-04575-WJM-MF (D.N.J.); <u>Teacher Retirement System of Texas, et al. v. Tyco Int'l Ltd., et al.</u>, Case No. 07-CV-05704-WJM-MF (D.N.J.); <u>Federated American Leaders Fund, Inc. et al. v. Tyco Intl Ltd., et al.</u>, Case No. 2:08-cv-00478-WJM-MF (D.N.J.); <u>Nuveen Balanced Municipal and Stock Fund, et al. v. Tyco Int'l Ltd., et al.</u>, Case No. 08-CV-00518-WJM-MF (D.N.J.); and <u>Blackrock Global Allocation Fund, Inc., et al. v. Tyco International Ltd., et al.</u>, Case No. 2:08-cv-00519-WJM-MF (D.N.J.). Except as alleged herein, the underlying information relating to Defendants' misconduct and the particulars thereof are not available to plaintiff and the public and lie exclusively within the possession, custody, and control of Defendants and other insiders, thus preventing plaintiff from further detailing Defendants' misconduct. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

### III.  JURISDICTION AND VENUE

3.      This action arises under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78j(b), 78(n) and 78t(a), 78(t)-1(a), and SEC Rule 10b-5, 17 C.R.F. § 240.10b-5, promulgated thereunder; under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k(a), 77l(a)(2), and 77o; and under the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJ RICO") (N.J.S.A. 2C:41-1, *et seq*.).

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331; Section 22 of the Securities Act, 15 U.S.C. § 77v; and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. This Court also has supplemental jurisdiction over the NJ RICO claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Furthermore, Tyco maintains offices in this District and many of the acts and omissions charged herein, including the preparation and dissemination of materially false and misleading information, occurred, at least in part, in this District.

6.      In connection with the acts alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, internet communications, and the facilities of the New York Stock Exchange (the "NYSE").

7.      In connection with Colorado PERA's claims under New Jersey's RICO Statute, the racketeering enterprises engaged in trade or commerce in New Jersey or affected trade or commerce in New Jersey.

## IV.      PARTIES

### A.      Plaintiff

8.      Colorado PERA, which was established in 1931, operates by authority of the Colorado General Assembly.  Colorado PERA provides retirement and other benefits to the employees of more than 400 government agencies and public entities in the State of Colorado. Colorado PERA's membership includes employees of the Colorado state government, most teachers in the State of Colorado, many university and college employees, judges, many employees of Colorado cities and towns, Colorado State Troopers, and the employees of a number of other public entities within the State of Colorado.  With approximately $42 billion in assets and more than 230 employees, Colorado PERA is the 25th largest public pension plan in the United States.

9.      Colorado PERA purchased Tyco securities at artificially inflated prices during the Relevant Period, as set forth in the tables that are attached hereto in Exhibit A.  Colorado PERA

was damaged as the truth regarding the Defendants' wrongful actions and statements gradually emerged to the public and the value of the Tyco securities declined in response.

**B.     Tyco Defendants**

10.     Defendant Tyco is a Bermuda corporation.  The headquarters of Tyco's principal U.S. subsidiary have been located at 9 Roszel Road, Princeton, New Jersey 08540 since on or about August 29, 2002.  Prior to that time, the headquarters of Tyco's principal U.S. subsidiary were located at 1 Tyco Park, Exeter, New Hampshire 03833.

11.     Tyco is a diversified manufacturing and services company.  During the Relevant Period, Tyco designed, manufactured, and distributed electronic and electrical components, undersea cable communications systems, disposable medical supplies, fire detection and suppression systems, electronic security systems, and other products.

12.     Tyco's common stock has at all relevant times traded on the NYSE under the ticker symbol TYC.

13.     On June 29, 2007, Tyco split itself into three entities:  (i) Tyco; (ii) Covidien Ltd. ("Covidien"); and (iii) Tyco Electronics Ltd. ("Tyco Electronics").  According to Tyco's Form 10-K filed with the SEC on November 27, 2007, each of the three separate entities assumes responsibilities for any alleged violations of the securities laws pre-existing the split:

> Tyco will assume 27%, Covidien will assume 42% and Tyco Electronics will assume 31% of certain Tyco pre-separation contingent and other corporate liabilities, which include securities class action litigation, ERISA class action litigation, certain legacy tax contingencies and any actions with respect to the spin-offs or the distributions made or brought by any third party.  Any amounts relating to these contingent and other corporate liabilities paid by Tyco after the spin-offs that are subject to the allocation provisions of the Separation and Distribution Agreement will be shared among Tyco, Covidien and Tyco Electronics pursuant to the same allocation ratio.  As described in the Separation and Distribution Agreement, Tyco, Tyco Electronics and Covidien are jointly and severally liable for all amounts relating to the previously disclosed

4

securities class action settlement. All costs and expenses that Tyco
incurs in connection with the defense of such litigation, other than
the amount of any judgment or settlement, which will be allocated
in the manner described above, will be borne equally by Covidien,
Tyco Electronics and Tyco.

14.     As described above, Defendant Covidien is a successor corporation of Tyco that
is liable jointly and severally with Tyco. Covidien split from Tyco on June 29, 2007 and began
trading as a public company on July 2, 2007 on the NYSE under the ticker symbol COV.

15.     As described above, Defendant Tyco Electronics is a successor corporation of
Tyco that is liable jointly and severally with Tyco. Tyco Electronics split from Tyco on June 29,
2007 and began trading as a public company on July 2, 2007 on the New York Stock Exchange
under the ticker symbol TEL.

16.     Defendant L. Dennis Kozlowski was Tyco's Chairman and Chief Executive
Officer throughout the Relevant Period until June 3, 2002. On June 17, 2005, Kozlowski was
convicted by a New York jury of 22 of 23 counts of grand larceny, securities fraud, conspiracy,
and falsifying business records. As a consequence, Kozlowski was sentenced to 8 1/3 to 25
years in prison, ordered to pay $134 million in restitution, and fined $70 million by Manhattan
Supreme Court Judge Michael Obus. Kozlowski's conviction and sentence were upheld by the
Appellate Division of the New York Supreme Court on November 13, 2007.

17.     Defendant Mark H. Swartz was Tyco's Executive Vice-President and Chief
Financial Officer during the Relevant Period. Before his appointment as CFO, Swartz was
Tyco's Director of Mergers and Acquisitions. Swartz became a Tyco Board member in 2001
and ranked as the highest paid CFO in the United States that year. According to research firm
Equillar Inc., Swartz earned nearly $47 million in compensation in 2001, or nearly $15 million
more than the next highest paid CFO, Richard Bressler of Viacom. On June 17, 2005, Swartz
was convicted by a New York jury of 22 of 23 counts of grand larceny, securities fraud,

conspiracy, and falsifying business records. As a consequence, Swartz was sentenced to 8 1/3 to 25 years in prison, ordered to pay $134 million in restitution, and fined $35 million by Manhattan Supreme Court Judge Michael Obus. Swartz's conviction and sentence were upheld by the Appellate Division of the New York Supreme Court on November 13, 2007.

18.     Defendant Frank E. Walsh, Jr. was a director of Tyco throughout the Relevant Period until February 2002, when he did not stand for re-election to the Board. On December 17, 2002, Walsh pleaded guilty to a felony violation of New York's Martin Act in the Supreme Court of the State of New York (New York County) and settled a civil action for violation of federal securities laws brought by the SEC in United States District Court for the Southern District of New York.

19.     Both the felony charge and the civil action were brought against Walsh based on a $20 million payment by Tyco, $10 million of which went to Walsh with the balance going to a charity of which Walsh is trustee. The payment was purportedly made for Walsh's assistance in arranging Tyco's acquisition of The CIT Group, Inc. ("CIT"). The felony charge accused Walsh of intentionally concealing information concerning the payment from Tyco's directors and shareholders while engaged in the sale of Tyco securities in the State of New York. The SEC action alleged that Walsh knew that the registration statement covering the sale of Tyco securities as part of the CIT acquisition contained a material misrepresentation concerning fees payable in connection with the acquisition.

20.     Pursuant to the plea, Walsh agreed to pay $20 million in restitution to Tyco and to pay other fines to the State of New York. Pursuant to the settlement, Walsh consented to an order permanently enjoining him from violating provisions of the federal securities laws, requiring him to pay restitution to Tyco, and permanently barring him from serving as an officer

or director of a publicly held company. Tyco received Walsh's restitution payment of $20 million.

21.     Collectively, Defendants Kozlowski, Swartz, and Walsh shall be referred to hereafter as the "Individual Defendants." Collectively, Tyco, Covidien, Tyco Electronics, and the Individual Defendants shall be referred to hereafter as the "Tyco Defendants."

## C.     PricewaterhouseCoopers LLP

22.     Defendant PwC, which is headquartered in New York City, acted as the Company's purportedly independent outside auditor at all relevant times. PwC audited Tyco's materially false and misleading financial statements during the Relevant Period and issued materially false and misleading opinions as to those financial statements. Additionally, PwC consented to the use of its unqualified opinions on Tyco's financial statements in Tyco's reports, Registration Statements, and Prospectuses filed with the SEC and disseminated to the investing public.

23.     On August 13, 2003, the SEC issued an order instituting settled cease-and-desist proceedings against Richard P. Scalzo, CPA, the PwC engagement partner for the firm's audits of Tyco's financial statements for the fiscal years 1997 through 2001. The SEC's order found that Scalzo recklessly violated the antifraud provisions of the federal securities laws by recklessly issuing fraudulent audit reports and engaging in improper professional conduct by failing to conduct the audits in accordance with generally accepted auditing standards ("GAAS"). Scalzo consented to the issuance of the order, which ordered him to cease and desist from violations of the antifraud provisions and permanently barred him from appearing or practicing before the SEC as an accountant.

## V.     DEFENDANTS' WRONGFUL COURSE OF CONDUCT

24.     Throughout the Relevant Period, the Defendants failed to disclose and falsely

denied the falsification of Tyco's financial reporting, reported acquisition costs, and the purported success of its acquisition strategy. The Defendants also failed to disclose the systematic looting of the Company by its senior executives who were conducting Tyco as a criminal enterprise. For example, Tyco has now admitted that during the Relevant Period the Company engaged in the following misconduct:

- Failed to disclose that it was engaged in "a pattern of aggressive accounting which . . . was intended to increase reported earnings above what they would have been if more conservative accounting had been employed";

- Misrepresented that growth was "organic," and failed to disclose that it engineered financial results through a wide variety of improper accounting procedures, including the widespread use of undocumented journal entries;

- Failed to disclose that senior management "exerted pressure" on and "provided incentives" to employees to artificially inflate reported earnings;

- Failed to disclose that it paid off executives at companies it acquired by incentivizing them to manipulate their financial reporting before the acquisition to create the false appearance of superior earnings for Tyco after the acquisition;

- Failed to disclose "a number of accounting entries that were incorrect and required correction";

- Failed to disclose a number of material related party transactions, including (i) "abuse of [Tyco's] employee relocation loan program;" (ii) "unapproved bonuses;" (iii) "compensation arrangements;" (iv) "perquisites;" and (v) "self-dealing transactions";

- Failed to disclose that it artificially inflated Tyco's earnings by engaging in "Financial Engineering" and the improper manipulation of accounting reserves;

- Failed to disclose that Tyco's earnings were inflated as a result of the failure to timely recognize expenses, including an impairment in the value of reported goodwill;

- Failed to disclose that it improperly included excess "reimbursements" received by its home security business (ADT) in the Company's earnings

rather than recognizing such payments over the life of the contract, with the net effect of the appropriate recognition of such payments totaling approximately $186 million;

- Failed to disclose contingent liabilities and significant risks and uncertainties;

- Failed to disclose the effects of Tyco's approximately 700 undisclosed acquisitions ("Undisclosed Acquisitions"); and

- Failed to disclose that it improperly withheld incriminating responsive documents from the SEC during that agency's 1999-2000 inquiry into Tyco's accounting practices.

**A.    Material Omitted Information Concerning the Falsification of Tyco's Financial Reporting, Reported Acquisition Costs, and the Purported Success of Its Acquisition Strategy**

25.    Throughout the Relevant Period, the Tyco Defendants touted Tyco's financial success, falsely stating that it arose "organically" out of "synergies" created by the management strategies that Tyco applied to the companies it acquired.  In fact, Tyco's financial reporting was falsified in numerous ways to create the appearance of financial success through an intentional and undisclosed scheme to inflate financial results, as Tyco has now admitted after the close of the Relevant Period.  The nature of this scheme was never disclosed to investors during the Relevant Period.  To the contrary, the Tyco Defendants falsely and repeatedly represented that there was no accounting manipulation at Tyco.  As a result, throughout the Relevant Period, all of Tyco's periodic reports of earnings and revenues and its financial projections given to investors and securities analysts were materially false and misleading and omitted material information.

26.    As the Company has recently admitted in its Form 8-K filed on December 30, 2002 (the "December Report"), during at least the five years preceding Defendant Kozlowski's resignation in June 2002, Tyco pursued a "pattern of aggressive accounting" that was "intended" to "increase current earnings above what they would have been if a more conservative

9

accounting approach had been followed."  The Company has also admitted that there were instances when senior management "exerted pressure and provided incentives which had the purpose and effect of encouraging unit and segment officers to achieve higher earnings, including in some cases by their choice of accounting treatments."

27.     The admissions in the December Report were largely based on the findings of Boies Schiller & Flexner LLP (the "Boies firm"), a law firm retained by Tyco to conduct an internal investigation.  As described in the December Report, the investigation by the Boies firm was intentionally limited in scope.  The December Report states that the investigation was principally restricted to "the integrity of the company's financials and the possible existence of systemic or significant fraud, or other improper accounting that would materially adversely affect the Company's reported earnings or cash flow from operations *in 2003 or thereafter*." (Emphasis added.)  Thus, the Company's past financial statements were not examined to see whether they were false, and indeed the adjustments that did result from the investigation were largely recorded in fiscal year 2002, which ended on September 30, 2002.  As Tyco admits:  "the Company has not sought to go back and identify every accounting decision and every corporate act over a multi-year period that was wrong or questionable, or whether there was a preferable accounting treatment among the alternative accounting treatments available under generally accepted accounting principles (GAAP)."[1]  Such an examination was deemed "impossible" in the December Report, which stressed that "documentation was not always available; the documentation that was available was often dispersed."

28.     The investigation was also limited because of the "Company's past failure to

---

[1] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.

document many decisions contemporaneously." Journal entries[2] were apparently used to engineer desired financial results and in many cases lacked any documentation that would detail who made, prepared, or approved the entry.

29.     In addition, according to the December Report:

> the accounting for fifteen large transactions, the selection of which was made after consultation with the SEC staff, has been reviewed in detail.  Of the fifteen, three of the transactions (AMP, Surgical, and Keystone) were accounted for under the pooling of interests method.  The remaining twelve (Sherwood, Mallinckrodt, Carlisle Plastics, Thomas & Betts, SSI, Raychem, Central Sprinkler, AFC Cable, Scott Tech, Simplex, Sensormatic, and Wells Fargo) were accounted for under the purchase accounting method.

Although it states that "[d]uring the period 1999-2002, Tyco completed more than 700 acquisitions," the December Report considered only 15 of those deals "where there was sufficient documentation on the nature of the reserve to reach a conclusion."

30.     Moreover, at least with respect to the Company's purchase accounting, the December Report concludes that there was "a notable lack of documentation supporting the establishment and utilization of reserves and a pattern of aggressive purchase accounting."

31.     Even as to this circumscribed subset of transactions for which "sufficient documentation" was available to permit examination, virtually all of the conclusions in the December Report are phrased as follows:  "On the basis of information currently available, the Company with the concurrence of its auditors has concluded that the accounting treatment … should not be revised."  Or: "there is not now sufficient evidence to warrant changing" the accounting treatment previously given.

_____

[2]  Journal entries are records made to change numerical account balances in a company's accounting system. Standard internal control practices and procedures require that journal entries include: (i) an explanation as to why account balances are being changed; (ii) the date of the journal entry; (iii) the identification of the preparer of the journal entry; and (iv) the identification of management who approved the recording of the journal entry.

32.     Indeed, the December Report acknowledges that "the Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ."  The December Report also acknowledges that Tyco's Form 8-K filed on September 17, 2002 (the "September Report") contained admissions of "evidence of intentional fraud."

33.     The December Report admits the existence of pay-offs to executives at companies that were acquired by Tyco, and that the financial reporting of those companies was manipulated by Tyco in advance of the acquisitions to create the false appearance of superior earnings and management by Tyco after the acquisitions.  Moreover, the December Report concludes that there were "instances" where Tyco's prior management paid off executives at acquired companies "to influence the management of an acquisition target into adopting accounting treatments that 'over-accrued' expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP."

34.     Despite their limitations, the September and December Reports amply document numerous instances of a previously undisclosed pattern of company-wide accounting fraud.  For example, the December Report states that:

> in 1999 a controller for one of [Tyco's] Fire & Security business
> units prepared and gave a presentation to the subsidiary's operating

managers relating to what was entitled "Acquisition Balance Sheet Opportunities." [The controller] urged [the managers] to "be aggressive in determining exposures; determine reserves with worst case scenario; have a strong story to tell regarding each reserve; book the reserves on the acquired company's financial system; use the owner for ideas; improve on your estimates." [The controller] also told [the] audience to "be aggressive in determining the reductions of the asset," and "create stories to back the reductions."

35.     The December Report also states that one version of the presentation (which has not yet been made available to the public) has a marginal notation adjacent to this comment as follows:  **"Be Careful!! -- I wouldn't want this to get out."**  (Emphasis added.)  In addition, opposite the comment "Severance -- if immaterial, our existing business -- include fringe at high rate," there is a handwritten notation that states, **"I would strongly recommend <u>Never</u> to put this in writing!!"**  (Emphasis added.)

36.     With respect to "transitioning the acquired company" by creating reserves to cover one-time costs, the presentation stated, **"being aggressive in our estimates will allow us to be aggressive in the cost we apply."**  (Emphasis added.)  It also stated, **"keep the reserve descriptions within the accounting rules but stretch the expenditures that go in."**  (Emphasis added.)

37.     A similar document cited in the December Report summarizes a September 18, 1998 Tyco presentation on the US Surgical merger (which document has not yet been made available to the public) that closed on October 1, 1998.  In a section called "Synergies Summary," the presentation indicated that with "Financial Engineering," Tyco could recognize $72 million in 1999, $52 million in 2001, and $52 million in 2002.

38.     An August 17, 1998 memorandum cited in the December Report (which document has not yet been made available to the public) identified similar means to achieve EBIT ("Earnings Before Interest and Taxes") goals for US Surgical in the first year after the

merger. The memo lists numerous cost-savings measures and discusses a "total savings before financial engineering" of $145.4 million. The memo also suggests $64.6 million in "financial engineering" categories, including plans to "over-accrue expenses in Q3 before closing," and to "accrue in advance rebates."

39.    Another document that has not yet been made available to the public, dated September 10, 1996, discusses "Carlisle Plastics -- Financial Engineering and Purchase Accounting." The memo and attachments define "financial engineering" as "pre-merger entries" and "purchase accounting" items as "post-merger entries." A "Discussion Items" attachment states, "we'll book additional 'Financial Engineering' reserves in July with the objective of having a break even month. This way we won't raise any flags with the Lender reporting. The balance of the reserves will be booked in August." According to the December Report, the equity balance sheet attachment for the Carlisle acquisition contemplates $26,440,000 in "financial engineering," thereby reducing pre-merger earnings by that amount. The detailed schedule demonstrates that the overwhelming portion of the financial engineering was to be in the month just before the consummation of the merger.

40.    In the December Report, the Company also admits:

> Tyco's aggressive accounting in the past was not neutral as to the timing of the recognition of revenues and expenses. The Company, for example, devoted considerably less attention to identifying appropriate accounting adjustments that would reduce reported earnings in the period immediately after an acquisition than it devoted to identifying appropriate accounting adjustments that would increase reported earnings after an acquisition.

41.    Moreover, the December Report admits that:

> there were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that "over-accrued" expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP. For example, in the month before the merger,

US Surgical accrued $18.7 million for potential legal fees related to on-going patent defenses and other items. The Company later reduced this amount by $18.2 million, in the same period, as a result of discussions with the Company's external auditors [Defendant PwC], because it concluded that the initial accrual did not represent a reasonable estimate of legal fees. As set forth below, in a number of instances the accounting treatment applied to certain transactions in the Company's reported financials was erroneous.

42. The Tyco Defendants' scheme to manipulate Tyco's financial results is confirmed by the Company's announcement that first quarter profit fell 32% in fiscal 2003. This is in stark contrast to the manipulated financial results released by the Company throughout the Relevant Period.

1. **Tyco's Materially False and Misleading Financial Statements and Financial Disclosures**

43. During the Relevant Period, Tyco represented that each of the financial statements it issued to investors was prepared in accordance with GAAP and the rules and regulations of the SEC. These representations were materially false and misleading because, as Tyco has now admitted, the Tyco Defendants knowingly or recklessly employed numerous deceptive accounting practices over an extended period of time that were intended to artificially increase reported current earnings.

44. Despite this admission, Tyco baselessly contends that the Tyco Defendants' deliberate and long-standing attempts to inflate the Company's operating results did not result in a "significant or systematic fraud affecting Tyco's prior financial statements." This conclusion is flatly inconsistent with Tyco's recognition of the following in the December Report and the Company's fiscal 2002 Form 10-K: (i) "a number of accounting entries that were incorrect and required"; (ii) the "aggressive accounting pursued by prior senior management"; (iii) "breakdowns of internal control which occurred during fiscal 2002"; (iv) "abuse of our employee

relocation loan programs"; (v) "unapproved bonuses"; (vi) "undisclosed compensation arrangements"; (vii) "unreported perquisites"; (viii) "self-dealing transactions"; (ix) "a lack of a stated and demonstrable commitment by former senior management to set appropriate standards of ethics, integrity, accounting, and corporate governance"; and (x) "other misuses of corporate trust."

45.     In addition to the foregoing, Tyco has also admitted: (i) instances in which senior management "exerted pressure" and "provided incentives" to report higher earnings; (ii) the recording and manipulation of "Financial Engineering" reserves; (iii) instances in which Tyco's management pressured the management of an acquisition target into adopting accounting treatments that violated GAAP; and (iv) a "pattern" of "aggressive" accounting over a period of years.

46.     Civil lawsuits against Tyco and media coverage of the Tyco scandal prompted: (i) investigations by the US. Attorney, the SEC, the District Attorney for New York County, and the State of New Hampshire Bureau of Securities Regulation; (ii) the replacement of Tyco's entire Board of Directors; (iii) the termination and criminal indictment of Tyco's former Chief Executive Officer, Chief Financial Officer, and Chief Corporate Counsel; (iv) the guilty plea of one of Tyco 's former outside directors in New York County in connection with accepting an improper $20 million payment; and (v) the convictions of Defendants Kozlowski and Swartz as described above.  *See* December Report; 2002 Form 10-K.

47.     The undisputed facts that constitute a pattern of acts of corporate misconduct at the Company belie Tyco's current representation that there "was no significant or systemic fraud affecting Tyco's prior financial statements."

### a. Tyco's Admission That It Issued Materially False and Misleading Financial Statements During the Relevant Period

48. At all relevant times during the Relevant Period, each of Tyco's financial statements was represented to have been prepared in accordance with GAAP. The representations were materially false and misleading because Tyco's financial statements artificially and improperly inflated the Company's operating results and failed to disclose numerous acts of self-dealing.

49. By failing to file financial statements with the SEC that conformed to GAAP (and the rules and regulations of the SEC), the Tyco Defendants repeatedly disseminated financial statements that are "presumed to be misleading or inaccurate."[3] In fact, Tyco's actual financial performance was materially distorted and its Relevant Period financial statements were materially false and misleading, as Defendants knew or recklessly ignored.

50. In an apparent attempt to shield itself and Defendant PwC from liability, Tyco has also now concluded that:

> *[t]he incorrect accounting entries and treatments are not <u>individually</u> or in the aggregate material to the overall financial statements of Tyco.*

(Emphasis added.)

51. Contrary to this assertion, the "incorrect accounting entries and treatment" are indeed material. First, Tyco's restatements have been limited by a lack of documentation and by an internal investigation into the Company's accounting matters that was "selected" in scope. By the Company's own admission, these factors "limited the conclusions that could be drawn concerning individual accounting treatments in any event." Second, Tyco's restatements of its

---

[3] Regulation S-X (17 C.F.R. § 210.4-01(a)(l)) states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

interim 2002 financial statements are admissions, in and of themselves, that those financial statements were materially misstated. GAAP provides that the retroactive restatement of previously-issued financial statements is appropriate only when those statements were materially misstated when issued. *See generally* Accounting Principles Board ("APB") Opinion No. 20, ¶¶ 13, 38.

52.     In fact, Tyco has admitted that during the quarter ended December 31, 2001, Tyco's pre-tax income was overstated by more than 21%. During the quarter ended March 31, 2002, Tyco understated its reported loss by more 71%, and for the quarter ended June 30, 2002, Tyco's reported pre-tax income of $150.6 million was restated to a loss of $236.1 million.

53.     For example, Tyco's actual net loss for the quarter ended March 31, 2002 was $3.22 per diluted common share, not $0.96 as originally reported. Accordingly, Tyco's March 31, 2002 Form 10-Q filed with the SEC, which represented that "in the opinion of management, such financial statements include all adjustments, consisting only of normal recurring adjustments, necessary to summarize fairly the Company's financial position and results of operations," was materially false and misleading.

54.     Concerning the false financial statements that Tyco issued before fiscal 2002, Tyco's 2002 Form 10-K disclosed:

> As a result of the Phase 2 Review, the Company identified certain adjustments relating to years preceding fiscal 2002. Such adjustments were recorded in the first quarter of fiscal 2002, and are discussed further below.
>
> CHARGES RELATING TO PRIOR YEARS RECORDED IN FISCAL 2002-
>
> During the fourth quarter of fiscal 2002, the Company identified various adjustments relating to prior year financial statements. Management concluded the effects of these adjustments, as well us any unrecorded proposed audit adjustments, were not material individually or in the aggregate to the current year or any prior

year.  Accordingly, prior year financial statements have not been restated.  Instead, these adjustments, which aggregate $261.6 million on a pre-tax income basis or $199.7 million on an after-tax income basis, have been recorded effective October 1, 2001.  The nature and amounts of these adjustments are principally as follows:  The Company determined the amounts reimbursed from dealers under ADT's authorized dealer program exceeded the costs actually incurred.  The cumulative effect of reimbursements recorded in years prior to fiscal 2002 in excess of costs incurred, net of the effect of the deferred credit, which would have been amortized as described further in Note 1, is $185.9 million.

55.     Tyco's conclusion -- that the effects of the adjustments in question were not material individually or in the aggregate -- is untrue.  For example, $98.8 million of the $185.9 million "adjustment" for ADT reimbursements related to fiscal 2001.[4]  During fiscal 2001, Tyco reported that the operating income of its Fire and Security Services segment, after restructuring and other charges, totaled $1,207.7 million.[5]  Accordingly, the operating income of Tyco's Fire and Security Services segment for fiscal 2001 was overstated by approximately 9%.[6]

56.     An approximately nine percent overstatement of a company's reported segment's operating income is, at least individually, a material overstatement.  Nonetheless, Tyco, in violation of GAAP, failed to restate its fiscal 2001 financial statements because its management concluded such overstatement is ***"not material <u>individually</u> or in the aggregate*** to the current year or any prior year."  (Emphasis added.)

57.     As the SEC's Staff Accounting Bulletin ("SAB") No. 99, 17 C.F.R. Part 211,

---

[4]  Tyco's Fire and Security Services segment includes the results of ADT.

[5]  Tyco's 2002 Form 10-K indicates the reported $1,289.2 million in operating income for its Fire and Security Services Segment excludes restructuring, other unusual, and impairment charges of $81.5 million.  Reducing Tyco's reported $1,289.2 million in operating income for its Fire and Security Services Segment by the excluded charges yields $1,207.7 million.

[6]  The Fire and Security Services segment's purported operating income for 2001 of $1,207.7 million less the admitted overstatement of $98.8 million totals $1,108.9 million.  $98.8 million divided by $1,108.9 million equals an overstatement of approximately 9%.

provides:

> Evaluation of materiality requires a registrant and its auditor to consider *all* the relevant circumstances, and the staff believes that there are numerous circumstances in which **misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material;** as stated in the auditing literature:

> As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements.

> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are

- Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate.

- Whether the misstatement masks a change in earnings or other trends.

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise.

- Whether the misstatement changes a loss into income or vice versa.

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

- Whether the misstatement affects the registrant's compliance with regulatory requirements.

- Whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements.

- Whether the misstatement has the effect of increasing management's compensation - - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

- Whether the misstatement involves concealment of an unlawful transaction.

This is not an exhaustive list of the circumstances that may affect the materiality of a

quantitatively small misstatement.

58.    If management's conduct demonstrates a lack of integrity or candor, that lack of integrity or candor is relevant to an investor and thus material, even if the conduct itself was not financially significant to the company.  Accordingly, the nine percent overstatement of operating income for Tyco's Fire and Security Services segment is material.

59.    Indeed, Tyco has admitted that the Tyco Defendants engaged in numerous "financial engineering" practices that were "undertaken with the purpose and effect of increasing reported results."  In addition, the December Report concluded that "[d]uring at least the five years preceding Kozlowski's resignation, Tyco pursued a pattern of aggressive accounting that was intended, within the range of accounting permitted by GAAP, to increase current earnings above what they would have been if a more conservative accounting approach had been followed."

60.    All the facts belie Tyco's denials that it engaged in fraud or materially misstated its Relevant Period financial statements.  Tyco's position in the December Report that "aggressive accounting is not necessarily improper accounting" -- that certain of its accounting practices may have been "aggressive" but not improper -- is untrue.

61.    Because it urgently needed financing in the face of an imminent cash crunch, Tyco was strongly motivated to minimize reporting of its improper accounting practices prior to and during the Relevant Period.  According to a November 15, 2002 report on *The Street.com:*

> Tyco (TYC:NYSE) will be glad to bid farewell to this year.  But believe it or not, 2003 could be even worse for the troubled conglomerate.
>
> Next year, Ed Breen, the ex-Motorola (MOT:NYSE) executive who recently replaced the disgraced Dennis Kozlowski as CEO, must find a way to pay back nearly $12 billion in debt and other obligations that fall due.  If the size of the debt mountain weren't problem enough, Breen's task is made more arduous by a strict

legal provision that could complicate any efforts by Tyco to pledge assets to secure loans from risk-averse lenders.

This potential legal thicket is important, because it's no exaggeration to say that Tyco's future now lies in the hands of its banks and bond creditors. Tyco's cash crunch was eased after it sold its commercial lender CIT (CIT.NYSE) for $4.4 billion in July, and the company has $6.5 billion of cash on its balance sheet. Yet even with that cash on hand, the company's maturity schedule looks daunting.

* * *

But a look at the company's demanding debt repayment schedule suggests Tyco's next bout of trouble may come quite a bit sooner. The company must repay nearly $3.9 billion of bank debt that comes due in February [2003], the same month that investors have the right to demand that Tyco repay $2.3 billion of convertible bonds -- an obligation Tyco can meet in stock or cash.

There could be as much as $1.85 billion of bond debt coming due in the second and third quarters of 2003, though the actual sum may have been reduced by debt repurchases. Then, in the fourth quarter, holders of another convertible issue have the right to redeem their securities for $3.6 billion in cash.

At the same time, cash from operations looks anemic. All those obligations add up to $11.7 billion. In fiscal 2003 ending next September, Tyco expects $2.5 billion to $3 billion of free cash flow, which is a company-devised measure of cash flow that factors in capital spending but excludes other types of cash outflows. The company hasn't updated its guidance for the last quarter of calendar 2003, though in an August regulatory filing Tyco indicated it expected to bring in cash flow of around $700 million for that period. Previous cash flow guidance provided by Tyco has proved to be generous, however.

If Tyco were to pay its February convertible back in stock, its cash obligations would be $9.4 billion, which more or less matches cash flow plus cash in hand.

Lemon Fresh

Clearly, that's too close for comfort. No surprise, then, that Tyco is talking to its banks to gain some financial breathing room. On a third-quarter earnings conference call in October, Tyco's Breen said that dealing with the financing issue "continues to be our top priority, and added that he hopes to have a deal with the banks

"well in advance of our February maturities."

The market is eager to see details of a bank deal. "The clock is ticking, as far as I am concerned," says Cynthia Wemeth, the analyst at the Standard & Poor's rating agency who covers Tyco. "I would hope we see something soon."

* * *

The other important factors in the bank negotiations are the status and findings of the SEC and Manhattan DA investigations of Tyco. These may not be completed before February. If they're not, the threat that the probes will turn up evidence of accounting fraud after February is one more argument for why the banks will be ultra cautious when deciding whether to roll over their loans.

The company has itself appointed experts and lawyers to conduct its own internal accounting investigation, and it is probably hoping that if it finds no serious fraud the banks will be placated. However, the banks might doubt the thoroughness of the probe after the third-quarter conference call, when David Boies, the outside lawyer overseeing the probe, said 'we're obviously not reauditing the company and going through every single accounting issue."

62.     Whatever Tyco's motivation for minimizing its Relevant Period restatements, Tyco's pattern of "aggressive" accounting did in fact violate GAAP. For example, the Company's December Report disclosed that "Tyco's aggressive accounting in the past was not neutral as to the timing of the recognition of revenues and expenses." Indeed, as set forth above, the December Report acknowledges that "the Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment

and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ."

63. Tyco has also admitted (in the December Report) that it is unable to make judgments about the appropriateness of accounting treatments because of "the Company's past failure to document many decisions contemporaneously," and because documentation supporting its transactions is "not always available" and is "often dispersed." These failures of documentation violate the mandate of Section 13 of the Securities Exchange Act of 1934, and the rules thereunder which require SEC registrants to make and keep books, records, and accounts that accurately and fairly reflect its transactions.

64. Moreover, the December Report admits the existence of pay-offs to executives at companies to be acquired by Tyco, and that the financial reporting of its acquired companies was manipulated by Tyco in advance of the acquisition to create the false appearance of superior earnings and management by Tyco after the acquisition.

65. Indeed, in Concepts Statement No. 2, GAAP provides that accounting information is not useful if it is unreliable, and that reliable accounting information must be verifiable and neutral. In addition, in Concepts Statement No. 2, GAAP provides that the convention of conservatism -- meaning prudence -- is to be applied in financial accounting and reporting. Similarly, FASB's Concepts Statement No. 1 states that the role of "financial reporting requires it to provide evenhanded, neutral, or unbiased information."

66. In addition, GAAP provides that:

a. financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions (Concepts Statement No. 1, ¶ 34);

b.      financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

c.      financial reporting should provide "information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

d.      financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

e.      financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

f.      financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79); and

g.      financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid

injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

67. Accordingly, Tyco's "pattern" of "aggressive" accounting and its employment of numerous "financial engineering" practices undertaken with the purpose and effect of increasing reported results caused Tyco to issue Relevant Period financial statements that were neither useful, complete, neutral, conservative, nor unbiased. In short, Tyco has admitted, albeit backhandedly, that it violated fundamental precepts of GAAP,[7] and that its "aggressive" accounting practices rendered its Relevant Period financial statements materially false and misleading.

### b. Tyco's Improper Failure To Disclose Material Related Party Transactions

68. In FASB's SFAS No. 57, GAAP provides guidance on disclosures of transactions between related parties.[8] SFAS No. 57 states that an "enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable." Accordingly, SFAS No. 57 requires that financial statements identify material related party transactions and disclose (i) the nature of the relationship(s), (ii) a description of the transaction, (iii) the dollar amount of transactions for each period for which an income statement is presented, and (iv) the amounts due from or to the related parties as of the date of each balance sheet.[9]

---

[7] In Concepts Statement No. 2, GAAP defines neutrality as the absence in reported information of bias intended to attain a predetermined result or to induce a particular mode of behavior. Neutrality is a necessary and important characteristic of accounting information. FASB's Statement of Financial Accounting Standards ("SFAS") No. 141.

[8] Pursuant to SFAS No. 57, related party transactions include transactions between an enterprise and its Directors of the Board, CEO, COO, Vice Presidents in charge of principal business functions, and other persons who perform similar policy-making functions.

[9] Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary

69.     In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that

> in some cases, the significance of an amount may be independent
> of the amount involved.  For example, amounts due to and from
> officers and directors, because of their special nature and origin,
> ought generally to be set forth separately [in financial statements]
> even though the dollar amounts involved are relatively small.

70.     As Tyco has now admitted, before and during the Relevant Period, it engaged in numerous material related party and self-dealing transactions that were not disclosed in its financial statements in violation of GAAP, including at least the following (during the Relevant Period):

### i.     Undisclosed Extraordinary Related Party Compensation

71.     On June 17, 2002, Tyco filed a complaint in the United States District Court for the Southern District of New York alleging that Defendant Kozlowski approved a $20 million "fee" that was paid to Defendant Walsh, who served as a member of Tyco's Board of Directors from 1997 through February 2002.  This fee, $10 million of which went to Walsh with the balance to a charity of which he was a trustee, purportedly compensated Walsh in connection with Tyco's acquisition of CIT.

72.     In September 2000, Defendant Kozlowski caused Tyco to pay "special" bonuses purportedly related to the successful completion of the TyCom initial public offering.  These bonuses approximated $96 million, of which Defendants Kozlowski and Swartz received approximately $33 million and $17 million respectively.

73.     In connection with the above arrangement, a Tyco Vice President of Finance prepared a memorandum signed by Defendant Swartz that explained:

> The sale of 14% of TyCom generated a one-time gain of
> approximately $1.76 billion on the books of Tyco.  We have

course is necessary for users to understand financial statements.

decided to award special bonuses to various Tyco employees for their efforts over the past few years in enhancing the value of TyCom and thereby contributing to this gain. Selected employees will receive their bonus in the form of cash, forgiveness of relocation loans, and/or Tyco Common shares under Tyco's restricted stock program.

74.     As a result of this accounting treatment, Tyco's September Report admitted: "[T]his extraordinary $100 million charge was allocated to several different accounts and appears in the general ledger and financial statements."

75.     In addition, according to the September Report, Tyco purchased a cooperative apartment in New York City in 1998 for approximately $5.5 million and thereafter made improvements to the apartment. In May 2000, Defendant Kozlowski purchased the property from Tyco at its depreciated book value of approximately $7 million, rather than its then current market value.

76.     In July 2000, Tyco purchased a Rye, New Hampshire property worth $1.5 million from Defendant Kozlowski for approximately $4.5 million. In addition, Defendant Kozlowski also used millions of dollars of Company funds to pay for, among other things: (i) a $700,000 investment; (ii) an "extravagant" $1 million birthday celebration for his wife in Sardinia; (iii) over $1 million in undocumented business expenses; and (iv) at least $43 million in personal donations or for his personal benefit.

**ii.     Undisclosed Related Party Loans**

77.     The Tyco Defendants also violated GAAP by failing to disclose in the Company's financial statements a number of related party loans. As set forth below in Sections V.B.1 and V.B.4, these loans were either repaid by the Individual Defendants without interest, repaid through unauthorized "forgiveness," or simply reclassified to other loan accounts that the Individual Defendants had with the Company.

78.     For example, in violation of the terms of Tyco's relocation loan program, Defendant Kozlowski "borrowed" approximately $29.7 million from the Company to purchase land and construct a home in Boca Raton, Florida during the years 1997 to 2000.  In addition, Defendant Kozlowski improperly "borrowed" approximately $7 million to purchase a cooperative apartment in New York City in 2000.

79.      Similarly, Defendant Swartz "borrowed" approximately $20.1 million from Tyco in violation of the Company's relocation loan program purportedly to purchase property in Boca Raton, Florida during the period 1997-2000.

80.     Additionally, Mark A. Belnick, Tyco's former Executive Vice President and Chief Corporate Counsel, "borrowed" approximately $4.2 million from Tyco during the period September 1998 through May 2001 for the purchase and improvement of a cooperative apartment in New York City.  From 2001 through March 2002, Belnick "borrowed" an additional $10.4 million from Tyco to purchase land and build a home in Park City, Utah.  Belnick then charged Tyco $1,600 per month for his home office located in that house.

81.     In 1997, the President of Tyco's Fire and Security Services division "borrowed" a total of $5 million from Tyco to purchase property in Boca Raton, Florida.  The former President of Tyco Engineered Products and Services and, later, the Plastics division, "borrowed" $1,750,000 from Tyco, and a former President and Chief Executive Officer of TyCom borrowed $5,000,000 from Tyco in 2000.

82.     In apparent violation of the terms of Tyco's Key Employee Loan ("KEL") Program, Defendant Kozlowski "borrowed" over $55.9 million from Tyco in 1999.  As of June 30, 2002, Defendant Kozlowski owed Tyco approximately $43.8 million, plus accrued interest, for amounts borrowed under Tyco's KEL Program.

83.     Similarly, Defendant Swartz's total principal outstanding balance under the KEL program as of July 18, 2002 was approximately $2.8 million, plus accrued interest.  In addition, other Tyco Executive Officers "borrowed" more than $14.6 million under the KEL program.

84.     The Tyco Defendants knew that, in gross violation of GAAP, the material related party transactions (to which the Company has now admitted) were not disclosed in Tyco's financial statements during the Relevant Period.  The Tyco Defendants also knew that, by failing to do so, the Company's financial statements during the Relevant Period violated GAAP and were materially false and misleading.

> **c.      Tyco's False and Misleading Accounting for Acquired Companies and Improper Manipulation of Accounting Reserves**

85.     As noted above, the Tyco Defendants knew or recklessly ignored that they caused certain of the companies acquired by Tyco to engage in deceptive accounting practices before the closing of an acquisition so that the financial performance of these companies would compare favorably after the acquisition.  Among other things, these acquired entities overstated accounting reserves to show more favorable financial metrics in quarters after Tyco's acquisition.

86.     For example, on March 13, 2001, Tyco announced that it had entered into a definitive agreement to acquire CIT.  According to a senior economist that worked for CIT, at or around that time, the Company sent Brad McGee, who was Executive Vice President and Chief Strategy Officer at Tyco, as well as Defendant Kozlowski's "right hand man," to CIT's offices in Livingston, New Jersey to, according to Kozlowski, "develop synergies" and help "boost business."  In reality, according to the CIT senior economist, McGee was there to "prepare for the acquisition."

87.     According to the witness, although McGee (with the assistance of another Tyco

employee) was supposed to assist with the transition and report to Al Dumper (CIT's CEO),

McGee began dictating important business decisions for CIT.  In fact, according to the witness,

what had previously been a mild-tempered and quiet executive staff, quickly changed upon

McGee's arrival.  Screaming matches between McGee and CIT's executives were common.

According to the CIT senior economist, "[t]here were some acrimonious issues there.  Lots of

shouting and screaming.  A lot of screaming at each other, and it was tense and bad on executive

row.  McGee was de facto dictating and running the company."

88.     On January 7, 2002, *The Wall Street Journal's* "Heard On The Street" column

reported that some investors were critical of "a series of charges by" CIT immediately before the

acquisition that "depressed CIT's earnings but didn't show up on Tyco's books."  As a result,

*The Wall Street Journal* reported, "CIT's results surged in the first month after Tyco took

control."  Specifically, *The Wall Street Journal* reported that during April and May of 2001 CIT

posted a $148 million provision for credit loss resulting in a net loss of $78.8 million.  In June

2001, after being absorbed by Tyco, CIT posted net profits of $71.2 million, which added 1.5

cents per share to Tyco's third quarter results, and substantially contributed to Tyco's beating

analysts' expectations by $0.03 per share.

89.     Albert J. Meyer, an analyst working for David W. Tice & Associates, explained

the highly suspicious nature of the Tyco Defendants' accounting treatment with respect to CIT in

an interview on February 25, 2002 with *Business Week Online* ("Behind Tyco's Accounting

Alchemy: The CIT acquisition offers new insight into how the company produced huge pop up

profits"):

> "This is one of the most startling examples of financial engineering
> you can hope to fine. . . . Several things look fishy about that $150
> million turnabout, Tice's Meyer maintains.  To start with, in that
> April-May (2001) period, CIT -- took a massive $148.1 million

"provision for credit losses." That was well over twice the $68.3 million provision CIT took in the entire first quarter.

90.     The same article reported that:

At the same time [that CIT appeared to achieve a $150 million swing in profit after the merger], CIT booked a $54 million charge for acquisition-related costs. . . . Jack Ciesielski, publisher of the *Accounting Observer*, notes that CIT also adopted "a new basis of accounting" on June 2 [2001], allowing Tyco to "push down" deal costs to CIT. "That [shifts] some of Tyco's closing transactions into the CIT financials, making them appear as if they were CIT's own," he says.

* * *

[T]he bottom-line impact is indisputable: The huge surge in charges taken by CIT just before the deal closed - - combined with the drop in "other revenue" - - helped produce a noticeable jump in CIT earnings just after the deal closed. Indeed, CIT was the major reason Tyco reported a 34% increase in per-share earnings for the quarter ending September 30 [2001] . . . .

91.     The February 25, 2002 *Business Week Online* article quoted McGee's admission that "CIT made downward 'adjustments' to income totaling $221.6 million last May, just before the [CIT] deal closed." The article also stated that "McGee concedes [that] the provision for credit losses and the acquisition charge caused a $143.5 million spike in CIT's costs in April and May [2001]."

92.     Furthermore, the *Business Week Online* article reported that Tyco's financial statements for fiscal 2001 revealed that, in CIT's first four months under Tyco's umbrella -- from June 2 to September 30, 2001 -- CIT generated $252.5 million in net income, more than triple the $81.3 million CIT earned in the last four months as an independent public company (from January 1, 2002 to June 1, 2002).

93.     Similarly, on June 12, 2002 *The New York Daily News* reported that the SEC was again looking into Tyco's accounting for acquisitions:

The original inquiry got its start in 1999 after a Dallas investment manager began warning clients that cash flow from Tyco acquisitions appeared inflated.

One theory was that Tyco was aggressively undervaluing the assets of acquisition targets before the new companies joined Tyco's balance sheet.

The practice, detractors said, allowed Tyco to build a pool of assets from which it could then unlock value at a later point.

Though the SEC gave Tyco a clean bill of health two years ago, at least one New York businessman with close ties to Simplex Time Recorder, a December 2000 Tyco acquisition, told the Daily News he witnessed such dealings first-hand.

"I think it's fair and accurate to say they made (Simplex) writedowns on the value of their receivables to a level that, if it didn't break the law, certainly bordered on breaking the law," the businessman said.

94.     Tyco has now admitted that the Tyco Defendants engaged in the above-noted accounting manipulations throughout the Relevant Period so that the Company could report favorable pre- to post-acquisition comparisons and mislead investors about Tyco management's ability to generate better returns from acquired entities than the previous management of such entities.

95.     For example, Tyco has now admitted in its December Report:

[A] June 19, 1998 letter from the Sigma Chief Financial Officer was identified in which the Sigma CFO indicated that he was "prepared to delay shipment of certain product until early July" as requested by Tyco and as a result of which, Sigma would not achieve its anticipated revenue minimum established in the June 1, 1998 Merger Agreement. The Sigma CFO asked Tyco to confirm that the resulting failure of Sigma to meet the quarterly revenue minimum established in the Merger Agreement was "acceptable to Tyco and within the spirit of the Definitive Agreement." The Sigma CFO's June 19 letter was faxed to Tyco the same day and, later that day, faxed from the recipient to others within Tyco.

Similarly, Tyco's acquisition of Raychem was announced May 19, 1999 and consummated August 12, 1999. Internal Tyco documents raise issues

whether actions taken by Raychem, even if consistent with GAAP, artificially reduced revenue or increased expenses in the quarter immediately prior to the consummation of the acquisition, and artificially inflated earnings and cash flow in subsequent quarters. These actions included directions from Raychem management to hold back shipments and pay all bills received whether due or not, prior to the consummation of the acquisition. The documents fit the pattern discussed above of the Company's aggressive use of numerous accounting opportunities where available to enhance earnings in the first few quarters after companies were acquired, compared to the period just before acquisition.

96.     Indeed, on September 30, 2002, *The Wall Street Journal* reported that the SEC and the Manhattan District Attorney's Office were investigating whether a secret $40 million payment made by Tyco to settle a 2000 lawsuit represented a pay-off to hide incriminating documents that detailed the ways Tyco would help U.S. Surgical slow its growth after Tyco agreed to acquire that company in the months before the purchase was completed.

97.     Moreover, Tyco has also admitted in the December Report that "there were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that 'over-accrued' expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP." In fact, among other things, Tyco caused acquired entities to record significant accounting reserves for: (i) litigation and other accruals recorded in purchase accounting, some of which were subsequently reversed; (ii) exit costs, which included amounts that did not qualify as exit costs; and (iii) matters not reserved previously by the acquired entity (including warranty and environmental accruals).

98.     For example, Tyco has admitted in its December Report:

- "With respect to the purchase accounting and pooling transactions examined, there were instances in which the pre-acquisition earnings of an acquired entity for the period immediately preceding the consummation of its acquisition by Tyco were significantly lower than the entity's earnings in prior periods. The decrease in reported earnings in the period immediately preceding the consummation of an acquisition, which decreases were for the most part due to non-recurring charges, raise the issue as to whether the acquired entity's pre-merger financials

had been improperly manipulated in order to increase reported earnings subsequent to the consummation of the acquisition."

"For example, in the month before the merger, US Surgical accrued $18.7 million for potential legal fees related to on-going patent defenses and other items. The Company later reduced this amount by $18.2 million, in the same period, as a result of discussions with the Company's external auditors, because it concluded that the initial accrual did not represent a reasonable estimate of legal fees."

"Another document dated September 10, 1996 discusses 'Carlisle Plastics — Financial Engineering and Purchase Accounting.' The memo and attachments define 'financial engineering' as 'pre-merger entries' and 'purchase accounting' items as 'post-merger entries.' A 'Discussion Items' attachment states 'we'll book additional 'Financial Engineering' reserves in July with the objective of having a break even month. This way we won't raise any flags with the Lender reporting. The balance of the reserves will be booked in August. The equity balance sheet attachment for the Carlisle acquisition contemplates $26,440,000 in financial engineering, thereby reducing pre-merger earnings by that amount. The detailed schedule demonstrates that the overwhelming portion of the financial engineering will be in the month just prior to the consummation of the merger."

"A September 9, 1998 memo stated that a manager 'started putting pressure' on Surgical's former CFO and presented a 'plan' for increasing earnings."

"A similar document summarizes a September 18, 1998 Tyco presentation on the US Surgical ('Surgical') merger which closed October 1, 1998. The presentation in its 'Synergies Summary,' indicated that Tyco could recognize $72 million from 'Financial Engineering' in 1999 and $52 million in the each of the following two years."

"An August 17, 1998 memorandum similarly identified means to achieve EBIT goals for Surgical in the first year after the merger. The memo lists numerous cost-savings measures, and reaches a 'total savings before financial engineering' of $145.4 million. The memo also suggests $64.6 million in 'financial engineering' categories, including plans to 'over-accrue expenses in Q3 before closing' and 'accrue in advance rebates.'"

99. The manipulation of accounting reserves employed by the Tyco Defendants in accounting for acquisitions is one that the SEC specifically has identified as improper. For example, the SEC's SAB No. 100, issued in 1999, addresses asset reserves and liabilities

associated with acquisitions. SAB No. 100 provides:

> . . . the staff believes that purchase price adjustments necessary to record liabilities and loss accruals at fair value typically are required, while merely adding an additional "cushion" of 10 or 20 or 30 percent to such account Balances is not appropriate.

100.    In fact, Tyco has now admitted in its Form 10-K for fiscal 2002 that it has "identified several adjustments" that Defendant PwC proposed to make during its year-end audits but which Tyco never recorded. For example, prior to fiscal 2000, PwC identified and proposed adjustments to Tyco's financial statements for improper "adjustments" to Tyco's acquisition reserves that overstated Tyco's reported income by a net amount of $22.7 million. In fiscal 2001, PwC identified and proposed adjustments to Tyco's financial statements for improper "adjustments" to Tyco's acquisition reserves that overstated Tyco's reported income by a net amount of $26.4 million.

101.    In addition to Tyco's improper manipulation of reserves when accounting for acquired entities, Tyco otherwise manipulated accounting reserves in order to inflate its reported operating results.

102.    For example, on September 30, 2002, *The Wall Street Journal* reported:

> Typically, accounting experts say, employee bonuses are accounted for as part of general and administrative expenses. But Tyco's [report on its internal investigation filed with the SEC] says the TyCom bonus was booked in three different accounts totaling $97.4 million -- a slightly larger figure than the bonus payments, which Tyco didn't explain. About $44.6 million of the total was booked as part of the TyCom offering expense, which some accounting experts said was incorrect but at least resulted in a similar bottom-line effect as the proper accounting treatment.

> The other $52.8 million, however, doesn't appear to have been counted as an expense at all, according to three accounting experts who reviewed Tyco's filing. Instead, Tyco seems to have hidden the sum in two different reserve accounts that had been previously established on the balance sheet for unrelated purposes. The majority of the money, $41 million, was booked against "Accrued

Federal Income Tax," the filing says, in effect reducing sums that Tyco had put aside to pay its federal corporate taxes.

"This looks like blatant misstatement of both the income statement and the balance sheet," said Charles Mulford, an accounting professor at Georgia Institute of Technology in Atlanta, who reviewed the Tyco report but isn't involved in the case. Based on the filing, Mr. Mulford said the maneuver appears to have improperly inflated Tyco's pretax income by $52.8 million in the period, the fourth quarter of fiscal 2000. For that quarter, Tyco reported net income of $1.1 billion before the TyCom gain.

Mr. Mulford called dipping into the income-tax kitty particularly "egregious," and said "it would be very surprising if it wasn't picked up by the auditors."

103.    Indeed, GAAP expressly prohibits the manipulation of accounting reserves described herein. Tyco has admitted in the December Report the existence of accounting reserve reversals that were "timed on a number of occasions for the purpose of making EBIT targets."

104.    In SFAS No. 5, GAAP provides that companies may establish reserves for identifiable, probable and estimable risks, and precludes the use of reserves for general or unknown business risks, including excess reserves, because they do not meet the accrual requirements of SFAS No. 5. Any reserves that do not meet the accrual requirements of SFAS No. 5, when identified, should be immediately released into income. A systematic or timed release of excess reserves into income violates GAAP. *See, e.g., In re Rush,* SEC Exchange Act of 1934 Release No. 44501 (July 2, 2001); *SEC v. Dunlap, No.* 01-8437-Civ, SEC Litig. Release No. 17710 (Sept. 4, 2002); *Xerox Settles SEC Enforcement Action,* SEC Press Release No. 2002-52 (Apr. 11, 2002).

105.    Moreover, Tyco has stated in the December Report that the above-noted admissions have been circumscribed by a lack of documentation.

106.    During the Relevant Period, the Tyco Defendants also falsely stated that the Company had and would continue to acquire other companies that would be immediately

accretive to the Company's free cash flow (the net amount of cash generated from operating activities, less capital expenditures, less dividends paid) and earnings and, consequently, that the Company's healthy cash flow position would not require it to tap into its high-interest emergency credit facilities. This disclosure was materially false and misleading as Tyco failed to disclose that its reported cash flow was manipulated because it required companies about to be acquired to accelerate payments on outstanding obligations prior to the acquisition, as noted herein in detail. This undisclosed practice had the effect of increasing Tyco's reported cash flow after the acquisition.

107. In fact, Tyco has now admitted that it "encouraged" companies it was acquiring to accelerate vendor payments, which increased Tyco's operating cash flow after the acquisition. For example, on February 28, 2002, *The New York Times* reported:

> Tyco International said yesterday that it had encouraged Raychem, an electronic components maker that it bought in 1999, to prepay some expenses before the acquisition was completed.
>
> The disclosure about Raychem came in response to questions about a letter sent by a former Raychem employee to the Securities and Exchange Commission. The letter outlined payments that Raychem made at Tyco's behest before the acquisition closed.

108. In furtherance of its scheme to mislead investors, the Tyco Defendants actually told investors to focus on its misleading reporting of cash flow in measuring the Company's financial performance. For example, on March 5, 2002, *The Wall Street Journal* reported that:

> Tyco repeatedly has pointed to what it characterizes as its strong "free cash flow." . . . Tyco considers the [free cash flow] measure so critical that its chief financial officer, Mark Swartz, told investors last month to "forget reported earnings" and instead focus on cash flow generation as a percentage of net income, to "show that our quality of earnings is good."

109. Thus, in furtherance of their scheme to defraud unsuspecting investors while shamelessly enriching themselves, and in a gross violation of GAAP, the Tyco Defendants

engaged throughout the Relevant Period in a practice of manipulating the accounting for Tyco's

acquisitions and accounting reserves in a deliberate attempt to materially overstate Tyco's

operating results and misrepresent the performance, ability, and integrity of Tyco's management.

### d. Tyco's Improper Failure To Timely Record Impaired Goodwill

110.    Tyco's Relevant Period financial statements were also materially false and

misleading because the Company failed to timely record a loss due to an impairment in the value

of its CIT subsidiary, as it has now admitted.  Thus, in yet another way, Tyco's Relevant Period

financial statements were not presented in conformity with GAAP, the rules and regulations of

the SEC, and deceived investors about the Company's true financial condition and operating

performance.

111.    As noted in Tyco's financial statements for the year-ended September 30, 2002:

> During the quarter ended March 31, 2002, Tyco experienced
> disruptions to its business surrounding its ratings, and a significant
> decline in its market capitalization.  During this same time period,
> CIT also experienced credit downgrades and a disruption to its
> historical funding base.  Further, market-based information used in
> connection with the Company's preliminary consideration of the
> proposed IPO of CIT indicated that CIT's book value exceeded its
> estimated fair value as of March 31, 2002.  As a result, the
> Company performed a SFAS 142 first step impairment analysis as
> of March 31, 2002 and concluded that an impairment charge was
> warranted at that time.

112.    In furtherance of its on-going scheme to inflate it operating results, Tyco

improperly failed to record such impairment in conformity with GAAP.  In fact, when Tyco filed

its financial statements for the quarter ended March 31, 2002 with the SEC on Form 10-Q on or

about May 15, 2002, such financial statements did not recognize an impairment in the value of

CIT's goodwill.  To the contrary, Tyco's March 31, 2002 Form 10-Q disclosed:

> The Company periodically reviews and evaluates its goodwill and
> other intangible assets for potential impairment.  Effective October
> 1, 2001, the beginning of Tyco's fiscal year 2002, the Company

adopted SFAS No. 142, "Goodwill and Other Intangible Assets," under which goodwill is no longer amortized but instead is assessed for impairment at least annually. Under the transition provisions of SFAS No. 142, there was no goodwill impairment at October 1, 2001. Updated valuations were completed as of March 31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and Tyco Capital,[10] which resulted in no impairment of goodwill at that date.

(Footnote added).

113.    Tyco's March 31, 2002 financial statements further disclosed:

However, during the quarter ended March 31, 2002, circumstances developed that could potentially impair the value of goodwill with respect to our Tyco Telecommunications reporting unit and Tyco Capital. Updated valuations were completed as of March 31, 2002, which resulted in no impairment of goodwill at that date.

114.    Shortly after Defendant Kozlowski resigned, however, Tyco filed an amendment to its March 31, 2002 Form 10-Q that included its restated financial statements for the quarter then ended.

115.    Tyco's restated March 31, 2002 financial statements filed with the SEC on or about June 12, 2002 reported a $4.5 billion impairment in the value of CIT's goodwill. The effect of this charge eliminated almost 40% of the retained earnings Tyco accumulated since its inception. In its originally filed financial statements for the quarter ended March 31, 2002, Tyco reported accumulated earnings of $11.8 billion. This amount, which generally represents the total net income, less dividends, over the life of a corporation was inflated, as Tyco has admitted, by $4.5 billion, or approximately 38%.

116.    In addition, Tyco has now admitted that it improperly failed to timely record an impairment in the value of goodwill at Tyco Telecommunications and Tyco Infrastructure Services during the quarter ended June 30, 2002. As a result, Tyco's reported pre-tax earnings of

---

[10] Tyco Capital includes CIT and all of its subsidiaries.

approximately $151 million during the quarter ended June 30, 2002 were overstated by approximately $387 million.

117.    Here again, Tyco has admitted that its previously issued Relevant Period financial statements were, when issued, materially false and misleading to the detriment of unsuspecting investors.

      **e.    Tyco's Improper Recognition of Excess Reimbursements From Independent Dealers**

118.    As of January 2003, Tyco's ADT subsidiary routinely purchased residential security monitoring contracts from external independent dealers who operated under the umbrella of ADT's authorized dealer network.  ADT incurred costs for performing due diligence associated with the purchase of such contracts and for maintaining and operating the authorized dealer network.

119.    The independent dealers operating within the network reimbursed ADT for certain of the costs noted above.  Tyco has now disclosed that the amounts reimbursed to ADT by the independent dealers materially exceeded the actual costs incurred by ADT.[11]  Prior to fiscal 2002, Tyco improperly recognized into earnings the amount by which the independent dealer reimbursements exceeded the amount actually incurred by ADT.

120.    In 1999, the SEC issued SAB No. 101, which includes a series of hypothetical questions and interpretive responses intended to provide guidance to SEC registrants associated with the recognition of revenue.  Question 6 of SAB No. 101 provides:

> Facts: Company A provides its customers with activity tracking or similar services tracking of property tax payment activity, sending delinquency letters on overdue accounts, etc.) for a ten-year period. Company A requires customers to prepay for all the services for

---

[11]  It is uncertain why costs "reimbursed" to ADT should exceed the actual amount of costs incurred.

the term specified in the arrangement. The on-going services to be provided are generally automated after the initial customer set-up. At the outset of the arrangement, Company A performs set-up procedures to facilitate delivery of its on-going services to the customers. Such procedures consist primarily of establishing the necessary records and files in Company A's pre-existing computer systems in order to provide the services. Once the initial customer set-up activities are complete, Company A provides its services in accordance with the arrangement. Company A is not required to refund any portion of the fee if the customer terminates the services or does not utilize all of the services to which it is entitled. However, Company A is required to provide a refund if Company A terminates the arrangement early. Assume Company A's activities are not within the scope of SFAS No. 91.

Question: When should Company A recognize the service revenue?

Interpretive Response: The staff believes that, provided all other revenue recognition criteria are met, service revenue should be recognized on a straight line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer. In this case, the customer contracted for the on-going activity tracking service, not for the set-up activities. The staff notes that the customer could not and would not, separately purchase the set-up services without the on-going services. The services specified in the arrangement are performed continuously over the contractual term of the arrangement (and any subsequent renewals). Therefore, the staff believes that Company A should recognize revenue on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer.

In this situation, the staff would object to Company A recognizing revenue in proportion to the costs incurred because the set-up costs incurred bear no direct relationship to the performance of services specified in the arrangement. The staff also believes that it is inappropriate to recognize the entire amount of the prepayment as revenue at the outset of the arrangement by accruing the remaining costs because the services required by the contract have not been performed.

121.    In violation of the requirements of SAB No. 101, Tyco improperly included the

excess "reimbursements" received by ADT in the Company's earnings rather than recognizing such payments over the life of the contract, as the Tyco Defendants knew or recklessly ignored.

122. Tyco has now admitted that the cumulative effect of the "reimbursements" recorded in years prior to fiscal 2002 in excess of costs incurred, net of the effect of the appropriate recognition of such payments, totaled approximately $186 million and materially inflated, at least, the reported operating results of Tyco' Fire and Security Services segments, as noted above.

123. The Tyco Defendants knew or recklessly ignored that GAAP, in SAB No. 101, required Tyco to recognize such fee income over the life of the dealer contract. In order to accelerate the recognition of such fee income, Tyco improperly accounted for the fees charged to dealers as an immediate reduction in its reported expenses. In so doing, Tyco improperly inflated its reported financial performance during the Relevant Period.

124. Moreover, GAAP, in Accounting Principles Board ("APB") Opinion No. 22, ¶ 7, provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. (APB Opinion No. 22, ¶ 8.) Accordingly, GAAP, in ¶ 12 of APB Opinion No. 22 provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
>     a.    A selection from existing acceptable alternatives;
>
>     b.    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are

predominantly followed in that industry;

       c.      Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

125.     Tyco's Relevant Period financial statements were thus also false and misleading and failed to comply with GAAP because they improperly failed to identify and describe important judgments associated with its recognition of excess "reimbursements" received by ADT. Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Tyco's accounting of excess payments received by ADT or even, for that matter, the bona-fides of such "reimbursements" that Tyco has admitted materially exceeded the actual cost it incurred.

**f.**     **Violations of SEC Regulations**

126.     Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A''), require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

> The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results…

127.     In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a

known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item

303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment,
> event or uncertainty is both presently known to management and is
> reasonably likely to have a material effect on the registrant's
> financial condition or results of operations.

128.    Nonetheless, Tyco's Relevant Period Forms 10-K and 10-Q failed to disclose that

the Company's internal control system deficiencies, "pattern" of aggressive accounting for the

purpose of inflating Tyco's operating results, related party transactions, accounting reserves

manipulation, including the employment of "financial engineering" reserves, each of which were

all reasonably likely to have a material adverse effect on Tyco's operating results, which was

necessary for a proper understanding and evaluation of the Company's operating performance

and an informed investment decision.

### 2.    Tyco's Failure To Disclose Numerous Acquisitions During the Relevant Period

129.    In addition to engaging in manipulative accounting, Tyco failed to disclose the

sheer number of companies it was acquiring, and the amount it was paying for each.  According

to a February 4, 2002 report in *The Wall Street Journal* ("Tyco Made $8 Billion of Acquisitions

Over 3 Years but Didn't Disclose Them"), Defendant Swartz admitted that Tyco had spent out

$8 billion over the three previous fiscal years on more than 700 acquisitions that were never

announced to the public.  In fiscal 2001 alone, "Tyco paid $4.19 billion in cash for [350]

unannounced deals . . . , or about 37% of the $11.3 billion in cash it spent on all deals."

Moreover, according to the report, Swartz admitted that it would be impossible for an investor to

discern the amounts Tyco spent on the unannounced deals because Tyco failed to disclose the

amount of cash on the balance sheets of the companies it acquired.  Tyco subtracted that amount

from its total acquisition spending to get the "net" figure, according to the report, but calculating

the unannounced deals requires it to be added back. "You could fault me for that," Defendant Swartz is quoted as saying.

### 3. Tyco's Withholding of Documents From the SEC During Its 1999-2000 Inquiry

130. In 1999 and 2000, the SEC conducted a Matter Under Inquiry (MUI) concerning the Company's acquisition accounting. At the beginning of the inquiry, the SEC requested that Tyco produce various categories of documents.

131. The Tyco Defendants withheld a substantial number of documents from the SEC during its 1999-2000 inquiry, causing the SEC to reach a false conclusion in its investigation. Moreover, as set forth below, the Tyco Defendants made false statements to investors concerning the merits of the SEC investigation and the Company's purported "cooperation."

132. In July 2000, the SEC closed its informal inquiry. However, the Company has recently admitted in its December Report that "[a] large quantity of documents collected by Tyco and its counsel in connection with the SEC's document request had not been produced to the SEC at the time the SEC closed its inquiry."

133. An article in the December 27, 2002 edition of *The Wall Street Journal* also shows that Tyco's outside counsel knew in early 2000 that the Company had serious accounting problems and that corporate funds were being misused by the Company's senior executives, including the Individual Defendants. The article states:

> Newly discovered e-mails written by attorneys at Tyco International Ltd.'s former outside law firm reveal that they knew about personal use of corporate funds by former Tyco Chairman L. Dennis Kozlowski and a host of accounting problems at the company in early 2000.
>
> The e-mails -- written by Wilmer, Cutler & Pickering partners Lewis Liman and William McLucas -- have been obtained by the Manhattan district attorney's office and the Securities and Exchange Commission in their continuing investigation into Tyco

and some of its former top executives, according to people familiar with the matter. Part of the SEC's probe involves whether the conglomerate and Wilmer Cutler withheld relevant information that would have helped the SEC in an informal inquiry it launched in 1999 into Tyco's accounting practices . . . .

134. The December 27th article in *The Wall Street Journal* quotes two of the emails:

> March 23, 2000 e-mail from Lewis Liman (Wilmer Cutler partner) to Mark Belnick, former Tyco General Counsel: "There are payments to a woman whom the folks in finance describe to be Dennis's girlfriend. I do not know Dennis's situation, but this is an embarrassing fact." (This refers to payments from the key Employee Loan Account in 1997 to Karen Mayo, now Karen Kozlowski.)

> May 25, 2000 e-mail from William McLucas of Wilmer Cutler to Belnick: "We have found issues that will likely interest the SEC. . . creativeness is employed in hitting the forecasts. . ." "There is also a bad letter from the Sigma people just before the acquisition confirming that they were asked to hold product shipment just before the closing. . ." The same e-mail also said that the company's financial reports suggest "something funny which is likely apparent if any decent accountant looks at this."

135. As a result of the Company's failure to cooperate with the investigation, the SEC reached a false conclusion concerning Tyco's accounting practices and investors remained in the dark concerning the Tyco Defendants' fraudulent scheme.

### 4. Breakdown of Tyco's Internal Controls

136. Although the Tyco Defendants claimed throughout the Relevant Period that there was no accounting fraud at Tyco and that it had been vindicated by the conclusion of an investigation commenced by the SEC, the Company was in fact suffering from a chronic and systematic breakdown of its internal controls and procedures such that its internal financial reporting was inherently corrupted, subject to manipulation, and unreliable, resulting in materially false and misleading financial statements. Indeed, according to the December Report: (found in 10-K)

We learned of instances of breakdowns of certain internal controls during fiscal 2002. This began in January 2002 when our Board of Directors learned of an unauthorized payment to our former Lead Director, Frank E. Walsh, and eventually led to the Board replacing our senior management team. The instances included abuse of our employee relocation loan programs, unapproved bonuses, attempted unauthorized credits to employee loans, undisclosed compensation arrangements, unreported perquisites, self-dealing transactions and other misuses of corporate trust, and have been widely reported in the press. We believe the publicity resulting from such instances negatively impacted our results of operations and cash flow in fiscal 2002. In addition, such publicity contributed to a deterioration in our financial condition as we lost access to the commercial paper market and credit ratings on our term debt declined during fiscal 2002 from ratings as of the end of fiscal 2001.

137.     In addition, the December Report concluded that, during the Relevant Period:

the company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ.

138.     In addition, the Company's Form 10-K for fiscal 2002 (dated December 30, 2002) stated that the Company's new senior management team (in conjunction with its Board of Directors) reviewed overall company policies and procedures in areas that were viewed as important. Specific areas of focus included acquisition accounting, restructuring, financial and legal controls, reserve utilization, incentive compensation, and a number of other areas relevant to Tyco's financial statements. The Company's new senior management determined that Tyco's existing policies and standards of approval needed "substantial improvement" and found that there were instances in which documentation of important financial reporting matters was

substandard; there had been limited review of bonuses and incentive compensation across Tyco; and the manner in which former senior management managed Tyco reflected neither a commitment to sound corporate governance nor the processes required to ensure the highest standards of financial integrity and accounting rigor.

139.    According to Tyco's fiscal 2002 Form 10-K, prior senior management's "primary focus" was on earnings-per-share accretive acquisitions that resulted in Tyco's growing considerably over the past several years, including the acquisition of approximately 700 companies of varying size and in varying businesses around the world, "but which also strained the internal control environment and limited [the Company's] investment in these areas."

140.    In addition, the fiscal 2002 Form 10-K states that Tyco now believes that prior senior management during the past three years placed "undue reliance on non-recurring charges and pro forma financial information."  According to Tyco's new senior management, "the rapid pace of acquisitions and attendant restructurings made it difficult to ascertain the level of [the Company's] organic growth."

141.    Tyco's lack of adequate internal controls increased the opportunity for the Tyco Defendants to commit the fraud alleged above, and rendered the Company's Relevant Period financial statements inherently unreliable and non-compliant-with GAAP.  Nonetheless, throughout the Relevant Period, the Company consistently issued materially false and misleading financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls.

142.    Although these materially adverse factors, trends, and facts were apparent to Defendants, including Defendant PwC, at all material times Defendants failed to timely and adequately disclose them during the Relevant Period.  Instead, as detailed below, PwC continued

to knowingly or recklessly issue "clean" audit opinions on the Company's fraudulent financial statements throughout the Relevant Period, and the Tyco Defendants continued to portray the Company in positive terms, and any partial disclosures that they may have made of certain of these problems were materially incomplete and calculated to deceive or mislead investors as to the true nature and extent of the problems and material liabilities facing the Company.

### 5. PwC's Participation in the Fraud and Its Scienter

143. Tyco has been a long time and significant client of PwC and a major source of income for PwC's Boston office. In fact, during fiscal 2001 alone, the fees paid by Tyco to PwC exceeded $51 million. Indeed, 75% of this amount was non-audit fees, including fees for consulting and other services rendered to Tyco by PwC.

144. As noted in the SEC's 2001 Revision of the Commission's Auditor Independence Requirements:[12]

> In a June 2000 study, Brand Finance plc surveyed analysts and representatives of companies listed on the London Stock Exchange. Brand Finance reported, Analysts are concerned that the acceptance of non-audit fees by auditors is likely to result in the independence of the audit being compromised. 94% of analysts stating an opinion believe that significant non-audit fees are likely to compromise audit independence. 76% of companies stating an opinion felt that auditor independence is likely to be compromised where significant non-audit fees are received from audit clients.
>
> Brand Finance also found that "83% of analysts who expressed an opinion believe objectivity is threatened even when the non-audit fee is less than the audit fee."
>
> In another recent survey, the Association for Investment Management and Research surveyed its members and certified financial analyst candidates regarding auditor independence issues. AIMR reported that "[p]otential threats to auditor independence,

---

[12] 17 CFR Parts 210 and 240, Release Nos. 33-7919; 34-43602; 35-27279; IC-24744; IA-1911; FR-56.

resulting from audit firms providing non-audit services to their audit clients [were) troublesome to many. . . respondents."

A recent poll was conducted by Public Opinion Strategies to determine, among other things, how the investing public views our proposed rules. The results showed that eighty percent of investors surveyed favor (forty-nine percent strongly favor; thirty-two percent somewhat favor) an SEC rule that generally would require restrictions on the types of consulting services accounting firms can provide their audit clients, and fifty-one percent thought the new rule was "very important" to protecting individual stock market investors. As summarized by James C. Stadler of Duquesne University, "The results of our national poll indicate that average American investors, in fact, overwhelmingly support the need for some new rulemaking in this area." He further stated, "The survey results confirm what most practitioners have felt for decades -- that large consulting engagements for audit clients can raise serious concerns regarding audit independence"

(Footnotes deleted.)

145.    As a result of its longstanding relationship with Tyco and the nature of the auditing and consulting services rendered to the Company, PwC's personnel were regularly present at Tyco's corporate headquarters throughout the year and had continual access to, and knowledge of, Tyco's internal accounting records and confidential corporate financial and business information through conversations with employees of Tyco and through review of Tyco's non-public documents.

146.    In fact, according to the Company's 2001 Proxy Statement, the Tyco Audit Committee was asked to:

- Determine whether based on the review and discussion of the audited financial statements with management and independent accountants, if the Committee should recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the last fiscal year for filing with the Securities and Exchange Commission;

- Meet with management and the external auditors to discuss the results of the annual audit, including any significant changes in accounting principles and any serious difficulties or disputes with management

encountered during the audit;

- Review with management and the external auditors the interim financial statements prior to filing;

- Periodically consult with independent accountants, without the presence of management, about internal controls and the fullness and accuracy of the Company's financial statements;

- Review the Company's financial reporting process, both internal and external, in consultation with the independent accountants;

- Consider the independent accountants' judgments about the quality and appropriateness of the Company's accounting principles applied, including management's handling of proposed audit adjustments identified by external auditors;

- Consider suggestions made by independent accountants, management, or internal audit, regarding the Company's accounting principles and practices;

- Establish regular and separate systems of reporting to the Committee by management, independent accountants and internal audit regarding any significant judgments made in management's preparation of the financial statements and the view of each as to the appropriateness of such judgments;

- Review with management, independent accountants and internal audit difficulties encountered during the course of the annual audit, including any restrictions on the scope of work or access to required information and any other significant disagreements in connection with preparing the financial statements; and

- Discuss with management, independent accountants and internal audit the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented.

147.    Given the nature of the auditing and consulting services rendered to the Company, and the fact that PwC's personnel were regularly present at Tyco and had intimate knowledge of Tyco's financial reporting practices based on its access to internal accounting records and Tyco employees, PwC knew of or recklessly disregarded adverse facts concerning the Company's improper financial reporting during the Relevant Period, including the Company's 1999, 2000,

and 2001 year-end financial statements and PwC's unqualified audit opinions thereon.

Nonetheless, PwC knowingly, or recklessly, issued false unqualified audit opinions during the

Relevant Period.

148.    PwC issued its audit opinion, dated October 21, 1999, except as to "Revision" in

Note 1, which is as of June 12, 2000, on Tyco's 1999 year-end financial statements.  PwC's

opinion falsely stated that such Tyco financial statements were presented in conformity with

GAAP and that PwC's audit was performed in accordance with GAAS:

> In our opinion, based upon our audits and the reports of other
> auditors, the accompanying consolidated balance sheets and the
> related consolidated statements of operations, shareholders' equity
> and cash flows present fairly, in all material respects, the financial
> position of Tyco International Ltd and its subsidiaries at September
> 30, 1999 and 1998, and the results of their operations and their
> cash flows for the years ended September 30, 1999 and 1998, and
> the nine months ended September 30, 1997, in conformity with
> accounting principles generally accepted in the United States.  In
> addition, in our opinion, the accompanying financial statement
> schedule presents fairly, in all material respects, the information
> set forth therein when read in conjunction with the related
> consolidated financial statements.  These consolidated financial
> statements and financial statement schedule are the responsibility
> of the Company's management; our responsibility is to express an
> opinion on these consolidated financial statements and financial
> statement schedule based on our audits. . . .  We conducted our
> audits of these statements in accordance with auditing standards
> generally accepted in the United States, which require that we plan
> and perform the audit to obtain reasonable assurance about
> whether the financial statements are free of material misstatement.
> An audit includes examining, on a test basis, evidence supporting
> the amounts and disclosures in the financial statements, assessing
> the accounting principles used and significant estimates made by
> management, and evaluating the overall financial statement
> presentation.  We believe that our audits and the reports of other
> auditors provide a reasonable basis for the opinion expressed
> above.
>
> As discussed under the heading "Revision" in Note 1, the
> accompanying consolidated financial statements for the fiscal year-
> ended September 30, 1999 have been revised to adjust merger,
> restructuring and other non-recurring charges and charges for the

impairment of long-lived assets for the timing and classification of certain charges.

149.    PwC issued its audit opinion, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), on Tyco's 2000 and 1999 financial statements.  PwC's opinion stated that such Tyco financial statements were presented in conformity with GAAP and that PwC's audit was performed in accordance with GAAS:

> In our opinion, based upon our audits and the report of other auditors, the accompanying consolidated balance sheets and the related consolidated statements of operations, shareholders' equity and cash flows present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2000, in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.  The financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.  . . .  We conducted our audits of the statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

150.    PwC issued its audit opinion, dated October 18, 2001 (except as to Note 31, which is as of December 18, 2001), on Tyco's 2001 and 2000 financial statements, which it stated were presented in conformity with GAAP and that PwC's audit was performed in accordance with GAAS:

In our opinion, based upon our audits, the accompanying consolidated balance sheets and the related consolidated statements of operations, of shareholders' equity and of cash flows present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2001, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of the statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion. As described in Note 18, the Company changed its method of revenue recognition and changed its method of accounting for derivative instruments and hedging activities.

151. PwC also issued a number of Consent Letters during the Relevant Period that permitted Tyco to incorporate by reference PwC's materially false and misleading reports in the Company's Registration Statements. These Consent Letters are discussed below.

152. In issuing such audit opinions, PwC turned a blind eye to Tyco's myriad of improper accounting practices as described above and issued unqualified audit opinions on Tyco's 2001, 2000, and 1999 financial statements, even though PwC knew or recklessly disregarded that: (i) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position, the results of operations, and cash flow of Tyco and its subsidiaries as of September 30, 2001, 2000,

and 1999; and (ii) PwC had not audited Tyco's 2001, 2000, and 1999 financial statements in accordance with GAAS.

153.     Among other things, PwC knew or recklessly disregarded that Tyco's 2001, 2000, and 1999 year-end financial statements violated numerous provisions of GAAP and were materially false and misleading.  Tyco's violations of GAAP during the Relevant Period include, among other things:

- the improper accounting for acquisitions;
- the manipulation of accounting reserves for the purpose of inflating the Company's reported operating results;
- the failure to timely recognize expenses, including impairments in the value of the Company's assets;
- the failure to disclose material related party transactions;
- engaging in "aggressive" accounting for the purpose of inflating the Company's reported results;
- the failure to appropriately restate previously issued and materially misstated financial statements;
- the improper recognition of "reimbursements" from independent dealers;
- the failure to disclose accounting policies in accordance with GAAP; and
- the failure to disclose material contingent liabilities and significant risks and uncertainties.

154.     In certifying Tyco's 2001, 2000, and 1999 year-end financial statements, PwC also falsely represented that its examination was made in accordance with GAAS.  These statements were materially false and misleading because the audits conducted by PwC were knowingly or recklessly not performed in accordance with GAAS in the following respects:

a.       PwC violated GAAS Standard of Reporting No. 1 requires the audit report to state whether the financial statements are presented in accordance with GAAP.  PwC's opinion falsely represented that Tyco's 2001, 2000, and 1999 financial statements were presented in conformity with GAAP when they were not for the reasons herein alleged.

b.     PwC violated GAAS Standard of Reporting No. 2 which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated.  PwC should have stated that no opinion could be issued by it on Tyco's 2001, 2000, or 1999 financial statements or issued an adverse opinion stating that the 2001, 2000, and 1999 financial statements were not fairly presented.

c.     PwC violated GAAS General Standard No. 2 which requires that an independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

d.     PwC violated SAS No. 82 by failing to adequately consider the risk that the audit financial statements of Tyco were free from material misstatement, whether caused by errors or fraud.  PwC knew or recklessly ignored numerous events and conditions that occurred or existed at Tyco during the Relevant Period, which events and conditions are specifically identified in SAS No. 82 as being "risk factors relating to misstatements arising from fraudulent financial reporting."  These risk factors include but are not limited to:

- An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices;

- A failure by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process;

- Management displaying a significant disregard for regulatory authorities;

- Management continuing to employ an ineffective accounting, information technology, or internal auditing staff;

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm; and

- Significant bank accounts or subsidiary or branch operations in tax-haven jurisdictions for which there appears to be no clear business justification.

e.     PwC violated SAS No. 54 in that PwC failed to perform the audit

procedures required in response to possible improper acts by Tyco in connection with its audit of Tyco's 2001, 2000, and 1999 year-end financial statements. PwC knew or recklessly disregarded that Tyco engaged in numerous improper acts. In fact, on September 30, 2002, *The Wall Street Journal* reported:

> New York prosecutors are investigating whether Tyco International Ltd.'s outside auditor, PricewaterhouseCoopers LLP, knew about secret bonuses paid to former Tyco executives as well as accounting practices that regulators have charged were used to hide the payments, according to people with knowledge of the matter.

> * * *

> Prosecutors' level of interest in PricewaterhouseCoopers suggest they now may be attempting to make a criminal case against the nation's largest accounting firm, which so far hasn't been ensnared in the widening Tyco scandal. One focus of the probe is whether PricewaterhouseCoopers uncovered the secret bonuses in the course of its audit work, the people with knowledge of the matter said. The people said prosecutors also are seeking to determine whether PricewaterhouseCoopers was aware of the improper accounting techniques that the Securities and Exchange Commission alleges Tyco used to "bury" the bonus payments.

> Moreover, Tyco has now admitted that it engaged in "a pattern of using aggressive accounting that, even when not erroneous, was, undertaken with the purpose and effect of increasing reported results," and that it put "pressure on," and gave "inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ."

      f.      PwC violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements. PwC knew, or recklessly ignored, that it failed to adequately plan its audits or supervise its staff in a manner designed to reasonably identify Tyco's manipulation of

accounting reserves, prematurely recognized fees on dealer contracts and unreported reported related party transactions.

g.     PwC violated GAAS General Standard No. 3 which requires that due professional care must be exercised by the auditor in the performance of the audit and the preparation of the report.

h.     PwC violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial, and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing, and extent of tests to be performed.  AU § 150.02.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures.  AU § 319.02.  The control environment, which includes management's integrity and ethical values, is the foundation of internal control and provides discipline, and structure, and sets the tone of an organization. After obtaining an understanding of an entity's internal control structure, the auditor assesses the entity's control risk.  AU § 319.02.  Control risk is the risk that a material misstatement in an assertion by management contained in a company's financial statements will not be prevented or detected on a timely basis by an entity's internal control structure policies or procedures.  AU § 319.29.  The ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements.  AU § 319.61.

In the course of auditing Tyco's 2001, 2000, and 1999 financial statements, PwC

either knew or recklessly disregarded facts that evidenced that it either failed to sufficiently understand Tyco's internal control structure and/or it disregarded weaknesses and deficiencies in Tyco's internal control structure. These deficiencies, each of which Tyco has now admitted, include: (i) "the failure to document decisions contemporaneously", (ii) documentation that was "not always available" or "dispersed," (iii) "poor" documentation, (iv) "inadequate policies and procedures to prevent misconduct of senior executives," (v) "inadequate approval procedures and documentation," (vi) "a lack of oversight by senior management," (vii) "serious abuses of trust and self-dealing by the highest officers of Tyco," and (viii) "a lack of a stated and demonstrable commitment by former senior corporate management to set appropriate standards of ethics, integrity, accounting, and corporate governance."

      i.     PwC violated Standard of Field Work No. 3, which requires sufficient competent evidential matter to be obtained through inspection, observation, inquires, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. PwC knew or recklessly disregarded that it did not obtain sufficient competent evidential matter concerning the myriad of material transactions Tyco admittedly has improperly recorded.

      j.     PwC also violated AU § 334, which requires auditors to identify, examine, and determine that financial statements disclose related party transactions. As stated above, Tyco's financial statements failed to provide the disclosure required by GAAP concerning the transactions between it and its officers and directors.

      k.     In fact, Mark Belnick, in his Memorandum of Law in Support of Omnibus Retrial Motion filed in the Supreme Court of the State of New York on or about October 18, 2002, asserts that, as early as August 25, 1999, he "fully disclosed" to and

"personally confirmed" with PwC the loans that Plaintiff now alleges that Tyco's financial statements, in violation of GAAP, improperly failed to disclose.

155.     As a result of its failure to accurately report on Tyco's 2001, 2000, and 1999 financial statements, PwC utterly failed in its role as an auditor as defined by the SEC.  SEC Accounting Series Release No. 296, *Relationships Between Registrants and Independent Accountants,* Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.  The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.

156.     In addition, PwC violated the requirements of Section 10A of the Securities Exchange Act, which requires auditors of public companies to design procedures to provide reasonable assurance of detecting illegal acts and to identify material related party transactions. Section 10A of the Securities Exchange Act requires an auditor to notify the SEC if he or she becomes aware of information indicating that an illegal act has, or may have occurred, if management or the Board of the company fails to take appropriate remedial actions with respect to the illegal acts.  PwC knew or recklessly ignored that it violated Section 10A of the Securities Exchange Act in the performance its "audits" of Tyco's 2001, 2000, and 1999 year-end financial statements.

157.     In fact, Charles Mulford, an accounting professor at Georgia Institute of Technology in Atlanta, when asked of certain of the accounting reserve manipulations noted

herein stated, in a September 30, 2002 *The Wall Street Journal* article, that "it would be very surprising if it wasn't picked up by the auditors."

158.     In addition, the same *The Wall Street Journal* article reported:

> Lynn Turner, a former chief accountant at the Securities and Exchange Commission who also reviewed [Tyco's September Report], went even further, saying "this is called fraud." As for the auditors, he asked: "How the hell do you do that and not have PricewaterhouseCoopers find it?"

159.     PwC's opinions, which represented that Tyco's 2001, 2000, and 1999 year-end financial statements were presented in conformity with GAAP, were materially false and misleading because PwC knew or was reckless in not knowing that Tyco's 2001, 2000, and 1999 year-end financial statements violated the principles of fair reporting and GAAP. In the course of rendering its unqualified audit certification on Tyco's 2001, 2000, and 1999 year-end financial statements, PwC knew it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. PwC, in issuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

160.     PwC knew or recklessly disregarded facts that indicated that it should have: (i) disclaimed or issued adverse opinions on Tyco's 2001, 2000, and 1999 year-end financial statements; or (ii) withdrawn, corrected, or modified its opinion for the years ended September 30, 2001, 2000, and 1999 to recognize Tyco's improper accounting and financial reporting alleged herein.

**B.** **Material Omitted Information Concerning Looting of the Company by Its Senior Executives Who Were Conducting Tyco as a Criminal Enterprise**

161.    The Tyco Defendants and other executives at Tyco were motivated to engage in the financial misreporting and manipulation of Tyco's financial results by engaging in wide-scale looting of Tyco.  Similarly, the previously undisclosed abuse and improper accounting of Tyco's executive compensation and loan programs for the benefit of other Tyco executives and employees was intended by the Tyco Defendants to incentivize Tyco's management to participate in the scheme, including the falsification of Tyco's financial reporting.

162.    The Tyco Defendants did not disclose their looting to investors during the Relevant Period.  Rather, the Tyco Defendants vehemently denied what they falsely described as unfounded "rumors" and falsely represented that Tyco's management and its practices were of the highest integrity.  Accordingly, all of the Tyco Defendants' Relevant Period statements concerning the integrity of its executives and management team, Tyco's financial reporting, and the compensation received by its executives were materially false and misleading and omitted to state this material information.

163.    According to the Company's September Report, "during at least the five years prior to June 3, 2002, Tyco's three top corporate officers -- its CEO, its CFO, and its Chief Corporate Counsel -- engaged in a pattern of improper and illegal conduct" by which they looted hundreds of millions of dollars from Tyco.  In fact, the Company has recently admitted in its December Report that senior management's stewardship of Tyco, both prior to and during the Relevant Period, "was characterized by serious abuses of trust and self-dealing by the highest officers of Tyco."

164.    The Tyco Defendants were obligated to disclose this information to investors. For example, Regulation S-K sets forth instructions for filing forms under the 1933 and 1934

Acts. One of these rules, Item 402, relates to the disclosure of information concerning

"Executive Compensation." Item 402 provides:

> 2) All compensation covered. This item requires clear, concise and understandable disclosure of all plan and non-plan compensation awarded to, earned by, or paid to the named executive officers designated under paragraph (a)(3) of this item, and directors covered by paragraph (g) of this item by any person for all services rendered in all capacities to the registrant and its subsidiaries, unless otherwise specified in this item.
>
> 3) Persons covered. Disclosure shall be provided pursuant to this item for each of the following (the "named executive officers"):
>
> > (i) All individuals serving as the registrant's chief executive officer or acting in a similar capacity during the last completed fiscal year ("CEO"), regardless of compensation level;
> >
> > (ii) The registrant's four most highly compensated executive officers other than the CEO who were serving as executive officers at the end of the last completed fiscal year;
> >
> > (iii) Up to two additional individuals for whom disclosure would have been provided pursuant to paragraph (a)(3)(ii) of this item but for the fact that the individual was not serving as an executive officer of the registrant at the end of the last completed fiscal year.
>
> Instructions to Item 402(a)(3). 1. Determination of Most Highly Compensated Executive Officers. The determination as to which executive officers are most highly compensated shall be made by reference to total annual salary and bonus for the last completed fiscal year . . . .

165. Similarly, Item 404 requires disclosure of "Certain Relationships and Related

Transactions":

> (a) Transactions With Management and Others. Describe briefly any transaction, or series of similar transactions, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, or series of similar transactions, to which the registrant or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000, and in which any of the following persons had, or will have, a direct or indirect material interest, naming such person and indicating the person's relationship to the registrant, the nature of such person's interest in the transaction(s), the amount of such transaction(s) and, where practicable, the amount of such person's interest in the transaction(s):

(1)       Any director or executive officer of the registrant;

(2)       Any nominee for election as a director;

(3)       Any security holder who is known to the registrant to own of record or beneficially more than five percent of any class of the registrant's voting securities; and

(4)       Any member of the immediate family of any of the foregoing persons.

Instructions to Paragraph (a) of Item 404.

1.       The materiality of any interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of the particular case. The importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transactions are among the factors to be considered in determining the significance of the information to investors.

\* \* \*

(c)       Indebtedness of Management. If any of the following persons has been indebted to the registrant or its subsidiaries at any time since the beginning of the registrant's last fiscal year in an amount in excess of $60,000, indicate the name of such person, the nature of the person's relationship by reason of which such person's indebtedness is required to be described, the largest aggregate amount of indebtedness outstanding at any time during such period, the nature of the indebtedness and of the transaction in which it was incurred, the amount thereof outstanding as of the latest practicable date and the rate of interest paid or charged thereon:

(1)       Any director or executive officer of the registrant;

(2)       Any nominee for election as a director;

(3)       Any member of the immediate family of the persons specified in paragraph (c)(l) or (2);

(4)       Any corporation or organization (other than the registrant or a majority-owned subsidiary of the registrant) of which any of the persons specified in paragraph (c)(1) or (2) is an executive officer or partner or is, directly or indirectly, the beneficial owner of ten percent or more of any class of equity securities; and

(5)       Any trust or other estate in which any of the persons specified in paragraphs (c)(1) or (2) has a substantial beneficial interest or as to which such person serves as a trustee or in a similar capacity.

166.    As set forth below, the Tyco Defendants failed to comply with these disclosure requirements.

## 1.    Relocation Programs

167.    The September Report admits that the Individual Defendants "used the relocation program to receive non-qualifying loans and unauthorized benefits that were not generally available to all salaried employees affected by relocations, or were not related to any Tyco relocation."  This provided the Individual Defendants with an additional method to steal from the Company.

### a.    L. Dennis Kozlowski

168.    According to the September Report, Defendant Kozlowski "improperly borrowed approximately $29,756,000 in non-qualifying relocation loans to purchase land and construct a home in Boca Raton, Florida during the years 1997 to 2000, and improperly borrowed approximately $7,012,000 in non-qualifying relocation loans to purchase a cooperative apartment in New York City in 2000."

169.    The table attached hereto as Exhibit B is from the September Report and sets forth undisclosed interest-free "relocation loans" improperly taken by Defendant Kozlowski since the inception of his relocation program account, including loans and charges reflected in the Company's records for Kozlowski's relocation account.

170.    In sum, the September Report concludes that:

- "$7,011,669 in interest free loans was charged by Mr. Kozlowski for purported New York relocations that did not qualify under the New York Relocation Program;"

- "$29,756,110 in interest free loans was charged by Mr. Kozlowski for the acquisition of property under an unauthorized Florida relocation program;" and

- "$24,922,849 in interest free loans was borrowed by Mr.

Kozlowski for the acquisitions of other properties that were not authorized by any relocation program."

171.     Of Defendant Kozlowski's $61,690,628 of unauthorized interest free relocation loans, the September Report concludes that:

- "$21,697,303 were actually repaid by him, but without interest;"

- "$19,439,392 were repaid through unauthorized forgiveness, discussed in the next section, that he bestowed upon himself" and

- "$20,553,933 were reclassified to other Mr. Kozlowski loan accounts that he maintained with the Company."

**b.      Mark H. Swartz**

172.     As set forth above, Defendant Swartz was Tyco's CFO from 1995 through August 2002, and a Tyco director from February 2001 through August 2002. The table attached hereto as Exhibit C is from the September Report and sets forth undisclosed interest free "relocation loans" improperly taken by Defendant Swartz since the inception of his relocation program account, including loans and charges reflected in the Company's records for Defendant Swartz's relocation account.

173.     In sum, the September Report concludes that:

- "$7,668,750 in interest free loans were taken by Mr. Swartz for property acquisitions in New York and New Hampshire under the unauthorized New York Relocation Program;"

- "$20,992,000 in interest free loans were taken by Mr. Swartz under an unauthorized Florida relocation program;" and

- "$4,437,175 was borrowed, interest-free, for the acquisition of other properties that were not authorized by any relocation program."

174.     Of Defendant Swartz's $33,097,925 of unauthorized interest-free relocation loans, the September Report concludes that:

- "$10,786,977 was repaid by him, but without interest";

- "$9,792,000 was repaid through forgiveness that Mr. Kozlowski was not

authorized to bestow and"

- "$12,518,948 was reclassified to other Mr. Swartz loan accounts that he maintained with the Company."

### c.    Other Executive Officers

175.    Mark A. Belnick served as Tyco's Executive Vice President and Chief Corporate Counsel from September 1998 until June 10, 2002.  According to the September Report, Belnick improperly "used the unauthorized version of the New York relocation program to borrow approximately $4,217,000 from September 1998 through May 2001 for the purchase and improvement of a cooperative apartment in New York City."  The September Report also admits that Belnick improperly "used the relocation program to pay his rent for several months while his new apartment was being renovated."

176.    From 2001 through March 2002, the September Report also states that Belnick wrongly "borrowed an additional $10,418,599 to purchase land and build a home" in Park City, Utah.  The report states that Belnick "then charged Tyco $1600 per month for his home office located in that house," even though the Company maintains no corporate offices in Utah, and Belnick was not requested to relocate to Utah.

177.    In sum, the September Report concludes that Belnick's indebtedness "was not incurred through an authorized employee relocation plan available generally to all salaried employees, and as such was not exempt from disclosure in the Company's proxies."

178.    The September Report also describes the relocation loan activity of Tyco's executive officers (as defined by Section 16 of the Securities Exchange Act of 1934 and identified in Tyco's proxy statements during the Relevant Period).  Many (if not all) of these loans were given as pay-offs for participating in the Tyco Defendants' fraudulent scheme to manipulate the Company's financial results.  For example, almost $12 million was loaned to

senior executives to incentivize them to participate in the Tyco Defendants' fraudulent scheme to

manipulate Tyco's financial results:

- **Jerry R Boggess.** Mr. Boggess was President of Tyco's Fire and Security Services division. Mr. Boggess borrowed a total of $5,000,000 in relocation loans to purchase property in Boca Raton in 1997. This loan was forgiven and grossed-up as part of the TyCom Bonus in September 2000 discussed hereafter, which also had not been approved by the Compensation Committee. Mr. Boggess also borrowed an additional amount which was purportedly forgiven by Defendant Kozlowski in January 2002.

- **Neil R Garvey.** Mr. Garvey served as President and Chief Executive Officer of TyCom Ltd., a Tyco subsidiary, until July 19, 2002. Mr. Garvey borrowed $5,000,000 in relocation loans related to his relocation to New Hampshire in 2000. Mr. Garvey's loan exceeded approved program guidelines by $472,703. As of September 2002, Mr. Garvey's entire $5,000,000 loan was outstanding, and the Company was seeking repayment of the balance.

179.    In addition, and as set forth in the December Report, "relocation loans outstanding

at the segment level units [rather than the corporate level] reviewed as of June 30, 2002, totaled

$3.8 million," and "of the total $3.8 million loans outstanding, about $3.2 million appear not to

have conformed to applicable policies and guidelines, although some had legitimate business

justification."

## 2.    The "TyCom Bonus" Misappropriation

180.    The September Report also admits that in September 2000, Defendant Kozlowski

"caused Tyco to pay a special, unapproved bonus to 51 employees who had relocation loans with

the Company." (The list is set forth as an exhibit to Tyco's civil complaint against Defendant

Kozlowski.) According to the report, "[t]he bonus was calculated to forgive the relocation loans

of all 51 employees, at a total cost of $56,415,037, and to pay compensation sufficient to

discharge all of the tax liability due as a result of the forgiveness of those loans." The September

Report explains that "[t]his action was purportedly related to the successful completion of the

TyCom Initial Public Offering." The September Report concludes that the "total gross wages paid by the Company in this loan forgiveness program were $95,962,000, of which amount Mr. Kozlowski received $32,976,000 and Mr. Swartz $16,611,000."

181.    Listed below are key managers of Tyco — other than Defendants Kozlowski and Swartz — who received unauthorized loan forgiveness and "gross-up" bonuses pursuant to the September 2000 program that, according to the September Report, was "conceived and implemented by Mr. Kozlowski":

| NAME | LOAN BALANCES | GROSSED UP |
|------|--------------|------------|
| Jerry Boggess | $ 5,000,000 | $ 8,481,764 |
| Irving Gutin | $ 3,109,971 | $ 5,275,608 |
| Jeffrey Mattfolk | $ 825,000 | $ 1,399,491 |
| Brad McGee | $ 1,942,026 | $ 3,294,361 |
| Patricia Prue | $ 748,309 | $ 1,269,396 |
| Michael Robinson | $ 1,063,355 | $ 1,803,826 |
| Scott Stevenson | $ 845,869 | $ 1,434,893 |
| **Total** | **$ 13,534,523** | **$ 22,959,338** |

182.    In sum, the September Report concludes that:

> the program was discriminatory in scope, terms or operation in favor of executive officers. First, forgiveness was offered to some people who never moved, some people at the operating division level who were never part of the corporate relocation to Florida and people who did not even have a Tyco mortgage. Second, forgiveness was never offered to those who were originally eligible for relocation, yet declined to move. In short, forgiveness was never part of the Florida relocation program, but rather was an extra-program benefit. Regardless of advice that may have been offered relating to the disclosure requirements for nondiscriminatory relocation benefits, the forgiveness benefit was not applied in a nondiscriminatory fashion as part of a nondiscriminatory program and, therefore, should not have qualified for nondisclosure.

183.     All of the forgiveness benefits were individually reported on separate W-2s, yet Tyco admits in its September Report that "none of the income associated with the forgiveness benefits was reported in the Company's proxies for [Defendants Kozlowski and Swartz] in the year 2000."

### 3.     The "ADT Automotive Bonus" Misappropriations

184.     The September Report also states that Defendant Kozlowski introduced a second bonus program only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability.  According to the September Report, "Mr. Kozlowski sent a letter to 16 of the Company's executive officers and key managers [on November 13, 2000] thanking them for their many contributions towards the successful divestiture of Tyco's ADT Automotive business and enclosing bonuses and 'relocation' payments."  The report states that "[e]ach of the intended recipients of the purported relocation benefits had already recovered all of the grossed-up costs associated with their recent relocations as part of the near-$100 million unauthorized forgiveness program just completed."  The report also states that "[t]he total of the additional ADT Automotive cash bonus and 'relocation' benefits were $3,979,000 and $32,009,641, respectively."

185.     According to the September Report, Defendant Kozlowski's letter "noted that information regarding the vested shares had already been previously communicated and that the amounts listed were reviewed and approved by the Chairman of Tyco's Compensation Committee."  The report states that "[t]he total number of shares awarded was 261,500 with a then market value of $14,804,038."

186.     Thus, the September Report concludes that "the total benefits awarded at the time of the ADT Automotive divestiture were, and total cost [to] the Company was, approximately $55,954,455."  The distribution of this benefit is summarized in the Company's September

Report as follows:

| EMPLOYEES | CASH BONUS | VALUE OF RESTRICTED SHARES | "RELOCATION" BENEFITS | TOTAL |
|---|---|---|---|---|
| Kozlowski | $700,000.00 | $8,378,576.00 | $16,488,034.00 | $25,566,610.00 |
| Swartz | $350,000.00 | $4,189,288.00 | $8,305,344.00 | $12,844,632.00 |
| Foley | $100,000.00 | $113,224.00 | $422,180.00 | $635,404.00 |
| Gutin | $500,000.00 | | $2,637,804.00 | $3,137,804.00 |
| Mattfolk | $312,500.00 | $424,590.00 | $699,746.00 | $1,436,836.00 |
| McGee | $500,000.00 | $424,590.00 | $1,647,181.00 | $2,572,771.00 |
| Prue | $312,500.00 | $424,590.00 | | $737,090.00 |
| Robinson | $312,500.00 | $424,590.00 | $901,913.00 | $1,639,003.00 |
| Stevenson | $312,500.00 | $424,590.00 | $717,447.00 | $1,454,537.00 |
| Other Employees | $579,000.00 | $424,590.00 | $189,992.00 | $768,992.00 |
| **Total** | **$3,979,000.00** | **$14,804,038.00** | **$32,009,641.00** | **$50,792,679.00** |

187.    In sum, the Company has admitted in its September Report that "in November 2000, Mr. Kozlowski authorized Tyco to pay cash, award property and restricted shares of Tyco common stock, and purportedly forgive the same relocation loans (and make related tax payments) to those Tyco officers and employees - - notwithstanding that the relocation loans of each of these persons had already been paid in full as a result of the September 2000 misappropriation described above."

**4.    Key Employee Loan Program**

188.    Tyco's Key Employee Loan Program ("KEL Program") was intended to encourage ownership of Tyco common shares by executive officers and other key employees. The KEL Program was intended to provide loans ("KEL loans") on favorable terms to Tyco officers to enable them to pay taxes due upon the vesting of shares granted under Tyco's restricted share ownership plan without having to sell the shares at the time of vesting to pay the

resultant tax liability.

189.	According to the September Report, during the fiscal years from 1997 to 2002, "certain executive officers used KEL loans for purposes other than the payment of taxes due upon the vesting of restricted shares, borrowed more than the limits allowed under the program's terms, or both."

### a.	L. Dennis Kozlowski

190.	According to the Company's September Report, throughout the Relevant Period Defendant Kozlowski improperly "borrowed funds for purposes other than those stated in the KEL program and used the KEL program like an unlimited line of credit. In addition to taking non-program loans, Kozlowski borrowed in excess of the KEL program's limits."

191.	According to the September Report, Defendant Kozlowski's "non-program KEL borrowing principally occurred in 1999 and afterwards" The September Report stated:

> As of August 1998, Mr. Kozlowski's total KEL account balance was $132,310. By August 1999, Mr. Kozlowski's outstanding balance had increased to over $55.9 million. By the end of 2001, Mr. Kozlowski had taken over 200 KEL loans — some for millions of dollars, and some as small as $100. Mr. Kozlowski used these loans to purchase, develop and speculate in real estate; to fund investments in various business ventures and partnerships (including private ventures in which both he and Mr. Swartz used Tyco KEL loans to invest); and for miscellaneous personal uses having nothing to do with any taxes due on the vesting of his shares of Tyco stock.

192.	According to Tyco records cited in the September Report, "approximately 90% of Mr. Kozlowski's KEL loans were non-program loans, which he used to fund his personal lifestyle, including speculating in real estate, acquisition of antiques and furnishings for his properties (including properties purchased with unauthorized 'relocation loans'), and the purchase and maintenance of his yacht."

193.	The September Report sets forth some of Defendant Kozlowski's KEL loans,

including the journal entries used to describe the purpose for which the money was used and the resulting total loan balance (including both authorized program uses and non-authorized non-program loans). Balances after the date of August 31, 1999 reflect the effect of a $25 million unauthorized credit that has been reversed by Tyco and all balances thereafter should be adjusted accordingly. *See* Exhibit D.

194. The September Report also concludes that Defendant Kozlowski "generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested (or shortly thereafter — thus violating both the spirit and the letter of the KEL program)."

195. Defendant Kozlowski was indicted on September 12, 2002 for using the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco. The September Report states that Defendant Kozlowski's "total principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of June 30, 2002, was approximately $43,841,000, plus accrued interest."

### b. Mark H. Swartz

196. As Tyco's Chief Financial Officer, Defendant Swartz was responsible for approving and monitoring the KEL loans of senior management, including Defendant Kozlowski's KEL loans. As such, the September Report admits that "he was aware of the nature and extent of Mr. Kozlowski's loans." As a Tyco director, the report states that Defendant Swartz was also "responsible for reporting any issues relating to those loans to the Compensation Committee."

197. The Company admitted in its September Report that:

> Mr. Swartz, like Mr. Kozlowski, borrowed millions in non-program loans. Like Mr. Kozlowski, Mr. Swartz used those unauthorized loans to purchase, develop and speculate in real

estate; to fund investments in various business ventures and partnerships (including private ventures in which both he and Mr. Kozlowski used Tyco KEL loans to invest); and for miscellaneous personal uses having nothing to do with the ownership of Tyco stock.

198.    The Company's September Report sets forth some of Defendant Swartz's KEL loans, including the journal entries used to describe the purpose for which the money was used and the resulting total loan balance (including both authorized program uses and non-authorized non-program loans).   Balances after the date of August 31, 1999, reflect the effect of a $12.5 million unauthorized credit that has been reversed by Tyco and all balances thereafter should be adjusted accordingly.  *See* Exhibit E.

199.    The September Report concludes that, like Kozlowski, "Mr. Swartz also generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested or shortly thereafter - - thus violating both the spirit and the letter of the KEL program."  As explained above, Defendant Swartz was indicted on September 12, 2002 for conspiring with Defendant Kozlowski to use the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco.  The September Report states that Defendant Swartz's "total principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of July 18, 2002, was approximately $2,853,025, plus accrued interest."

### 5.    Attempted Unauthorized Credits to Key Employee Loan Accounts

200.    The September Report admits that in August 1999, at the direction of Defendants Kozlowski and Swartz, "entries were made in Tyco's KEL records that purported to reduce $25,000,000 of Mr. Kozlowski's outstanding KEL indebtedness, $12,500,000 of Mr. Swartz's KEL indebtedness, and $1,000,000 of the KEL indebtedness of another employee."  According to the Company, "[t]his was done without the knowledge or approval of the Compensation

Committee"

201.     As set forth in the September Report, "Mr. Kozlowski, through his attorneys, has acknowledged to Tyco that he sought no approvals for these credits and that, if they were entered as a credit to his KEL account, it was done so improperly."  The September Report also states that "Mr. Swartz was advised that the credit was unauthorized and has also agreed to repay his forgiven indebtedness with interest."  Thus, Tyco has stated that it has "reversed these unauthorized entries, after notice to investigating authorities."

### 6.     Self-Dealing Transactions and Other Misuses of Corporate Trust

202.     The Company has also admitted to numerous other examples of self-dealing and flagrant abuses of corporate trust.  These include, but are not limited to, the following:

### a.     Kozlowski Evidence Tampering

203.     The September Report admits that from at least 1997 through the time of his departure in 2002, "Mr. Kozlowski has systematically abused his position and caused Tyco to expend funds for his personal benefit."  For example, the September Report states that "after his violation of the sales tax rules led to the service of a subpoena on the Company, [Kozlowski] caused Tyco not to comply with a subpoena.  Concerned only with protecting his wrongdoing from discovery, he tampered with evidence subject to a subpoena, and risked exposing the Company to an obstruction of justice claim."

### b.     Kozlowski Fraudulent New York Home Purchase

204.     According to the Company's September Report, a Tyco subsidiary purchased a cooperative apartment in New York City in November 1998 for $5,547,248 "[u]pon Mr. Kozlowski's instructions," and made subsequent improvements to it.  The September Report admits that "Mr. Kozlowski purchased this property from the Tyco subsidiary in May 2000 at the depreciated book value of $7,011,669, rather than its then current market value."

### c.  Concealed, Fraudulent Overpayment to Kozlowski for New Hampshire Property

205.    The September Report also admits that Defendant Kozlowski and others caused a Tyco subsidiary to purchase property in Rye, New Hampshire from Kozlowski on July 6, 2000 for approximately $4,500,000.  After an appraisal in March 2002 valued the property at $1,500,000, the September Report states that "Tyco wrote down the carrying value of the property to the appraised value and charged Mr. Kozlowski's $3,049,576 overpayment to expense."

### d.  Kozlowski Non-Legitimate Business Expenses

206.    The Company's September Report also admits that Defendant Kozlowski "used millions of dollars of Company funds to pay for his other personal interests and activities" prior to and during the Relevant Period, "including a $700,000 investment in the film 'Endurance'; more than $1 million for an extravagant birthday party celebration for his wife in Sardinia; over $1 million in undocumented business expenses, including a private venture called West Indies Management ($134,113); jewelry ($72,042); clothing ($155,067); flowers ($96,943); club membership dues ($60,427); wine ($52,334); and an undocumented $110,000 charge for the purported corporate use of Mr. Kozlowski's personal yacht, 'Endeavour.'"

### e.  Kozlowski Charitable Contributions for Personal Benefit

207.    Also prior to and throughout the Relevant Period, as set forth in the Company's September Report, Defendant Kozlowski:

> caused Tyco to make donations or pledges to charitable
> organizations totaling -- over $106 million.  Of this total, at least
> $43 million in donations were represented in transmittal letters or
> otherwise as Mr. Kozlowski's personal donations, or were made
> using the Company's funds for Mr. Kozlowski's personal benefit.
> Mr. Kozlowski's letters accompanying these donations or pledges
> often indicated that they were made "on behalf of L. Dennis
> Kozlowski," such as a 1997 pledge to Seton Hall University that

enclosed a $1 million Tyco check with a letter signed by Mr. Kozlowski that referred to "my pledge to Seton Hall University." Mr. Kozlowski made two other million-dollar pledges to schools under his own name but using Tyco funds, and made several other pledges that were publicly announced as being from Mr. Kozlowski, or in which a facility was named after him or his family, even though he had used Tyco's money to make the pledge.

208.    In addition, Defendant Kozlowski donated $4 million to Cambridge University to study corporate governance, falsely claiming that half the contribution was being made from his personal funds, whereas in fact all the money had been appropriated from Tyco.  According to the November 6, 2002 edition of *The Daily Telegraph*:

> Even the producers of The Office [a British television sitcom] would be hard-pressed to invent a script quite as whacky as a chair of Corporate Governance donated to Cambridge University by Tyco International.
>
> Mr. Kozlowski claimed the glory for endowing the chair with $4m, but it seems that half of it came from the Tyco shareholders.  In practice, it all came from their pockets, since he seemed to have some difficulty in distinguishing between what was his, and what belonged to the company . . .

209.    According to the September Report:

> [m]ost egregiously, in 2001 Mr. Kozlowski donated to the Nantucket Conservation Foundation, Inc. a total of $1,300,000 in Company money.  The donation was used partially to purchase 60 acres of property called "Squam Swamp" adjacent to Mr. Kozlowski's own Nantucket estate on Squam Road.  The effect of this gift was to preclude future development of the land and thereby increase the value of Mr. Kozlowski's home.

### f.    Walsh Payment

210.    In early 2001, according to the Company's September Report, Frank E. Walsh, Jr., Tyco's Lead Director and the former Chairman of its Compensation Committee, recommended to the Board that Tyco acquire a financial services company, and later proposed that he introduce Kozlowski to the Chairman and CEO of The CIT Group, a large financial

services company.  The report states:

> Subsequent negotiations led to an agreement for Tyco to acquire CIT, which closed in June 2001.  After the terms of the CIT transaction had been agreed to, Mr. Kozlowski caused Tyco to pay to and for the benefit of Mr. Walsh a $20 million fee for his role in the transaction.
>
> Mr. Kozlowski told Mr. Walsh, and Mr. Walsh agreed, that they should conceal this payment from the Board.

211.    On June 17, 2002, Tyco filed suit against Walsh for breaching his fiduciary obligations by arranging an unauthorized $20 million "finder's fee" from Tyco for himself in connection with the Company's 2001 acquisition of CIT, hiding it from his fellow directors and, when confronted by the Board, refusing to return it.

212.    According to the Walsh Complaint, the day after the fee was disclosed in the Company's proxy statement, Tyco's stock dropped sharply, resulting in an almost $17 billion decline in the Company's market capitalization in a single day.  As stated by Tyco in the Walsh Complaint:

> On January 28, 2002, Tyco filed its proxy statement for its upcoming annual general meeting with the Securities and Exchange Commission, and the contents of that proxy, including the disclosure of the payments to Walsh, became public. Following this disclosure, which was immediately picked up and publicized in the national financial press, the share price of Tyco's stock fell from $42 to $33.65, reducing the Company's market capitalization by $16.7 billion, in one day.

213.    Tyco said in a June 17, 2002 press release:

> We are taking this action because Frank Walsh violated his fiduciary duties as a Tyco director and put his personal gain ahead of the interests of the company and its shareholders.  Mr. Walsh engaged in a pattern of self-dealing and unethical conduct.  He had a clear and unambiguous disclosure obligation to the Board that he chose not to honor.  We will pursue this matter aggressively so that Mr. Walsh is held accountable for the damage done to Tyco and its shareholders.  The company is also continuing its investigation of Dennis Kozlowski's conduct and will pursue whatever remedies

are appropriate based on the results of that investigation.

### g.    Swartz Breach of Nominee Agreement

214.    According to the September Report, Defendant Swartz lived in a Tyco-owned apartment at 30 E. 85th Street, New York since April 2000.  On May 6, 2002, he caused the Company to enter a notation in its books and records purporting to transfer title to that apartment, including fixtures and furniture, to himself at its depreciated book value of $9,646,975, which Swartz paid in cash.  No appraisal was performed in connection with this transfer.  On July 18, 2002, Defendant Swartz agreed to reverse that transaction.  The Company stated in its report that Swartz's KEL, account has been credited $9,646,975 to reflect this reversal.

### h.    Swartz Personal Expense Reimbursement

215.    The Company admitted in its September Report that Defendant Swartz caused Tyco to pay him a reimbursement of $1.2 million on March 1, 2002 to cover lost deposits on personal real estate transactions involving apartments in Trump Tower on Fifth Avenue in New York.

### i.    Compensation Committee Deceptions

216.    On June 22, 2001, Tyco acquired 15 million shares of Flag, a telecom company for $11,421,810 cash and 5,580,647 TyCom shares.  The Company reported a $79,364,700 gain associated with the swap of TyCom shares for the Flag equity.  As a result of the gain, purportedly as another bonus, accelerated vestings of restricted shares were made to various key individuals.[13]  Each of the executives involved in the grant of restricted shares sold the shares back to the Company's Newington subsidiary on June 20, 2001 and received wire transfers to

---

[13]  For example, defendant Kozlowski received 155,000 shares with a vesting value of $8,219,650 and defendant Swartz received 77,500 shares with a vesting value of $4,109,825.

their personal accounts in the amounts indicated in the note below, justified on the basis that the transaction resulted in a $79 million gain to TyCom. The Compensation Committee approved and certified the vesting of 290,000 shares for Defendants Kozlowski and Swartz only on October 1, 2001 "in conjunction with the gain" on the Flag transaction. The total cost to the Company related to the award of these shares was $15,378,700. However, by the end of the quarter (September 30, 2001) and prior to the October 1, 2001 certification by the Compensation Committee, the value of the Flag stock decreased substantially, to the point that it was impaired, thus undermining the basis on which the special bonus vesting was approved. The Company admitted in its September Report that neither Defendants Kozlowski nor Swartz, who were both members of the Board of Directors during this time period, ever disclosed this impairment or the full circumstances of the Flag transaction to the Compensation Committee. Their entitlement to these bonuses was predicated upon a failure to disclose relevant facts for their own personal benefit. Other examples of self-dealing and serious breaches of fiduciary duties owed to Tyco by Defendant Kozlowski, in particular his deceptions to the Compensation Committee resulting in the accelerated vesting of his own and other executives' shares of restricted stock and his entitlement to executive benefits, are the subject of litigation in Tyco's civil suit against Kozlowski and are farther detailed in that complaint.

### j. Other Undisclosed Transactions Between Tyco and Its Directors

217. Following the Tyco/ADT merger in 1997, Lord Ashcroft KCMG, a Tyco director and the former Chief Executive Officer of ADT, offered for sale his residential property in Boca Raton, Florida. According to news reports, on October 27, 1997, Ashcroft sold his Royal Palm Yacht and Country Club home to his wife for $100. On the same day, she sold it to Byron Kalogerou, who was then Tyco's vice-president and general counsel, for $2.5 million. According to a June 10, 2002 article in *The Wall Street Journal*, the house was purchased with

Tyco funds, without input from the Tyco Board, and placed in Kalogerou's name. According to the article, Kalogerou did not use the home — Kozlowski did.

### 7. Kozlowski and Swartz Engage in Short Swing Trading

218. According to a complaint filed by Tyco against both Kozlowski and Swartz in December 2002, between August 1, 2000 and January 30, 2002, while Kozlowski served as a director and Chief Executive Officer of Tyco, he bought and sold a number of Tyco equity securities within a six-month period in violation of 15 U.S.C. § 78p(b). Tyco's complaint also alleges that between August 1, 2000 and April 26, 2002, while Swartz served as an executive vice president and Chief Financial Officer of Tyco, he bought and sold a number of Tyco equity securities within a six-month period in violation of 15 U.S.C. § 78p(b). Tyco estimates Kozlowski and Swartz's profits from these short swing trades exceed $40 million.

## VI. THE DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

### A. Materially False and Misleading Statements Throughout the Relevant Period That Acquisitions Will Be Immediately "Positive" or "Accretive"

219. Throughout the Relevant Period, in a series of press releases, the Tyco Defendants repeatedly touted the "positive" or "accretive" impact of its disclosed acquisitions on the Company's free cash flow and earnings. As the Tyco Defendants either knew or were reckless in not knowing, each of these statements when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

220. For example, on May 7, 2000, Tyco announced its acquisition of the Thomas & Betts Electronic OEM Business. The press release headline stated that the acquisition would be immediately accretive to earnings. According to the press release:

> "This acquisition offers significant cost saving opportunities through manufacturing synergies, rationalization of R&D and efficiencies through combined product marketing, distribution and

purchasing," Mr. Kozlowski stated.  Mr. Kozlowski also noted that the addition of this business would provide an immediate positive contribution to Tyco's earnings.

"Our previous acquisitions in Tyco Electronics have achieved strong top line growth and exceeded cost reduction targets.  We expect that the acquisition of the Electronic OEM Business of Thomas & Betts will also provide positive benefits to Tyco shareholders," Mr. Kozlowski concluded.

221.    On June 28, 2000, Tyco announced the acquisition of Mallinckrodt.  The Company's press release stated:

Acquisition Will Have Immediate Positive Impact on Earnings; Strengthens Tyco Healthcare's Leading Positions in Medical Devices

\* \* \*

"The Mallinckrodt acquisition will be immediately accretive to Tyco's earnings," Mr. Kozlowski stated.  "It offers consolidation opportunities as well as significant manufacturing, purchasing and distribution synergies.  Our past acquisitions in Tyco Healthcare have achieved strong top line growth and operating efficiencies. We expect that the acquisition of Mallinckrodt also will provide ongoing positive benefits to Tyco shareholders.

222.    On October 17, 2000, Tyco announced the completion of the Mallinckrodt purchase.  According to the Company's press release:

"The Mailinckrodt acquisition will be immediately accretive to Tyco's earnings," according to L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer.  "It offers consolidation opportunities as well as significant manufacturing, purchasing and distribution synergies.  Our past acquisitions in Tyco Healthcare have achieved strong top line growth and operating efficiencies. The acquisition of Mallinckrodt also will provide ongoing positive benefits to Tyco shareholders.

223.    On November 13, 2000, Tyco announced that it had agreed to acquire Lucent's Power Systems Business.  As set forth in the Company's press release:

Acquisition Provides Excellent Strategic Fit for Tyco Electronics and TyCom, Will be Immediately Accretive to earnings. . . . Tyco

International Ltd. …, today announced that it has agreed to acquire Lucent Technologies' Power Systems business unit ("LPS") from Lucent Technologies Inc. (NYSE: LU) for $2.5 billion in cash. . . .

According to L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco international Ltd., "We expect that the acquisition of LPS, like previous acquisitions, will be immediately accretive to Tyco's earnings. Previous acquisitions in Tyco Electronics continue to achieve strong top line growth and exceed cost reduction targets."

224. On December 4, 2000, Tyco announced that it would acquire Simplex Time Recorder Co. According to the Company's press release:

According to L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer, "This transaction meets all of Tyco's acquisition criteria. The transaction will be immediately accretive to Tyco's earnings per share and generate positive operating cash flows. In addition, Simplex is a leader in the markets it serves, provides a strong recurring revenue stream and is an excellent complement to Tyco's existing Fire and Security Services product offering, capabilities and geographic reach. The combination of Simplex with Tyco Fire and Security Services will provide excellent manufacturing and service synergies, allowing for immediate positive benefits for Tyco shareholders."

225. On December 29, 2000, Tyco announced that it had completed its acquisition of Lucent's Power Systems Business. According to the press release:

According to L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco International Ltd., "This business is an excellent fit for Tyco Electronics. We expect that the acquisition of LPS will be immediately accretive to Tyco's earnings. Previous acquisitions in Tyco Electronics continue to achieve strong top line growth and exceed expected earnings targets."

226. On February 5, 2001, Tyco announced that it would acquire Scott Technologies. The press release stated:

Acquisition Will Have Immediate Positive Impact on Tyco's Earnings . . .

According to L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer, "This transaction will be immediately accretive

to Tyco's earnings per share and will generate positive operating cash flows. Scott Technologies, which is a leader in its markets, will add significant recurring revenue to Tyco Fire & Security Services. Scott's equipment is sold to many customers of the Tyco Fire & Security Services group, providing complementary products through a common distribution channel."

227. On March 28, 2001, Tyco issued a press release announcing that it had been named the "number one performing company of 2000 by *BusinessWeek* magazine." According to the press release:

Tyco is the top performer based on its revenue growth, earnings growth, return to shareholders, profit margins and return on equity, tallied for both one year and three years. . . . L. Dennis Kozlowski, Chairman and CEO of Tyco, commented, "Tyco is delighted to receive this recognition from *BusinessWeek*. Tyco's 'growth on growth' strategy has been designed to deliver ongoing solid, sustainable organic growth coupled with growth through acquisitions. Our strategy has positioned Tyco as the leader in our markets and as the high-quality, low-cost producer in the industries in which we operate.". . . In addition, Tyco has made and integrated more than 118 acquisitions, all of them accretive to shareholders.

228. On May 3, 2001, Tyco announced the completion of the acquisition of Scott Technologies. As set forth in the press release:

According to L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer, "This acquisition will be immediately accretive to Tyco's earnings per share and will generate positive operating cash flows. Scott Technologies, which is a leader in its markets, will add significant recurring revenue to Tyco Fire & Security Services.

229. On May 17, 2001, Tyco announced the acquisition of SecurityLink. As stated in the Company press release:

Tyco International Ltd. to Acquire SecurityLink and Other Businesses Of Cambridge Protection Industries L.L.C.; Acquisition Will Have Immediate Positive Impact on Tyco's Earnings . . .

Also, as with our existing ADT operations, we expect this business

85

to generate healthy organic growth with attractive incremental margins. Cooling at the near-term, we expect the transaction will be immediately accretive to Tyco's earnings per share and free cash flow per share. The integration of the Cambridge businesses with ADT will provide product, service and operational synergies, which will result in ongoing positive benefits to Tyco shareholders."

230.    On May 30, 2001, Tyco announced the acquisition of C. R. Bard. As stated in the

Company press release:

Tyco International to Acquire C. R. Bard; Provides New Product Platforms For International Growth Of Tyco Healthcare's Medical Devices Business; Acquisition Will Be Immediately Accretive to Tyco Earnings and Cash Flow. . .

Mr. Kozlowski added: "Bard also offers substantial cost synergies through leveraging administrative costs as well as gaining efficiencies in manufacturing, distribution and purchasing. The transaction will be immediately accretive to Tyco's earnings and free cash flow per share. The acquisition will provide ongoing benefit to our customers and shareholders."

231.    On July 5, 2001, Tyco announced the completion of the SecurityLink acquisition.

According to the Company's press release:

Tyco International Ltd. Completes Purchase Of SecurityLink and Other Businesses of Cambridge Protection Industries LLC; Acquisition Expected To Be Immediately Accretive to Tyco's Earnings

According to Tyco's Chairman and Chief Executive Officer L. Dennis Kozlowski: "We expect this transaction will be immediately accretive to Tyco's earnings per share and free cash flow."

232.    On August 3, 2001, Tyco announced another acquisition:

Tyco International to Acquire Sensormatic; Provides Comprehensive Range of New Products and Services Within Tyco Fire & Security; Acquisition will be Immediately Accretive to Tyco Cash Flow and Earnings

According to Mr. Kozlowski: "This transaction will provide excellent, ongoing value to our customers and shareholders. It will

be immediately accretive to Tyco's earnings and free cash flow per
share.  We see significant cost savings and synergistic
opportunities in the areas of sales, administration, manufacturing
and distribution."

233.    On December 3, 2001, Tyco announced the acquisition of Paragon Trade Brands.

In the Company press release headline Tyco stated, "Acquisition Will Be Immediately Accretive

to Tyco Earnings and Cash Flow."

234.    On December 20, 2001, Tyco announced the acquisition of McGrath RentCorp.

According to the Company's press release:

Tyco International to Acquire McGrath RentCorp; Acquisition
Expands Tyco Capital's Product Portfolio and Recurring Revenue
Base; Immediately Accretive to Tyco Earnings and Cash Flow

According to L. Dennis Kozlowski . . .  "As is the case with all
Tyco acquisitions, the transaction will be immediately accretive to
both Tyco's earnings and cash flow."

## B.    1999 Materially False and Misleading Statements and Omissions

235.    Even before the Relevant Period began on December 13, 1999, when the Tyco

Defendants filed the Company's Form 10-K for the fiscal year-ended September 30, 1999, the

SEC had begun a nonpublic, informal inquiry relating to charges and reserves taken in

connection with the Company's acquisitions.  In a press release dated December 9, 1999, only

four days before the start of the Relevant Period, the Tyco Defendants denied any impropriety,

quoting Defendant Kozlowski:  "we welcome the opportunity to respond to [the SEC's] request.

We remain confident of our accounting methodology, our public disclosures and the continuing

strength of our business"[14]  This statement was materially false and misleading for the reasons

specified above in Section(s) V.A, A.1.a, A.1.c, and A.3.  It remained uncorrected through the

ensuing Relevant Period, and was reinforced throughout the Relevant Period by other similar

_____

[14]  The press release was subsequently filed with the SEC on December 9, 1999 in a Form 8-K,
signed by defendant Swartz.

statements by the Tyco Defendants falsely denying the scheme of accounting manipulation in which they were continuously engaged throughout the Relevant Period.

236.     The price of Tyco stock closed at $28.25 on December 9, 1999, the first day of the Relevant Period.

### 1.     The 1999 10-K Filed on December 13, 1999

237.     On December 13, 1999, the first day of the Relevant Period, the Tyco Defendants filed Tyco's 10-K for the fiscal year-ended September 30, 1999 (the "1999 10-K"), signed by Defendants Swartz and Kozlowski.  In it, the Tyco Defendants set out numerous statements that were materially false and misleading and that omitted material information, as evidenced by (among other things) the Tyco Defendants' restatement of its operating results in a June 26, 2000 10-K/A for fiscal year-ended September 30, 1999 (discussed below).  These false and misleading statements addressed a variety of topics, including the following:

### a.     Tyco's "Strategy"

238.     The 1999 10-K purports to set forth Tyco's "strategy," which the Tyco Defendants later repeated verbatim in filings with the SEC throughout the Relevant Period. According to the 1999 10-K:

> Tyco's strategy is to be the low-cost, high quality producer and provider in each of its markets.  It promotes its leadership position by investing in existing businesses, developing new markets and acquiring complementary businesses and products.  Combining the strengths of its existing operations and its business acquisitions, Tyco seeks to enhance shareholder value through increased earnings per share and strong cash flows.

As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### b.      Tyco's Manipulation of Purchase Accounting Reserves

239.    The 1999 10-K sets forth statements that were materially false and misleading

concerning Tyco's manipulation of purchase accounting reserves:

> In Fiscal 1999, the Company made acquisitions that were
> accounted for under the purchase accounting method at an
> aggregate cost of $6,923.3 million.  Of this amount, $4,546.8
> million was paid in cash (net of cash acquired), $1,449.6 million
> was paid in the form of Tyco common shares, and the Company
> assumed $926.9 million in debt.  In connection with these
> acquisitions, the Company established purchase accounting
> reserves of $525.4 million for transaction and integration costs.  At
> the beginning of Fiscal 1999, purchase accounting reserves were
> $505.6 million as a result of purchase accounting transactions
> made in prior years.  During Fiscal 1999, the Company paid out
> $354.4 million in cash and incurred $16.3 million in non-cash
> charges against the reserves established during and prior to Fiscal
> 1999.  Also in Fiscal 1999, the Company determined that $90.0
> million of purchase accounting reserves related to acquisitions
> prior to Fiscal 1999 were not needed and reversed that amount
> against goodwill.  At September 30, 1999, there remained $570.3
> million in purchase accounting reserves on the Company's
> Consolidated Balance sheet, of which $408.0 is included in current
> liabilities and $162.3 million is included in long-term liabilities.
> The Company expects to pay out approximately $350.0 million in
> cash in Fiscal 2000 that will be charged against the purchase
> accounting reserves.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.l.a, and A.1.c.

240.    The 1999 10-K also provides information about specific acquisitions, including

Tyco's merger with AMP Inc. ("AMP") and U.S. Surgical Corp. ("US Surgical') in "pooling of

interests" transactions, but fails to acknowledge either the Tyco Defendants' practice of

aggressive accounting (through the manipulation of accounting reserves, *inter alia*) or their

practice of incentivizing executives at acquiree companies to manipulate the acquiree's financial

reporting before the acquisition to create the false appearance of superior earnings for Tyco after

the acquisition. According to the 1999 10-K:

> In Fiscal 1999, the Company consummated two mergers that were accounted for under the pooling of interests method of accounting. The merger with United States Surgical Corporation closed on October 1, 1998, and the merger with AMP Incorporated closed on April 2, 1999. As required by generally accepted accounting principles, the Company restated its financial statements as if USSC and AMP had always been a part of the Company. The Company recorded as expenses during Fiscal 1999 costs directly associated with the USSC and AMP mergers and the costs of terminating employees and closing or consolidating facilities as a result of the mergers. The Company also expensed in Fiscal 1999 the costs of staff reductions and facility closings that AMP undertook as part of a plan to improve its profitability unrelated to the Company's merger with AMP. In Fiscal 1998, the Company expensed charges for staff reductions and facility closings under the AMP profit improvement plan and charges that USSC incurred to exit certain of its businesses. These are discussed in more detail under "Liquidity and Capital Resources" below.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

241. As the December Report states in the case of AMP: "the recorded quarterly results for AMP show a decline in profits prior to the acquisition by Tyco and an increase in profits following the acquisition." Similarly, the December Report says of US Surgical: "Surgical's reported results also declined during the quarter immediately prior to the merger, as compared with quarters prior to and after the consummation of the merger."

### c.    Tyco's Operating Results

242. The 1999 10-K also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, the Tyco Defendants provide the following summary information:

|  | FISCAL 1999 | FISCAL 1998 | (UNAUDITED) TWELVE MONTHS ENDED SEPTEMBER 30, 1997 |
|---|---|---|---|
|  | (IN MILLIONS) | | |
| Pre-tax income before extraordinary items and cumulative effect of accounting changes | 1,651.2 | 1,702.8 | 79.0 |
| Income taxes | (620.2) | (534.2) | (379.5) |
| Income (loss) before extraordinary items and cumulative effect of accounting changes | 1,031.0 | 1,168.6 | (300.5) |
| Extraordinary items, net of taxes | (45.7) | (2.4) | (60.9) |
| Cumulative effect of accounting changes, net of taxes | -- | -- | 15.5 |
| Net Income (loss) | $985.3 | $1,166.2 | $(345.9) |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

243. In addition, these operating statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to "organic growth" and "synergies" resulting from Tyco's acquisitions. According to the 1999 10-K:

> Operating profits improved in all segments in each of Fiscal 1999 and Fiscal 1998, with the exception of the Healthcare and Specialty Products segment in Fiscal 1998 for reasons that are discussed below. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.

Similarly, regarding the AMP and US Surgical mergers, the 1999 10-K states: "[b]y integrating merged companies with the Company's existing businesses, the Company expects to realize operating synergies and long-term cost savings." And concerning profits in Tyco's electrical business, Defendant states:

> The 40.5% increase in operating profits in Fiscal 1999 compared

with Fiscal 1998 was due to improved margins at AMP, the acquisition of Raychem, and higher sales volume at TSSL and the Tyco Printed Circuit Group. The improved operating margins in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP's profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem. For information on the implementation of the AMP profit improvement plan and the cost reduction programs related to the AMP merger, see Note 16 (1999 Charges and 1998 Charges) to the Consolidated Financial Statements. These improvements were partially offset by $253.4 million of certain costs in Fiscal 1999 at AMP prior to the merger with Tyco, including costs to defend the AlliedSignal Inc. tender offer, the write-off of inventory and other balance sheet write-offs and adjustments.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

### d. Management Remuneration

244. The 1999 10-K addresses management remuneration only by reference, stating: "Information concerning management remuneration is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year." Because the 1999 10-K incorporates Tyco's Proxy Statement, filed on March 1, 2000, by reference, the 1999 10-K contains the same materially false and misleading statements set forth therein, as described below.

245. The 1999 10-K also gives limited information concerning loans taken by senior management under Tyco's KEL, which was instituted to encourage ownership of the Company's common stock by executives and other key employees. According to the 10-K: "During Fiscal 1999, the maximum amount outstanding under the program was $91.6 million." As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was

materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.1.b, B, and B.4.

246.     On December 14, 1999, J.P. Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, "Long Awaited 10K Provides Full Disclosure and Reinforces Accounting Confidence."  The report stated:

> Tyco's recently filed 10-K provides unprecedented disclosure and reinforces our confidence that the Company has not misrepresented its financial picture.

**2.        The 1999 10-K/A Filed on 1/28/00**

247.     On January 28, 2000, the Tyco Defendants filed Tyco's 10-K/A for the fiscal year-ended September 30, 1999 (the "1/28/00 10-K/A"), signed by Defendant Swartz.  The 1/28/00 10-K/A provides additional information about the remuneration of top management at Tyco.  For example, the Tyco Defendants submitted the following information concerning the compensation of Defendants Kozlowski and Swartz:

| Name & Principal Position | | | Annual Compensation(2) | | | Long-Term Compensation | | |
| | YEAR | SALARY | CASH BONUS (3) | STOCK BONUS (4) | RESTRICIED STOCK AWARD(S)(5) | SHARES UNDERLYING STOCK OPTIONS | LONG-TERM INCENTIVE PAYOUTS | ALL OTHER COMPENSATION (6) |
|---|---|---|---|---|---|---|---|---|
| L. DENNIS KOZLOWSKI | 1999 | $1,350,000 | $3,200,000 | | $25,707,178 | 6,621,834 | | $387,001 |
| CHAIRMAN & CHIEF | 1998 | 1,250,000 | 2,500,000 | | 20,140,000 | 3,832,000 | | 901,002 |
| EXECUTIVE OFFICER, TYCO INTERNATION LTD | 1997 | 1,250,000 | 2,544,260 | | | 6,600,000 | $6,508,125 | 108,125 |
| | * * * | | | | | | | |
| MARK H. SWARTZ | 1999 | 750,000 | 1,600,000 | | 12,029,641 | 2,976,480 | | 150,014 |
| EXECUTIVE VICE PRESIDENT | 1998 | 559,500 | 1,250,000 | | 10,070,000 | 2,764,666 | | 256,878 |
| AND CHIEF FINANCIAL OFFICER, TYCO INTERNATION LTD. | 1997 | 559,500 | 1,272,130 | | | 2,200,000 | 2,169,375 | 31,994 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.B, B.1.a-b, B.4.a-b, B.5, and B.6.[15]

248.    And the 1/28/00 10-K/A contains the following materially false and misleading

statement concerning Tyco's KEL program:

> At September 30, 1999, the amount of loans outstanding under the
> loan program totaled $18,569,137, of which $0 was loaned to Mr.
> Kozlowski . . . and $0 to Mr. Swartz.  The largest amount of
> indebtedness since October 1, 1998 incurred by each of the Named
> Officers was: $52,688,249 for Mr. Kozlowski . . . .

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made

were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) V.B, B.1.a-b, B.5, and B.6.

### 3.    The 1999 10-K/A Filed on 6/26/00

249.    On June 26, 2000, the Tyco Defendants filed another 10-K/A for the fiscal year-

ended September 30, 1999 (the "6/26/00 10-K/A"), signed by Defendant Swartz.  At the same

time, Tyco restated its operating results for the first two quarters of fiscal 2000 (as discussed

below).  The Tyco Defendants announced the restatement in a release issued over the PR

*NEWSWIRE* on June 26, 2000, which said that the restatement was in response to a "limited

review" of a single Tyco registration statement for a debt exchange offer filed in December

1999, and that the review included "those portions of Tyco's financial statements principally

relating to charges and reserves reported in connection with Tyco's acquisition activity."

250.    In the 6/26/00 10-K/A, the Tyco Defendants gave the following explanation for

the need to restate Tyco's operating results:

> The amendment to the financial statements is being filed to

---

[15]   On February 1, 2000, the Tyco Defendants filed a 10-K/A for the fiscal year ended
September 30, 1999 (the "2/1/00 10-K/A"), signed by defendant Swartz. The 2/1/00 10-K/A
simply corrects a formatting error in the chart above.  The corrected information from the 2/1/00
10-K/A, rather than the version in the 1999 10-K, is used in the chart as quoted.

reclassify certain charges and to adjust merger, restructuring and other non-recurring charges between periods due to the timing of the underlying events as follows:

- To reclassify $172.5 million of charges, incurred by AMP prior to its merger with Tyco, related to the write-off of goodwill and fixed assets of exited businesses in the Consolidated Statement of Operations out of the "merger, restructuring and other non-recurring charges'' line and into the "charge for the impairment of long-lived assets" line;

- To reclassify $27.5 million of inventory related restructuring costs in the Consolidated Statement of Operations out of the "merger, restructuring and other non-recurring charges" line and into the "cost of sales" line;

- To eliminate $26.0 million of merger, restructuring and other non-recurring charges which were originally recorded in fiscal 1999 related primarily to severance and facility closings and the subsequent reversal of such charge recorded as a credit to merger, restructuring and other non-recurring (credits) charges taken in the first quarter of fiscal 2000;

- To record a credit in fiscal 1999 for the reversal of $16.9 million of merger, restructuring and other non-recurring charges which were originally recorded in fiscal 1997 related primarily to facility closings and lease termination costs (this credit was previously recorded in the first quarter of fiscal 2000);

- To report certain non-recurring costs related to the integration of the USSC suture business originally recorded in the first quarter of fiscal 1999 as costs in later periods when such activity was completed (deferring $11.1 million of merger, restructuring and other non-recurring charges originally recorded in fiscal 1999 until fiscal 2000); and

- To update various disclosures primarily related to purchase accounting liabilities and merger, restructuring and other non-recurring charges.

251. Although Tyco's filing of an amended 10-K was in effect an admission that it had materially misstated its operating results during the Relevant Period, the Tyco Defendants attempted to downplay that admission by restating its results only minimally, by denying that there were any materially false statements in its previously filed 10-K, and by denying any

involvement in a scheme, later admitted in the December Report, to manipulate its acquisition accounting. This scheme, described in detail above in Section(s) V.A, A.1.a, and A.1.c, included the Tyco Defendants' practice of aggressive accounting (through the manipulation of accounting reserves, *inter alia*), and their practice of incentivizing executives at acquired companies to manipulate the acquired company's financial reporting before the acquisition to create the false appearance of superior earnings for Tyco after the acquisition.

252. The 6/26/00 10-K/A itself contains numerous materially false and misleading statements on a variety of topics, including the following:

### a. Tyco's Operating Results

253. The 6/26/00 10-K/A also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, the Tyco Defendants provide the following summary information:

|  | FISCAL 1999 | FISCAL 1998 | (UNAUDITED) TWELVE MONTHS ENDED SEPTEMBER 30, 1997 |
|---|---|---|---|
|  | | (IN MILLIONS) | |
| Pre-tax income before extraordinary items and cumulative effect of accounting changes | 1,705.2 | 1,702.8 | 79.0 |
| Income taxes | (637.5) | (534.2) | (379.5) |
| Income (loss) before extraordinary items and cumulative effect of accounting changes | 1,067.7 | 1,168.6 | (300.5) |
| Extraordinary items, net of taxes | (45.7) | (2.4) | (60.9) |
| Cumulative effect of accounting changes, net of taxes | -- | -- | 15.5 |
| Net income (loss) | $1,022.0 | $1,166.2 | $(345.9) |

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

254. In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), and instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income improved in all segments in each of Fiscal 1999 and Fiscal 1998, with the exception of the Healthcare and Specialty Products segment in Fiscal 1998 for reasons that are discussed below. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

**4.      12/21/99 S-8**

255. On December 21, 1999, the Tyco Defendants filed a Form S-8 for the registration of 10,000,000 shares of Tyco common stock (the "12/21/99 S-8"), signed by Defendants Swartz, Kozlowski, and Walsh. Because the 12/21/99 S-8 incorporates Tyco's 1999 10-K by reference, it contains the same materially false and misleading statements set forth in the 1999 10-K, as described above.

256. The 12/21/99 S-8 also sets forth the Consent of PwC, dated December 17, 1999, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above.

**5.      12/21/99 S-4 (and Related S-4/A and Prospectus)**

257. On December 21, 1999, the Tyco Defendants filed with the SEC a Form S-4 relating to Tyco's proposed offer to exchange up to $1,000,000,000 aggregate principal amount of new 6 7/8% notes due 2002 for any and all of its outstanding 6 7/8% notes due 2002 (the

"12/21/99 S-4"). The 12/21/99 S-4 was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 12/21/99 S-4 incorporates Tyco's 1999 10-K by reference, the S-4 contains the same materially false and misleading statements set forth in the 1999 10-K, as described above.

258. Like the 1999 10-K and many of Tyco's other flings with the SEC throughout the Relevant Period, the 12/2I/99 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

259. In addition, the 12/21/99 S-4 sets forth the Consent of PwC, dated December 17, 1999, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above.

260. On June 26, 2000, the Tyco Defendants filed with the SEC a Form S-4/A (the "6/26/00 S-4/A"), amending the 12/21/99 S-4. The 6/26/00 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski, and Walsh. Because the 6/26/00 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999 and January 20, 2000.

261. Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 6/26/00 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing,

this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

262. In addition, the 6/26/00 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated June 26, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

**6.     1999 Annual Report to Shareholders**

263. On or about March 14, 2000, Tyco released its 1999 Annual Report to Shareholders (the "1999 Annual Report"). The 1999 Annual Report falsely and misleadingly states on its first page that "we have grown our earnings at a 35% compounded rate for the past five years." As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c above.

264. The 1999 Annual Report also included a letter to Tyco shareholders from Defendant Kozlowski, which states:

> Fiscal 1999 was an excellent year for Tyco International. We exceeded our corporate goals and continued to build on our recurring revenue be and forge strong partnerships with our customers. We also acquired many fine companies that will provide an immediate boost to our already strong profit and cash flow and become an additional source of sustainable growth well into the future.
>
> For the sixth consecutive year, we increased revenues and earnings substantially. Revenues rose 18 percent to $22.5 billion and earnings grew $1.15 billion to $2.56 billion, an 82 percent increase over the prior year.
>
> Fiscal 2000, which began for Tyco on October 1, 1999, is off to a good start. We expect sales to exceed $26 billion and free cash flow -- an important measure of our underlying business performance -- to nearly double, from $1.7 billion to over $3.0

billion. This free cash flow figure is after the reinvestment of $1.6 billion in capital expenditures to strengthen our position in each of our four business areas.

Today, Tyco is healthier than ever.

* * *

We aim for sustained earnings growth in excess of 20 percent, powered by increased revenues and margin expansion. We achieve this by: the elimination of overhead and burdensome bureaucracy, economies of scale; a relentless focus on costs, productivity improvements and quality; and an increase in growth in the higher-margin service components of our business. Where growth, margin improvement and cost reduction are concerned, Tyco has no finish line. This model has produced consistently strong results for well over a decade.

* * *

Although we have successfully integrated our major acquisitions, we never assume such success will automatically be ours. Indeed, we know the corporate landscape is littered with failed marriages, that the hope of wondrous synergies is often a mirage. Therefore, we spend hundreds of hours assessing the benefits and risks of each transaction we consider. We always ask: What's the worst-case scenario?

We perform thorough due diligence every time, and we walk away from nine out of every ten transactions we evaluate. Even when we decide that the rewards significantly outweigh the risks, we spend a great deal of time planning the integration process to minimize the difficulties inherent in each acquisition.

265. The 1999 Annual Report also provided investors with a false overview of the

Company's operations:

Overview

Sales increased 18.0% during Fiscal 1999 to $22,496.5 million from $19,061.7 million in Fiscal 1998. Sales in Fiscal 1998 increased 14.4% compared to the twelve months ended September 30, 1997. Income (loss) before extraordinary items and cumulative effect of accounting changes was $1,031.0 million in Fiscal 1999, as compared to $1,168.6 million in Fiscal 1998 and ($300.5) million in the twelve months ended September 30, 1997. Income before extraordinary items for Fiscal 1999 included an after-tax

> charge of $1,341.5 million ($1,596.7 million pre-tax) related to the mergers with USSC and AMP and costs associated with AMP's profit improvement plan. Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP's profit improvement plan and costs incurred by USSC to exit certain businesses. Loss before extraordinary items and cumulative effect of accounting changes for the twelve months ended September 30, 1997 included an after-tax charge of $1,485.5 million ($1,670.4 million pretax) for merger and transaction costs, write-offs and integration costs primarily associated with the mergers of ADT, Former Tyco, Keystone and Inbrand.

As the Tyco Defendants either knew or were reckless in not knowing, these statements made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

266. The 1999 Annual Report also gives limited information concerning loans taken by senior management under Tyco's KEL, which was instituted to encourage ownership of the Company's common stock by executives and other key employees. According to the 1999 Annual Report:

> Loans are made to employees of the Company under the Former Tyco 1983 Key Employee Loan Program for the payment of taxes on the vesting of shares granted under Former Tyco's Restricted Stock Ownership Plans. The loans are unsecured and bear interest, payable annually, at a rate which approximates the Company's incremental short-term borrowing rate. Loans are generally repayable in ten years, except that earlier payments are required under certain circumstances. During Fiscal 1999, the maximum amount outstanding under this program was $91.6 million. Loans receivable under this program were $18.6 million and $22.2 million at September 30, 1999 and 1998, respectively.

As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and B.4.

**C.    2000 Materially False and Misleading Statements and Omissions**

**1.    1/18/00 Conference Call**

267.    On January 18, 2000, Tyco held a conference call to discuss, among other things, its earnings during the first quarter of fiscal 2000.  Defendants Kozlowski and Swartz also addressed the informal inquiry begun by the SEC the month before into potential accounting improprieties at Tyco.  During the call both Kozlowski and Swartz falsely reassured investors and analysts that there had been no improprieties at Tyco, and that Tyco was looking forward to a very profitable future:

SWARTZ:    Since we disclosed last month, when the SEC informed us about the informal inquiry being performed, we ended up making the submissions as expected, beginning in January and will continue to provide the information that's being requested by the SEC.  What's extremely important to realize though is that we have gone through this information, reviewed the materials going back three years; we at the company remain very comfortable and confident that our accounting was appropriate for reserves as our auditors also remain confident with the accounting that we performed for those acquisitions.  We will continue to make the submissions as requested by the SEC and move as quickly as possible in providing it to them so that we can get this behind us; however, we continue, as I said, to remain very comfortable with our accounting.

* * *

KOZLOWSKI:    So with that, these are the reasons why I say prospects have never been better here, the core businesses are great, the undersea fiber optic cable network appears to be great for us, our cash flow is terrific, we believe we have no issues with the SEC from everything we've seen but, you know, we're still going through this informal inquiry and we will fully cooperate with the SEC and we're looking forward to having a very, very good and exciting year here, and there are some acquisitions on the

horizon for us.

\* \* \*

. . . we're looking at a company that, you know, will have strong organic growth for us, and we're looking at a company that should be enjoying organic growth in double figures going forward.

\* \* \*

Just to quickly reiterate, we're very pleased with where we are at Tyco, we had strong revenue growth of some 27% of which about 16% of it was organic growth . . . you can see our results have never been better and our prospects have never seemed stronger to us . . . .

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**2. 1/20/00 8-K**

268. On January 20, 2000, the Tyco Defendants filed a Form 8-K announcing that diluted earnings per share for the first quarter of fiscal 2000 (ending December 31, 1999), before non-recurring charges and credits and extraordinary items, were 46 cents per share, a 48 percent increase over the previous year's 31 cents per share. In the attached press release Defendant Kozlowski is quoted as saying: "Organic growth across each of our four business segments and all geographies drove Tyco's performance in the first quarter. . . . Free cash flow was improved as well. The strength of our core businesses combined with strong cash flows are indicative of another strong year for Tyco." As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

**3.      1/28/00 S-8**

269.     On January 28, 2000, Tyco filed a Form S-8 for the registration of 10,000,000 shares of Tyco common stock (the "1/28/00 S-8"), signed by Defendants Swartz, Kozlowski, and Walsh.  Because the 1/28/00 S-8 incorporates Tyco's 1999 10-K by reference, the S-8 contains the same materially false and misleading statements set forth in the 1999 10-K, as described above.

270.     In addition, the 1/28/00 S-8 sets forth the Consent of PwC, dated January 27, 2000, permitting the incorporation by reference of its materially false and misleading report dated October 21, 1999, quoted in the 1999 10-K and discussed above.

**4.      2/11/00 10-Q for Quarter Ended 12/31/99**

271.     On February 11, 2000, the Tyco Defendants filed Tyco's Form 10-Q for the quarter ended December 31, 1999 (the "2/11/00 10-Q"), signed by Defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements, as evidenced by (among other things) the Tyco Defendants' restatement of its operating results in a June 26, 2000 10-Q/A for the same period (discussed below).  These false and misleading statements addressed a variety of topics, including the following:

**a.      Tyco's Operating Results**

272.     The 2/11/00 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, the Tyco Defendants provide the following summary information:

|  | (UNAUDITED) FOR THE QUARTERS | |
| --- | --- | --- |
|  | 1999 | 1998 |
|  | (IN MILLIONS) | |
| Pre-tax income (loss) before extraordinary items | 1,069.9 | (74.4) |

| | | |
|---|---|---|
| Income taxes | (278.5) | (33.3) |
| Income (loss) before extraordinary items | 791.4 | (107.7) |
| Extraordinary items net of taxed | (0.2) | (2.4) |
| Net income (loss) | $791.2 | $(110.1) |

As the Tyco Defendants either knew or were reckless in not kowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

273.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), and instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income improved in all segments in the quarter ended December 31, 1999 as compared to the quarter ended December 31, 1998. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

### b.    Tyco's Charges and Reserves

274.    The 2/11/00 10-Q also gives materially false and misleading information regarding Tyco's reserves. For example:

> In the quarter ended December 31, 1999, the Company established restructuring and other non-recurring reserves of $14.4 million primarily related to the exiting of USSC's interventional cardiology business and the restructuring of AMI's Brazilian operations. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $453.3 million. During the quarter ended December 31, 1999, the Company paid out $58.3 million in cash and incurred $19.9 million in non-cash

charges that were charged against these reserves. Also in the quarter ended December 31, 1999, the Company determined that $137.6 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit to the merger, restructuring and other non-recurring charges line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, whose costs were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At December 31, 1999, there remained $251.9 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $207.7 million is included in current liabilities and $44.2 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

275. During this same period, *The New York Times* reported in an article entitled "Cashing in Gets Tougher at Tyco" (2/13/00) an announcement by Defendant Kozlowski that, "after questions about his company's accounting practices and a big stock drop, . . . Tyco would have to hit impressive financial targets for executives to exercise future stock options." As Defendant Kozlowski either knew or was reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.l.b, A.3, and B.

276. Nonetheless, the Tyco Defendants continued to tout Tyco's "strategy" of aggressive acquisition. According to an article in *The Wall Street Journal* entitled "Lion's

Share: For Plastic Hangers, You Almost Need to Go to Tyco International" (2/15/00), executives of Tyco "have said the acquisitions frequently allow them to bring leadership to fragmented, inefficient industries.  Purchased firms are melded with Tyco units and the overlap eliminated. Profit margins of acquisitions often double in just a year, the company says."  As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**5.      3/1/00 Proxy Statement for 2000 Annual meeting**

277.      On March 1, 2000, the Tyco Defendants filed with the SEC Tyco's Proxy Statement for the 2000 annual meeting (the "2000 Proxy Statement").  The 2000 Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key Employee Loan Program, and allegations of accounting impropriety by the Company.

**a.      Management Remuneration**

278.      Concerning Tyco's executive compensation program generally, the 2000 Proxy Statement states:

> Tyco's executive compensation program [offers] significant financial rewards when the Company and the individual achieve superior results (as exemplified in the above chart), but significantly lower compensation is paid if performance goals are not met.  Specifically, if the compensation targets are not achieved, the Company's executives are ineligible for either cash bonuses or equity-based compensation.  In order for Mr. Kozlowski and Mr. Swartz to earn a cash bonus in fiscal 1999, cash income and operating cash flow growth of a minimum of 15% over fiscal 1998 performance was required, and before they could earn shares in fiscal 1999, an increase in earnings per share of at least 17.5% growth over fiscal 1998 was required. . .

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B.

279.    The 2000 Proxy Statement also contains materially false and misleading information regarding the administration of compensation to executive officers and key managers:

> The Compensation Committee of the Board of Directors approves all of the policies under which compensation is paid or awarded to the Company's executive officers and key managers and oversees the administration of executive compensation programs. The Compensation Committee is composed solely of independent directors, none of whom has any interlocking relationships with the Company that are subject to disclosure under rules of the SEC relating to proxy statements.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B.

280.    The 2000 Proxy Statement contains the following specific information concerning the compensation of Defendants Kozlowski and Swartz:

| Name & Principal Position | Year | Annual Compensation (2) | | | Long-Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|
| | | Salary | Cash Bonus (3) | Stock Bonus (4) | Restricted Stock Award(S) (5) | Shares Underlying Stock Options | Long-Term Incentive Payouts | All Other Compensation (6) |
| L. Dennis Kozlowski Chairman & Chief Executive officer Tyco International LTD. | 1999 | $1,350,000 | $3,200,000 | | $25,707,178 | 6,621,834 | | $387,001 |
| | 1998 | 1,250,000 | 2,500,000 | | 20,140,000 | 3,832,800 | | 901,002 |
| | 1997 | 1,250,000 | 2,544,260 | | | 6,600,000 | $6,508,125 | 108,125 |
| | | | | * * * | | | | |
| Mark H. Swartz Executive Vice President and Chief Financial Officer, Tyco International Ltd. | 1999 | 750,000 | 1,600,000 | | 12,029,641 | 2,976,480 | | 150,014 |
| | 1998 | 559,500 | 1,250,000 | | 10,070,000 | 2,764,666 | | 256,878 |
| | 1997 | 559,500 | 1,272,130 | | | 2,200,000 | 2,169,375 | 31,994 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, B.1, B.4, B.5, and B.6.

281.    The 2000 Proxy Statement also failed to disclose and misrepresented the actual compensation of Defendant Kozlowski:

> For fiscal 1999, Mr. Kozlowski received a base salary of $1.35 million and a cash bonus in the amount of $3.2 million, as shown in the SUMMARY COMPENSATION TABLE on page 12.  Mr. Kozlowski was also granted 624,000 shares of restricted stock on October 18, 1999.  Mr. Kozlowski's eligibility for the cash bonus was conditioned on the Company's experiencing minimum growth in pre-tax income and operating cash flow of 15% over fiscal 1998 and his eligibility for the stock award was conditioned upon an increase in earnings per share of at least 17.5% over fiscal 1998.  The Company's performance substantially exceeded these benchmarks.  These shares were granted based on achievement of fiscal 1999 performance criteria and vested on January 5, 2000.  While Mr. Kozlowski did not receive any new stock option awards during fiscal 1999, he did receive restoration options.  The restoration provision enables executive officers to use their earned equity award to repay indebtedness owed to the Company or to use option proceeds for tax planning purposes while maintaining their equity position in the Company.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, B.1.a, B.4.a, B.5, and B.6.

282.    In an effort to justify this astronomical compensation, the 2000 Proxy Statement describes fiscal 1999 as Tyco's "most successful year ever,"

> with increases over fiscal 1998 in earnings per share before non-recurring items of 51%, net income before non-recurring items of 117%, and net sales of 83%, prior to the restatement of 1998 results for the pooling of interests with United States Surgical Corporation and AMP Incorporated.  Executive compensation was directly tied to, and is reflective of, this performance.

It attributes that success to Kozlowski:

> Mr. Kozlowski also led the Company in making strategic

acquisitions that, along with the organic growth of the Company, laid the groundwork for continued growth and performance.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

> **b.    Key Employee Loan Program**

283.    The 2000 Proxy Statement provides materially false and misleading statements concerning Tyco's KEL Program.  It states, for example:

> The Compensation Committee administers the loan program.  The Compensation Committee authorizes loans, which may not exceed the amount allowable under any regulation of the United States Treasury or other applicable statute or regulation.  Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured.  Loans generally bear interest at Tyco's incremental short-term borrowing rate (5.5% for 1999).  Loans are generally repayable in ten years or when the participant reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the participant's employment with the Company or its subsidiaries terminates.  The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above, in Section(s) V.B.4 and B.5.

284.    The 2000 Proxy Statement also falsely and misleadingly states:

> At September 30, 1999, the amount of loans outstanding under the [Key Employee Corporate Loan Program] totaled $18,569,137, of which $0 was loaned to Mr. Kozlowski . . . and $0 to Mr. Swartz.  The largest amount of indebtedness since October 1, 1998 incurred by each of the Named Officers was: $52,688,249 for Mr. Kozlowski . . . .

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, B.1.a-b, B.4.a-b, B.5, and B.6.

###    c.    Allegations of Misconduct Against Tyco

285.    Finally, the 2000 Proxy Statement addresses the informal SEC investigation, and characterizes allegations that the Tyco Defendants engaged in improper acquisition accounting as mere "rumors":

> As shareholders are aware, certain recent rumors and allegations, which we believe to be unfounded, have adversely affected Tyco's stock price.  Shareholders are also aware that the SEC is conducting an inquiry and that shareholder lawsuits have been filed against the Company in various courts across the country. . . We continue to have complete confidence in the senior management team and feel the fundamentals driving the company have not changed.  As indicated earlier, our philosophy is to reward stellar performances, which is what we did for fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.1 and A.3.

###    6.    4/18/00 Earnings Announcement

286.    On April 18, 2000, Tyco released its financial results for the quarter ending March 31, 2000:

> Tyco International Ltd. . . . reported today that diluted earnings per share before non-recurring charges and credits and extraordinary item, for its second quarter ended March 31, 2000 were 50 cents per share, a 47 percent increase over 34 cents per share for the same quarter last year.  Net income rose to $853.6 million, an increase of 50 percent compared to $567.8 million last year.  Sales for the quarter rose 35 percent to $7.07 billion compared with last year's $5.24 billion.  The results for last year have been restated to reflect the merger with AMP, which occurred on April 2, 1999 and was accounted for as a pooling of interests, and are before acquisition-related and non-recurring charges and extraordinary item.  After giving effect to acquisition related and other non-recurring charges and credits, and extraordinary item, diluted

earnings per share were 50 cents, or $855.9 million, in fiscal 2000 compared to 7 cents, or $119.5 million, in fiscal 1999.

Income before non-recurring charges an credits and extraordinary items for the first half of fiscal 2000 rose to $1.64 billion, or 96 cents per diluted share, a 48 percent increase over last year's diluted per share earnings of 65 cents.  After giving effect to acquisition related and other non-recurring charges and credits, and extraordinary item, diluted earnings per share were 96 cents, or $1.65 billion for the first half of fiscal 2000 compared to 1 cent, or $9.4 million, in fiscal 1999.  Revenues for the first half increased to $13.7 billion, 31 percent higher than last year's $10.5 billion.

"Each of our four businesses had strong organic growth and generated positive free cash flow in the second quarter," said L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer. "Our core businesses are well positioned to continue that trend for the remainder of the year."

287.     As Defendants knew or recklessly disregarded, these statements were materially false and misleading for the reasons set forth in Sections V.A.1 and A.3.

**7.     4/18/00 Conference Call**

288.     On April 18, 2000, Tyco held a conference call to discuss, among other things, its earnings during the second quarter of fiscal 2000.  Defendants Kozlowski and Swartz also addressed the SEC's informal investigation of the Tyco Defendants' acquisition accounting. During the call, Defendant Swartz falsely stated:

SWARTZ:          . . . we continue to be confident with the financial results we've reported previously and the personnel working on that, we continue to provide the information to the SEC that was requested and we're really not in a position to give any update in far as timing in that we don't control that.  What we do control though is getting the information to them and seeing what's going in and we continue to remain very confident with the financial results we've reported.

* * *

Q:          But when. . . when you're saying you're happy with the way things are going, what . . . what is it that

112

| | |
|---|---|
| | you're looking at that makes you happy? |
| SWARTZ: | That we're . . . that we're in a situation that we're able to produce the information to them quickly on what had been requested and based on the additional review that we've gone through as well as outside advisors that we've brought in, to be. . . continue to be very comfortable with the financial results. |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.1 and A.3.

289.     During the call, Defendant Kozlowski also emphasized the financial health of the Company.

| | |
|---|---|
| KOZLOWSKI: | . . .we're very pleased with our quarter, with the strong outlook we have going forward but the fact that our organic growth for the company has been some 19% that our earnings are up some 47%· and then the prospects and outlook for a very strong cash flow. |

As *The Wall Street Journal* quoted Kozlowski the following day in an article entitled "Tyco's Profit Surged in Fiscal 2nd Quarter, Helped by Sales Gain" (4/19/00):  "Each of our four businesses had strong organic growth and generated positive free cash flow in the second quarter . . . Our core businesses are well-positioned to continue that trend for the remainder of the year." As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

290.     On May 12, 2000, J.P. Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued an upbeat analyst report, entitled "Business Review Delivers Message of Powerful Fundamentals and On Track."  The report

stated:

> CFO Mark Swartz made an interesting observation about things we
> haven't seen with Tyco that are almost always associated with
> companies that have real accounting concerns: (1) [t]here have
> been no management departures, (2) [t]he auditors have not backed
> away from the opinion in the least (and the external forensic
> accountants remain very comfortable the accounting is clean), and
> (3) [i]n the 7 months since the negative allegations have been
> made, business results have not deteriorated - - to the contrary they
> have accelerated. These are simply not characteristics of a
> company that has been cooking its books.

* * *

> A healthy acquisition pipeline and plenty of available cash should
> lead to stepped up deal flow.

As Defendant Swartz either knew or was reckless in not knowing, the statements when made
were materially false and misleading and omitted material information for the reasons set forth
above in Section(s) V.A.1 and A.3.

**8.      5/15/00 10-Q for Quarter Ended 3/31/00**

291.    On May 15, 2000, the Tyco Defendants filed Tyco's Form 10-Q for the quarter
ended March 31, 1999 (the "5/15/00 10-Q"), signed by Defendant Swartz.  In it, the Tyco
Defendants set out numerous materially false and misleading statements, as evidenced by
(among other things) the Tyco Defendants' restatement of its operating results in a June 26, 2000
10-Q/A for the same period (discussed below).  These false and misleading statements addressed
a variety of topics, including the following:

**a.      Tyco's Operating Results**

292.    The 5/15/00 10-Q also gives favorable, purportedly accurate information
concerning Tyco's operating results.  For example, the Tyco Defendants provide the following
summary information:

| | For The Quarters Ended March 31, | | For The Six Months Ended March 31, | |
|---|---|---|---|---|
| | **2000** | **1999** | **2000** | **1999** |
| | | (IN MILLIONS) | | |
| Pre-Tax income before extraordinary items | 1,140.4 | 308.2 | 2,210.4 | 233.8 |
| Income taxes | (284.5) | (146.2) | (563.1) | (179.5) |
| Income before extraordinary items | 855.9 | 162.0 | 1,647.3 | 54.3 |
| Extraordinary items, net of taxes | -- | (42.5) | (0.2) | (44.9) |
| Net income | $855.9 | $119.5 | $1,647.1 | $9.4 |

(Unaudited)

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

293.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), and instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income improved in all segments in the six months ended March 31, 2000 as compared to the six months ended March 31, 1999.  The operating improvements are the result of both increased revenues and enhanced margins.  Increased revenues resulted from organic growth and from acquisitions.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

**b.    Tyco's Charges and Reserves**

294.    The 5/15/00 10-Q also gives materially false and misleading information regarding Tyco's reserves.  For example:

> In the six months ended March 31, 2000, the Company established restructuring and other non-recurring reserves of $24.8 million, of which $7.3 million is included in cost of sales, primarily related to

the exiting of USSC's interventional cardiology business and the restructuring activities in AMP's Brazilian operations and wireless communications business. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $453.3 million. During the six months ended March 31, 2000, the Company paid out $92.4 million in cash and incurred $45.5 million in non-cash charges that were charged against the reserves. Also in the six months ended March 31, 2000, the Company determined that $150.3 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $144.0 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At March 31, 2000, there remained $189.9 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $147.6 million is included in current liabilities and $42.3 million is included in long-term liabilities.

Similarly:

The Company has taken recent merger, restructuring and other non-recurring charges and charges for the impairment of long-lived assets with respect to AMP and USSC.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially False and misleading and omitted material information for the reasons set forth above in Section(s) V.A and A.1.c.

295.    Tyco's share price closed at $50.75 in May 15, 2000.

**9.      6/26/00 10-Q/A Filed for Quarter Ended 12/31/99**

296.    On June 26, 2000, the Tyco Defendants filed another 10-Q/A for the quarter

ended December 31, 1999 (the "6/26/00 10-Q/A(1)"), signed by Defendant Swartz. According to the 6/26/00 10-Q/A(1), the restatement was in response to a "limited review" by the SEC.

297. In the 6/26/00 10-Q/A(1), the Tyco Defendants gave the following explanation for the need to restate Tyco's operating results:

> The amendment to the financial statements herein is being filed to reclassify certain charges and to adjust merger, restructuring and other non-recurring charges between periods due to the timing of the underlying events as follows:
>
> - To reclassify $65.6 million of charges, incurred by AMP during the quarter ended December 31, 1998 prior to its merger with Tyco, related to the write-off of goodwill and fixed assets of exited businesses in the Consolidated Statements of Operations out of the "merger, restructuring and other non-recurring (credits) charges, net" line and into the "charge for the impairment of long-lived assets" line;
>
> - To eliminate $26.0 million of merger, restructuring and other non-recurring credits recorded to merger, restructuring and other non-recurring (credits) charges in the first quarter of fiscal 2000 related to charges which were originally recorded in fiscal 1999 related primarily to severance and facility closings;
>
> - To reverse a $16.9 million credit previously recorded in the quarter ended December 31, 1999, related to merger, restructuring and other non-recurring charges which were originally recorded in fiscal 1997 related primarily to facility closings and lease termination costs, and to record $3.0 million of that credit in the quarter ended December 31, 1998;
>
> - To reclassify $15.0 million of inventory related restructuring costs, incurred during the quarter ended December 31, 1998, in the Consolidated Statements of Operations out of the "merger, restructuring and other non-recurring (credits) charges, net" line and into the "cost of sales" line;
>
> - To report certain non-recurring costs related to the integration of the USSC suture business originally recorded in the first quarter of fiscal 1999 as costs in later periods when such activity was completed (reversing a $22.3 million charge in the quarter ended December 31, 1998 and recording $7.7 million of that charge in the quarter ended December 31, 1999); and

- To update various disclosures primarily related to the above adjustments.

298.    Although Tyco's filing of an amended 10-Q was in effect an admission that it had materially misstated its operating results during the Relevant Period, the Tyco Defendants attempted to downplay that admission by restating its results only minimally, by denying that there were any materially false statements in its previously filed 10-Q, and by denying any involvement in a scheme, later admitted in the December Report, to manipulate its acquisition accounting.  This scheme, described in detail above, included the Tyco Defendants' practice of aggressive accounting (through the manipulation of accounting reserves, *inter alia*), and their practice of incentivizing executives at acquired companies to manipulate the acquired company's financial reporting before the acquisition to create the false appearance of superior earnings for Tyco after the acquisition.

299.    The 6/26/00 10-Q/A(1) itself contains numerous materially false and misleading statements on a variety of topics, including the following:

**a.       Tyco's Operating Results**

300.    The 6/26/00 10-Q/A(l) also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, the Tyco Defendants provide the following summary information:

|  | Unaudited for the Quarters Ended December 31, | |
|---|---|---|
|  | 1999 | 1998 |
|  | (In Millions) | |
| Pre-tax income (loss) before extraordinary items | 1,019.3 | (49.1) |
| Income taxes | (262.1) | (40.5) |
| Income (loss) before extraordinary items | 757.2 | (89.6) |
| Extraordinary items, net of taxes | (0.2) | (2.4) |
| Net Income (loss) | $757.0 | $(92.0) |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.1.a, and A.1.c.

301.     In addition, these statements are materially false and misleading because they fail

to disclose the aggressive accounting and incentivizing practices described above (and admitted

by Tyco in the December Report), and instead attribute Tyco's favorable results to organic

growth and synergies resulting from Tyco's acquisitions:

> Operating income improved in all segments in the quarter ended
> December 31, 1999 as compared to the quarter ended December
> 31, 1998.  The operating improvements are the result of both
> increased revenues and enhanced margins.  Increased revenues
> resulted from organic growth and from acquisitions.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.1.a, and A.1.c.

### b.     Tyco's Charges and Reserves

302.     The 6/26/00 10-Q/A(1) also gives materially false and misleading information

regarding Tyco's reserves:

> In the quarter ended December 31, 1999, the Company established
> restructuring and other non-recurring reserves of $22.1 million
> primarily related to the exiting of USSC's interventional
> cardiology business, charges associated with USSC's suture
> business and the restructuring of AMP's Brazilian operations.  At
> September 30, 1999, there existed merger, restructuring and other
> non-recurring reserves of $399.3 million.  During the quarter
> ended December 31, 1999, the Company paid out $58.3 million in
> cash and incurred $19.9 million in non-cash charges that were
> charged against these reserves.  Also in the quarter ended
> December 31, 1999, the Company determined that $94.7 million of
> merger, restructuring and other non-recurring reserves established
> in prior years was not needed and recorded a credit to the merger,
> restructuring and other non-recurring charges line item in the
> Consolidated Statement of Operations.  The changes in estimates
> of the restructuring plan at AMP were attributable primarily to
> increased demand for certain of AMP's products which was not
> anticipated at the time of the merger and to recent acquisitions
> such as Siemens EC.  Therefore, the Company has determined not

to close several facilities and not to terminate approximately 3,000 employees, whose costs were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At December 31, 1999, there remained $248.5 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $204.3 million is included in current liabilities and $44.2 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A and A.1.c.

### 10. 6/26/00 10-Q/A filed for Quarter Ended 3/31/00

303. On June 26, 2000, the Tyco Defendants filed another 10-Q/A for the quarter ended March 31, 1999 (the "6/26/00 10-Q/A(2)"), signed by Defendant Swartz. According to the 6/26/00 10-Q/A(2), the restatement was in response to a "limited review" by the SEC.

304. In the 6/26/00 10-Q/A(2), the Tyco Defendants gave the following explanation for the need to restate Tyco's operating results:

The amendment to the financial statements herein is being filed to reclassify certain charges and to adjust merger, restructuring and other non-recurring charges between periods due to the timing of the underlying events as follows:

- To reclassify $103.5 million of charges, incurred by AMP during the quarter ended March 31, 1999 prior to its merger with Tyco, related to the write-off of goodwill and fixed assets of exited businesses in the Consolidated Statement of Operations out of the "merger, restructuring and other non-recurring charges (credits), net" line and into the "charge for the impairment of long-lived assets" line;

- To record a credit in the quarter ended March 31, 1999 for the reversal of $5.3 million of merger, restructuring and other non-recurring charges which were originally recorded in fiscal 1997 related primarily to facility closings and lease termination costs

(this credit was previously recorded in the first quarter of fiscal 2000);

- To reclassify $1.9 million of inventory related restructuring costs, incurred during the quarter ended March 3,1 1999, in the Consolidated Statement of Operations out of the "merger, restructuring and other non-recurring charges (credits), net" line and into the "cost of sales" line;

- To report certain non-recurring costs related to the integration of the USSC suture business originally recorded in the first quarter of fiscal 1999 as costs in later periods when such activity was completed (recording $2.0 million of that charge in the quarter ended March 31, 1999 and $0.5 million in the quarter ended March 31, 2000); and

- To update various disclosures primarily related to the above adjustments.

305.    Although Tyco's filing of an amended 10-Q was in effect an admission that it had materially misstated its operating results during the Relevant Period, the Tyco Defendants attempted to downplay that admission by restating its results only minimally, by denying that there were any materially false statements in its previously filed 10-Q, and by denying any involvement in a scheme, later admitted in the December Report, to manipulate its acquisition accounting. This scheme, described in detail above, included the Tyco Defendants' practice of aggressive accounting (through the manipulation of accounting reserves, *inter alia*), and their practice of incentivizing executives at acquired companies to manipulate the acquired company's financial reporting before the acquisition to create the false appearance of superior earnings for Tyco after the acquisition.

306.    The 6/26/00 10-Q/A(2) itself contains numerous materially false and misleading statements on a variety of topics, including the following:

###    a.    Tyco's Operating Results

307.    The 6/26/00 10-Q/A(2) also gives favorable, purportedly accurate information

concerning Tyco's operating results.  For example, the Tyco Defendants provide the following summary information:

| | (UNAUDITED) | | | |
| | FOR THE QUARTERS ENDED MARCH 31, | | FOR THE SIX MONTHS ENDED MARCH 31, | |
| | 2000 | 1999 | 2000 | 1999 |
| | (In Millions) | | | |
| Pre-tax income (loss) before extraordinary items | 1,139.9 | 311.5 | 2,159.3 | 262.4 |
| Income taxes | (284.4) | (147.2) | (546.6) | (187.7) |
| Income (loss) before extraordinary items | 855.5 | 164.3 | 1,612.7 | 74.7 |
| Extraordinary items, net of taxes | -- | (42.5) | (0.2) | (44.9) |
| Net Income (loss) | $855.5 | $121.8 | $1,612.5 | $29.8 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

308.    In addition, the statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income improved in all segments in the six months ended March 31, 2000 as compared to the six months ended March 31, 1999.  The operating improvements are the result of both increased revenues and enhanced margins.  Increased revenues resulted from organic growth and from acquisitions.  The Company enhances its margins through improved productivity and cost reductions in the ordinary cause of business, unrelated to acquisition or divestiture activities.  The Company regards charges that it incurs to reduce costs in the ordinary course of business as recurring charges, which are reflected in cost of sales and in selling, general and administrative expenses in the Consolidated Statements of Operations.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

### b.    Tyco's Charges and Reserves

309.    The 6/26/00 10-Q/A(2) also gives materially false and misleading information

regarding Tyco's reserves:

> In the six months ended March 31, 2000, the Company established
> restructuring and other non-recurring reserves of $33.0 million, of
> which $7.3 million is included in cost of sales, primarily related to
> the exiting of USSC's interventional cardiology business, charges
> associated with USSC's suture business and the restructuring
> activities in AMP'S Brazilian operations and wireless
> communications business.  At September 30, 1999, there existed
> merger, restructuring and other non-recurring reserves of $399.3
> million.  During the six months ended March 31, 2000, the
> Company paid out $92.4 million in cash and incurred $45.5 million
> in non-cash charges that were charged against the reserves.  Also
> in the six months ended March 31, 2000, the Company determined
> that $107.4 million of merger, restructuring and other non-
> recurring reserves established in prior years was not needed and
> recorded a credit of $101.1 million to the merger, restructuring and
> other non-recurring charges line item and a credit of $6.3 million
> to the cost of sales line item in the Consolidated Statement of
> Operations.  The changes in estimates of the restructuring plan at
> AMP were attributable primarily to increased demand for certain
> of AMP's products which was not anticipated at the time of the
> merger and to recent acquisitions such as Siemens EC.  Therefore,
> the Company has determined not to close several facilities and not
> to terminate approximately 3,000 employees, the costs of which
> were provided for in previous AMP restructuring plans.  In
> addition, certain restructuring activities at AMP were completed
> for amounts lower than originally anticipated.  The changes in
> estimates of the Company's 1997 restructuring plans and the
> USSC restructuring plans were due primarily to the completion of
> activities for amounts lower than originally recorded.  At March
> 31, 2000, there remained $187.0 million of merger, restructuring
> and other non-recurring reserves on the Company's Consolidated
> Balance Sheet, of which $144.7 million is included in current
> liabilities and $42.3 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A and A.1.c.

310.    On June 26, 2000, UBS Warburg, reporting materially false and misleading

information received from the Tyco Defendants, issued an analyst report entitled, "TYC: SEC Review = Positive Outcome . . . Overhang Lifted."  The report stated:

> Magnitude of SEC Accounting Requests Is Insignificant, in our view.
>
> * * *
>
> Management also expressed comfort with consensus estimates for the second quarter, $0.57, and 2000, $2.16. . . We remain extremely bullish on TYC.
>
> * * *
>
> [W]e are looking for $3.3 billion in free cash flow generation this fiscal year, which along with the company's unlevered balance sheet, afford ample powder for acquisitions - implying our earnings estimates are conservative.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.1 and A.3.

311.    On June 27, 2000, the day after the Tyco Defendants filed the 6/26/00 10-K/A the 6/26/00 10-Q/A (1), and the 6/26/00 10-Q/A (2), *The Wall Street Journal* reported that, with the filing of the restatements, the SEC's informal inquiry was effectively put to rest ("Tyco's Shares Rise 13% After Concern Restates Results Following SEC Review").  Analyst response was favorable.  According to the article: "Michael Holton, analyst at T. Rowe Price Associates in Baltimore . . . said the results of the inquiry 'put to rest any lurking fears about the company's accounting and the credibility of its management.'  He called the announcement 'positive across the board.'"

312.    That same day, Defendant Kozlowski was cited by the *Financial Times* as saying that "the changes [reflected in the restatements] only affected the timing of non-recurring charges at Tyco."  According to the June 27 article ("Tyco Lifted by Conclusion of SEC

Review"), Kozlowski said that "[t]he company has 'the financial resources and flexibility to continue to pursue acquisitions that will have an immediate positive impact on our earnings per share.''' As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.l and A.3.

**11.     6/28/00 Conference Call**

313.    On June 28, 2000, Tyco held a conference call to discuss, among other things, its acquisition of Mallinckrodt and its projections for the quarter. During the call, Defendant Kozlowski continued to falsely predict a favorable quarter:

> KOZLOWSKI:    To begin with, first of all we are confident of our quarter and our year at Tyco. Business continues to be good. Our organic growth continues to go well. We expect we will have a strong quarter. . . .
>
> We are still projecting our $33 billion of free cash this year.

314.    About the Malluackrodt acquisition and other acquisitions he stated:

> KOZLOWSKI:    Mallinckrodt fits all the criteria that we often talk about for a Tyco acquisition. It will be immediately accretive to the company. It has strong growth. As a matter of fact, the growth of the Mallinckrodt businesses markets are even better than the strong growth that we're experiencing in current Tyco Healthcare markets.
>
> * * *
>
> But as we said back in May, you're seeing good strong organic growth from us. We do anticipate real good organic growth out for the next 12-24 months in all of our businesses, from everything we see and we're well positioned. And we will be adding to that with these selective acquisitions that make a whole lot of sense. That are immediately accretive, give us good strong cash flows and fit right within to what we're doing.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

   **12.    7/12/00 S-4 (and Related S-4/A and Prospectus)**

   315.    On July 12, 2000, Tyco filed with the SEC a Form S-4 relating to a proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco (the "7/12/00 S-4"). The 7/12/00 S-4 was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 7/12/00 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999 and January 20, 2000.

   316.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 7/12/00 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 238. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Mallinckrodt:

> At a meeting held on June 22, 2000, Tyco's Board of Directors determined that the acquisition of Mallinckrodt was in keeping with its corporate strategy of complementing its internal growth with acquisitions that are likely to benefit from cost reductions and synergies when combined with Tyco's existing operations and that are expected to be accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

317. In addition, the 7/12/00 S-4 sets forth the Consent of PwC, dated July 10, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

318. On August 9, 2000, the Tyco Defendants filed with the SEC a Form S-4/A (the "8/9/00 S-4/A"), amending the 7/12/00 S-4. The 8/9/00 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski, and Walsh. Because the 8/9/00 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

319. Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/9/00 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 238. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Mallinckrodt, using precisely the same language quoted from the 7/12/00 S-4 above. As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

320. In addition, the 8/9/00 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated August 8, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and

other materially false and misleading materials discussed herein.

321.     On August 11, 2000, the Tyco Defendants filed with the SEC a Prospectus relating to the proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco (the "8/11/00 Prospectus").  Because the 8/11/00 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

322.     Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/11/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 238.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Mallinckrodt, using precisely the same language quoted from the 7/12/00 S-4 above.  As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

**13.     7/13/00 Press Release**

323.     On July 13, 2000, Tyco issued a press release, filed with the SEC in a Form 8-K the following day, announcing that the SEC had terminated its informal inquiry into Tyco's accounting practices without recommending an enforcement action.  According to the press release:  "As Tyco has previously stated, the Company has at all times been confident with respect to the propriety of its accounting and its previously issued financial statements."  As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth in

Section(s) V.A.1 and A.3.

**14.      7/19/00 Earnings Announcement**

324.      On July 19, 2000, Tyco issued a press release announcing Tyco's financial results

for the quarter ended June 30, 2000:

> Tyco . . . reported today that diluted earnings per share before non-recurring charges and credits and extraordinary item, for its third quarter ended June 30, 2000 were 58 cents per share, a 38 percent increase over 42 cents per share for the same quarter last year.  Net income rose to $992.1 million, an increase of 42 percent compared to $699.4 million last year.  Sales for the quarter rose 27 percent to $7.42 billion compared with last year's $5.82 billion.  The results for last year are before restructuring and non-recurring charges and extraordinary item.  After giving effect to restructuring and other non-recurring charges and credits, diluted earnings per share before extraordinary items were 58 cents, or $997.3 million, in fiscal 2000 compared to 13 cents or $212.2 million, in fiscal 1999.
>
> Income before non-recurring charges and credits and extraordinary items for the nine months of fiscal 2000 rose to $2.63 billion, or $1.54 per diluted share, a 44 percent increase over last year's diluted per share earnings of $1.07.  After giving effect to acquisition related and other non-recurring charges and credits, diluted earnings per share before extraordinary item were $1.52, or $2.61 billion for the first nine months of fiscal 2000 compared to 17 cents, or $286.9 million, in fiscal 1999.  Revenues for the nine months increase to $21.13 billion, 30 percent higher than last year's $16.27 billion.
>
> "The results we reported for our third quarter reflected some solid organic revenue growth and strong operating margins in each of our business segments.  This has created free cash flow of over $900 million in the quarter.  Free cash flow in the first nine months of fiscal 2000 was $1.9 billion, which exceeds the free cash flow generated for all of fiscal year 1999," said L. Dennis Kozlowski, Tyco's Chairman and Chief Executive.
>
> "The integration of the acquisitions we completed this year have served to enhance our performance, and will provide for continued improvements as we complete this fiscal year and move into fiscal year 2001.  The completion of the acquisition of the Electronics OEM business of Thomas & Betts in July and the announced acquisition of Mallinckrodt will create additional positive impact going forward.  In addition, our balance sheet will be enhanced by

the closing of the ADT Automotive divestiture, expected to be completed in mid-August, and the completion of the Mallinckrodt acquisition, expected in October," he added.

325.    As Defendants knew or recklessly disregarded, these statements were materially false and misleading when made for the reasons set forth in Sections V.A., A.1, and A.1.c.

**15.    7/19/00 Conference Call**

326.    On July 19, 2000, Tyco held a conference call to discuss, among other things, its earnings during the third quarter of fiscal 2000.  Defendant Kozlowski falsely stated:

> KOZLOWSKI:          Revenue was up 27% versus last year to 7.4 billion with strong organic growth.  We had organic growth of over 17% this quarter. . . We here at Tyco continue to see strong performance across all business segments, we anticipate a good fourth quarter and our fiscal year 2001 which begins on October 1st looks very good to us at this time. . .We are very comfortable with the estimates for next quarter. . . .

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

327.    Kozlowski also addressed the termination of the SEC's inquiry into Tyco's accounting practices.  Reiterating the message of Tyco's recent press release, Defendant Kozlowski stated: "the company has at all times been confident with respect to the propriety of its accounting and its previously issued financial statements.  I hope with that we will not deal with accounting questions or accounting inquiries here at Tyco."  When asked whether he was "aware of any new negative news articles or anything that happens to be coming out," Kozlowski responded: "Not at all."  As Defendant Kozlowski either knew or was reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.l and A.3.

**16.    7/24/00 S-4 (and related S-4/A, Prospectuses, and Post-Effective Amendment)**

328.    On July 24, 2000, Tyco filed with the SEC a Form S-4 relating to Tyco's proposal to exchange up to Euro 600,000,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6 1/8% Notes due 2007 (the "7/24/00 S-4"). The 7/24/00 S-4 was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 7/24/00 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999 and January 20, 2000.

329.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 7/24/00 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

330.    In addition, the 7/24/00 S-4 sets forth the Consent of PricewaterhouseCoopers, dated July 21, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially False and misleading materials discussed herein.

331.    On August 3, 2000, Tyco filed with the SEC a Form S-4/A (the "8/3/00 S-4/A"), amending its 7/24/00 S-4. The 8/3/00 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski, and Walsh. Because the 8/3/00 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco's Annual Report on Forms 10-K and 10-A for

the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999 and March 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

332. Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/3/00 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

333. Under the heading "Recent Developments," the 8/3/00 S-4/A states as follows:

On July 19, 2000, Tyco announced its results for the third quarter of fiscal 2000, the three and nine months ended June 30, 2000. Tyco reported that diluted earnings per share before non-recurring charges and credits and extraordinary item, for its third quarter ended June 30, 2000 were 58 cents per share, a 38 percent increase over 42 cents per share for the same quarter last year. Net income rose to $992.1 million, an increase of 42 percent compared to $699.4 million last year. Sales for the quarter rose 27 percent to $7.42 billion compared with last year's $5.82 billion. The results for last year are before restructuring and non-recurring charges and extraordinary item. After giving effect to restructuring and other non-recurring charges and credits, diluted earnings per share before extraordinary item were 58 cents, or $997.3 million, in fiscal 2000 compared to 13 cents, or $212.2 million, in fiscal 1999.

Income before non-recurring charges and credits and extraordinary items for the nine months of fiscal 2000 rose to $2.63 billion, or $1.54 per diluted share, a 44 percent increase over last year's diluted per share earnings of $1.07. After giving effect to acquisition related and other non-recurring charges and credits, diluted earnings per share before extraordinary item were $1.52, or $2.61 billion for the first nine months of fiscal 2000 compared to 17 cents, or $286.9 million, in fiscal 1999. Revenues for the nine months increased to $21.13 billion, 30 percent higher than last year's $16.27 billion.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.l.a, and A.1.c.

334.     In addition, the 8/3/00 S-4/A sets forth the Consent of PwC, dated August 2, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

335.     On August 11, 2000, Tyco filed with the SEC a Prospectus relating to Tyco's proposed offer to exchange up to Euro 600,000,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6 1/8% Notes due 2007 (the "8/11/00 Prospectus").  Because the 8/11/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 8/3/00 S-4/A, it contains the same materially false and misleading statements set forth in those documents, as described herein.

336.     Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/11/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 238.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

337.     Under the heading "Recent Developments," the 8/11/00 Prospectus uses precisely the same language quoted from the 8/3/00 S-4/A above.  As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

338.     On November 29, 2000, Tyco filed with the SEC a Post-Effective Amendment to the 7/24/00 S-4 and the 8/3/00 S-4/A discussed above (the "11/20/00 Post-Effective

Amendment"). The 11/20/00 Post-Effective Amendment was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh. Because the 11/20/00 Post-Effective Amendment incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, November 1, 2000, and November 15, 2000.

339.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 11/20/00 Post-Effective Amendment recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

340.    In addition, the 11/20/00 Post-Effective Amendment contains materially false and misleading statements about Tyco under the heading "Current Developments." For example:

> On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax gain

> from the initial public offering of TyCom Ltd. Fourth quarter sales
> rose 25% to $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

341.    Further:

> For fiscal 2000, revenues increased to $28.93 billion, up 29% from
> revenues of $22.50 billion in fiscal 1999. Income before
> restructuring and other nonrecurring credits, charges, gain and
> extraordinary items rose to $3.73 billion, or $2.18 per diluted
> share, a 42% increase over $1.53 per diluted share in fiscal 1999.
> After giving effect to restructuring and other non-recurring credits,
> charges, gain and extraordinary items, net income for fiscal 2000
> was $4.52 billion, or $2.64 per diluted share, compared to $1.02
> billion or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

342.    The 11/20/00 Post-Effective Amendment also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, the Tyco Defendants provide the following summary information:

|  | Nine Months Ended June 30, 2000 | Year-ended September 30, 1999 |
| --- | --- | --- |
| Earnings: |  |  |
| Income (loss) before extraordinary items and cumulative effect of accounting changes | $2,610.0 | $1,067.7 |
| Income taxes | 878.9 | 637.5 |
|  | 3,448.9 | 1,705.2 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

343.     The 11/20/00 Post-Effective Amendment also includes information on charges included in earnings:

> Earnings for the nine months ended June 30, 2000, the years ended September 30, 1999 and 1998, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995 include net merger, restructuring and other non-recurring (credits) charges of $(81.3) million (of which net charges of $1.0 million are included in cost of sales), $1,035.2 million (of which $106.4 million is included in cost of sales), $256.9 million, $947.9 million, $344.1 million and $97.1 million, respectively. Earnings also include charges for the impairment of long-lived assets of $99.0 million, $507.5 million, $148.4 million, $744.7 million and $8.2 million in the nine months ended June 30, 2000, the year-ended September 30, 1999, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995, respectively.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

344.     In addition, the 11/20/00 Post-Effective Amendment sets forth the Consent of PwC, dated November 27, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

**17.     12/15/00 Prospectus**

345.     On December 15, 2000, Tyco filed with the SEC a Prospectus relating to the proposed offer by Tyco International Group S.A. to exchange up to (Euro) 26,885,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6 1/8% notes due 2007 not heretofore exchanged (the "12/15/00 Prospectus"). Because the 12/15/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 11/20/00 Post-Effective Amendment, it contains the same materially false and misleading

statements set forth in those documents, as described herein.

346.     Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 12/15/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 238.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

347.     In addition, the 12/15/00 Prospectus contains materially false and misleading statements about Tyco under the heading "Current Developments."  These statements are identical to those quoted above from the 11/29/00 Post-Effective Amendment under the same heading, and are materially false and misleading for the same reasons.

348.     The 12/15/00 Prospectus also contains information on charges included in earnings that is identical to that quoted above from the 11/29/00 Post-Effective Amendment.  That information, too, is materially false and misleading for the same reasons given above.

**18.     8/14/00 10-Q for Quarter Ended 6/30/00**

349.     On August 14, 2000, the Tyco Defendants filed Tyco's Form 10-Q for the quarter ended June 30, 2000 (the "8/14/00 10-Q"), signed by Defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements addressing a variety of topics, including the following:

**a.     Tyco's Operating Results**

350.     The 8/14/00 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, the Tyco Defendants provide the following summary information:

| | FOR THE QUARTERS ENDED JUNE 30, | | FOR THE NINE MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| | (UNAUDITED) | | | |
| | (IN MILLIONS) | | | |
| Pre-tax income before extraordinary items | 1,329.7 | 399.2 | 3,488.9 | 661.5 |
| Income taxes | (332.4) | (187.0) | (878.9) | (374.6) |
| Income before extraordinary items | 997.3 | 212.2 | 2,610.0 | 286.9 |
| Extraordinary items, net of taxes | -- | (0.5) | (0.2) | (45.4) |
| Net Income | $997.3 | $211.7 | $2,609.8 | $241.5 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

351. In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income, before certain credits (charges), improved in all segments in the quarter and nine months ended June 30, 2000 as compared to the quarter and nine months ended June 30, 1999. The operating improvements are the result of increased revenues and enhanced margins in certain segments. Increased revenues resulted from organic growth and from acquisitions.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

**b. Tyco's Charges and Reserves**

352. The 8/14/00 10-Q also gives materially false and misleading information regarding Tyco's reserves, such as:

> In the nine months ended June 30, 2000, the Company established restructuring and other non-recurring reserves of $35.9 million, of

138

which $7.3 million is included in cost of sales, primarily related to the restructuring activities in AMP's Brazilian operations and wireless communications business, charges associated with USSC's suture business and the exiting of USSC's interventional cardiology business. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $399.3 million. During the nine months ended June 30, 2000, the Company paid out $116.4 million in cash and incurred $50.5 million in non-cash charges that were charged against the reserves. Also in the nine months ended June 30, 2000, the Company determined that $117.2 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $110.9 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At June 30, 2000, there remained $151.1 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $117.6 million is included in accrued expenses and other current liabilities and $33.5 million is included in other long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**19.    8/18/00 S-3 (and Related Prospectus)**

353.    On August 18, 1999, Tyco filed a Form S-3 relating to the public offering and sale of 4,703,999 shares of Tyco common stock issuable upon exercise of stock options held by Kozlowski and the KMS Family Partnership L.P. (the "8/18/00 S-3(1)"). The 8/18/00 S-3(1)

was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 8/18/00 S-3(1) incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

354. Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/18/00 S-3(1) recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

355. In addition, the 8/18/00 S-3(1) sets forth the Consent of PricewaterhouseCoopers, dated August 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

356. On September 12, 2000, Tyco filed with the SEC a Prospectus relating to the public offering and sale of 4,703,999 shares of Tyco common stock issuable upon exercise of stock options held by Kozlowski and the KMS Family Partnership L.P. (the "9/12/00 Prospectus"). Because the 9/12/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 8/18/00 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

357. Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the

Relevant Period, the 9/12/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

    **20.**    **8/18/00 S-3**

358.    On August 18, 2000, Tyco filed a Form S-3 (the "8/18/00 S-3(2)") for the registration of up to $2,500,000,000 of any of the following securities either separately or in units: debt securities, preference shares, depositary shares, and common shares. The 8/18/00 S-3(2) was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 8/18/00 S-3(2) incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

359.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/18/00 S-3(2) recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

360.    The 8/18/00 S-3(2) also sets out the following operating information about the Company:

| | NINE MONTHS<br>ENDED JUNE 30, 2000 | YEAR-ENDED<br>SEPTEMBER 30, 1999 |
|---|---|---|
| Earnings: | | |
| Income (loss) before extraordinary items and cumulative effect of accounting changes | $2,610.0 | $1,067.7 |
| Income taxes | 878.9 | 637.5 |
| | 3,488.9 | 1,705.2 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

361.    In addition, the 8/18/00 S-3(2) sets forth the Consent of PricewaterhouseCoopers, dated August 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

**21.    8/18/00 S-3 (and Related Prospectus and Prospectus Supplements)**

362.    On August 18, 2000, Tyco filed a Form S-3 for the registration of $3,500,000,000 in debt securities of Tyco International Group S.A. (the "8/18/00 S-3(3)").  The 8/18/00 S-3(3) was signed by Defendants Swartz, Kozlowski, and Walsh).  Because the 8/18/00 S-3(3) incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

363.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/18/00 S-3(3) recites Tyco's purported strategy, quoted and discussed above in paragraph 238.  As the Tyco Defendants either knew or were reckless in not knowing,

this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

364.    The 8/18/00 S-3(3) also sets out the following operating information about the Company:

| | NINE MONTHS ENDED JUNE 30, 2000 | YEAR-ENDED SEPTEMBER 30, 1999 |
|---|---|---|
| Earnings: | | |
| Income (loss) before extraordinary items and cumulative effect of accounting changes | $2,610.0 | $1,067.7 |
| Income taxes | 878.9 | 637.5 |
| | 3,488.9 | 1,705.2 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

365.    In addition, the 8/18/00 S-3(3) sets forth the Consent of PricewaterhouseCoopers, dated August 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

366.    On September 18, 2000, Tyco filed with the SEC a Prospectus relating to the registration of $3,500,000,000 in debt securities of Tyco International Group S.A. (the "9/18/00 Prospectus").  Because the 9/18/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 8/11/00 S-3(3), it contains the same materially false and misleading statements set forth in those documents, as described herein.

367.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 9/18/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 238.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material

information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

368.    On February 20, 2001, the Tyco Defendants filed with the SEC a Prospectus Supplement (the "2/20/01 Prospectus Supplement") to the 9/18/00 Prospectus.  Because the 2/20/01 Prospectus Supplement incorporates by reference the same documents that were incorporated by reference in the 8/11/00 S-3(3), it contains the same materially false and misleading statements set forth in those documents, as described herein.

369.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 2/20/01 Prospectus Supplement recites Tyco's purported strategy, quoted and discussed below in paragraph 430.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

370.    On June 5, 2001, the Tyco Defendants filed with the SEC a Prospectus Supplement to the 9/18/00 Prospectus (the "6/5/01 Prospectus Supplement").  Because the 6/5/01 Prospectus Supplement incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K and 10-K/A for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

371.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 6/5/01 Prospectus Supplement recites Tyco's purported strategy, quoted and discussed below in paragraph 430.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted

material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

372.     On July 26, 2001, Tyco filed with the SEC a Prospectus Supplement (the "7/26/01 Prospectus Supplement") to the 9/18/00 Prospectus.  Because the 7/26/01 Prospectus Supplement incorporates by reference the same documents that were incorporated by reference in the 8/11/00 S-3(3), it contains the same materially false and misleading statements set forth in those documents, as described herein.

373.     Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 7/26/01 Prospectus Supplement recites Tyco's purported strategy, quoted and discussed below in paragraph 430.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

374.     The 7/26/01 Prospectus Supplement also states as follows:

> On July 18, 2001, Tyco announced its results for the third quarter of fiscal 2001, the three months ended June 30, 2001.  Revenues for the quarter rose 25% to $9.29 billion compared with last year's $7.42 billion.  Diluted earnings per share before extraordinary items for the third quarter of fiscal 2001 were $0.67, or $1.22 billion, compared to $0.58 or $997.3 million, in the third quarter of fiscal 2000.  Net income before non-recurring and extraordinary items rose to $1.31 billion, an increase of 32% compared to $992.1 million last year.  Diluted earnings per share before non-recurring and extraordinary items for the third fiscal quarter ended June 30, 2001 were $0.72, a 24% increase over earnings of $0.58 per diluted share in the third quarter of fiscal 2000.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**22.     10/18/00 Press Release**

375.     In a press release dated October 18, 2000 (filed with a Form S-8 on November 1,

2000), Tyco announced that it had completed the acquisition of Mallinckrodt. The press release stated:

> "The Mallinckrodt acquisition will be immediately accretive to Tyco's earnings," according to L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer. "It offers consolidation opportunities as well as significant manufacturing, purchasing and distribution synergies. Our past acquisitions in Tyco Healthcare have achieved strong top line growth and operating efficiencies. The acquisition of Mallinckrodt also will provide ongoing positive benefits to Tyco shareholders.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

### 23.    10/18/00 S-4 (and Related S-4/A's)

376.    On October 18, 2000, Tyco filed with the SEC a Form S-4 relating to a proposed merger between InnerDyne and a subsidiary of Tyco (the "10/18/00 S-4"). The 10/18/00 S-4 was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 10/18/00 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

377.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 10/18/00 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 238. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of InnerDyne:

At a meeting of Tyco's board of directors held on October 3, 2000, Tyco's board determined that the acquisition of InnerDyne was in keeping with its corporate strategy of complementing its internal growth with acquisitions that are likely to benefit from cost reductions and synergies when combined with Tyco's existing operations and that are expected to be accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

378.    In addition, the 10/18/00 S-4 sets forth the Consent of PwC, dated October 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

379.    On October 20, 2000, Tyco filed with the SEC a Form S-4/A (the "10/20/00 S-4/A"), amending the 10/18/00 S-4. The 10/20/00 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh. Because the 10/20/00 S-4/A incorporates by reference the same documents that were incorporated by reference in the 10/18/00 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

380.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 10/20/00 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 238. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of InnerDyne, using precisely the same language quoted from the 10/18/00 S-4 above. As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

381.    In addition, the 10/20/00 S-4/A sets forth the Consent of PwC, dated October 16, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

382.    On November 14, 2000, Tyco filed with the SEC a Form S-4/A (the "11/14/00 S-4/A"), amending its S-4 filed on October 18, 2000 and S-4/A filed on October 20, 2000.  The 11/14/00 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh.  Because the S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, and November 1, 2000.

383.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 11/14/00 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 238.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of InnerDyne, using precisely the same language quoted from the 10/18/00 S-4 above.  As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

384.    In addition, the 11/14/00 S-4/A contains materially false and misleading statements about Tyco under the heading "Recent Developments."  For example:

On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999.  After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999.  Results in the fourth quarter of fiscal 2000 included a $ 1.76 billion pretax gain from the initial public offering of TyCom Ltd.  Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

385.    Further Tyco stated:

For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999.  Income before restructuring and other non-recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a 42% increase over $1.53 per diluted share in fiscal 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion, or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

386.    In addition, the 11/14/00 S-4/A S-3 sets forth the Consent of PwC, dated November 14, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

387. On March 15, 2001, the Tyco Defendants filed with the SEC a Prospectus Supplement relating to Tyco's proposed offer of 31,085 common shares relating to a proposed merger between InnerDyne and a Tyco subsidiary (the "3/15/01 Prospectus Supplement"). Because the 3/15/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, and March 15, 2001.

388. Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 3/15/01 Prospectus Supplement recites Tyco's purported strategy, quoted and discussed below in paragraph 430. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

**24.    10/23/00 S-8**

389. On October 23, 2000, Tyco filed a Form S-8 for the registration of 1,000,000 shares of Tyco common stock relating to the Investment Plan for Employees of Mallinckrodt Inc. (the "10/23/00 S-8"), signed by Defendants Swartz, Kozlowski, and Walsh. Because the 10/23/00 S-8 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, and July 14, 2000.

390.    In addition, the 10/23/00 S-8 sets forth the Consent of PwC, dated August 16,

2000, permitting the incorporation by reference of its materially false and misleading report,

dated October 23, 1999, quoted in the 1999 10-K and discussed above, and other materially false

and misleading materials discussed herein.

### 25.    10/24/00 Earnings Announcement

391.    On October 24, 2000, Tyco issued a press release announcing its financial results

for the quarter ended September 30, 2000:

> Tyco . . . reported today that diluted earnings per share for its
> fourth quarter ended September 30, 2000 were 64 cents, a 39
> percent increase over earnings of 46 cents per share in its fourth
> quarter of 1999.  Net income before extraordinary item rose to
> $1.10 billion, an increase of 40 percent compared to $782.7 million
> last year.  Sales for the quarter rose 25 percent to $7.81 billion
> compared with last year's $6.22 billion.  These results are before
> restructuring and other non-recurring credits, charges, gain and
> extraordinary item.  After giving effect to restructuring and other
> non-recurring credits, charges and gain, diluted earnings per share
> before extraordinary item for the fourth quarter of fiscal 2000 were
> $1.12, or $1.91 billion, compare to 46 cents, or $780.8 million, in
> the fourth quarter of fiscal 1999.
>
> For fiscal 2000, income before restructuring and other non-
> recurring credits, charges, gain and extraordinary item rose to
> $3.73 billion, or $2.18 per diluted share, a 42 percent increase over
> last year's diluted per share earnings of $1.53.  After giving effect
> to restructuring and other non-recurring credits, charges and gain,
> diluted earnings per share before extraordinary item were $2.64, or
> $4.52 billion for fiscal 2000 compared to 64 cents, or $1.07 billion
> in fiscal 1999.  Revenues for the twelve months increased to
> $28.93 billion, 29 percent higher than last year's $22.50 billion.

392.    As the Tyco Defendants either knew or were reckless in not knowing, these

statements when made were false and misleading and omitted material information for the

reasons set forth in Sections V.A, A.1.a, and A.1.c.

### 26.    10/24/00 Conference Call

393.    On October 24, 2000, Tyco held a conference call to discuss, among other things,

its earnings during the fourth quarter of fiscal 2000.  Defendant Kozlowski touted Tyco's

performance for the quarter:  "The organic growth for the entire fiscal year was in excess of 16%

. . . [W]e detect no signs of weakness in any areas of any of our businesses."  He said also:  "I

hope you got the sense from our conference call here today that business is very good at Tyco,

the outlook is quite strong.  You will be seeing robust organic growth from us."  As Defendant

Kozlowski either knew or was reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in Section(s) V.A, A.l.a, and A.1.c.

394.     In addition, Defendant Kozlowski described Tyco's strategy for acquiring other

companies, emphasizing that each and every acquisition has to be "strongly accretive" to Tyco:

> KOZLOWSKI:          . . . [I]rregardless of the size [all our acquisitions]
> have to meet the same criteria of being strongly
> accretive to us, and we get that accretion through
> cost reductions, we do not count revenue
> enhancements into any of that but we've push hard
> for revenue enhancement and we wouldn't buy a
> company whose revenues we didn't think we could
> enhance, we simply wouldn't pay for it at the time it
> comes to a part of the company, it has to fit within
> the segments that we are in, it has to have
> management sponsorship here, and it has to be
> something that just makes a whole lot of sense.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.1.a, and A.1.c.

395.     The following day, in an article entitled "Tyco's Net Income More Than Doubles;

Profit Before One-Time Items Rises 40%," *The Wall Street Journal* quoted an "upbeat"

Kozlowski as saying: "we detect no signs of weakness in any of our businesses," and called the

company's outlook "quite strong."  As Defendant Kozlowski either knew or was reckless in not

knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A and B.

### 27. 11/9/00 S-3 (and Related S-3/A and Prospectus)

396. On November 9, 2000, Tyco filed a Form S-3 for the registration of 2,180,010 shares of Tyco common stock relating to Tyco's October 26, 2000 acquisition of CIGI Investment Group, Inc. (the "11/9/00 S-3"). The 11/9/00 S-3 was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 11/9/00 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, and November 1, 2000.

397. Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 11/9/00 S-3 recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

398. In addition, the 11/9/00 S-3 contains materially false and misleading statements about Tyco under the heading "Current Developments." For example:

> On October 24, 2000, Tyco announced its preliminary unaudited results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary item was $1.10 billion, or $0.64 per share on a fully diluted basis, as compared to $782.7 million, or $0.46 per share on a fully diluted basis, for the quarter ended September 30,

1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary item, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter included a $1.76 billion pretax gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

399. Further, the 11/30/00 S-3/A stated:

For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999. Income before restructuring and other non-recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a 42% increase over $1.53 in fiscal 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary item, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion, or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

400. In addition, the 11/9/00 S-3 sets forth the Consent of PwC, dated November 8, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

401. On November 14, 2000, Deutsche Banc Alex Brown, issued an analyst report entitled, "TYC Sees $0.05 FY01 LPS Accretion LPS - Buying Opportunity - Consensus EPS Should Rise." The report stated, "[o]nce again, Tyco has made an acquisition that makes both

economic and strategic sense. We've come to expect nothing less from Tyco."

402. On November 30, 2000, Tyco filed a Form S-3/A (the "11/30/00 S-3/A"), amending the 11/9/00 S-3. The 11/30/00 S-3/A was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh. Because the S-3/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, November 1, 2000, and November 15, 2000.

403. Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 11/30/00 S-3/A recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy, when made, was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

404. In addition, the 11/30/00 S-3/A contains materially false and misleading statements about Tyco under the heading "Current Developments." For example:

> On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax gain

> from the initial public offering of TyCom Ltd. Fourth quarter sales
> rose 25% to $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

405.    Further, the filing stated:

> For fiscal 2000, revenues increased to $28.93 billion, up 29% from
> revenues of $22.50 billion in fiscal 1999. Income before
> restructuring and other non-recurring credits, charges, gain and
> extraordinary items rose to $3.73 billion, or $2.18 per diluted
> share, a 42% increase over $1.53 per diluted share in fiscal 1999.
> After giving effect to restructuring and other non-recurring credits,
> charges, gain and extraordinary items, net income for fiscal 2000
> was $4.52 billion, or $2.64 per diluted share, compared to $1.02
> billion or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a and A.1.c.

406.    In addition, the 11/30/00 S-3/A sets forth the Consent of PricewaterhouseCoopers, dated November 29, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

407.    On December 8, 2000, Tyco filed with the SEC a Prospectus in connection with the registration of 2,180,010 shares of Tyco common stock relating to Tyco's October 26, 2000 acquisition of CIGI Investment Group, Inc. (the "12/8/00 Prospectus"). Because the 12/8/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 11/30/00 S-3/A, it contains the same materially false and misleading statements set forth in those documents, as described herein.

408.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the

Relevant Period, the 12/8/00 Prospectus recites Tyco's purported strategy, quoted and discussed

above in paragraph 238.  As the Tyco Defendants either knew or were reckless in not knowing,

this statement of strategy when made was materially false and misleading and omitted material

information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

409.    In addition, the 12/8/00 Prospectus contains materially false and misleading

statements about Tyco under the heading "Current Developments."  These statements are

identical to those quoted above from the 11/30/00 S-3/A under the same heading, and are

materially false and misleading for the same reasons.

### 28.    11/14/00 Conference Call

410.    On November 14, 2000, Tyco held a conference call to announce a deal to

purchase a unit of Lucent.  According to Defendant Kozlowski:

> KOZLOWSKI:    The deal is very attractive financially in terms of
> earnings per share accretion and return.  This is
> possible through some $385 million in synergies. . .
> About 60% of the synergies will be realized in the
> first full year we have the company and about 99%
> of the synergies will be realized in year 2.  So
> therefore, as we pointed out, year one accretion will
> be about 6¢, year two and year three will be out 12
> and 15¢ respectively. . . . We believe we will have
> no problems meeting the goals, the financial goals
> that we have set out before your within this
> business.  And overall we are pleased to also report
> that Tyco continues to function well.  All of our
> businesses are operating at a high level.  We're very
> comfortable with the earnings estimates that we
> have out for the quarter and for the year and this
> deal will be accretive as we pointed out to those
> earnings estimates for the year.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.1.a, and A.l.c.

### 29.    12/4/00 Simplex Acquisition

411.    On December 4, 2000, Tyco announced that it would acquire Simplex Time

Recorder Co.  The Company's press release stated:

> According to L. Dennis Kozlowski, Tyco's Chairman and Chief
> Executive Officer, "This transaction meets all of Tyco's
> acquisition criteria.  The transaction will be immediately accretive
> to Tyco's earnings per share and generate positive operating cash
> flows."

412.    Defendant's December 4, 2000 statements were false and misleading because

they failed to disclose the existence of the acquisitions scheme described in Section(s) V.A,

A.1.a, and A.1.c, including but not limited to the fact that acquisition would be accretive because

of Defendants' erroneous and misleading accounting and manipulation of the acquired

company's financial statements and recording of excess goodwill.

413.    According to a December 5, 2000 *The Wall Street Journal* article ("Tyco Agrees

to Buy Simplex Time Recorder"), Defendant Kozlowski said of the deal:  "The combination of

Simplex with Tyco Fire and Security Services will provide excellent manufacturing and service

synergies, allowing for immediate benefits for Tyco shareholders."  As Defendant Kozlowski

either knew or was reckless in not knowing, this statement when made was materially false and

misleading and omitted material information for the reasons set forth above in Section(s) V.A,

A.l.a, and A.1.c.

### 30.    12/8/00 S-3 (and Related S-3/A and Prospectus)

414.    On December 8, 2000, Tyco filed a Form S-3 for the registration of

$4,657,500,000 in Liquid Yield Option Notes due 2020 (the "12/8/00 S-3").  The 12/8/00 S-3

was signed by Defendants Swartz, Kozlowski, and Walsh.  Because the 12/8/00 S-3 incorporates

the following documents by reference, it contains the same materially false and misleading

statements set forth in those documents, as described above: (i) Tyco's Annual Report on Forms 10-K and 10-K/A for the fiscal year-ended September 30, 1999; (ii) Tyco's Quarterly Reports on Forms 10-Q and 10-Q/A for the quarters ended December 31, 1999, March 31, 2000, and June 30, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on December 9, 1999, January 20, 2000, July 14, 2000, November 1, 2000, and November 15, 2000.

415.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 12/8/00 S-3 recites Tyco's purported strategy, quoted and discussed above in paragraph 238. As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

416.    In addition, the 12/8/00 S-3 contains materially false and misleading statements about Tyco under the heading "Current Developments." For example, the filing states:

> On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

417.    Further:

For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999. Income before restructuring and other non-recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a 42% increase over $1.53 per diluted share in fiscal 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion or $0.61 per diluted share, in fiscal 1999.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

418. The 12/8/00 S-3 also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, the Tyco Defendants provide the following summary information:

| | NINE MONTHS ENDED JUNE 30, 2000 | YEAR-ENDED SEPTEMBER 30, 1999 |
|---|---|---|
| Earnings: | | |
| Income (loss) before extraordinary items and cumulative effect of accounting changes | $2,610.0 | $1,067.7 |
| Income taxes | 878.9 | 637.5 |
| | 3,488.9 | 1,705.2 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

419. The 12/8/00 S-3 also includes information on charges included in earnings:

Earnings for the nine months ended June 30, 2000, the years ended September 30, 1999 and 1998, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995 include net merger, restructuring and other non-recurring (credits) charges of $(81.3) million (of which net charges of $1.0 million are included in cost of sales), $1,035.2 million (of which $106.4 million is included in cost of sales), $256.9 million, $947.9 million, $344.1 million and $97.1 million, respectively. Earnings

160

> also include charges for the impairment of long-lived assets of $99.0 million, $507.5 million, $148.4 million, $744.7 million and $8.2 million in the nine months ended June 30, 2000, the year-ended September 30, 1999, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995, respectively.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

420.    In addition, the 12/8/00 S-3 sets forth the Consent of PricewaterhouseCoopers, dated December 8, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other materially false and misleading materials discussed herein.

421.    On December 15, 2000, Tyco filed a Form S-3/A (the "12/15/00 S-3/A"), amending the 12/8/00 S-3.  The 12/15/00 S-3/A was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh.  Because the 12/15/00 S-3/A incorporates by reference the same documents that were incorporated by reference in the 12/8/00 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

422.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 12/15/00 S-3/A recites Tyco's purported strategy, quoted and discussed above in paragraph 238.

423.    In addition, the 12/15/00 S-3/A contains materially false and misleading statements about Tyco under the heading "Current Developments."  These statements are identical to those quoted above from the 12/8/00 S-3 under the same heading, and are materially false and misleading for the same reasons.

424.    The 12/15/00 S-3/A also includes information on charges included in earnings

that is identical to that quoted above from the 12/8/00 S-3.  That information, too, is materially false and misleading for the same reasons given above.

425.    The 12/15/00 S-3/A also sets forth the Consent of PricewaterhouseCoopers, dated December 15, 2000, permitting the incorporation by reference of its materially false and misleading report, dated October 21, 1999, quoted in the 1999 10-K and discussed above, and other false and misleading materials discussed herein.

426.    On December 19, 2000, the Tyco Defendants filed with the SEC a Prospectus relating to the registration of $4,657,500,000 in Liquid Yield Option Notes due 2020 (the "12/19/00 Prospectus").  Because the 12/19/00 Prospectus incorporates by reference the same documents that were incorporated by reference in the 12/8/00 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

427.    Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 12/19/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 238.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

428.    In addition, the 12/19/00 Prospectus contains materially false and misleading statements about Tyco under the heading "Current Developments."  The statements are identical to those quoted above from the 12/8/00 S-3 under the same heading, and are materially false and misleading for the same reasons.

**31.    The 2000 10-K Filed on 12/21/00**

429.    On December 21, 2000, Tyco filed its 10-K for the fiscal year-ended September 30, 2000 (the "2000 10-K"), signed by Defendants Swartz, Kozlowski, and Walsh.  In it, the Tyco Defendants set out numerous materially false and misleading statements on a variety of

topics, including the following:

### a. Tyco's "Strategy"

430. Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the

Relevant Period, the 2000 10-K recites Tyco's purported strategy:

> Tyco's strategy is to be the low-cost, high quality producer and
> provider in each of our markets. We promote our leadership
> position by investing in existing businesses, developing new
> markets and acquiring complementary businesses and products.
> Combining the strengths of our existing operations and our
> business acquisitions, we seek to enhance shareholder value
> through increased earnings per share and strong cash flows.

As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy

when made was materially false and misleading and omitted material information for the reasons

set forth above in Section(s) V.A, A.1.a, and A.1.c.

### b. Tyco's Manipulation of Purchase Accounting Reserves

431. The 2000 10-K sets forth statements that were materially false and misleading

concerning Tyco's manipulation of purchase accounting reserves:

> In Fiscal 2000, we made acquisitions that were accounted for
> under the purchase accounting method at an aggregate cost of
> $5,162.0 million. Of this amount, $4,246.5 million was paid in
> cash (net of cash acquired), $671.4 million was paid in the form of
> Tyco common shares, and we assumed $244.1 million in debt. In
> connection with these acquisitions, we established purchase
> accounting reserves of $426.2 million for transaction and
> integration costs. At the beginning of Fiscal 2000, purchase
> accounting reserves were $570.3 million as a result of purchase
> accounting transactions made in prior years. During Fiscal 2000,
> we paid out $544.2 million in cash and incurred $52.1 million in
> non-cash charges against the reserves established during and prior
> to Fiscal 2000. Also in Fiscal 2000, we determined that $117.8
> million of purchase accounting reserves related to acquisitions
> made prior to Fiscal 2000 were not needed and reversed that
> amount against goodwill. At September 30, 2000, there remained
> $372.6 million in purchase accounting reserves on our
> Consolidated Balance Sheet, of which $349.2 million is included in
> current liabilities and $23.4 million is included in long-term

liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made
were materially false and misleading and omitted material information for the reasons set forth
above in Section(s) V.A, A.1.a, and A.1.c.

### c. Tyco's Operating Results

432. The 2000 10-K also gives favorable, purportedly accurate information concerning
Tyco's operating results. For example, the Tyco Defendants provide the following summary
information:

|  | Fiscal 2000 | Fiscal 1999 | Fiscal 1998 |
|---|---|---|---|
| Income before income taxes, minority interest and extraordinary items | 6,464.8 | 1,705.2 | 1,702.8 |
| Income taxes | (1,926.0) | (637.5) | (534.2) |
| Minority interest | (18.7) | -- | -- |
| Income before extraordinary items | 4,520.1 | 1,067.7 | 1,168.6 |
| Extraordinary items, net of taxes | (0.2) | (45.7) | (2.4) |
| Net income | $4,519.9 | $1,022.0 | $1,166.2 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when
made were materially false and misleading and omitted material information for the reasons set
forth above in Section(s) V.A, A.1.a, and A.1.c.

433. In addition, these statements are materially false and misleading because they fail
to disclose the aggressive accounting and incentivizing practices described above (and admitted
by Tyco in the December Report), and instead attribute Tyco's favorable results to "organic
growth" and "synergies" resulting from Tyco's acquisitions. According to the 2000 10-K:

> Operating income improved in all segments in each of Fiscal 2000
> and Fiscal 1999. The operating improvements are the result of
> both increased revenues in all segments and enhanced margins in
> all but one segment in Fiscal 2000. Increased revenues result from
> organic growth and from acquisitions that are accounted for under
> the purchase method of accounting.

The Tyco Defendants also state: "By integrating merged companies with our existing businesses, we expect to realize operating synergies and long-term cost savings." And concerning profits in Tyco's electrical business, the Tyco Defendants state:

> The 49.6% increase in operating income, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 was due to improved margins at AMP, the acquisition of Raychem, and higher sales volume at the Tyco Printed Circuit Group. The unproved operating margins, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP's profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

### d. Management Remuneration and Related Transactions

434. The 2000 10-K addresses management remuneration only by reference, stating: "Information concerning management remuneration is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year." Because the 2000 10-K incorporates Tyco's Proxy Statement, filed on January 29, 2001, by reference, the 2000 10-K contains the same materially false and misleading statements set forth therein, as described below at paragraphs 449-455.

435. Similarly, the 2000 10-K addresses related transactions by reference, stating: "Information concerning certain relationships and related transactions is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year." Because the 2000 10-K incorporates Tyco's Proxy Statement, filed on January 29, 2001, by reference, the 2000 10-K contains the same

materially false and misleading statements set forth therein, as described below at paragraphs 449-455.

### 32. 12/29/00 Lucent Acquisition Closes

436.     On December 29, 2000, Tyco announced that it had completed its acquisition of Lucent's Power Systems Business. According to the press release, Kozlowski stated:

> This business is an excellent fit for Tyco Electronics. We expect that the acquisition of LPS will be immediately accretive to Tyco's earnings. Previous acquisitions in Tyco Electronics continue to achieve strong top line growth and exceed expected earnings targets.

437.     On January 2, 2001, *The Wall Street Journal* reported that Tyco completed its purchase of a Lucent unit for $2.5 billion. The article included a comment from Tyco concerning the benefits of the acquisition:

> Tyco said the acquisition, which gives it a strong foothold in the fast-growing business of providing power supplies to telecommunications concerns, will be "immediately accretive."

As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c, including that the acquisition would be "accretive" because of Defendants' erroneous and misleading accounting and manipulation of the acquired company's financial statements and recording of excess goodwill.

### 33. 2000 Annual Report to Shareholders

438.     On or about January 30, 2001, Tyco released its 2000 Annual Report to Shareholders (the "2000 Annual Report"). On its very first page, the 2000 Annual Report falsely and misleadingly states that its "exceptional financial results" are the product of its "growth-on-growth" strategy:

> Tyco has demonstrated the ability to grow each of its businesses

> organically, as well as by the acquisition of complementary
> businesses or product lines. This "growth-on-growth" strategy has
> yielded exceptional financial results for several years, and puts us
> in a position to achieve excellent growth in the future.

As the Tyco Defendants either knew or were reckless in not knowing, these statements, when made, were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

439. The 2000 Annual Report touts Tyco's ability to achieve "Organic Growth," even in the absence of any additional acquisitions:

> Based on its performance to date, Tyco would continue growing
> revenues and achieving double-digit earnings gains annually for
> the foreseeable future even without additional acquisitions. This is
> because we have leadership positions in many of the world's best
> growth industries. Thus, we have the ability to increase sales each
> year through a combination of geographic expansion, the
> introduction of innovative new products and market share gains
> fueled by our status as the low-cost producer in most of our
> markets.

As the Tyco Defendants either knew or were reckless in not knowing, these statements, when made, were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

440. The 2000 Annual Report included a full page description of the Company's "free cash flow":

> At Tyco, cash is king. We judge ourselves by the amount of free
> cash flow that we generate each year after we have paid all
> necessary expenses, including capital expenditures, which
> exceeded $1.8 billion last year. In fiscal 2000, Tyco generated
> over $3.3 billion in free cash flow. Cash generation is crucial
> because it is the very best indicator of how a company is really
> performing and it provides the resources for us to continue to grow
> our businesses by acquisition or other types of investment, such as
> through Tyco Ventures, our new venture capital arm.

As the Tyco Defendants either knew or were reckless in not knowing, these statements, when

made, were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

441.     The 2000 Annual Report also provided investors with a false and misleading explanation of Tyco's acquisition strategy, including its purported ability to acquire companies that "immediately'' add to earnings:

> Acquisitions are a definite growth driver at Tyco.  The second part of the growth-on-growth with strategy involves acquisitions that add new products and businesses to complement our core groups. We seek to acquire companies with superior products that have long-term growth potential but are performing below peak level, or companies that fill a gap in our existing product lines.  All acquisitions must immediately add to earnings, but they must also make strategic sense by helping us become a stronger competitor in one of our existing business segments.  Buying at a good price is important; finding a company whose people and products fit well in our organization is essential.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

442.     The 2000 Annual Report also included a letter to Tyco shareholders from Defendant Kozlowski, which states:

> Fiscal 2000 was another very strong year for Tyco.  I am pleased to report that all our operating units beat their performance targets, and they are in a position to achieve excellent growth in 2001 and beyond.
>
> Tyco's internal revenue growth in fiscal 2000 was 14 percent, a remarkable feat for a company of our size.  Put another way, our business units delivered $3.7 billion in incremental sales last year alone - not counting acquisitions.  That is what I call a growth company.
>
> For the seventh consecutive year, we increased revenues and earnings substantially.  Revenues rose 29 percent to $28.9 billion and earnings grew $1.2 billion to $3.7 billion, a 46 percent increase over the prior year.  Our diluted earnings per share increased 42

> percent to $2.18. These are outstanding numbers, the result of our focus on lean, efficient management, continuous production improvement and aggressive expansion into new markets. . . .
>
> I have never been more confident about Tyco's core businesses and our growth opportunities. We generated more than $3.3 billion in free cash flow in 2000, an amount that we hope to increase to over $4 billion - - before capital spending on the TyCom Global Network - - in 2001. . . .
>
> Growth on Growth
>
> At Tyco, we have a two-pronged growth strategy. First, we seek to achieve double-digit organic growth every year. This is growth without ever doing another acquisition. . . .
>
> Strategic acquisitions also play a key role in our growth. A good acquisition should not only be profitable on its own terms, it should also help existing businesses and product lines. . . .
>
> Tyco's future looks outstanding and I am confident that our "growth-on-growth" strategy will continue to deliver enviable results. We are poised for growth because we have the best brand names in our industries, names that represent "reliability" and "innovation" to purchasers.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

443.    In addition, the 2000 Annual Report provided investors with a false overview of the Company's operations:

> Sales increased 28.6% during Fiscal 2000 to $28,931.9 million from $28,496.5 million in Fiscal 1999. Sales in Fiscal 1999 increased 18.0% compared to Fiscal 1998, income before extraordinary items was $4,520.1 million in Fiscal 2000, as compared to $1,067.7 million in Fiscal 1999 and $1,168.6 million in Fiscal 1998. Income before extraordinary items for Fiscal 2000 included an after-tax net credit of $793.7 million ($1,484.7 million pre-tax) consisting of restructuring, non-recurring and impairment charges of $327.3 million ($424.2 million pre-tax) primarily for non-recurring claims related to a merged company and the exiting of USSC's interventional cardiology business, offset by a credit of

$113.6 million ($148.9 million pre-tax) representing a revision of estimates of merger, restructuring and other non-recurring accruals and a gain of $1,007.4 million ($1,760.0 million pre-tax) on the issuance of common shares in connection with TyCom's initial public offering. Income before extraordinary items for Fiscal 1999 included an aftertax net charge of $1,304.8 million ($1,542.7 million pre-tax) primarily related to the mergers with USSC and AMP and costs associated with AMP's profit improvement plan. Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP's profit improvement plan and costs incurred by USSC to exit certain businesses.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

444.     The 2000 Annual Report also provides limited information concerning loans taken by senior management under Tyco's KEL program, which was instituted to encourage ownership of the Company's common stock by executives and other key employees. According to the 2000 Annual Report: "During Fiscal 2000, the maximum amount outstanding under is program was $26.0 million. Loans receivable under this program were $11.4 million and $18.6 million at September 30, 2000 and 1999, respectively." As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.1.b, B.4, and B.5.

445.     Finally, the 2000 Annual Report includes PwC's audit opinion, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), on Tyco's 2000 and 1999 financial statements. As set forth above, PwC's opinion falsely stated that such Tyco financial statements were presented in conformity with GAAP, and that PwC's audit was performed in accordance with GAAS.

**D.    2001 Materially False and Misleading Statements and Omissions**

**1.    1/17/01 Press Release**

446.    On January 2001, Tyco announced its earnings for the quarter ended December

31, 2000:

> Tyco . . . reported today that diluted earnings per share for its first
> quarter ended December 31, 2000 were 57 cents, a 24 percent
> increase over earnings of 46 cents per share in its first quarter of
> fiscal 2000.  Net income before extraordinary items and
> cumulative effect of accounting change rose to $1.01 billion, an
> increase of 28 percent compared to $784.3 million last year.  Sales
> for the quarter rose 21 percent to $8.02 billion compared with last
> year's $6.64 billion.  These results are before non-recurring items.
> After giving effect to such items, diluted earnings per share before
> extraordinary items and cumulative effect of accounting change for
> the first quarter of fiscal 2001 were 57 cents, or $1.01 billion,
> compared to 44 cents, or $757.2 million in the first quarter of fiscal
> 2000.
>
> "Each of Tyco's segments reported solid gains in revenue,
> operating profits and cash flow, even in the face of a turning
> economic environment.  The strongest growth was recorded by
> Tyco Electronics, where double-digit organic growth was
> enhanced by the successful integration of the Thomas & Betts
> OEM division," said L. Dennis Kozlowski, Tyco's Chairman and
> Chief Executive Officer.
>
> "Although we face an uncertain economic environment, we remain
> comfortable with Tyco's outlook for the remainder of 2001.  We
> have in place a very deliberate strategy to focus each of the
> businesses on recurring and other sources of revenue and earnings
> that are less sensitive to economic cycles.  Based on current
> business trends, we believe that although some parts of our
> business will see slower growth, overall Tyco's results will be in
> line with our expectations.  We will benefit from the integration of
> the acquisitions we have recently completed, particularly from the
> resulting synergies," he added.

447.    As the Tyco Defendants either knew or were reckless in not knowing, these

statements were materially false and misleading and omitted material information as set forth in

Sections V.A, A.1.a, and A.1.c.

### 2.     1/17/01 Conference Call

448.    On January 17, 2001, Tyco held a conference call with analysts.  During the call, the Tyco Defendants continued to report "organic growth":

> KOZLOWSKI:      Tyco International today reported a 24% increase in first quarter earnings per share.  Our earnings per share increased to 57 cents a share from 46 cents last year.  Our revenue was up 21% to $8 billion for the quarter and we are pleased to report that organic growth for Tyco which excluding TyCom which has a different business model now where they building out their own system.  Organic growth was up from 16%.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### 3.     2001 Proxy Statement

449.    On January 29, 2001, the Tyco Defendants filed with the SEC Tyco's Proxy Statement for the 2001 annual meeting (the "2001 Proxy Statement").  The 2001 Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key Employee Loan Program, and allegations of accounting impropriety by the Company.

### a.     Management Remuneration

450.    Concerning Tyco's executive compensation program generally, the 2001 Proxy Statement states:

> Tyco's executive compensation program [offers] significant financial rewards when Tyco and the individual achieve excellent results; however, significantly lower compensation is tied to lower levels of performance.  Specifically, if the compensation targets are not achieved, Tyco executives are ineligible for either cash bonuses or equity-based compensation.  In order for Mr. Kozlowski and Mr. Swartz to earn a cash bonus in fiscal 2000, a

> minimum of 22.5% growth in pre-tax income and operating cash flow growth over fiscal 1999 performance was required. In addition, in order to meet the performance criteria to vest the minimum number of restricted shares, growth in earnings per share of at least 22.5% over fiscal 1999 was required.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B.

451.    The 2001 Proxy Statement also contains materially false and misleading information regarding the administration of compensation to executive officers and key managers:

> The Compensation Committee of the Board of Directors is composed solely of independent directors, none of whom has any interlocking relationships with Tyco that are subject to disclosure under as of the SEC relating to proxy statements. The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, review and, as required, approves such policies for executive officers and key managers, and oversees the administration of executive compensation programs.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B.

452.    The 2001 Proxy Statement contains the following specific information concerning the compensation of Defendants Kozlowski and Swartz:

| Name & Principal Position | YEAR | Annual Compensation | | | | Long-Term Compensation | | |
|---|---|---|---|---|---|---|---|---|
| | | SALARY | CASH BONUS (3) | STOCK BONUS (4) | RESTRICIED STOCK AWARD(S) (5) | SHARES UNDERLYING STOCK OPTIONS | TYCOM SHARES UNDERLYING STOCK OPTIONS | ALL OTHER COMP (6) |
| L. DENNIS KOZLOWSKI | 2000 | $1,350,000 | $2,800,000 | | $21,207,540 | 5,107,158 | 800,000 | $527,152 |
| CHAIRMAN & CHIEF EXECUTIVE | 1999 | 1,350,000 | 3,200,000 | | 25,707,178 | 6,621,834 | | 387,001 |
| OFFICER, TYCO INTERNATION LTD | 1998 | 1,250,000 | 2,500,000 | | 20,140,000 | 3,832,000 | | 901,002 |

* * *

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| MARK H. SWARTZ | 2000 | 768,750 | 1,400,000 | | 10,603,770 | 2,535,999 | 500,000 | 292,487 |
| EXECUTIVE VICE PRESIDENT AND | 1999 | 750,000 | 1,600,000 | | 12,029,641 | 2,976,480 | | 150,014 |
| CHIEF FINANCIAL OFFICER, TYCO | 1998 | 559,500 | 1,250,000 | | 10,070,000 | 2,764,666 | | 256,878 |
| INTERNATIONAL LTD. | | | | | | | | |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B.1, B.2, B.3, B.4, B.5, and B.6.

453.   The 2001 Proxy Statement failed to disclose and misrepresented the actual compensation of Defendant Kozlowski:

> For fiscal 2000, Mr. Kozlowski received a be salary of $1.35 million and a cash bonus in the amount of $2.8 million, as shown in the SUMMARY COMPENSATION TABLE on page 14.  Mr. Kozlowski was granted 600,000 shares of restricted stock on January 5, 2000.  These shares will vest over a period of up to three years if the specified performance criteria refereed to above are met.

> Mr. Kozlowski also received an aggressive performance-based option award, which includes significant growth in earnings per share and stock price appreciation measures (described in footnote 3 on page 16).  Mr. Kozlowski also received restoration options in accordance with the restoration option provision.  The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco.  At the time of the TyCom initial public offering, Mr. Kozlowski received an award of options to purchase 800,000 TyCom common shares at the initial public offering price of $32.00 with pro-rata vesting over four years.  The Committee believes Tyco is best served by the continued leadership of Mr. Kozlowski.  The Committee conferred with a nationally recognized consulting firm that analyzed Tyco's performance, as well as the marketplace for executive talent.  The firm reviewed the performance option award, designed to focus on Mr. Kozlowski's retention as well as growth in shareholder value, and made its recommendations.  Another consulting firm reviewed and concurred with the recommendations.

> The Committee considers Mr. Kozlowski's level of compensation appropriate in view of his performance and continued leadership of

174

Tyco during fiscal 2000. As noted above, Tyco experienced outstanding growth in earnings per share of 42.5%, operating cash flow of 48.6%, and net sales of 29%.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B.1.a, B.2, B.3, B.4.a, B.5, and B.6.

### b. Key Employee Loan Program

454. The 2001 Proxy Statement provides materially false and misleading statements concerning Tyco's KEL Program. It states, for example:

> The Compensation Committee administers the loan program. The Compensation Committee authorizes loans, which may not exceed the amount allowable as provided by any regulation of the United States Treasury or other state or federal statute. Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured. Loans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (6.67% for 2000) and are generally repayable in ten years or when the participant reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the participant's employment with Tyco or its subsidiaries terminates. The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B.4 and B.5.

455. The 2001 Proxy Statement also falsely and misleadingly states:

> At September 30, 2000, the amount of loans outstanding under the [Key Employee Loan] program totaled $11,421,655, of which nothing was outstanding for any of the Named Officers. The largest amount of indebtedness since October 1, 1999 for each of these individuals was $12,711,768 for Mr. Kozlowski, $304,363 for Mr. Garvey, and $1,000,000 for Mr. Swartz. Neither Dr. Gromer nor Mr. Meelia had loans under the program during fiscal

2000.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B.4 and B.5.

**4.     1/31/01 S-8**

456.     On January 31, 2001, the Tyco Defendants filed a Form S-8 for the registration of 200,000 shares of Tyco common stock (the "1/31/01 S-8"), signed by Defendants Swartz, Kozlowski, and Walsh.  Because the 1/31/01 S-8 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; and (ii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, and November 15, 2000.

457.     In addition, the 1/31/01 S-8 sets forth the Consent of PricewaterhouseCoopers, dated January 29, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

**5.     2/13/01 10-Q for Quarter Ended 12/31/00**

458.     On February 13, 2001, the Tyco Defendants filed Tyco's Form 10-Q for the quarter ended December 31, 2000 (the "2/13/01 10-Q"), signed by Defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

**a.     Tyco's Operating Results**

459.     The 2/13/01 10-Q also gives favorable, purportedly accurate information

concerning Tyco's operating results. For example, the Tyco Defendants provide the following

summary information:

| | (Unaudited) For the quarters ended December 31, | |
|---|---|---|
| | 2000 | 1999 |
| Income before income taxes, minority interest, extraordinary item and cumulative effect of accounting change | 1,551.2 | 1,024.3 |
| Income taxes | (529.5) | (263.9) |
| Minority interest | (12.5) | (3.2) |
| Income before extraordinary item and cumulative effect of accounting change | 1,009.2 | 757.2 |
| Extraordinary item, net of tax | -- | (0.2) |
| Cumulative effect of accounting change, net of tax | (29.7) | -- |
| Net income | $979.5 | $757.0 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.l.a, and A.l.c.

### b. Tyco's Reserves

460. The 2/13/01 10-Q also gives materially false and misleading information

concerning Tyco's reserves, such as:

> During the quarter ended December 31, 2000, we recorded
> restructuring and other non-recurring charges of $18.1 million
> primarily related to an environmental remediation project and the
> closure of a manufacturing plant. Additionally, we incurred a non-
> recurring charge of $25.0 million related to the write-up of
> inventory under purchase accounting. The $25.0 million charge
> has been included in cost of sales. At September 30, 2000, there
> existed merger, restructuring and other non-recurring reserves of
> $365.9 million. During the quarter ended December 31, 2000, we
> paid out $11.3 million in cash and incurred $1.7 million in non-
> cash charges that were charged against these reserves. At
> December 31, 2000, there remained $371.0 million of merger,
> restructuring and other non-recurring reserves in our Consolidated
> Balance Sheet, of which $3413 million is included in current
> liabilities and $29.7 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

177

forth above in Section(s) V.A, A.l.a, and A.l.c.

**6.    2/23/01 S-4 (and Related S-4/A and Prospectus)**

461.    On February 23, 2001, Tyco filed with the SEC a Form S-4 relating to Tyco's proposed offer to issue 9,415,481 shares of Tyco stock upon consummation of the merger with Scott Technologies, Inc. (the "2/23/01 S-4").  The 2/23/01 S-4 was signed by Defendants Kozlowski, Swartz, and Walsh.  Because the 2/23/01 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, and February 9, 2001.

462.    Like many of Tyco's other filings with the SEC throughout the Relevant Period, the 2/23/01 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 238. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Scott:

> At a meeting held on January 10, 2001, Tyco's Board of Directors
> determined that the acquisition of Scott was in keeping with its
> corporate strategy of complementing its internal growth with
> acquisitions that are likely to benefit from cost reductions and
> synergies when combined with Tyco's existing operations and that
> are expected to be accretive to Tyco's earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

463.    In addition, the 2/23/01 S-4 sets forth the Consent of PricewaterhouseCoopers, dated February 20, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4,

2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

464.     On March 30, 2001, Tyco filed with the SEC a Form S-4/A (the "3/30/01 S-4/A") and a Prospectus (the "3/30/01 Prospectus") relating to the proposed merger between Scott Technologies, Inc. and Tyco.  Because the 3/30/01 S-4/A and the 3/30/01 Prospectus each incorporate the following documents by reference, they each contain the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, and March 29, 2001.

465.     Like many of Tyco's other filings with the SEC throughout the Relevant Period, the 3/30/01 S-4/A and the 3/30/01 Prospectus each recite Tyco's purported strategy, quoted and discussed above in paragraph 438.  They also reiterate its so-called strategy in their discussion of Tyco's acquisition of Scott, using precisely the same language quoted from the 2/23/01 S-4 above.  As the Tyco Defendants either knew or were reckless in not knowing, the statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

466.     The 3/30/01 S-4/A and the 3/30/01 Prospectus also give favorable, purportedly accurate information concerning Tyco's operating results, including the identical historical financial data of Tyco represented in the 2/23/01 S-4, quoted above.  As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s)

V.A, A.1.a, and A.l.c.

467.    In addition, the 3/30/01 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated March 14, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

**7.    3/13/01 Conference Call**

468.    On March 13, 2001, Tyco held a conference call to discuss, among other things, its proposed acquisition of CIT.  Defendant Kozlowski stated:

> KOZLOWSKI:    On the plus side, this transaction is accretive to Tyco shareholders delivering 10 cents the first full year.  If one were to take out the amortization on this we'd be delivering some 7 ½ cents the first full year.  The new accounting rules allow us to deliver 10 cents and if we were to pool, to be on an apples to apples basis, we would be delivering that 10 cents.  This 10 cents now is based upon putting the two companies together at current rent rates and a little bit of some cost reductions at CIT . . . . This acquisition meets all of our criteria.  CIT is a market leader.  The transaction is immediately accretive to earnings before any revenue enhancements.
>
> * * *
>
> We're very, very enthused by this acquisition.  It's certainly going to add to earnings.  We feel good about our earnings right now.  The transaction most likely will close in about July.  It should add a couple of cents this year, that we're in, and next year for the full year for the full fiscal year now we're probably talking about some 10 to 12 cents before we get into the revenue enhancements for the business.

As Defendant Kozlowski either knew or was reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) V.A, A.l, A.1.c, and A.1.d.

### 8. 3/16/01 S-3 (and related Prospectus)

469. On March 16, 2001, Tyco filed with the SEC a Form S-3 related to the February 12, 2001 issuance of $3,035,000,000 of Zero Coupon Convertible Debentures due February 12, 2021 (the "3/16/01 S-3"). The 3/16/01 S-3 was signed by Defendants Kozlowski, Swartz, and Walsh. Because the 3/16/01 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, and March 15, 2001.

470. The 3/16/01 S-3 also sets out the following favorable, purportedly accurate information concerning Tyco's operating results:

| | Quarter Ended December 31, 2000 | Year-ended September 30, | | | Nine Months Ended September 30, 1997 | Year-ended December 31, 1996 |
| | | 2000 | 1999 | 1998 | | |
| | | | (in millions, except ratio) | | | |
| Earnings: Income (loss) before extraordinary items and cumulative effect of accounting changes | $1,009.2 | $4,520.1 | $1,067.7 | $1,168.6 | $(348.5) | $49.4 |
| Income taxes | 529.5 | 1,926.0 | 637.5 | 534.2 | 348.1 | 469.4 |
| Minority interest | 12.5 | 18.7 | -- | -- | -- | -- |
| | 1,551.2 | 6,464.8 | 1,705.2 | 1,702.8 | (0.4) | 518.8 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

471. In addition, the 3/16/01 S-3 sets forth the Consent of PricewaterhouseCoopers, dated March 14, 2001, permitting the incorporation by reference of its materially false and

misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

472.　　On April 3, 2001, Tyco filed with the SEC a Prospectus related to the February 12, 2001 issuance of the Zero Coupon Convertible Debentures (the "4/3/01 Prospectus"). Because the 4/3/01 Prospectus incorporates by reference the same documents that were incorporated by reference in the 3/16/01 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

**9.　　3/29/01 S-4 (and Related S-8)**

473.　　On March 29, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), a direct wholly owned subsidiary of Tyco (the "3/29/01 S-4"). The 3/29/01 S-4 was signed by Defendants Kozlowski, Swartz, and Walsh. Because the 3/29/01 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, and February 9, 2001.

474.　　Like many of Tyco's other filings with the SEC throughout the Relevant Period, the 3/29/01 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 430. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of CIT:

> The acquisition of CIT would also be consistent with Tyco's corporate strategy of complementing internal growth with synergistic acquisitions that are expected to be immediately accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.1.c, and A.1.d.

475.     The 3/29/01 S-4 also gives favorable, purportedly accurate information concerning Tyco's operating results, including the following:

| | QUARTERS ENDED DECEMBER 31, | | YEAR-ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2000 (2) | 1999 (2) | 2000 (3) | 1999 (4) |
| | | (UNAUDITED) (IN MILLIONS, EXCEPT PER SHARE DATA) | | |
| Consolidated statements of operations data: | | | | |
| Operating income | 1,308.9 | 1,189.0 | 5,474.4 | 2,190.8 |
| Income (loss) from continuing operations | 1,009.2 | 757.2 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share (10): | | | | |
| Basic | 0.58 | 0.45 | 2.68 | 0.65 |
| Diluted | 0.57 | 0.44 | 2.64 | 0.64 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

476.     In addition, the 3/29/01 S-4 sets forth the Consent of PricewaterhouseCoopers, dated March 26, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

477.     On April 13, 2001, the Tyco Defendants filed with the SEC a Form S-4/A (the "4/13/01 S-4/A"), amending the 3/29/01 S-4.  Because the 4/13/01 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q

for the quarters ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, and April 3, 2001.

478. Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 4/13/01 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 430. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of CIT, using precisely the same language quoted from the 3/29/01 S-4 above. As the Tyco Defendants either knew or were reckless in not knowing, the statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

479. In addition, the 4/13/01 S-4/A sets forth the Consent of PwC, dated April 13, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

480. On April 24, 2001, Tyco filed with the SEC a prospectus relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV) (the "4/24/01 Prospectus"). Because the 4/24/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, and April 3, 2001.

481.     Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the

Relevant Period, the 4/24/01 Prospectus recites Tyco's purported strategy, quoted and discussed

above in paragraph 430.  It also reiterates the so-called strategy in its discussion of Tyco's

acquisition of CIT, using precisely the same language quoted from the 3/29/01 S-4 above.  As

the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy

when made were materially false and misleading and omitted material information for the

reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

482.     The 4/24/01 Prospectus also gives favorable, purportedly accurate information

concerning Tyco's operating results, including the following:

| | QUARTERS ENDED DECEMBER 31, | | YEAR-ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2000 (2) | 1999 (2) | 2000 (3) | 1999 (4) |
| | | (UNAUDITED) (IN MILLIONS, EXCEPT PER SHARE DATA) | | |
| Consolidated statements of operations data: | | | | |
| Operating income | 1,308.9 | 1,189.0 | 5,474.4 | 2,190.8 |
| Income (loss) from continuing operations | 1,009.2 | 757.2 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share (10): | | | | |
| Basic | 0.58 | 0.45 | 2.68 | 0.65 |
| Diluted | 0.57 | 0.44 | 2.64 | 0.64 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.l.a, and A.l.c.

483.     On May 24, 2001, the Tyco Defendants filed with the SEC a Post-Effective

Amendment No. 1 to Form S-4 relating to the proposed merger between The CIT Group, Inc.

and Tyco Acquisition Corp. XIX (NV) (the "5/24/01 Post-Effective Amendment").  The 5/24/01

Post-Effective Amendment was signed by Defendant Swartz for himself and for Defendants

Kozlowski and Walsh.  Because the 5/24/01 Post-Effective Amendment incorporates the

following documents by reference, it contains the same materially false and misleading

statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form I0-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, and May 24, 2001.

484. Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 5/24/01 Post-Effective Amendment recites Tyco's purported strategy, quoted and discussed above in paragraph 430. As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

485. In addition, the 5/24/01 Post-Effective Amendment sets forth the Consent of PricewaterhouseCoopers, dated May 23, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

486. On June 5, 2001, the Tyco Defendants filed with the SEC a prospectus relating to Tyco's proposed offer to exchange up to 7,141,083 common shares of Tyco stock for exchangeable shares of Tyco's direct subsidiary, CIT Exchangeco, Inc. (the "6/5/01 Prospectus"). Because the 6/5/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000,

November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, and May 24, 2001.

487.     Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 6/5/01 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 460.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

488.     On June 7, 2001, Tyco filed with the SEC a Form S-8 in connection with the issuance of securities to The CIT Group, Inc. Savings Incentive Plan, relating to the proposed merger between The CIT Group, Inc. and Tyco (the "6/7/01 S-8").  The 6/7/01 S-8 was signed by Defendants Kozlowski, Swartz, and Walsh.  Because the 6/7/01 S-8 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, and May 24, 2001.

489.     In addition, the 6/7/01 S-8 sets forth the Consent of PricewaterhouseCoopers, dated June 7, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

**10.     4/18/01 Press Release**

490.     On April 18, 2001, Tyco announced its financial results for the quarter ended

March 31, 2001:

> Tyco . . . reported today that diluted earnings per share for its second quarter ended March 31, 2001 were 65 cents, a 30 percent increase over earnings of 50 cents per share in its second quarter of fiscal 2000. Net income before extraordinary items rose to $1.16 billion, an increase of 35 percent compared to $853.6 million last year. Sales for the quarter rose 26 percent to $8.9 billion compared with last year's $7.07 billion. These results are before non-recurring items. After giving effect to such items, diluted earnings per share before extraordinary items for the second quarter of fiscal 2001 were 65 cents, or $1.15 billion, compared to 50 cents, or $855.5 million, in the second quarter of fiscal 2000.

> For the first half of fiscal 2001, income before non-recurring items, extraordinary items and cumulative effect of accounting change rose to $2.16 billion, or $1.22 per diluted share, a 27 percent increase over last year's diluted earnings per share of 96 cents. After giving effect to non-recurring items, diluted earnings per share before extraordinary items and cumulative effect of accounting change were $1.22, or $2.16 billion, for the first half of fiscal 2001 compared to 94 cents, or $1.61 billion, in fiscal 2000. Revenues for the first half of fiscal 2001 increased to $16.92 billion, 23 percent higher than last year's $13.71 billion.

491. The Tyco Defendants either knew or recklessly disregarded the fact that these statements, when made, were materially false and misleading and omitted material information for the reasons set forth in Sections V.A, A.1.a, and A.1.c.

**11. 4/18/01 Conference Call**

492. On April 18, 2001, the Tyco Defendants held a conference call with analysts to discuss the Company's purported earnings growth. During the call, Defendant Kozlowski stated, among other things, that Tyco's earnings continued to increase despite the economic downturn:

> KOZLOWSKI: Okay, so to recap here, we're very pleased with our earnings increase of 30% from last year, our revenue growth of some 25%, overall Tyco organic growth of some 13% and our free cash flow of $1.1 billion. We had what we feel was a strong quarter. We anticipate a strong ending to the second half of our year and our outlook for next year at this time continues to be, continues to be good in spite of the

> various economic conditions that are going on
> around the world.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

**12.     5/11/01 10-Q for Quarter Ended 3/31/01**

493.     On May 11, 2001, the Tyco Defendants fled Tyco's Form 10-Q for the quarter ended March 31, 2001 (the "5/11/01 10-Q"), signed by Defendant Swartz.  In it, the Tyco Defendants set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

**a.     Tyco's Operating Results**

494.     The 5/11/01 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, the Tyco Defendants provide the following summary information:

|  | FOR THE QUARTERS ENDED MARCH 31, | | FOR THE SIX MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|
|  | 2001 | 2000 | 2001 | 2000 |
| Income before income taxes, minority interest, extraordinary item and cumulative effect of accounting change | 1,544.9 | 1,141.6 | 3,096.1 | 2,166.0 |
| Income taxes | (385.9) | (285.0) | (915.4) | (549.0) |
| Minority interest | (11.7) | (1.1) | (24.2) | (4.3) |
| Income before extraordinary item and cumulative effect of accounting change | 1,147.3 | 855.5 | 2,156.5 | 1,612.7 |
| Extraordinary item, net of tax | (10.3) | -- | (10.3) | (0.2) |
| Cumulative effect of accounting change, net of tax | -- | -- | (29.7) | -- |
| Net income | $1,137.0 | $855.5 | $2,116.5 | $1,612.5 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

495.     In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted

by Tyco in the December Report), and instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income, before certain credits (charges), improved in all segments in both the three months and six months ended March 31, 2001 as compared to the three months and six months ended March 31, 2000, with the exception of the Telecommunications segment for reasons that are discussed below. The operating income improvements are the result of both increased revenues and, with the exception of Tyco Healthcare, enhanced margins. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting. We enhance our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### b. Tyco's Reserves

496.    The 5/11/01 10-Q also gives materially false and misleading information regarding the Company's reserves, such as:

> During the six months ended March 3I, 2001, we recorded restructuring and other non-recurring charges of $164.5 million, of which $32.4 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project. In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales. We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement of litigation. At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million. During the six months ended March 31, 2001, we paid out $55.6 million in cash and incurred $35.7 million in non-cash charges that were charged against these reserves. At March 31, 2001, there remained $272.3 million of merger, restructuring and other non-recurring reserves in our Consolidated Balance Sheet, of which $231.6 million is included in current liabilities and $40.7 million is

included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**13.    5/30/01 Conference Call**

497.    On May 30, 2001, Tyco held a conference call with analysts to discuss the Company's continued strategy of growing through acquisitions (including the CIT merger).  The Tyco Defendants stated:

KOZLOWSKI:         This morning we announced the acquisition of C.R. Bard for roughly $3.2 billion.  We are of course excited about this deal and let me tell you why.  It strengthens and broadens our healthcare franchise and is immediately accretive by about 5¢ per share for the first 12 months of ownership. . . our operations continue to perform well and we are on target to achieve our earnings and cash flow targets for the quarter and for the rest of our fiscal year.

* * *

We are on schedule to close CIT this coming Friday. . . . CIT will be immediately accretive to us probably adding about a penny to our fiscal third quarter earnings for the one month that we own the company and another couple of cents for our fiscal fourth quarter results.  The accretion is incremental to the earnings comments we have made in the past. in other words, we are comfortable with earning expectations of around 69¢ per share in the third quarter, consensus is now around 68¢, and around 277-278 for the year versus a consensus of about 275 for the year.  I also want to take this opportunity to briefly outline the acquisition of Cambridge Security. . . . This deal is a classic Tyco bolt-on transaction.  We'll fold Cambridge into our existing ADT infrastructure, thereby standing about $220 million of cost efficiencies.  We look for the deal to add about 3¢ to earnings during the first year that we have it, with an initial cash on cash return in

> excess of 20% for the year. So from our organic
> growth plan for next year and the acquisitions of
> Cambridge, CIT, and Bard, we're starting to view
> the year fiscal year 2002 as a good year - - a very
> good year for us.

As Defendant Kozlowski either knew or was reckless in not knowing, the statements when made

were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) V.A, A.1.a, A.1.c, and A.l.d.

498. On July 6, 2001, in an article entitled, "Tyco Closes $1 Billion Purchase, *The*

*Wall Street Journal* reported that:

> Tyco International Ltd. said it closed its $1 billion acquisition of
> the electronic-security business of Cambridge Protection Industries
> LLC. . . . Tyco Chairman Dennis Kozlowski said the acquisition
> would be "immediately accretive" to earnings and would generate
> "strong organic growth with attractive incremental margins." The
> acquisition was announced May 17.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.1.a, and A.1.d.

**14.     7/18/01 Earnings Announcement**

499. On July 18, 2001, Tyco announced its results for the third quarter of fiscal 2001

(the three months ended June 30, 2001), which were subsequently filed with the SEC on Form 8-

K on July 25, 2001 and signed by Defendant Swartz:

> Revenues for the quarter rose 25% to $9.29 billion compared with
> last year's $7.42 billion. Diluted earnings per share before
> extraordinary items for the third quarter of fiscal 2001 were $0.67,
> or $1.22 billion, compared to $0.58, or $997.3 million, in the third
> quarter of fiscal 2000. Net income before non-recurring and
> extraordinary items rose to $1.31 billion, an increase of 32%
> compared to $992.1 million last year. Diluted earnings per share
> before non-recurring and extraordinary items for the third fiscal
> quarter ended June 30, 2001 were $0.72, a 24% increase over
> earnings of $0.58 per diluted share in the third quarter of fiscal

2000.

500. As the Tyco Defendants either knew or recklessly disregarded, these statements when made were materially false and misleading and omitted material information for the reasons set forth in Section(s) V.A, A.l.a, and A.1.c.

### 15.  7/18/01 Conference Call

501. On July 18, 2001, Tyco held a conference call to discuss, among other things, its earnings during the third quarter of fiscal 2001.  According to Defendant Kozlowski:

KOZLOWSKI:  Organic growth excluding TyCom, was 6% for the combined company, with a 17% increase at Fire & Security, an 8% increase in Healthcare more than offsetting a 5% decline at Electronics. . . .

* * *

The outlook for continued growth at Tyco is excellent.  Based on the business trends we see today, we remain comfortable with our previous guidance of 277-278 for fiscal year 2001.  That's primarily because of the recurring revenue, healthcare and service businesses that I emphasized earlier on.  Looking out to 2002, while it may be too early to be precise, we believe that a 345 estimate is quite reasonable.  In regards to Free Cash Flow, our previous guidance of $4 billion for 2001 now appears to be too conservative and I would point toward a higher $4.3 or 4.4 billion number.  We are confident we can grow our Free Cash Flow by 20% to exceed $5 billion and some of that is coming from some reduction in working capital, specifically on the Electronics side of the business.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### 16.  7/24/01 S-3

502. On July 24, 2001, Tyco filed with the SEC a Form S-3 relating to the registration

of $300,000,000 of debt securities of a Tyco subsidiary (the "7/24/01 S-3"). The 7/24/01 S-3 was signed by Defendant Swartz for himself and for Defendants Kozlowski and Walsh. Because the 7/24/01 S-3 incorporates the 8/18/00 S-3(2) by reference, it contains the same materially false and misleading statements set forth in that document, as described herein.

503. In addition, the 7/24/01 S-3 sets forth the Consent of PricewaterhouseCoopers, dated July 23, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

**17.    8/3/01 Conference Call**

504. On August 4, 2000, Tyco held a conference call to discuss, among other things, its acquisition of Sensormatic. According to Defendant Kozlowski: "This will be an excellent deal for us . . . and it's immediately accretive by at least 3 cents per share during the first year of our ownership."

505. About Tyco's earnings guidance, Kozlowski added:

KOZLOWSKI:          . . . all in all, we remain very comfortable with our
                    guidance of $2.77-2.78 per share for our fiscal 01
                    which closes on September 30th this year which
                    would represent about a 27% increase vs. Last year.
                    For fiscal year 2002, we continue to believe that
                    $3.45 per share is a reasonable estimate, but as we
                    said on the conference call, we will allow for a
                    range between $3.20 and $3.60. . .

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

506. On August 6, 2001, Deutsche Bank Alex Brown, reporting materially false and

misleading information received from the Tyco Defendants, issued an analyst report entitled, "TYC Electronics' July Okay . . . SRM's Strategic Impact Could Surpass EPS." The report stated, "Kozlowski said the acquisition pipeline was strong and was made up solely of tuck-in and bolt-on acquisitions for core companies, and contained "absolutely no surprises."

**18.    8/13/01 10-Q for Quarter Ended 6/30/01**

507.    On August 13, 2001, the Tyco Defendants filed Tyco's Form 10-Q for the quarter ended June 30, 2001 (the "8/13/01 10-Q"), signed by Defendant Swartz. In it, the Tyco Defendants set out numerous materially false and misleading statements. These false and misleading statements addressed a variety of topics, including the following:

**a.    Tyco's Operating Results**

508.    The 8/13/01 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, the Tyco Defendants provide the following summary information:

|  | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES | |
| --- | --- | --- |
|  | FOR THE QUARTERS ENDED JUNE 30, | |
|  | 2001 | 2000 |
| INCOME BEFORE INCOME TAXES, MINORITY INTEREST, AND EXTRAORDINARY ITEMS | 1,614.8 | 1,333.7 |
| Income taxes | (378.8) | (333.7) |
| Minority interest | (15.8) | (2.7) |
| Income before extraordinary items | 1,220.2 | 997.3 |
| Extraordinary items, net of tax | (3.4) | -- |
| NET INCOME | $1,216.8 | $997.3 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

509.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), and instead attribute Tyco's favorable results to organic

growth and synergies resulting from Tyco's acquisitions:

> Operating income, before certain (charges) credits, improved in all segments in both the quarter and nine months ended June 30, 2001 as compared to the quarter and nine months ended June 30, 2000, with the exception of the Telecommunications segment discussed below. The operating income improvements are the result of increased revenues resulting from organic growth and from acquisitions that are accounted for under the purchase method of accounting. We enhance our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

> **b.      Tyco's Reserves**

510.      The 8/13/01 10-Q also gives materially false and misleading information regarding the Company's reserves, such as:

> During the nine months ended June 30, 2001, we recorded restructuring and other non-recurring charges of $214.7 million, of which $39.8 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project. In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales. We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement of litigation. At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million. During the nine months ended June 30, 2001, we paid out $113.5 million in cash and incurred $86.2 million in non-cash charges that were charged against these reserves. At June 30, 2001, there remained $214.1 million of merger, restructuring and other non-recurring reserves in Tyco Industrial's Consolidated Balance Sheet, of which $183.8 million is included in current liabilities and $30.3 million is included in long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**19.    8/24/01 S-4 (and Related S-4/A and Prospectus)**

511.    On August 24, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed merger between Sensormatic Electronics Corporation ("Sensormatic") and a subsidiary of Tyco (the "8/24/01 S-4").  The 8/24/01 S-4 was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 8/24/01 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Reports on Forms 10-Q for the quarters ended December 31, 2000, March 31, 2001 and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2001, July 25, 2001, August 3, 2001, and August 16, 2001.

512.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/24/01 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 430.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Sensormatic:

> At a meeting of the executive committee of Tyco's board of directors held on August 1, 2001, the executive committee determined that the acquisition of Sensormatic was in keeping with its corporate strategy of complementing its internal growth with acquisitions that are likely to benefit from cost reductions and synergies when combined with Tyco's existing operations and that are expected to be accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

513. In addition, the 8/24/01 S-4 sets forth the Consent of PricewaterhouseCoopers, dated August 23, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000, quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

514. On September 13, 2001, the Tyco Defendants filed with the SEC a Form S-4/A (the "9/13/01 S-4/A"), amending the 8/24/01 S-4. The 9/13/01 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski, and Walsh. Because the 9/13/01 S-4/A incorporates by reference the same documents that were incorporated by reference in the 8/21/01 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

515. Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 9/13/01 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 430. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of Sensormatic, using precisely the same language quoted from the 8/24/01 S-4 above. As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

516. In addition, the 9/13/01 S-4/A sets forth the Consent of PricewaterhouseCoopers, dated September 10, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000, quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

517. On September 25, 2001, the Tyco Defendants filed a prospectus with the SEC relating to the proposed merger between Sensormatic and a subsidiary of Tyco (the "9/25/01

Prospectus").  Because the 9/25/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000, March 31, 2001, and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2002, July 25, 2001, August 3, 2001, and August 16, 2001.

518.    Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 9/25/01 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 430.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**20.    8/28/01 S-3 (and Related Prospectus and Supplemental Prospectus)**

519.    On August 28, 2001, Tyco filed a Form S-3 for the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities (the "8/28/01 S-3").  The 8/28/01 S-3 was signed by Defendants Swartz, Kozlowski, and Walsh.  Because the 8/28/01 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described above:  (i) Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Reports on Forms 10-Q for the quarters ended December 31, 2000, March 31, 2001, and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2001, July 25, 2001, August 3, 2001, and August 16, 2001.

520.     Like the 2000 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 8/28/01 S-3 recites Tyco's purported strategy, quoted and discussed above in paragraph 430.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

521.     In addition, the 8/28/01 S-3 sets forth the Consent of PwC, dated August 23, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4, 2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

522.     On August 31, 2001, Tyco filed with the SEC a Prospectus in connection with the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities (the "8/31/01 Prospectus").  Because the 8/31/01 Prospectus incorporates by reference the same documents that were incorporated by reference in the 8/28/01 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

523.     Like the 1999 10-K and many of Tyco's other filings with the SEC throughout the Relevant Period, the 12/8/00 Prospectus recites Tyco's purported strategy, quoted and discussed above in paragraph 430.  As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy, when made, was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

524.     On October 25, 2001, Tyco filed a Prospectus Supplement to the 8/31/01 Prospectus (the "10/25/01 Prospectus Supplement").  Because the 10/25/01 Prospectus Supplement incorporates by reference the same documents that were incorporated by reference

in the 8/28/01 S-3, it contains the same materially false and misleading statements set forth in those documents, as described herein.

525. The 10/25/01 Prospectus Supplement contains false and misleading statements about Tyco's operating results under the heading "Recent Developments of Tyco," such as:

> Revenues before non-recurring items . . . for the quarter rose 29% to $10.08 billion compared with last year's $7.80 billion. Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000. After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.
>
> * * *
>
> Revenues before non-recurring items and the adoption of SAB 101 for the year-ended September 30, 2001 increased to $36.29 billion, 25% higher than last year's $28.93 billion. Diluted earnings per share before non-recurring charges and credits and extraordinary items, and the adoption of SAB 101, for the year rose to $2.81 per diluted share, or $5.15 billion, a 29% increase over last year's diluted per share earnings of $2.18, or $3.73 billion.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a and A.1.c.

**21.  9/11/01 Conference Call**

526. On September 11, 2001, Tyco held a conference call/investor meeting with analysts. During the call, the Tyco Defendants provided investors with significant assurance that the Company was performing well and that it would remain profitable. For example, the Tyco Defendant Kozlowski stated as follows:

KOZLOWSKI:  . . . we remain very much on track to achieve our

earnings and cash flow targets for the year. Specifically, we're confident that Tyco will earn $2.77-2.78 a share in fiscal year '01 which would represent a 27% increase vs. last year. Our free cash flow will exceed $4 billion, compared to $3.4 billion last year. For fiscal year '02, we are looking for around $3.45 per share, with a range of 320 to 365, depending upon the end-markets for the electronics industry. This is the same thing we have been saying for months. The $3.45 would represent around a 25% increase above this year's record total and even the low end of our range would show better than a 15% growth. We expect free cash flows to exceed $5 billion next year. Our ability to deliver this growth in a pretty tough economic environment is a function of our very large exposure to recurring and service businesses such as security and businesses with no economic volatility like health care.

* * *

So we thought about titling my section of this agenda because the Re's been a lot of negative sentiment, a lot of questions, so we thought I'd call this part "Don't worry, be happy." Everything at Tyco is going to be okay.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**22.    10/18/01 Press Release**

527.    On October 18, 2001, Tyco announced its financial results for the quarter ending September 30, 2001:

Tyco . . . reported today that diluted earnings per share for its fourth quarter ended September 30, 2001 were 86 cents, a 34 percent increase over earnings of 64 cents per share for the same quarter last year. Revenues for the quarter rose 29 percent to $10.1 billion compared with last year's $7.8 billion. These results are before non-recurring charges and credits, extraordinary items, and the adoption of Staff Accounting Bulletin No. 101 (SAB 101).

After giving effect to such items, diluted earnings per share for the fourth quarter of fiscal 2001 were 70 cents, compared to $1.12 is 59 cents resulting from a gain on the issuance of share by a subsidiary.

For fiscal 2001, income before non-recurring charges and credits, extraordinary items, and the adoption of SAB 101, rose to $2.81 per diluted share, a 29 percent increase over last year's diluted per share earnings of $2.18. After giving effect to such items, diluted earnings per share were $2.17 for fiscal 2001 compared to $2.64 in fiscal 2000. Included in the prior year's $2.64 is 59 cents resulting from a gain on the issuance of shares by a subsidiary. Revenues for the twelve months increased to $36.3 billion, 25 percent higher than last year's $28.9 billion.

528.    As the Tyco Defendants either knew or recklessly disregarded, these statements when made were materially false and misleading and omitted material information for the reasons set forth in Section V.A., A.1.a, and A.1.c.

### 23.    10/18/01 Conference Call

529.    On October 18, 2001, the Tyco Defendants conducted another conference call with analysts to convey their positive earnings estimates:

KOZLOWSKI:    Putting this together, we are reiterating our previous guidance of $3.70 per share for the current fiscal year we are in that began on October 1st which represents around 23% growth.

* * *

We remain very comfortable with our projection 3 cents per share of earnings accretion from the [Sensormatic] deal.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a and A.1.c.

### 24.    10/23/01 S-4 (and Related S-4/A and Prospectus)

530.    On October 23, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed

amalgamation agreement between TyCom and a subsidiary of Tyco wherein TyCom would become a wholly-owned subsidiary of Tyco (the "10/23/01 S-4"). The 10/23/01 S-4 was signed by Defendants Swartz, Kozlowski, and Walsh. Because the 10/23/01 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Forms 10-K and I0-K/A for the fiscal year-ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarterly periods ended December 31, 2000, March 31, 2001 and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, May 24, 2001, June 15, 2001, July 25, 2001, August 3, 2001, and August 16, 2001.

531.    Under the heading "Recent Developments of Tyco and TyCom," the Tyco Defendants stated the following with regard to its fourth quarter of fiscal 2001 financial results:

> Revenues before non-recurring items…for the quarter rose 29% to $10.08 billion compared with last year's $7.80 billion. Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000. After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

532.    In addition, the 10/23/01 S-4 sets forth the Consent of PricewaterhouseCoopers, dated October 18, 2001, permitting the incorporation by reference of its materially false and misleading report, dated October 24, 2000 (except as to Note 25, which is as of December 4,

2000), quoted in the 2000 10-K and discussed above, and other materially false and misleading materials discussed herein.

533.     On November 9, 2001, the Tyco Defendants filed with the SEC a Form S-4/A (the "11/9/01 S-4/A"), amending the 10/23/01 S-4.  The 11/9/01 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski, and Walsh.  Because the 11/9/01 S-4/A incorporates by reference the same documents that were incorporated by reference in the 10/23/01 S-4, it contains the same materially false and misleading statements set forth in those documents, as described herein.

534.     Like the 10/23/01 S-4, the 11/9/01 S-4/A contains false and misleading statements about Tyco's financial results under the heading "Recent Developments of Tyco and TyCom."

> Revenues before non-recurring items . . . for the quarter rose 29% to $10.08 billion compared with last year's $7.80 billion.  Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

> * * *

> Revenues before non-recurring items and the adoption of SAB 101 for the year-ended September 30, 2001 increased to $36.29 billion, 25% higher than last year's $28.93 billion.  Diluted earnings per share before non-recurring charges and credits and extraordinary items, and the adoption of SAB 101, for the year rose to $2.81 per diluted share, or $5.15 billion, a 29% increase over last year's diluted per share earnings of $2.18, or $3.73 billion.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

535.    On November 13, 2001, the Tyco Defendants filed with the SEC a Prospectus

relating to the amalgamation agreement between Tycom and a subsidiary of Tyco (the "11/13/01

Prospectus").  Because the 11/13/01 Prospectus incorporates by reference the same documents

that were incorporated by reference in the 10/23/01 S-4, it contains the same materially false and

misleading statements set forth in those documents, as described herein.

536.    Like the 10/23/01 S-4 and 11/9/01 S-4/A, the 11/13/01 Prospectus contains false

and misleading statements about Tyco's financial results under the heading "Recent

Developments of Tyco and TyCom."  These statements are identical to those quoted above from

the 11/9/01 S-4/A under the same heading, and are materially false and misleading for the same

reasons.

### 25.    11/15/01 Conference Call

537.    The Tyco Defendants hosted another conference call with investors on November

15, 2001.  During the call, Defendant Kozlowski continued to provide investors with false

assurances concerning the Company's projected earnings growth:

> KOZLOWSKI:    Let me start here this morning with our guidance for
> fiscal year 2002.  We expect earnings per share to
> grow over 21% this year to $2.70 a share.
>
> * * *
>
> Looking to the business cycle, we believe Tyco will
> grow revenues at a 10% rate and we expect our long
> track record of margin improvements to continue. . .

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) A, A.1.a, and A.l.c.

### 26.    12/28/01 10-K for Fiscal Year-ended 9/30/01

538.    On December 28, 2001, Tyco filed its Form 10-K for the fiscal year-ended

September 30, 2001 (the "2001 10-K"), signed by Defendants Swartz, Kozlowski, and Walsh.

539.    In the 2001 10-K, the Tyco Defendants set out numerous materially false and misleading statements, as evidenced by (among other things) the Tyco Defendants' restatement of the Company's operating results in a December 31, 2002 Form 10-K/A for the 2001 fiscal year.  These materially false and misleading statements addressed a variety of topics, including the following:

### a.    Tyco's "Strategy"

540.    The 2001 10-K purports to set forth Tyco's "strategy," which the Tyco Defendants repeated verbatim in other SEC filings during the Relevant Period.  According to the 2001 10-K:

> Tyco's strategy is to be the low-cost, high-quality producer and provider in each of our industrial markets and, through Tyco Capital, to provide innovative financing and leasing solutions to independent customers and in support of our industrial segments. We promote our leadership position by investing in existing businesses, developing new markets and acquiring complementary businesses and products.  Combining the strengths of our existing operations and our business acquisitions, we seek to enhance shareholder value through increased earnings per share and strong cash flows.

As the Tyco Defendants either knew or were reckless in not knowing, this statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### b.    Tyco's Operating Results

541.    The 2001 10-K also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, the Tyco Defendants provide the following summary information ($ in millions):

|  | FISCAL 2001 | FISCAL 2000 | FISCAL 1999 |
|---|---|---|---|
| Income before income taxes, minority interest, extraordinary items and cumulative effect of accounting changes | 6,003.5 | 6,464.8 | 1,705.2 |
| Income taxes | (1,284.9) | (1,926.0) | (637.5) |
| Minority interest | (47.5) | (18.7) | -- |
| INCOME BEFORE EXTRAORDINARY ITEMS AND CUMULATIVE EFFECT OF ACCOUNTING CHANGES | 4,671.1 | 4,520.1 | 1,067.7 |
| Extraordinary items, net of tax | (17.1) | (0.2) | (45.7) |
| Cumulative effect of accounting changes, net of tax | (683.4) | -- | -- |
| TYCO INDUSTRIAL NET INCOME | $ 3,970.6 | $ 4,519.9 | $ 1,022.0 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

542.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), and instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions.  According to the 2001 10-K:

> Operating income, before certain (charges) credits and accounting change, improved in all segments in each of Fiscal 2001 and Fiscal 2000, with the exception of the Telecommunications segment as discussed below.  The operating improvements are the result of both increased revenues in all but our Telecommunications segment and enhanced margins in all but our Healthcare and Specialty Products segment.  Increased revenues resulted from acquisitions that are accounted for under the purchase method of accounting and from organic growth.

> We enhanced our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

543.    And concerning profits in Tyco's electrical business, the Tyco Defendants stated:

The 14.3% increase in revenue, before accounting change, in Fiscal 2001 over Fiscal 2000 resulted primarily from acquisitions. These acquisitions included: Siemens Electromechanical Components GmbH & Co. KG ("Siemens") and AFC Cable Systems, Inc. ("AFC Cable") in November 1999; Praegitzer Industries, Inc. ("Praegitzer") in December 1999; Critchley Group PLC ("Critchley") in March 2000; the electronic OEM business of Thomas & Betts in July 2000; CIGI Investment Group, Inc. ("CIGI") in October 2000; and Lucent Technologies' Power Systems business unit in December 2000. Excluding the impact of these acquisitions, revenue increased an estimated 0.3%, which reflects an economic slowdown in the computer and consumer electronics and communications industries and, to a lesser extent, the effect of foreign exchange rates.

The 62.1% increase in revenue in Fiscal 2000 over Fiscal 1999 was predominantly due to acquisitions and, to a lesser extent, organic growth. These acquisitions included: Glynwed International, plc in March 1999; Raychem Corporation ("Raychem") in August 1999; Siemens and AFC Cable in November 1999; Praegitzer in December 1999; Critchley in March 2000; and the electronic OEM business of Thomas & Betts in July 2000. Excluding the impact of these acquisitions, revenue increased an estimated 13.1%.

The 20.0% increase in operating income and the increase in margins, before certain (charges) credits and accounting change, in Fiscal 2001 compared with Fiscal 2000 was primarily due to acquisitions and improved margins at both Tyco Printed Circuit Group and AMP. These increases were somewhat offset by decreased operating income and margins at Allied Tube and Conduit resulting from higher raw material prices.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### c.  Management Remuneration

544.    The 2001 10-K addresses management remuneration only by reference, stating:

> Information concerning executive compensation is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year.

Because the 2001 10-K incorporates Tyco's Proxy Statement, filed on January 8, 2002, the 2001 10-K contains the same materially false and misleading statements set forth therein, as described below.

545.     The 2001 10-K also gives limited information concerning loans taken by senior management under Tyco's Key Employee Loan Program (the "KEL program"), which was instituted to encourage ownership of the Company's common stock by executives and other key employees.  According to the 10-K:  "During Fiscal 2001, the maximum amount outstanding under [the KEL] program was $29.5 million.  Loans receivable under this program were $11.2 million and $11.4 million at September 30, 2001 and 2000, respectively."  As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, B.4, and B.5.

### 27.     2001 Annual Report to Shareholders

546.     On or about January 11, 2002, Tyco released its 2001 Annual Report to Shareholders (the "2001 Annual Report").  The 2001 Annual Report again reminded investors of Tyco's strategy to achieve growth by acquisitions:

> DISCIPLINED ACQUIRER Good acquirers don't build empires. They make money.  Tyco approaches acquisitions with a strict set of rules.  We begin with the strategic logic: the transaction must improve our potential for long-term internal growth.  It must be immediately accretive to earnings and cash flow per share and produce high returns on invested capital.  To consistently achieve these targets, we require each acquisition be championed by a business unit that will oversee the integration into one of our existing segments.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted-material information for the reasons set forth above in Section(s) V.A, A.1.a and A.1.c.

547.     The 2001 Annual Report also set forth information concerning Tyco's Key

Employee Loan program:

> During Fiscal 2001, the maximum amount outstanding under [the
> Key Employee Loan] program was $29.5 million.  Loans
> receivable under this program were $11.2 million and $11.4
> million at September 30, 2001 and 2000, respectively.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.B, B.4, and B.5.

548.     The 2001 Annual Report also included a letter to Tyco shareholders from

Defendant Kozlowski, which states:

> We grew diluted earnings per share 29 percent in fiscal 2001 in
> large part because of the strategy we formed during the 1990-1991
> recession to reinvent Tyco as a company that could thrive in any
> economy.  Since then, we have built business with low cyclicality
> and the ability to generate strong recurring revenues.

As Defendants either knew or were reckless in not knowing, these statements when made were

materially false and misleading and omitted material information for the reasons set forth above

in Section(s) V.A, A.1.a, and A.1.c.

549.     Defendant Kozlowski's letter goes on to say:

> This strength was reflected in our earnings.  For the ninth
> consecutive year, we increased revenues and earnings
> substantially.  Revenues rose 25 percent to $36.3 billion and
> earnings grew $1.4 billion to $5.1 billion, a 38 percent increase
> over the prior year.  Our diluted earnings per share increased 29
> percent to $2.81.  Free cash flow exceeded $4.7 billion in fiscal
> 2001 and should surpass $5 billion next year.

> Much of the increase came from organic growth.  If Tyco never
> made another acquisition, we should be able to increase our
> earnings at a solid double-digit rate.  We are fortunate to be in the
> types of businesses that grow even during economic slowdowns.
> For fiscal 2002, we are looking forward to earnings growth of 20
> percent or better.

I remain optimistic about Tyco's future. It's a clichè today for a CEO to proclaim that his company is "well-positioned" but, in truth, we are.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.l.c, and A.1.d.

550. The letter also states:

In 2001, Tyco demonstrated that, despite difficult business conditions, it could indeed grow its business in virtually any environment. We believe we can continue to do so, and that we can deliver consistent growth for investors in the future.

We are in excellent businesses, and everywhere we look we see opportunities to expand by creating new products, by moving into new markets and sometimes by acquisitions. We are poised to deliver many years of exciting returns.

As Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.l.a and A.l.c.

551. The 2001 Annual Report also sets forth all the identical operating results quoted above from the 2001 10-K. Those results are materially false and misleading, and omit material information, for the same reasons given above.

**E. 2002 Materially False and Misleading Statements and Omissions**

**1. 1/8/02 S-4 (and Related S4/A)**

552. On January 8, 2002, Tyco filed with the SEC a Form S-4 relating to a proposed merger between McGrath RentCorp and Tyco (the "1/8/02 S-4"). The 1/8/02 S-4 was signed by Defendants Kozlowski, Swartz, and Walsh. Because the 1/8/02 S-4 incorporates Tyco's Annual Report on Form 10-K for the fiscal year-ended September 30, 2001 by reference, it contains the same materially false and misleading statements set forth in that document, as described herein.

553.    Like many of Tyco's other filings with the SEC throughout the Relevant Period,

the 1/8/02 S-4 recites Tyco's purported strategy, quoted and discussed above in paragraph 540.

It also reiterates the Company's so-called strategy in its discussion of Tyco's acquisition of

McGrath RentCorp:

> At a meeting held on December 12, 2001, the executive committee
> of Tyco's board of directors determined that the acquisition of
> McGrath was in keeping with its corporate strategy of
> complementing its internal growth with acquisitions that are likely
> to benefit from cost reductions and synergies when combined with
> Tyco's existing operations and that are expected to be immediately
> accretive to earnings per share.

As the Tyco Defendants either knew or were reckless in not knowing, the statements of strategy

when made were materially false and misleading and omitted material information for the

reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

554.    The 1/8/02 S-4 also gives favorable, purportedly accurate information concerning

Tyco's operating results, including the following:

| | YEAR-ENDED SEPTEMBER 30, | | |
| --- | --- | --- | --- |
| | 2001(2) | 2000(3) | 1999(4) |
| (IN MILLIONS, EXCEPT PER SHARE DATA) CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | |
| Total revenues(1) | $36,388.5 | $30,691.9 | $22,496.5 |
| Income (loss) from continuing operations | 4,671.1 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share (8): | | | |
| Basic | 2.59 | 2.68 | 0.65 |
| Diluted: | 2.55 | 2.64 | 0.64 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.l.a, and A.l.c.

555.    In addition, the 1/8/02 S-4 sets forth the Consent of PricewaterhouseCoopers,

dated January 7, 2002, permitting the incorporation by reference of its materially false and

misleading report, dated October 18, 2001 (except as to Note 31, which is as of December 18, 2001), quoted in the 2001 10-K and discussed above.

556.    On May 22, 2002, Tyco filed with the SEC a Form S-4/A relating to a proposed merger between McGrath RentCorp and Tyco (the "5/22/02 S-4/A").  The 5/22/02 S-4/A was signed by Defendant Swartz for himself and for Defendants Kozlowski, and Walsh.  Because the 5/22/02 S-4/A incorporates Tyco's Annual Report on Form 10-K for the year-ended September 30, 2001, and its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2002, it contains the same materially false and misleading statements set forth in those documents, as described herein.

557.    Like many of Tyco's other filings with the SEC throughout the Relevant Period, the 5/22/02 S-4/A recites Tyco's purported strategy, quoted and discussed above in paragraph 540.  It also reiterates the Company's so-called strategy in its discussion of Tyco's acquisition of McGrath RentCorp, using precisely the same language quoted from the 1/8/02 S-4 above.  As the Tyco Defendants either knew or were reckless in not knowing, these statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

558.    In addition, the 5/22/02 S-4/A sets forth the Consent of PwC, dated May 21, 2002, permitting the incorporation by reference of its materially false and misleading report, dated October 18, 2001 (except as to Note 31, which is as of December 18, 2001), quoted in the 2001 10-K and discussed above.

## 2.    1/15/02 Press Release

559.    On January 15, 2002, Tyco released its financial results for the quarter ended December 31, 2001:

Tyco . . . reported today that diluted earnings per share for its first

quarter ended December 31, 2001 were 74 cents, a 17 percent increase over pro forma earnings of 63 cents per share for the same quarter last year.  As required, results for the first quarter of fiscal 2001 have been restated to reflect the adoption of Staff Accounting Bulletin No. 101 (SAB 101) and are presented on a pro forma basis to exclude goodwill amortization as a result of the Company's adoption of Statement of Financial Accounting Standards No. (SFAS) 142, "Goodwill and Other Intangible Assets."  Revenues for the quarter rose 25 percent to $10.1 billion compared with last year's $8.0 billion.  Results presented above are before non-recurring charges and credits, extraordinary items, and, for fiscal 2001, the cumulative effect of accounting changes.  As discussed further below and in the accompanying tables, non-recurring charges and credits for the first quarter totaled a charge of approximately $26 million, before tax, in fiscal 2001.  After giving effect to such non-recurring items, diluted earnings per share before effect of accounting changes and extraordinary were 73 cents for the first quarter of fiscal 2002, compared to 57 cents in the first quarter of fiscal 2001.  The guidelines of SFAS 142 do not allow for restatement of prior year results.

560.     As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

**3.     1/15/02 Conference Call**

561.     On January 15, 2002, Tyco held a conference call to discuss, among other things, its earnings during the first quarter of fiscal 2002.  Although the Tyco Defendants were to announce the breakup of Tyco into four separate parts the following week, they continued to give false reassurance of favorable results:

KOZLOWSKI:          Putting all this together, we remain committed to our full year earnings guidance of $3.70 per share, up 21% from last year.  We have not previously offered any guidance at all on the second quarter.  Given the likelihood of another tough quarter in electronics, we think second quarter earnings will be in the range of 80-82¢ per share up roughly 17% for the quarter.

562.     Kozlowski also falsely reassured investors and analysts about "rumors" that were

resurfacing about Tyco's accounting, and about the openness of its disclosures:

> KOZLOWSKI: We're a very open company, we're very willing to talk about anything that our investors, shareholders, interested parties have to talk to us about, we have Jack Blackstock, Maryanne Kane, Mark Swartz, myself, available, we present our accounting in the best disclosures that we can possibly put together here. Are we complex? Yes, but because we are complex we have absolutely no qualms whatsoever in presenting a good disclosure, there's nothing hidden behind the scenes, our cash flows are going to be strong, we will back up our earnings with our cash flows and from time to time there are, of course, some motivated parties who can thrive or make money on rumors and that's an unfortunate part of this business, but here at Tyco we're very willing to discuss anything at all that anybody might have . . . .

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, A.1.c, and A.3.

563. A January 16, 2002 article in *The Wall Street Journal* entitled, "Tyco International Says Soft Demand Will Depress Fiscal Second-Quarter Results," reported:

> Mr. Kozlowski said the company remains "frustrated by continuing negative rumors" regarding the company's accounting. "There is nothing negative going on at any place at Tyco," he said, inviting anyone with questions about the company's accounting practices to "give us a call." He also said the company stands by its earnings estimate of $3.70 a share for the fiscal year.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

564. Similarly, a January 16, 2002 article in *The New York Times* entitled, "Tyco Shares Fall as Investors Show Concern on Accounting," reported:

Dennis Kozlowski, Tyco's chairman, expressed frustration in a conference call with analysts yesterday morning that Tyco's accounting continues to be questioned. "Our accounting has been reviewed and found to be sound," Mr. Kozlowski said "Our disclosure is exceptionally detailed."

* * *

Mr. Swartz, Tyco's chief financial officer, said Tyco follows standard accounting in its acquisitions and does not manipulate balance sheets.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.1.c,. and A.3.

565. Shortly thereafter, on January 22, 2002, Tyco issued a press release concerning its plan to separate into "four independent, publicly traded companies." The January 22, 2002 press release was subsequently filed with the SEC on Form 8-K on January 24, 2002, which was signed by defendant Swartz.

566. The press release stated:

PEMBROKE, BERMUDA, JANUARY 22, 2002--Tyco International Ltd. (NYSE-TYC, BSX-TYC, LSE-TYI) today announced a plan to unlock tens of billions of dollars of shareholder value by separating Tyco into four independent, publicly traded companies: Security and Electronics; Healthcare; Fire Protection and Flow Control; and Financial Services. Tyco believes these actions will lead to substantially greater total shareholder value by creating independent companies that will be more appropriately valued by the market. Each new public company created from these transactions will be a proven industry leader, and each will go forward with a global market position; a strong and experienced management team; an entrepreneurial culture; an independent Board of Directors and significant financial strength.

* * *

"This is a bold, shareholder-value driven plan that we believe will create extraordinary near- and long-term benefits for Tyco's

shareholders and bondholders, as well as for our employees and customers," said L. Dennis Kozlowski; Chairman and Chief Executive Officer of Tyco. "Over the past decade, Tyco's share price has increased ten-fold as we have used Tyco's size, access to capital and operating philosophy to build world-class healthcare, electronics, telecommunications, security, fire protection, flow control, and financial services businesses. These businesses have now developed to a size and stage where they can thrive on their own and perhaps be even more agile than Tyco. The plan we are announcing today is the logical extension of the same value creation strategy we have successfully pursued for nearly a decade."

"Furthermore, as independent, public companies, each of these businesses will offer investors a 'pure-play' opportunity with excellent growth prospects and greatly increased simplicity, clarity and transparency. As such, we believe each will be valued substantially higher than the implied valuations it has received in recent years as part of Tyco."

Mr. Kozlowski continued, "I am extremely proud of Tyco's performance. We have built a great portfolio of businesses and over the five years ended September 30, 2001, we have delivered earnings per share growth at a compounded annual rate of over 40% and industry-leading operating profit margins in each of our businesses. During this same period, we have increased annual free cash flow from $240 million in 1996 to $4.8 billion in fiscal 2001. Nonetheless, even with this performance, Tyco is trading at a 2002 P/E multiple of 12.0x, a discount of almost 50% to the S&P 500."

"The plan announced today is designed to close that gap-the gap between Tyco's market value in recent years and the value of our businesses. Our objective has always been to deliver value to our shareholders. That is why we are taking this action today, and why we are all very excited about the future."

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### 4.    1/22/02 Conference Call

567.    The Tyco Defendants held a conference call with analysts on January 22, 2002 to

discuss their plan to break the Company into four separate parts.  Defendants Kozlowski and

Swartz stated as follows:

> KOZLOWSKI: . . . the plan [to break up the company] will release value . . . separation will enhance our ability to continue to create shareholder value in the future. . . We are strictly playing offense here.  I want to stress that this is not a defensive response to the baseless ridiculous rumors last week nor the recent weakness in the stock price.

> SWARTZ: Related to the accounting rumors and accusations that Dennis talked about earlier, the split offs are going to create more transparency and financial disclosure on the pure play individual businesses that you will be seeing.

> SWARTZ: During the balance of this year, and as we look forward to fiscal 2003, the earnings of Tyco will continue strong.  Guidance for the second quarter is a strong 14% to 17% growth over the prior year. The full year earnings of $3.70 are in excess of 20% growth over the prior year, and every one of these businesses will enter fiscal 2003 with extremely strong organic fundamentals to continue to have these strong earnings.

> SWARTZ: I do take issue with better disclosure and we have many times asked people to show us better disclosure on acquisitions and we'll do it and have yet to see any that would be improved from what we currently have.  Secondly, as far as cash pay for acquisitions, they are included in those footnotes 100 percent and back to footnote 2 you can look and see exactly what the cash was this year and last year and go back every year you want to so every acquisitions we have made is disclosed and it is included. . . .

> SWARTZ: . . .So the amount of disclosure that will end up being seen will be the same good state of art disclosure that we have had better than anyone else we can find out there but it will be done on a more reduced level and even with all the accounting insinuations, allegations, rumors, etc we have had over the past few weeks, this has not changed our

> plan ANY nor any level of comfort as far as being
> able to go forward, have these individual financial
> statements and send each of the businesses off with
> extremely strong earnings and cash flows.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.l.c, and A.3.

568.    Defendant Kozlowski also went out of his way to assure investors that there were no accounting improprieties or cash flow issues at Tyco.  For example, Defendant Kozlowski stated:

KOZLOWSKI:          . . . we have no liquidity crisis .. .

* * *

… there's absolutely no new accounting questions .
. .

* * *

I want to stress that this is not a defensive response
to the baseless ridiculous rumors last week

* * *

The quality of our earnings has been excellent.  This
is shown in the ratio of pre-cash flow to earnings or
the cash conversion ratio.  Our free cash flow has
represented over 90% of earnings during the last
couple of years.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

569.    Investors saw Tyco's plan to break itself up as, a further sign that there were no accounting improprieties at the Company.  For example, a January 23, 2002 article in *USA TODAY* entitled, "Tyco to split into four independent companies," reported:

You don't create four new public entities if you have something to hide," says John Inch, analyst at Bear Stearns.

570. Defendant Kozlowski was then quoted in *The New York Times* on January 24, 2002 as saying that investors should not react negatively to the Company's new breakup strategy:

> "Crooks are going to be crooks at any company," Mr. Kozlowski said. "But we have executives of very high integrity."

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### 5. 1/28/02 Proxy Statement

571. On January 28, 2002, the Tyco Defendants filed with the SEC Tyco's Proxy Statement for the 2002 annual meeting. The Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key Employee Loan Program, and allegations of accounting impropriety by the Company.

### a. Management Remuneration

572. Concerning Tyco's executive compensation program generally, the 2002 Proxy Statement states:

> [Tyco's executive compensation program] offers the executive significant financial rewards when Tyco and the executive achieve excellent results. At lower levels of performance, where expected compensation targets are not achieved, executive compensation is sharply reduced. Executives are ineligible for cash bonuses and do not benefit from equity-based compensation. Thus, in order for Mr. Kozlowski and Mr. Swartz to have earned a cash bonus in fiscal 2001, the Company had to achieve a minimum of 15% growth in net income and at least a 10% growth in operating cash flow over fiscal 2000. The performance criterion required to vest the minimum number of restricted shares granted to the executives was a growth rate in earnings per share before non-recurring items of at least 15% over fiscal 2000. The Committee reports that the

Company achieved each of these benchmarks, reflecting superior
performance notwithstanding a very difficult business and
economic environment.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.B.

573.    The 2002 Proxy Statement also contains materially false and misleading

information regarding the administration of compensation to executive officers and key

managers:

The Compensation Committee of the Board of Directors is
composed solely of independent directors, none of whom has any
interlocking relationships with Tyco that are subject to disclosure
under rules of the SEC relating to proxy statements.  The
Compensation Committee approves all of the policies under which
compensation is paid or awarded to Tyco's Chief Executive
Officer, reviews and, as required, approves such policies for
executive officers and key managers, and has oversight of the
administration of executive compensation programs.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.B.

574.    The 2002 Proxy Statement contains the following specific information concerning

the compensation of Defendants Kozlowski and Swartz:

| Name & Principal Position | Year | | Annual Compensation (1) | | | | Long-Term Compensation | |
| | | Salary | Cash Bonus (3) | Stock Bonus (4) | Other annual compensation (5) | Restricted Stock Award(S) (6) | Shares Underlying Stock Options | All Other Compensation |
|---|---|---|---|---|---|---|---|---|
| L. Dennis Kozlowski Chairman & Chief Executive officer Tyco International LTD | 2001 | $1,650,000 | $4,000,000 | | $219,543 | $30,398,880 | 1,439,135 | $4,313,553 |
| | 2000 | 1,350,000 | 2,800,000 | | 143,652 | 21,207,540 | 5,357,798(8) | 383,500 |
| | 1999 | 1,350,000 | 3,2000,000 | | 81,960 | 25,707,178 | 6,621,834 | 305,041 |
| | | | | * * * | | | | |
| Mark H. Swartz | 2001 | 968,750 | 2,000,000 | 500,014 | 277,856 | 15,199,440 | 788,425 | 2,112,968 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Executive Vice President and Chief Financial Officer, Tyco International LTD | 2000 | 768,750 | 1,400,000 | | 171,039 | 10,603,770 | 2,692,649(8) | 121,448 |
| | 1999 | 750,000 | 1,600,000 | | 63,066 | 12,029,641 | 2,976,480 | 86,948 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, B.l.a-b, B.2, B.3, B.4.a-b, B.5, and B.6.

575.    The 2002 Proxy Statement failed to disclose and misrepresented the actual compensation of Defendant Kozlowski:

> For fiscal 2001, Mr. Kozlowski received a base salary of $1.65 million and, based on a 38.9% increase in Net Income before nonrecurring items and a 31.3% increase in Operating Cash Flow, a cash bonus in the amount of $4 million, as shown in the SUMMARY COMPENSATION TABLE on page 14.  Mr. Kozlowski was granted 600,000 shares of performance-based restricted stock on October 1, 2001.  If the pre-determined specified performance criteria are met, these shares will vest over a period of up to three years.  After three years, any remaining unearned shares will be forfeited and returned to the Company.

> Mr. Kozlowski also received restoration options in accordance with the restoration option provision of the Company's option program.  The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, B.l.a, B.2, B.3, B.4.a, B.5, and B.6.

## b.    Key Employee Loan Program

576.    The 2002 Proxy Statement provides materially false and misleading statements concerning Tyco's KEL Program.  It states, for example:

> The Compensation Committee administers the loan program.  The

Committee authorizes loans, which may not exceed the amount allowable under any regulation of the United States Treasury or other state or federal statute. Loans may be required to be secured by Tyco common shares owned by the borrower or may be unsecured. Loans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (which was 3.7% for 2001). The loans are generally repayable in ten years or when the borrower reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the borrower's employment with Tyco or its subsidiaries terminates. The borrower is also required to make loan payments upon the sale or other disposition of Tyco common shares with respect to which loans have been granted, other than gifts to certain family members.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, B.4, and B.5.

577. The 2002 Proxy Statement also falsely and misleadingly states:

At September 30, 2001, the amount of loans outstanding under the [Key Employee Loan] program totaled $11,230,192, of which $0 was outstanding for Mr. Kozlowski, $231,718 was outstanding for Mr. Boggess, $20,702 was outstanding for Mr. Meelia and $0 was outstanding for Mr. Swartz. The largest amount of indebtedness under the program during fiscal 2001 for each of the named officers was $23,009,703 for Mr. Kozlowski, $6,500,000 for Mr. Swartz, $20,702 for Mr. Meelia and $231,718 for Mr. Boggess. . . .

Mr. Walsh, a director, was instrumental in bringing about the acquisition by a subsidiary of the Company of The CIT Group, Inc. (now Tyco Capital Corporation) of Livingston, New Jersey. For his services, Tyco paid Mr. Walsh a fee of $10 million. In addition, at Mr. Walsh's request, Tyco contributed $10 million to a charitable fund established under The Community Foundation of New Jersey. Mr. Walsh, as trustee of this fund, recommends the public charities to which contributions are made. At the time of the acquisition, Mr. Walsh owned 50,000 shares of common stock of The CIT Group, Inc., which were converted to 34,535 Tyco common shares at the exchange ratio applicable to all stockholders of CIT.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

224

made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, B.4, B.5, and B.6.f.

578. In the January 29, 2002 edition of *The Wall Street Journal*, Tyco disclosed that it paid Defendant Walsh $20 million for his role in the CIT merger deal:

> Tyco spokeswoman Maryanne Kane said Tyco's board decided, without any outside help, that the $20 million payment was "appropriate based on the amount of work" Mr. Walsh did, which she said included providing guidance, advice and facilitating meetings.

A Tyco press release of that same date quoted Defendant Kozlowski as saying: "The Board felt that fee was appropriate in light of Mr. Walsh's efforts." As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, and B.6.f.

579. Tyco's stock fell 20% in reaction to Tyco's disclosure. On January 30, 2002, *The Wall Street Journal* reported that:

> L. Dennis Kozlowski, Tyco's chief executive, said in a statement that the payment was "appropriate in light of Mr. Walsh's efforts." But Mr. Kozlowski added that "clearly we are an environment where people are intensely skeptical of corporate America, and for that matter, of Tyco." Mr. Kozlowski has repeatedly defended the company's accounting as proper. He said he believes the sharp fall in Tyco's stock price was "unjustified," adding that the company is moving forward in "high gear" with its plan to break itself into four pieces to create more shareholder value.

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, A.l.c, and B.6.f.

580. On January 30, 2002, *The New York Times* reported that Defendants Kozlowski and Swartz had sold stock by returning it to the Company:

> Two senior executives of Tyco International Ltd. quietly disposed

of more than $100 million in Tyco stock during the company's last fiscal year, despite public comments that they rarely if ever sold Tyco shares.

L. Dennis Kozlowski, Tyco's chairman, and Mark Swartz, its chief financial officer, returned the stock to the company in late 2000 and 2001, according to forms filed with the Securities and Exchange Commission in November.

* * *

Mr. Kozlowski has repeatedly told analysts and the media that his large holdings in Tyco stock demonstrate his commitment to the company.

"I'm paid in Tyco stock," Mr. Kozlowski said in an interview last month. "We, the board, everybody, feel the best way to keep management's interest aligned with shareholders is to keep 100 percent of our net worth in Tyco's stock."

Mt Kozlowski returned about 1.25 million shares of stock to the company last year, according to the filings. Mr. Kozlowski owns about three million shares of Tyco stock, according to a report Tyco filed Monday with the S.E.C., and has an additional 11 million Tyco options.

As Defendant Kozlowski either knew or was reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.B, and B.7.

### 6. 1/31/02 Analyst Report

581. On January 31, 2002, J.P. Morgan, reporting materially false and misleading information received from the Tyco Defendants, issued an analyst report entitled, "Tyco Int'l: Our Rebuttal to the Short Case and Liquidity Risk." The report stated:

The notion that Tyco "spring loads" its results in the quarters following an acquisition is not supported by an analysis of the segment results. In spite of the continual grind of bad press, rumors and a falling stock price, we believe there remains no smoking gun on Tyco accounting or business practices, and we see no liquidity risks.

582. On February 4, 2002, Defendant Swartz admitted to *The Wall Street Journal* that

Tyco that, in fiscal years 1999, 2000, and 2001, the Company paid almost $8 billion in cash for

over 700 undisclosed acquisitions, the existence or terms of which were never revealed to the

investing public or disclosed in the Company's public filings.  The article stated:

> Tyco International Ltd said it spent about $8 billion in its past three
> fiscal years on more than 700 acquisitions that were never
> announced to the public.
>
> Although Tyco says its disclosures have been adequate, the
> company late last week sent a special alert to its investors giving
> new details about its unannounced acquisitions after questioned
> about them for this article.  The alert, which gave fresh information
> about last year but not the full three-year period, revealed that
> Tyco paid $4.19 billion in cash for unannounced deals in the fiscal
> year-ended Sept. 30, 2001, or about 37% of the $11.3 billion in
> cash it spent on all deals.  The company said separately that it
> made 350 unannounced acquisitions in that fiscal year.
>
> * * *
>
> Mark Swartz, Tyco's chief financial officer, said the company
> clearly states in its financial filings the "net" amount of cash it paid
> for all acquisitions, a number that includes the hundreds of
> unannounced deals.  He said the company doesn't disclose details
> on its numerous smaller deals because they aren't "material" given
> Tyco's huge size.
>
> When asked about prior years, Mr. Swartz said Tyco paid about
> $2.3 billion for 225 unannounced deals in fiscal 2000, and roughly
> $1.5 billion for between 150 and 175 companies in fiscal 1999.
>
> Mr. Swartz agreed that it would be impossible for an investor to
> discern the amounts it spent on unannounced deals, because Tyco
> doesn't provide a crucial piece of information in its regulatory
> filings: The amount of cash on the balance sheets in companies it
> acquires.  Tyco subtracts that amount from its total acquisition
> spending to get the "net" figure, but calculating the unannounced
> deals requires it to be added back.  "You could fault me for that,"
> Mr. Swartz said, adding that the company may include that extra
> detail in future financial filings.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made

were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) V.A, A.l.a, and A.1.c.

**7.    2/4/02 Press Release**

583.    On February 4, 2002, the Tyco Defendants admitted in a press release that, contrary to their repeated assurances, Tyco did not have a healthy cash flow, had to exit the commercial paper market, and had to draw down the full $5.9 billion from its emergency backup credit lines to pay for $4.5 billion in outstanding commercial paper debt.[16]  The press release stated:

> PEMBROKE, BERMUDA, FEBRUARY 4, 2002--Tyco
> International Ltd. (NYSE: TYC, LSE: TYI, BSX: TYC) today
> announced that it will repurchase all of the company's $4.5 billion
> commercial paper at its scheduled maturities.  To fund these
> purchases, Tyco will borrow under its $5.9 billion of existing bank
> facilities with a term maturity of February 2003 as to $3.9 billion
> and February 2006 as to the other $2.0 billion.
>
> L. Dennis Kozlowski, Tyco's Chairman and Chief Executive
> Officer, said, "While the increased interest costs will reduce
> earnings by up to $0.02 per share in fiscal 2002, by taking these
> actions we are enhancing Tyco's flexibility, liquidity, and
> eliminating uncertainty about our ability to finance our recently
> announced plan to unlock shareholder value.  Additionally, the
> company has projected remaining fiscal year 2002 free cash flow
> to be in excess of $4 billion, of which a majority will be used to
> reduce existing indebtedness."

584.    As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.l.c.

585.    In addition to admitting that Tyco's use of emergency debt would reduce the Company's earnings and free cash flow, Defendant Swartz also admitted that Tyco's draw-down of its emergency backup credit facilities substantially impaired the Company's credit rating.  At

---

[16]  The February 4, 2002 press release was filed with the SEC on Form 8-K on February 6, 2002, which was signed by defendant Swartz.

the beginning of Tyco's conference call on February 6, 2002, Defendant Swartz told investors that they "did see the effect of our draw down on two of the agencies this week. . . . S&P took a dramatic step downward to BBB in our rating." Standard & Poor's also placed the Company on "CreditWatch," citing concern over the "uncertainty" regarding Tyco's access to the capital markets, and the smaller cushion available to the Company after the exhaustion of its emergency backup credit facilities. Similarly, Fitch Ratings placed Tyco's commercial paper ratings on "Rating Watch Negative," downgraded Tyco's Senior Unsecured Debt (along with the Unconditionally Guaranteed Debt of Tyco's subsidiary, Tyco International Group S.A.) from A to A-, and downgraded Tyco's commercial paper from Fl to F2.

### 8. 2/6/02 Conference Call

586. In a conference call on February 6, 2002, the Tyco Defendants announced that it was drawing down its bank lines, and attempted to squelch rumors about manipulative acquisition accounting. According to Defendant Kozlowski:

> KOZLOWSKI: Tyco has been over the last few weeks subjected to various rumors and we believe misleading press coverage. We have several examples of this in recent days, ranging from outlandish headlines in a particular newspaper that is not even close to supported in the related article, to charges in things like TheStreet.com that we failed to disclose acquisitions that was later retracted by TheStreet.com. Reports and rumors such as this do harm to our company and our shareholders. They spook investors during the times, and they require lots of our management time to refute and they distract our employees.
>
> * * *
>
> Now that you heard about there's no liquidity problems and we're going to be filing even more disclosures on our Qs and Ks at the end of the quarter and we're rolling out . . . .even more disclosure to you and we have nothing at all that

concerns us and we'll walk anybody through any aspects of the accounting that is necessary. Now let's look back at the business. I want to assure that TYCO remains on solid ground in its businesses.

Another benefit of the bank debt is that it makes us less susceptible to various market rumors, including those that we could have a liquidity issue, which we don't, but if it is left to grow, it could become some kind of a self-fulfilling prophecy.

* * *

The bank lines that we have put in place are more expensive than commercial paper and that's why we did commercial paper in the past as opposed to bank lines.

* * *

SWARTZ:    On one other issue, the accounting questions that have been asked. Unfortunately, buried in a New York Times article today, they do come out and say that no evidence of accounting irregularities have been found at Tyco. That is true, that is exactly what happened two years ago when the same allegations were given, same exact arguments, and we were able to demonstrate two years ago that our accounting was sound, the results we were showing were appropriate, and that was confirmed by independent reviews both from the government and also from independent auditors. We are in the same position today as far as our approach to accounting. It's on a conservative basis, it is full disclosure, second to none, and we do know that as a result of the questions being thrown out into the marketplace, in a current jittery market, that there are questions that end up coming from just the allegations themselves. We understand that, we recognize that, and we are currently working on the best way to once again demonstrate that the accounting is sound and appropriate and we will put that on a public filing in an 8-K with SEC to be able to once again demonstrate to you that the accounting continues to be as sound as it was two years ago, a year ago and as included in our 10-K and our 10-Q that will be coming, one of full disclosure. So we do believe that the discussion we are having today, this

|  | morning, on our liquidity and accounting, will be able to prove that our business fundamentals and our approach to day-to-day business continues unchanged. |
|---|---|
| Kozlowski: | We still believe that we will earn about $4 billion in free cash for the year, even with some of the other fluctuations in earnings that we talked about here and the possibilities of some downturns in electronics. |

* * *

So to state the obvious, there is a crisis of confidence at Tyco, but there's no crisis of reality. Although I would argue this is not a crisis of our creation, but we will be out talking to you, doing whatever is necessary over communicating to do our best to eliminate this crisis, as well as providing you pertinent financial information that will answer all of your questions.

* * *

There is no liquidity issue.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, A.1.c, and B.3.

587. That same day, Tyco took an unusual step and issued a press release to reassert some points that were made during the February 6, 2002 conference call, including that "Tyco's business fundamentals are strong." The February 6, 2002 press release was filed with the SEC on Form 8-K on February 8, 2002, which was signed by defendant Swartz. As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### 9. 2/11/02 Disclosures

588.    On February 11, 2002, *The Wall Street Journal* reported that Tyco was trying to gain credibility with investors and convince them that the Company was healthy:

> Tyco International Ltd., seeking to raise its credibility with investors, released detailed quarterly financial projections showing strong cash flow from its operations, enough money to pay its debts and a $2.15 billion cash balance at the end of 2002.
>
> J. Brad McGee, a Tyco executive vice president, said the big industrial and financial-services concern took the unusual step to make a strong case it wasn't in financial distress. "We wanted to make sure questions about liquidity were off the table," he said.

As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.l.c.

### 10. 2/13/02 Conference Call

589.    As part of their ongoing effort to keep investors continually in the dark, the Tyco Defendants also held a conference with analysts on February 13, 2002. The Tyco Defendants stated:

> KOZLOWSKI:    I do want to remind you that we will be filing our fiscal first quarter Q on tomorrow. You'll see even more disclosure than you are used to at Tyco. We already provide substantially more disclosure than our peers. We believe this is a good thing. The more you know about our accounting, I believe the more comfortable you will be.
>
>                                    * * *
>
> SWARTZ:    . . . We believed that as with all of our accounting that the best approach for us is to follow the most conservative that we can as far as showing the financial strength of the company.
>
>                                     * * *
>
> KOZLOWSKI:    We're confident once we sit with these people and

> walk with them through what's going on they see
> there is a stable company that's a going concern,
> that'll continue to be a going concern and does not
> have a liquidity crisis.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.1.c, and B.3.

590. That same day *The New York Times* reported that in 30 months, Defendants Kozlowski and Swartz made hundreds of millions of dollars selling their shares of Tyco stock:

> Since July 1999, Tyco International's two top executives have
> made more than $500 million in profits by selling Tyco shares,
> while saying publicly that they rarely, if ever, reduce their
> holdings.

**11.    2/14/02 10-Q**

591. On February 14, 2002, the Tyco Defendants filed Tyco's Form 10-Q for the quarter ended December 31, 2001 (the "2/14/02 10-Q"), signed by Defendant Swartz. In it, the Tyco Defendants set out numerous materially false and misleading statements. These false and misleading statements addressed a variety of topics, including the following:

**a.    Tyco's Operating Results**

592. The 2/14/02 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, the Tyco Defendants provide the following summary information:

|  | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES FOR THE QUARTERS ENDED DECEMBER 31, | |
|---|---|---|
|  | 2001 | 2000 |
| Income before income taxes, minority interest, extraordinary item and cumulative effect of accounting change | 1,845.1 | 1,538.3 |
| Income taxes | (390.5) | (525.0) |
| Minority interest | (0.8) | (12.5) |
| Income before extraordinary item and cumulative effect | 1,453.8 | 1,000.8 |

| of accounting change | | |
|---|---|---|
| Extraordinary item, net of tax | (2.8) | -- |
| Cumulative effect of accounting change, net of tax | -- | (683.4) |
| Net income | $1,451.0 | $317.4 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

593.    In addition, these statements are false and misleading and omit material information because Tyco has admitted that during the quarter ended December 31, 2001, its pre-tax income was overstated by more than 21%.  As both the December Report and Tyco's 10-Q/A for the quarter ended December 31, 2001 (filed on December 31, 2002) reflect, Tyco has now recorded charges of $290.6 million for the first quarter of fiscal 2002, $185.9 million of which is attributable to ADT dealer reimbursements.

### b.    Tyco's Reserves

594.    The 2/14/02 10-Q also gives materially false and misleading information concerning Tyco's reserves, such as:

> At the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a result of purchase accounting transactions in prior years.  In connection with first quarter fiscal 2002 acquisitions, we established purchase accounting reserves of $80.7 million for transaction and integration costs.  In addition, purchase accounting liabilities of $216.2 million and a corresponding increase to goodwill and deferred tax assets were recorded during the quarter ended December 31, 2001 relating to fiscal 2001 acquisitions.  The reserves related primarily to revisions associated with finalizing the exit plans of LPS, Tyco Capital and SecurityLink, all acquired during fiscal 2001.  During the quarter ended December 31, 2001, we paid out $176.9 million in cash for purchase accounting liabilities, plus $41.8 million relating to earn-out liabilities, and incurred $2.6 million in non-cash charges (including $2.3 million relating to earn-out liabilities) against the reserves established during and prior to this quarter.  Certain acquisitions have provisions which require Tyco to make additional "earn-out" payments to the sellers, if the acquired

company achieves certain milestones subsequent to its acquisition by Tyco.  Also, in the quarter ended December 31, 2001, we determined that $15.8 million of purchase accounting reserves related primarily to acquisitions prior to fiscal 2002 were not needed and reversed that amount against goodwill.  At December 31, 2001, there remained $836.0 million in purchase accounting reserves on Tyco Industrial's Consolidated Balance Sheet, of which $650.8 million is included in accrued expenses and other current liabilities and $185.2 millions included in other long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### 12.    2/22/02 Boston Globe Article

595.    During this time, Defendant Kozlowski continued to assure investors that there were no accounting improprieties at Tyco.  For example, an article in the February 22, 2002 edition of the *Boston Globe*, entitled "CEO DEFENDS TYCO PLAN, ACCOUNTING TYCO CHIEF DEFENDS BREAKUP PLAN, ACCOUNTING," stated

HAMILTON, Bermuda - - Tyco International Ltd. chief executive Dennis Kozlowski yesterday defended the conglomerate's accounting methods and breakup plan, declaring, "We have nothing to hide," even as a large investor questioned the impartiality of Tyco's auditors.

Kozlowski sought to reassure investors at Tyco's annual shareholder meeting here that, despite a wave of uncertainty that has battered the company's stock in recent weeks, "Our accounting is conservative and it is proper."  He said Tyco had been unfairly sucked into the cyclone of concern around the collapse of Enron Corp.

"Let me assure you, Tyco is a very healthy and viable company," Kozlowski said.

As the Tyco Defendants either knew or were reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) V.A, A.l.a, A.1.c, and B.3.

### 13. 2/26/02 Conference Call

596. During a weekly conference call on February 26, 2002, Defendant Swartz sought to falsely reassure analysts and investors about the propriety of Tyco's acquisition accounting practices. According to Defendant Swartz:

> Swartz: This is the same corporate management team we have in place today that was in place 2 years ago which is the last time we had accounting allegations against the company. Allegations that are exactly the same today as they were 2 years ago, however the names of the acquisition and the dollar amount have changed. Two years ago when we had these false allegations, as the management group, we told you that our accounting was appropriate and conservative, that the auditor opinions continued unchanged, the SEC ended up their enforcement action with no action being taken, and that the shareholder suits were baseless. With the court coming out yesterday and affirming the last point, the integrity of what we communicated to you 2 years ago was completely true, and 2 years ago we saw the same stock market volatility and credit market uncertainty that is in place today. So now roll forward 2 years where we do have the same accounting allegations once again and as a management group we tell you once again that the accounting is appropriate and conservative, PwC, our outside auditors continue with their opinions unchanged and the new round of shareholder suits that copy the ones 2 years ago are also baseless. And our integrity is extremely important to us, that is why we believe in being completely open, disclosing to a level far beyond others and we will continue to do that until we are able to in the future provide you the same closure that we have been able to provide to the accusations that we had 2 years ago.
>
> * * *
>
> . . . to conclude, our accounting continues to be done appropriately and conservatively.

597.     Swartz also sought to give false reassurance regarding Tyco's liquidity:

SWARTZ:              …we are in a very liquid position right now for the
                     next 12 months and that divestitures that we're
                     looking at and have talked about publicly to this
                     point, which is both plastics and CIT, will be
                     incremental to that liquidity and should give people
                     even more comfort relative to our outlook and our
                     ability to continue to go ahead and increase
                     shareholder value and get the credit side of the
                     house comfortable that all these other assertions that
                     are being made are not true.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made

were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) V.A, A.1.a, and A.1.c.

## 14.     2/28/02 New York Times Article

598.     On February 28, 2002, *The New York Times* reported that, prior to acquisition,

Tyco encouraged Raychem to prepay some expenses before the acquisition was completed.

> Tyco International said yesterday that it had encouraged Raychem,
> an electronic components maker that it bought in 1999, to prepay
> some expenses before the acquisition was completed.
>
> Tyco executives have denied that Tyco changes the payment
> practices of companies it buys before the takeovers are final.  Brad
> McGee, a spokesman for Tyco, said yesterday that the
> prepayments at Raychem were standard business practices and did
> not contradict the company's earlier statements.
>
>                          * * *
>
> The disclosure about Raychem came in response to questions
> about a letter sent by a former Raychem employee to the Securities
> and Exchange Commission.  The letter outlined payments that
> Raychem made at Tyco's behest before the acquisition closed.
> Tyco paid $3 billion for Raychem in August 1999.
>
> Mr. McGee said last night that he had not seen the letter but that
> "some former employees did approach the S.E.C. with
> allegations."  He added that the S.E.C. had carefully reviewed
> Tyco's actions and had found no problems.

"The enforcement division of the S.E.C. specifically inquired into the allegations," he said. "The results of their inquiry are now a matter of public record, a no-action letter."

The accusations, Mr. McGee said, "are well-covered territory, lacking any substance, that we consider to be a dead issue." He said the prepayments had no effect on Tyco's reported income, although they did improve its reported cash flow.

\* \* \*

Last month, with its stock sliding, Tyco said it would split into four companies, reversing its decade-long strategy of growth by acquisition. Tyco's shares have also been buffeted by the disclosure that L. Dennis Kozlowski, its chairman, and Mark H. Swartz, its chief financial officer, have sold more than $500 million in Tyco stock over the last three years. Mr. Kozlowski said in December that "100 percent of my net worth" is in Tyco stock.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, A.1.c, and B.3.

### 15.  3/5/02 Conference Call

599. During a weekly conference call on March 5, 2002, Defendant Swartz continued to attempt, falsely, to allay concerns about Tyco's acquisition "strategy," and its accounting practices:

SWARTZ: . . . anyone who has been following Tyco over the past few years knows, we are extremely disciplined when it comes to acquisition. Every acquisition needs to be immediately additive to earnings and cash flow during the first quarter of ownership, needs to add to the competitive strength of our businesses, has to provide minimum returns in the mid teens during the first year of ownership. That is our acquisition strategy, it is true for every acquisition and we continue to expect as we make acquisitions going forward, that we will continue to have income statement benefits and cash flow benefits as it reflects the strength of these acquisitions and the benefit it ends up bringing to

> our business.

* * *

> Well again, thank you for listening to us today and
> learning more about the accounting here at Tyco
> which, as you hear, continues to be in conformance
> with GAAP, prepared on a conservative basis with
> proper disclosure for our investors to see the
> performance of our business.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, and A.1.c.

### 16.    3/10/02 Sun Sentinel Article

600.    On March 10, 2002, in an article entitled, "TYCO'S WALKING A FINE LINE; CEO INSISTS BREAKUP WILL ADD VALUE," *The Sun-Sentinel* (Ft. Lauderdale) reported:

> "Tyco has always been an open company and we have nothing to
> hide," Kozlowski told the shareholders, according to a Reuters
> report.  "Our accounting is conservative and proper, living up to
> the letter and the spirit of the law."

As Defendant Kozlowski either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.1.c, and B.3.

### 17.    3/12/02 Conference Call

601.    Swartz's campaign to falsely reassure investors and analysts about Tyco's acquisition accounting and liquidity continued during the next weekly conference call, on March 12, 2002:

> SWARTZ:          . . . as we have said, our accounting, as far as
> acquisition accounting, in addition to the other areas
> that we have talked about, is in accordance with
> GAAP in an appropriate and consistent basis.

* * *

239

> There is not a cash crisis looming at Tyco, nor has
> there been one in the past.
>
> * * *
>
> We have ample amounts of cash and liquidity
> available and given the ongoing uncertainty in that
> CP market, we don't think it makes sense for us to
> jump in until that all Balances itself out on issues
> unrelated to Tyco.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, and A.1.c.

### 18.    3/19/02 Conference Call and Wall Street Journal Article

602.    During the weekly investor call on March 19, 2002, Swartz again tried to characterize the allegations of improper acquisition accounting at Tyco as a "rehash":

> SWARTZ:        They [recent stories in *The Wall Street Journal*,
> *New York Times* and Fortune.com] continue to be a
> rehash of a rehash of items that we have thoroughly
> gone through and found to be totally appropriate not
> only by ourselves, but also our auditors and others.
> We are at a total loss to explain how recycled and
> disproved allegations like the warrant placement as
> the second most important news story in the global
> business in finance areas today.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.l.a, A.1.c, and A.5.

603.    On March 19, 2002, an article in *The Wall Street Journal* entitled "Tyco Inflated Cash Flow Of Acquisition" reported that the Company engaged certain accounting manipulations as part of its Raychem acquisition:

> A Tyco executive vice president, J. Brad McGee, denied there was
> any attempt to boost Tyco's results, and defended its accounting as
> proper.  Mr. McGee said the specific payments discussed in the e-

mails were investigated by the Securities and Exchange Commission in 1999 and 2000 as part of a broader informal probe of Tyco's accounting. The SEC ended its probe in mid-2000, taking no action.

* * *

Mr. McGee said Tyco has never "manipulated the cash flow or earnings of companies we acquire for the purpose of spring-loading, or getting better results after the acquisition."

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.1.c., and B.3.

### 19. 4/2/02 Conference Call

604. On April 2, 2002, the Company held yet another conference call in its ongoing efforts to provide false assurances concerning Tyco's accounting practices. Defendant Swartz stated as follows:

SWARTZ:         [Referring to] "recycled allegations of so-called spring loading"

* * *

As I have said over the past few weeks based on January and February's numbers, we see no need to revise earnings or cash flow guidance for the quarter.

* * *

SWARTZ:         We know of no insider sales that have taken place during this period.

* * *

We also are real pleased and proud of our accounting policies and the standard we have set for open and forthright disclosure.

* * *

We are unaware of any other management team of any company, of any size or complexity that has

> been willing to subject itself to as open a discussion
> of its accounting and disclosure practices as Tyco
> has. We think that says something about our
> confidence in Tyco and more importantly the
> integrity of our numbers.

As Defendant Swartz either knew or was reckless in not knowing, these statements when made

were materially false and misleading and omitted material information for the reasons set forth

above in Section(s) V.A, A.1.a, A.1.c, and B.3.

**20.    4/3/02 Analyst Report**

605.    On April 3, 2002, J.P. Morgan, reporting materially false and misleading

information received from the Tyco Defendants, issued an analyst report entitled, "Tyco Int'l:

The Weekly Conference Call and Fine Tuning Estimates." The report stated:

> Tyco's disclosure and openness in the past several months has
> been unprecedented, and we are still left without a "smoking gun".
> We think Tyco remains a collection of valuable and strong
> franchises that are position for growth.

> * * *

> We find Tyco a compelling investment given its strong collection
> of businesses and attractive valuation.

**21.    4/25/02 Press Release**

606.    On April 25, 2002, the Tyco Defendants announced the termination of the

breakup plan and poor financial results. The press release, which was filed with the SEC on

Form 8-K on May 1, 2002 and was signed by Defendant Swartz stated:

> Pembroke, Bermuda, April 25, 2002-Tyco International Ltd.
> (NYSE: TYC, BSX: TYC, LSE: TI) today announced that it has
> terminated its plan to separate the company into four separate
> businesses and is taking steps to further strengthen the long-term
> prospects of the company. It also reported earnings for the second
> quarter in an accompanying release.

607.    The press release also attached a letter from Defendant Kozlowski to all

shareholders in which he announced abandonment of the plan to break up Tyco, and then took

"full responsibility":

> Having said that, it's been upsetting to see inaccurate reporting and
> unsubstantiated rumors about Tyco given such a public platform.
> As stewards of a public company we know we are subject to
> scrutiny every day and the current climate is one in which all
> companies are under a microscope. We have always tried to be as
> transparent in our accounting as possible. Indeed, I consider our
> disclosure to be second to none among our peer companies. That
> some in the media would compare us to companies that may have
> intentionally misled investors through the use of financial
> chicanery is insulting and inaccurate. To be thrown into stories
> about "accounting scandals" damages our reputation and casts
> aspersions on our employees.

> By fully monetizing CIT, we can eliminate any lingering
> perceptions about the company's short-term financial position and
> create a strong foundation for the future.

>            * * *

> We will continue to drive organic growth through product
> innovation, superior service, and geographic expansion.

>            * * *

> In addition, the senior corporate management team will not receive
> bonuses this year.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when

made were materially false and misleading and omitted material information for the reasons set

forth above in Section(s) V.A, A.1.a, A.l.c, and B.3.

**22.    4/25/02 Conference Call**

608.    The Tyco Defendants elaborated on their announcement during a conference call

with analysts on April 25, 2002:

> KOZLOWSKI:       Finally, Tyco was the subject of a wave of some
> incorrect rumors and some misleading press reports.
> These shook investors' confidence and also scared
> our employees, suppliers and customers. In a melee

we lost some customers and we confused employees. In doing so the rumors became partially self-fulfilling. To prevent any risk of a liquidity squeeze we drew our backup bank lines and then triggered a debt rating downgrade from Standard & Poors and had higher costs of finds. We were comfortable being placed under a microscope but I have to admit to being very frustrated with some of the outlandish stories and headlines. They damaged our reputation, hurt and confused our employees, and certainly cost our shareholders money. We responded to the series of rumors with a series of weekly conference calls to answer questions from any and all. We are proud of our company and we believe that our openness will allow rationality ultimately to return.

* * *

On an all end basis Tyco lost 96 cents per share, this includes one dollar and 61 cents per share of impairment and other unusual charges. I will highlight these items to you to help you analyze the underlying performance of the business, but I do want to stress that I see them as real costs and that it will be included in our compensation calculations. As a result, senior corporate management will not receive bonuses this year although operating managers may depending upon the results of their specific units.

SWARTZ:  I'd like to stress that there are no liquidity issues, next February is a reasonable roll forward with the reasonable amounts of debt that we would be in a position to go ahead and refinance, the only significance put that we have after that time period is not until our first fiscal quarter of 2004.

* * *

KOZLOWSKI:  . . . I think on a going forward basis the press reports really had no accounting issues and they were getting more into the rumors and things on our sale of assets or our overall strategic direction which is probably a fair criticism because there was a lot of uncertainty as to where Tyco was going and by providing this clarity in our comprehensive letter to shareholders, our press release and this

244

> conference call today, hopefully we will clear that
> up but if conference calls are needed, then we will
> certainly re-institute them at a moments notice.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A, A.1.a, A.1.c, and B.3.

609.     That same day, April 25, 2002, Tyco publicly announced its plans for a 100% public offering of CIT in the amount of approximately $7.2 billion.  By selling-off CIT, either through an outright sale or via an IPO, Tyco, as it informed investors, would improve its liquidity and reduce its debt by at least $10 billion.  CIT filed an S-1 registration statement with the SEC that day.  As the Tyco Defendants either knew or were reckless in not knowing, this statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section V.A.1.

### 23.     4/30/02 Conference Call

610.     During a conference call on April 30, 2002, Defendant Swartz once again specifically addressed the question of Tyco's liquidity and earnings power, falsely attempting to reassure investors and analysts:

> SWARTZ:                . . . we continue to feel extremely comfortable as to
> the earnings power, the cash flow generation from
> every one of our businesses in which we participate.
>
>                                    * * *
>
> Two other points related to liquidity, just some
> misconceptions in the marketplace, we did not head
> the monetization route because we weren't in a
> position to spin CIT.  From a debt perspective, we
> very well could have gone ahead and spun it . . . we
> feel good about the liquidity, we have a plan in
> place to do it with minimal execution risk, there are
> plenty of assets with strong cash flows that we have
> that we can rely on,

* * *

> We are continuing to run the businesses without a
> liquidity issue in that we do not believe there is one
> right now and its not that our heads are in the sand
> but on the contrary it's an issue next February,
> we've got a plan in place to go ahead and raise the
> cash proceeds that are necessary to overcome that. .
> .

* * *

> I do want to make clear though, you know, I am not
> changing any guidance as far as the balance of the
> year, we do think where we are currently, that is the
> right level that people should factor in.

* * *

SWARTZ:   . . . there is no liquidity issue, for those of you
looking at next February.

As Defendant Swartz either knew or was reckless in not knowing, the statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) V.A.l.

**24. 5/15/02 10-Q for the Quarter Ended 3/31/02**

611. On May 15, 2002, the Tyco Defendants filed Tyco's Form 10-Q for the quarter ended March 31, 2002 (the "5/15/02 10-Q"), signed by Defendant Swartz. In it, the Tyco Defendants set out numerous materially false and misleading statements, as evidenced by (among other things) the Tyco Defendants' restatement of its operating results in a June 12, 2002 10-Q/A for the same period. These false and misleading statements addressed a variety of topics, including the following:

**a. Tyco's Operating Results**

612. The 5/15/02 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results. For example, the Tyco Defendants provide the following summary information:

246

| | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES | |
|---|---|---|
| | FOR THE QUARTERS ENDED MARCH 31, | |
| | 2002 | 2001 |
| (LOSS) INCOME BEFORE INCOME TAXES, MINORITY INTEREST AND EXTRAORDINARY ITEMS | (1,803.0) | 1,488.1 |
| Income taxes | (97.4) | (366.0) |
| Minority interest | (4.3) | (11.7) |
| (Loss) income before extraordinary items | (1,904.7) | 1,110.4 |
| Extraordinary items, net of tax | (0.7) | (10.3) |
| NET (LOSS) INCOME | $(1,905.4) | $1,100.1 |

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section V.A.1.

613.    In addition, these statements are false and misleading and omit material information because Tyco has admitted that during the quarter ended March 31, 2002, it understated its reported loss by more than 71%.  As both the December Report and Tyco's 10-Q/A for the quarter ended March 31, 2002 (filed on December 31, 2002) reflect, during the second quarter of fiscal 2002 Tyco failed to timely record a loss due to an impairment in the value of its CIT subsidiary, despite its contemporaneous analysis that an impairment charge was necessary.[17]  When Tyco ultimately restated its March 31, 2002 financial statements, it reported a $4.5 billion impairment in the value of CIT's goodwill.  The effect of this charge eliminated almost 40% of the earnings Tyco accumulated over its corporate life.

614.    Thus, the following additional statements in the 5/15/02 Tyco's 10-Q were materially false and misleading and omitted material information (as the Company has effectively admitted):

---

[17]  Tyco's 10-K for the year ended September 30, 2002 states that "the Company performed a SFAS 142 first step impairment analysis as of March 31, 2002 and concluded that an impairment charge was warranted at that time."  Nonetheless, the Company failed to record the charge.

The Company periodically reviews and evaluates its goodwill and other intangible assets for potential impairment. Effective October 1, 2001, the beginning of Tyco's fiscal year 2002, the Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets," under which goodwill is no longer amortized but instead is assessed for impairment at least annually. Under the transition provisions of SFAS No. 142, there was no goodwill impairment at October 1, 2001. Updated valuations were completed as of March 31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and Tyco Capital, which resulted in no impairment of goodwill at that date.

* * *

However, during the quarter ended March 31, 2002, circumstances developed that could potentially impair the value of goodwill with respect to our Tyco Telecommunications reporting unit and Tyco Capital. Updated valuations were completed as of March 31, 2002, which resulted in no impairment of goodwill at that date.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section V.A.1.

### b. Tyco's Reserves

615. The 5/15/02 10-Q also gives materially false and misleading information regarding Tyco's reserves, such as:

At the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a result of purchase accounting transactions in prior years. In connection with fiscal 2002 acquisitions, we established purchase accounting reserves of $182.2 million for transaction and integration costs. In addition, purchase accounting liabilities of $355.7 million and a corresponding increase to goodwill and deferred tax assets were recorded during the six months ended March 31, 2002 relating to fiscal 2001 acquisitions. These reserves related primarily to revisions associated with finalizing the exit plans of LPS, Tyco Capital and SecurityLink, all acquired during fiscal 2001. During the six months ended March 31, 2002, we paid out $318.4 million in cash for purchase accounting liabilities, plus $58.0 million relating to earn-out liabilities, and incurred $26.3 million in non-cash charges and reclassifications (including $2.3 million relating to earn-out

liabilities) against the reserves established during and prior to this six-month period. In addition, during the six months ended March 31, 2002, we assumed pre-existing put option rights of $105.9 million, of which $22.2 million has been paid in cash. Certain acquisitions have provisions which require Tyco to make additional "earn-out" payments to the sellers if the acquired company achieves certain milestones subsequent to its acquisition by Tyco. Also, in the six months ended March 31, 2002, we determined that $47.3 million of purchase accounting reserves related to acquisitions prior to fiscal 2002 were not needed and reversed that amount against goodwill. At March 31, 2002, there remained $880.3 million in purchase accounting reserves on Tyco Industrial's Consolidated Balance Sheet, of which $600.3 million is included in accrued expenses and other current liabilities and $280.0 million is included in other long-term liabilities.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section V.A.1.

### 25. 5/16/02 Conference Call

616. During a conference call on May 16, 2002, Defendant Swartz continued to reassure investors and analysts that Tyco was "comfortable with the guidance that we gave for the quarter and for the year," and that "there is no real liquidity issue going on here at Tyco." As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section V.A.1. Tyco's 10-Q/A (filed on December 31, 2002) later revealed that during the quarter ended June 30, 2002, Tyco's reported pre-tax income of $150.6 million was restated to a loss of $236.1 million because of an improper failure to timely record an impairment in the value of goodwill at Tyco Telecommunications and Tyco Infrastructure Services. As a result, Tyco's reported pre-tax earnings during that quarter were overstated by approximately $387 million.

617. On May 16, 2002, AP, Dow Jones, and Reuters reported that Swartz reiterated that the Company planned to pay off about $10 billion of its $27 billion in debt after spinning-off

CIT, and that the Company was on course to do so by the end of June.  According to Swartz, the Company was "not worried" about a potential debt downgrade to junk status given the Company's cash and cash-flow levels as well as the benefit from the expected sale or initial public offering of CIT.  Mr. Swartz further stated that the Company's "financial position as we sit right now is stronger than it was a year ago today."  As Defendant Swartz either knew or was reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section V.A.1.

618.    On May 17, 2002, numerous media outlets reported on the Company's positive statements from May 16, particularly focusing on the expected sale or IPO of CIT by the end of June 2002.  For example, *The Wall Street Journal* reported:

> [Tyco's] chief financial officer said the company is confident it can complete a sale or initial public offering of its CIT Group finance unit by the end of June.
>
> Mark Swartz also told an investor conference can that the company plans to pay off at least $10 billion of the $27 billion in debt being shouldered by its industrial arm, using the proceeds from the CIT deal, along with cash on hand from operations.
>
> An IPO or sale of CIT is considered critical to investor confidence in Tyco, which has lost credibility this year amid abrupt changes in strategic direction and questions about its liquidity and heavy debt load.  To raise cash, the company has been trying to unload CIT, which it bought last June for $9.5 billion, but which is probably worth much less now.  Mr. Swartz said the company continues to pursue both an IPO of the unit and an outright sale.

As the Tyco Defendants either knew or were reckless in not knowing, these statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section V.A.1.

### 26.    Announcements of Criminal Investigations

619.    The Tyco Defendants announced on June 1, 2002 that Defendant Kozlowski was

the target of a criminal investigation being undertaken by the District Attorney of the County of New York into possible violations of state sales tax laws.

620. According to the Company's December Report, the Board was then informed on June 1 and June 2, 2002: (i) that Defendant Kozlowski had been aware of the investigation since on or about May 3, 2002; (ii) that the Company itself had received a subpoena in connection with the investigation; (iii) that the Company had retained counsel to represent itself in the investigation; (iv) that the Company's counsel had met with prosecutors and had furnished prosecutors with data and documents; and (v) that it was now expected that Defendant Kozlowski would be indicted.

621. According to the December Report, on June 2, 2002, Tyco requested that the Boies firm represent it in connection with negotiating the terms of Defendant Kozlowski's resignation. Those negotiations led to Defendant Kozlowski resigning from the Tyco Board and from his position as the Company's Chief Executive Officer on June 3, 2002.

622. In light of this the market also immediately began to question all aspects of the Company's performance. For example:

a. *Reuters Business Report* (June 3, 2002):

"This is one more piece of uncertainty and the share price is telling you what shareholders think," said John Maack, director of equities at money manager Crabbe Huson Group. "What we needed here were signs of stability and that things were going to be OK, not this;"

b. TheStreet.com (June 30, 2002):

"The market is taking this as an indication that if [Kozlowski] were somewhat devious as a person, then they're extending that to the company," said Brett Gallagher, head of U.S. equities at Julius Baer Investment Management;

c. Wall Street Journal Online News Roundup (June 4, 2002):

Mr. Kozlowski resigned Monday amid an investigation into possible sales-tax evasion involving millions of dollars in artwork. Although the investigation appeared to focus on how he managed his vast personal fortune, much of it from sales of company stock, analysts said it raised serious concerns about his oversight of Tyco and its finances.

Investors already worried about the company's future sold Tyco stock with a vengeance, sending its shares down nearly 27% Monday in extremely heavy trading. Tyco stock has fallen 73% since Jan. 1; and

d.      Forbes.com (June 4, 2002):

Tyco's diminishing credibility took another big hit on the news as did its stock-which fell 27% to $16.05 on Monday. Why? Similarities between Kozlowski's personal dealings and Tyco's corporate strategy keep coming to light.

623.    On June 4, 2002, Kozlowski was indicted by the District Attorney of the County of New York for conspiring with executives and employees of art galleries and art consultants in New York and London to avoid paying more than $1 million in New York State and City sales taxes on millions of dollars in artwork purchased by Kozlowski and his wife (Kozlowski indictment). The Kozlowski Indictment alleges that from August 11, 2001 through June 3, 2002, Kozlowski and his co-conspirators avoided having either the customer pay or the vendor collect the sales taxes due on the sale of at least six expensive paintings valued at $13,175,000. According to an article in the *New York Post,* dated July 12, 2002, the paintings were paid for with Tyco funds and then repaid without interest. Kozlowski and his co-conspirators generated false documents, such as invoices and shipping documents, to make it appear that the art work was to be shipped out of New York and therefore not covered by New York State sales tax provisions.

624.    Upon the news of Kozlowski's indictment and forced resignation, the price of Tyco shares dropped $5.90, or 27%, to $16.05 from the previous closing price of $21.95 on May

31, 2002.

625.    On June 7, 2002, Tyco announced that it may delay the public offering of CIT and that two major agencies, Moody's Investors Services ("Moody's") and Standard & Poor's ("S&P"), had cut their ratings on Tyco's debt to one notch above junk status. Thus, Moody's cut Tyco's long-term credit rating to Baa3 from Baa2 and lowered its short-term rating to Prime 3 from Prime 2. Moody's warned that "Absent significant near-term debt reduction with proceeds from a successful sale of CIT, Tyco's ratings would likely fall into speculative grade." Moody's further warned that it may cut the Company's debt to junk status if a sale is not completed "in the very near future, as early as the end of June." Moody's also stated that it "believes that potential proceeds from the (IPO) will fall short of expectations and Tyco will face a significant debt burden with sizable maturities over the next 18 months."

626.    On the same day, S&P cut Tyco's long-term rating to BBB- and left its short term rating unchanged at A2. S&P said Tyco faced an erosion in management credibility and investor confidence, and was "concerned about the Company's ability to access capital markets or bank financing. "S&P changed its CreditWatch implication to "negative." S&P stated that its ratings could be lowered further in the coming days or weeks if there were further developments in the criminal investigation or if the CIT IPO was not launched within the next two weeks; did not close within a month of the launch; or if proceeds from the offering were insufficient to improve Tyco's liquidity.

627.    Tyco also confirmed on June 7, 2002 that it was launching its own "comprehensive internal investigation," with the assistance of the Boies firm, into Kozlowski's and other executives' use of company funds.

628.    That same day, there were also numerous reports that the Manhattan District

Attorney's Office and the SEC had broadened their investigations beyond Kozlowski to determine if executives used the Company's cash to buy any art and homes.

629.     Tyco's shares plunged $4.50 per share on June 7, to close at $10.10 (a six-year low) on volume of 199.8 million shares.  According to *Reuters Business Report*, on that date, "[t]he downgrades. . ., which are likely to make borrowing more expensive, could reduce [Tyco's] cash flow by $635 million in its third and fourth quarter, [Tyco] Chief Financial Officer Mark Swartz said.  Reuters further reported:

> "If the CEO would take those kinds of risks in his personal life, then you could make the assumption that he was acting that way at the company," Plaza said.
>
> "Kozlowski was so hands-on and so aggressive throughout all parts of the company that it has to touch other management.  You could assume that type of behavior was either allowed or encouraged."

630.     On June 7, 2002, J.P. Morgan Securities cut its rating on Tyco to "market perform" from "buy," citing corporate governance issues and the Company's potential legal problems.

631.     During a conference call held that same day, the last day of the Relevant Period, Defendant Swartz tried to downplay the crisis at Tyco as "a credibility and a perception issue."  Similarly, John Fort, who was chosen by the Board to assume control of the Company, tried to reassure analysts and investors, falsely, that all was fundamentally well at Tyco.  According to Fort:

> FORT:     We are . . .  we expect nothing related to Dennis to be material to our financials, and I think that's worth repeating.  They're just not material.  They're not going to affect either our historic or expected financials.

*     *     *

> . . . we do not have a liquidity issue at this point
> even in spite of recent developments.

> * * *

> Now just look at this company and just take a look
> at it.  I mean our accounting is sound, even though
> we have tough economic times, our earnings and
> cash flows are strong and real.  We're built on real
> hard assets factories and products and customers.
> We're committed to solid organic growth going
> forward.  We have competent excellent employees
> and we have our liquidity issues under control and
> with all that, I think it's very difficult to forecast
> that we're not going to be successful going forward.

## VII.    POST-RELEVANT PERIOD EVENTS

632.    On June 10, 2002, Tyco announced that it had fired its Chief Corporate Counsel

Belnick because it had lost confidence in Belnick's willingness and ability to conduct a fair

investigation of company executives, including Belnick himself.

633.    Additionally, on June 10, 2002, Fitch Investors Services cut Tyco's corporate

credit rating to junk status, BB, from BBB and its commercial paper rating to B from F2, and

downgraded its ratings on CIT's senior debt to BBB from A, citing concerns about the chaos

surrounding Tyco.  Among other reasons cited by Fitch was "shortcomings in corporate

governance."  Fitch warned that it may cut the long-term rating again.  "It maybe more difficult"

to unload CIT amid an "erosion in investor confidence" S&P analyst Werneth said in a

conference call.  "The longer [CIT] is out there, the worse it is for [Tyco]" said S&P managing

director Kelly.

634.    On June 12, 2002, Tyco announced that it had restated previously issued financial

statements for the second quarter of fiscal 2002 to report a $4.5 billion estimated goodwill

impairment related to CIT Group Inc., then a wholly-owned subsidiary of Tyco.  The Company

filed amendments to both its and CIT's Forms 10-Q for the quarter ended March 31, 2002.  An

amendment to the Registration Statement on Form S-1 relating to the proposed IPO of CIT Group Inc. was also filed to reflect this change. Tyco later re-sold CIT in a public offering that generated billions of dollars less than Tyco had paid for CIT only eighteen months earlier.

635. Similarly, on June 12, 2002, the *New York Daily News* reported that the SEC was again looking into Tyco's accounting for acquisitions:

> . . . The original inquiry got its start in 1999 after a Dallas investment manager began warning clients that cash flow from Tyco acquisitions appeared inflated. One theory was that Tyco was aggressively undervaluing the assets of acquisition targets before the new companies joined Tyco's balance sheet. The practice, detractors said, allowed Tyco to build a pool of assets from which it could then unlock value at a later point.
>
> Though the SEC gave Tyco a clean bill of health two years ago, at least one New York businessman with close ties to Simplex Time Recorder, a December 2000 Tyco acquisition, told the Daily News he witnessed such dealings first-hand.
>
> "I think it's fair and accurate to say they made [Simplex] writedowns on the value of their receivables to a level that, if it didn't break the law, certainly bordered on breaking the law," the businessman said.

636. On June 17, 2002, Tyco filed a complaint in the United States District Court, Southern District of New York, alleging that Defendant Kozlowski approved a $20 million "fee" to Walsh, who served as a member of Tyco's Board of Directors from 1997 though February 2002. This fee was to compensate Walsh in connection with Tyco's acquisition of CIT.

637. On June 17, 2002, Tyco filed a lawsuit against Walsh in federal court in New York, seeking restitution and damages resulting from Walsh's breach of fiduciary duty and violation of the Company's By-Laws relating to Walsh's taking of the $20 million fee without the requisite Board approval and without making a full disclosure of his interest in a transaction being contemplated by the Company.

638. In addition to being sued by the Company, Walsh was criminally charged by the

New York County District Attorney for intentionally concealing information from Tyco's directors and shareholders about the $20 million finder's fee "while engaged in inducing and promoting the issuance, distribution, exchange, sale, negotiation and purchase" of Tyco securities.

639.     On July 1, 2002, Tyco priced the CIT shares at $23, well below the $25-$29 share estimated range announced on June 12, 2002.  Thus, the CIT IPO grossed proceeds of $4.6 billion, well below the reduced $5.0-$5.8 billion estimated range that was announced on June 12, 2002.  Given the announcement of the diminished proceeds Tyco would receive from the CIT IPO, Tyco's shares declined by 6.2% on July 1, 2002.

640.     During a conference call on July 2, 2002, Tyco stated that it was satisfied with the CIT IPO, and that it expected to beat Wall Street forecasts for the fiscal third-Quarter and year-end September 30, 2002.  Tyco did not announce any extraordinary events or charges.  Yet the very next day, after having deluded investors into thinking that Tyco was on the road to recovery, *The Wall Street Journal* reported that Tyco planned to take a $2.4 billion charge for the third quarter to "reflect the diminished value of its former CIT Group finance unit."

641.     On July 2, 2002, The Committee on Energy and Commerce of the United States Congress sent a letter to the SEC concerning accounting at five companies, including Tyco.  The Committee made a specific request for "all records" in the SEC's 1999-2000 investigation of Tyco's accounting, which was, at that time, found not to be improper by the SEC.

642.     On September 12, 2002, the New York County District Attorney charged Kozlowski and Swartz with "Enterprise Corruption," grand larceny, conspiracy, and falsifying business records relating to the theft of more than $170 million from Tyco and fraudulent sales of more than $430 million of Tyco securities.  The indictment alleges that from January 1, 1995

through September 9, 2002, Kozlowski and Swartz created and operated a criminal enterprise for

the purpose of stealing money from Tyco and defrauding investors by falsifying records,

concealing material information and providing false information to Tyco shareholders.

643.    The Enterprise Corruption Indictment noted that Kozlowski and Swartz did not

act alone and described their roles in the criminal enterprise:

> Defendant Kozlowski was the boss of the criminal enterprise, and
> set its policies.  He decided what bonuses would be paid, to whom,
> and when, without regard for the restrictions that the Board had put
> on executive officers' compensation.  He entered into private deals
> with executive officers and directors of Tyco, which he sought to
> keep secret even when they were required to be disclosed.  He
> caused Internal Audit to report to the Board through himself, and
> ensured that they would not audit TME [Management, Inc., a Tyco
> subsidiary].  Working with personnel from Investor Relations,
> Defendant Kozlowski met with and defrauded investors, analysts
> and journalists to manipulate Tyco's stock price.  He used the
> personnel in Executive Treasury to pay his bills from the Tyco
> "concentration account."  He established a system of internal
> controls in which his assistant's authorization was sufficient to
> warrant expenditures of many millions of dollars.
>
> Defendant Swartz was chief of operations of [the criminal
> enterprise]; he was the second-in-command to Defendant
> Kozlowski.  Defendant Swartz exercised control over the transfer
> of funds, the booking of accounting entries, and the operations of
> those portions of Tyco's Human Resources department dealing
> with certain compensation, bonuses, and loans.  Defendant Swartz
> established a system by which the Finance Department, and not the
> Tyco Legal Department, controlled the data going into Tyco's
> filings with the [SEC] and caused Tyco's filings to be false and
> deceptive.  Defendant Swartz deceived investors and the Board by
> misallocating substantial personnel costs resulting in falsely
> enhanced operating performance.

644.    According to the Enterprise Corruption Indictment, Kozlowski and Swartz

exercised control over Tyco's flow of information and funds by:  (i) granting themselves "excess

compensation in the form of improper bonuses; (ii) forgiving the payment of personal expenses

and unapproved loans; and (iii) concealing these payments from the Company's shareholders.

The indictment also alleges that "[a]s part of a scheme constituting a systematic on-going course of conduct the Defendants and others . . . falsely represented and materially omitted to represent accurately and in a timely fashion:

(1)     The compensation paid to executive officers.

(2)     The loans extended to executive officers.

(3)     The extent of stock sales by corporate insiders.

(4)     The earnings per share of Tyco stock before non-recurring charges.

(5)     The level of spending by the executive officers in managing the money and property of Tyco's owners and investors.

(6)     Related party transactions."

645.     The Enterprise Corruption Indictment charges that Kozlowski and Swartz concealed from Tyco's shareholders that:  (i) tens of millions of dollars worth of payments and forgiven loans were made to Tyco executives; (ii) tens of millions of dollars worth of credit lines and loans were given to Tyco executives; (iii) Kozlowski and Swartz sold substantial amounts of Tyco stock to Tyco; (iv) Tyco's reported earnings were artificially inflated; (v) Tyco executives used corporate resources to fund personal ventures and property acquisitions; (vi) Tyco purchased properties from members of Tyco's Board; and (vii) Tyco gifted residences, money, and other property to employees.

646.     Also according to the Enterprise Corruption Indictment, while Kozlowski was giving speeches to Tyco's investors about his confidence in the Company, he misrepresented the number of Tyco stock sales he made, which had exceeded 5.5 million shares.  During the time period covered by the indictment, Kozlowski received proceeds of more than $280 million in insider sales and Swartz received proceeds of more than $125 million in insider sales.

647.     The same day Kozlowski was indicted for the second time, Tyco filed a-lawsuit against Kozlowski in federal court in New York seeking the return of his income and benefits

since 1997 and the forfeiture of all his severance pay.

648.     Among the perks enjoyed by Kozlowski at Tyco's expense was the rent of a Fifth Avenue apartment from 1997 to 2001 at an annual rate of $264,000; the purchase of a $7 million Park Avenue apartment, purchased below market value in 2000 with interest free loans; the sale of his New Hampshire home to Tyco at higher than market value; the purchase of an apartment on Fifth Avenue in 2001 for $16.8 million and another $3 million in improvements and $11 million in furnishings; and the gross-up of benefits to insulate Kozlowski from tax liability.

649.     Kozlowski also abused Tyco's KEL Program, borrowing more than $274.2 million to pay for artwork, real estate maintenance fees, construction and remodeling costs for his homes, a yacht, investment property, antiques, and furniture.  Tyco's Complaint against Kozlowski also disclosed several charitable contributions made by Tyco at Kozlowski's direction.

650.     On September 12, 2002, the SEC filed an action against Kozlowski and Swartz for fraud, making false and misleading proxy statements, fraudulent stock sales, reporting violations, and record-keeping violations.

651.     On December 6, 2002, Tyco filed an action pursuant to 15 U.S.C. § 78p(b) against Kozlowski and Swartz to recover over $40 million in short-swing trading profits they made on the sale of Tyco stock between August 1, 2000 and April 26, 2002.

652.     On December 17, 2002, the SEC filed a settled civil action in federal court for the Southern District of New York, alleging that Walsh violated the federal securities laws by signing a Tyco registration statement that failed to disclose his $20 million finder's fee.

653.     Walsh's case was the first of the criminal cases brought by the New York County District Attorney involving Tyco executives to be resolved.  On December 17, 2002, Walsh

entered a guilty plea, agreed to pay $20 million in restitution to Tyco (which was paid on that date) and a $2.5 million fine, and resigned from the three for-profit Boards on which he sat. Separately, Walsh entered into a consent agreement with the SEC which bars him from serving on a public for-profit Board.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Insider Selling During the Relevant Period

654.    While the Tyco Defendants were issuing materially false favorable statements about the Company's financial condition and business prospects, and concealing or obscuring negative information, the Individual Defendants, who had access to confidential information and were aware of the truth about the Company and its financial condition, were benefiting from the illegal course of business or course of conduct described in this complaint by selling large blocks of the Company's stock at artificially inflated prices without disclosing the material adverse facts about the Company to which they were privy. Such sales were unusual in their amount and in their timing. The numerous and repeated insider sales of Tyco common stock by the Individual Defendants imposed upon them an additional duty of full disclosure of all of the material facts alleged in this complaint.

655.    The following table shows the heavy insider selling (totaling more than $691 million) by the Individual Defendants during the Relevant Period:

| INDIVIDUAL DEFENDANTS' RELEVANT PERIOD INSIDER SALES | | | | | | |
|---|---|---|---|---|---|---|
| Name | - | Position | Date | Shares | Price | $ Value |
| L. DENNIS KOZLOWSKI | | CEO,P,CB,OD | 01/05/00 | 744,000.00 | 35.35 | 26,300,400.00 |
| L. DENNIS KOZLOWSKI | | CEO,P,CB,OD | 09/07/00 | 934,417.00 | 58.28 | 54,457,822.76 |
| L. DENNIS KOZLOWSKI | | CEO,P,CB,OD | 09/07/00 | 934,417.00 | 58.28 | 54,457,822.76 |
| L. DENNIS KOZLOWSKI | | CEO,P,CB,OD | 09/07/00 | 451,191.00 | 58.28 | 26,295,411.48 |
| L. DENNIS KOZLOWSKI | | CEO,P,CB,OD | 09/07/00 | 451,191.00 | 58.28 | 26,295,411.48 |
| L. DENNIS KOZLOWSKI | | CEO,P,CB,OD | 09/07/00 | 30,626.00 | 58.28 | 1,784,883.28 |
| L. DENNIS KOZLOWSKI | | CEO,P,CB,OD | 09/07/00 | 30,626.00 | 58.28 | 1,784,883.28 |

| | | | | | |
|---|---|---|---|---|---|
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 1,007,401.00 | 56.83 | 57,250,598.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 1,007,401.00 | 56.83 | 57,250,598.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 240,501.00 | 56.83 | 13,667,671.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11100 | 240,501.00 | 56.83 | 13,667,671.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 7,700.00 | 56.83 | 437,591.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 7,700.00 | 56.83 | 437,591.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 219,107.00 | 55.25 | 12,105,661.75 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 219,107.00 | 55.25 | 12,105,661.75 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 52,308.00 | 55.25 | 2,890,017.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 52,308.00 | 55.25 | 2,890,017.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 1,674.00 | 55.25 | 92,488.50 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00. | 1,674.00 | 55.25 | 92,488.50 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/14/00 | 86,233.00 | 58.3 | 5,027,383.90 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/14/00 | 86,233.00 | 58.3 | 5,027,383.90 |
| L. DENNIS KOZLOWSKI | CEO;P,CB,OD | 10/24/00 | 600,000.00 | 54.31 | 32,587,500.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 10/31/00 | 148,000.00 | 56.69 | 8,389,750.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 01/30/01 | 350,000.00 | 62.8 | 21,980,000.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 06/20/01 | 107,935.00 | 52.96 | 5,716,237.60 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 07/03/01 | 155,000.00 | 54.98 | 8,521,900.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 08/01/01 | 117,696.00 | 53.15 | 6,255,542.40 |
| TOTAL | | | 8,284,947.0 | | $457,770,390.66 |
| | | | | | |
| MARK H. SWARTZ | CFO,O,EVP | 01/05/00 | 372,000.00 | 35.35 | 13,150,200.00 |
| MARK H. SWARTZ | CFO,O,EVP | 09/07/00 | 368,197.00 | 58.28 | 21,458,521.16 |
| MARK H. SWARTZ | CFO,O,EVP | 09/07/00 | 368,197.00 | 58.28 | 21,458,521.16 |
| MARK H. SWARTZ | CFO,O,EVP | 09/11/00 | 944,398.00 | 56.83 | 53,670,138.34 |
| MARK H. SWARTZ | CFO,O,EVP | 09/11/00 | 944,398.00 | 56.83 | 53,670,138.34 |
| MARK H. SWARTZ | CFO,O,EVP | 09/12/00 | 205,404.00 | 55.25 | 11,348,571.00 |
| MARK H. SWARTZ | CFO,O,EVP | 09/12/00 | 205,404.00 | 55.25 | 11,348,571.00 |
| MARK H. SWARTZ | CFO,OD,EVP | 10/24/00 | 300,000.00 | 54.31 | 16,293,750.00 |
| MARK H. SWARTZ | CFO,OD,EVP | 10/31/00 | 74,000.00 | 56.69 | 4,194,875.00 |
| MARK H SWARTZ | CFO,OD,EVP | 01/30/01 | 175,000.00 | 62.8 | 10,990,000.00 |
| MARK H. SWARTZ | CFO,O,EVP | 02/01/01 | 107,958.00 | 60.96 | 6,581,119.68 |
| MARK H. SWARTZ | CFO,OD,EVP | 06/20/01 | 53,967.00 | 53.03 | 2,861,870.01 |
| MARK H. SWARTZ | CFO,OD,EVP | 07/03/01 | 77,500.00 | 54.98 | 4,260,950.00 |
| TOTAL | | | 4,196,423.0 | | $231,287,225.69 |
| | | | | | |
| FRANK E. WALSH | D | 11/30/00 | 15,147.00 | 52.89 | 801,124.83 |
| FRANK E. WALSH | D | 11/30/00 | 15,147.00 | 52.96 | 802,185.12 |
| FRANK E. WALSH | D | 12/18/0I | 9,032.00 | 56.09 | 506,604.88 |
| FRANK E. WALSH | D | 12/18/01 | 6,691.00 | 56.09 | 375,298.19 |
| FRANK E. WALSH | D | 12/18/01 | 4,073.00 | 56.09 | 228,454.57 |
| TOTAL | | | 50,090.00 | | $2,713,667.59 |

| Total Insider Selling by Individual Defendants | | | 12,531,460.00 | | $691,771,283.94 |
|---|---|---|---|---|---|

656.     In addition to his open market sales, Kozlowski sold numerous Tyco shares to the Company.  Due to a loophole that does not require immediate disclosure of sales of stock by company executives - - regardless of their magnitude - - when the sale is made to the issuing company, these sales were not reported until the filing of a Form F-5, up to thirteen months after the sales.  Although the proceeds from these sales are not disclosed in the Form F-5, Plaintiff estimates that the proceeds exceed $65 million.

657.     In addition to his open market sales, Swartz sold numerous Tyco shares directly to the Company.  Due to a loophole that does not require immediate disclosure of sales of stock by company executives - - regardless of their magnitude - - when the sale is made to the issuing company, these sales were not reported until the filing of a Form F-5, up to thirteen months after the sales.  Although the proceeds from these sales are not disclosed in the Form F-5, Plaintiff estimates that the proceeds exceed $38 million.

658.     According to a February 13, 2002 article in *The New York Times*, although Defendants Kozlowski and Swartz publicly stated that they rarely if ever sold their Tyco shares, late in fiscal 2000 and during fiscal 2001, and unknown to the investing public, Defendants Kozlowski and Swartz secretly sold approximately $105 million of Tyco stock directly to the Company.  These sales were not disclosed to investors until November 13, 2001 - - thirteen months after the first of those sales were made (the "Undisclosed Insider Sales").  The Undisclosed Insider Sales are especially suspect because, by making them directly to the Company, Kozlowski and Swartz did not have to disclose them in SEC Form 4 within 10 days after the month of the sales, as would be required with open-market sales.  By selling their shares back to the Company, Kozlowski and Swartz were able to hide such sales from investors for

thirteen months.

659.     A February 11, 2002 article in The New York Times discussed the Undisclosed

Insider Sales:

> Two top executives at Tyco International sold more than $100
> million in Tyco shares in late 2000 and 2001, but the sales did not
> become public for as long as a year.  Today, Tyco shares are worth
> about half what they were at the time of the transactions. . . .
>
> [T]hese sellers . . . have taken advantage of an 11-year old
> loophole in federal securities laws that allows executives to wait as
> long as 13 months to disclose their sales when the buyer of the
> their shares is the company itself.  The loophole is the same one
> that enabled Kenneth L. Lay, the former chief executive of Enron,
> to sell millions of dollars of Enron shares in the months that the
> stock was plummeting, without filing the usual federal disclosure
> forms for insider sales.

Defendants Kozlowski and Swartz hid their private sales to the Company from public scrutiny

for over thirteen months while they continued making false and materially misleading statements

during the Relevant Period, and while secretly pocketing $105 million from the Undisclosed

Insider Sales alone.  Indeed, Defendants Kozlowski and Swartz even received new stock options

from the Company to replace the Tyco shares they sold through the Undisclosed Insider Sales.

660.     Furthermore, the Company's incentive plan (the "Plan") for additional payments

to Defendants Kozlowski and Swartz was directly tied to the Company's reported earnings

growth and free cash flow.  Under the Plan and during the Relevant Period, in fiscal 2000-2001

alone, Kozlowski and Swartz received 10,278,007 shares of restricted stock, worth $51,606,420

and $25,803,210, respectively, and were also each paid a cash bonus of $6.8 million and $3.4

million, respectively, based upon certain performance criteria.  According to the Company's

Schedule 14A, filed on January 29, 2001 (the "2001 Proxy Statement"), the incentive

compensation to Defendants Kozlowski and Swartz was based on, *inter alia*, (i) an increase in

earnings for the Company, and (ii) an improvement in operating cash flow for the Company.

Tyco's 2001 Proxy Statement also explicitly admitted that Defendants Kozlowski's and Swartz's incentive compensation "is in direct correlation to Tyco's performance and . . . ultimately determined by the future performance of Tyco as reflected by its share price."  Further, the Company's Schedule 14A filed on January 28, 2002 stated:

> [I]n order for Mr. Kozlowski and Mr. Swartz to have earned a cash bonus in fiscal 2001, the Company had to "achieve a minimum of 15% growth in net income and at least a 10% growth in operating cash flow over fiscal 2000.  The performance criterion required to vest the minimum number of restricted shares granted to these executives was a growth rate in earnings per share before non-recurring items of at least 15% over fiscal 2000.

As such, compensation to Kozlowski and Swartz under Tyco's incentive plan was inextricably linked to the Tyco Defendants' materially false and misleading statements during the Relevant Period.  This linkage is highly probative of the Tyco Defendants' motive and opportunity to commit securities fraud.

**B.      Tyco's $40 Billion in Public Stock Offerings During the Relevant Period**

661.    The Tyco Defendants' scienter is also established by virtue of their efforts during the Relevant Period to issue hundreds of millions of shares of common stock to pay, in whole or part, for the Company's more than $40 billion in acquisitions during the fiscal years 1999 through 2002.  These transactions using Tyco's artificially inflated common stock as currency constitute insider trading on a massive scale.

**IX.      INAPPLICABILITY OF STATUTORY SAFE HARBOR**

662.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements complained of concerned Tyco's financial statements and historical and/or current condition affecting the Company.  Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made nor does the safe harbor

apply to false or misleading statements that are made in connection with the Company's offering

of securities and/or are contained in financial statements that purport to have been prepared in

accordance with GAAP.  To the extent of any forward-looking statements, there were no

meaningful cautionary statements identifying the important then-present factors that could and

did cause actual results to differ materially from those in the purportedly forward-looking

statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time each of those statements was made, the particular speaker knew or

recklessly disregarded that the statement was false or misleading, knew of or recklessly

disregarded and failed to disclose adverse information relating to the statement, and/or the

statement was authorized and/or approved by an executive officer of Tyco who knew or

recklessly disregarded that the statement was materially false and misleading when made.

663.    Any warnings contained in the press releases and the financial statements quoted

herein were generic statements of the kind of risks that affect any company and misleadingly

contained no specific factual disclosure of any of Tyco's accounting irregularities or the

Undisclosed Acquisitions.

## X.    PLAINTIFF'S RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS

664.    At all relevant times, Colorado PERA reasonably relied upon the Defendants to

disclose material information as required by law and in the Company's SEC filings.  Plaintiff

would not have purchased or otherwise acquired Tyco securities at artificially inflated prices if

the Defendants had disclosed all material information as required.  Thus, to the extent

Defendants wrongfully failed to disclose material information, Plaintiff is presumed to rely on

Defendants' omissions as established by the Supreme Court in *Affiliated Ute Citizens v. United*

*States*, 406 U.S. 128 (1972).

665.    Furthermore, at all relevant times, the market for Tyco's securities was efficient in that it promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the price.  The common stock of Tyco met the requirements for listing, and was listed and traded on the NYSE, a highly developed and efficient market, under the ticker symbol "TYC."  During the Relevant Period, Tyco stock was heavily traded, with volume averaging at least several million shares daily.  Tyco filed periodic public reports with the SEC, and was followed by analysts from major brokerages, including Goldman Sachs, Salomon Smith Barney, and T. Rowe Price.  The reports of these analysts were redistributed to their customers and the public at large, and Tyco regularly issued press releases, which were carried by national newswires.  Thus, the analyst reports and Tyco's press releases entered the public marketplace.  As a result, the market for Tyco securities promptly digested current information with respect to Tyco from all publicly available sources, and reflected such information in Tyco's stock price.  Plaintiff relied on the integrity of the market price of Tyco's securities.  Based upon the foregoing, Plaintiff is entitled to a presumption of reliance upon the integrity of the market for the ultimate proof of their claims on the merits.

666.    Plaintiff will also rely, in part, upon Plaintiff's actual reliance upon the Defendants' false and misleading statements and omissions.

## XI.    LOSS CAUSATION

667.    Plaintiff was damaged as a result of Defendants' fraudulent conduct set forth herein.  Throughout the Relevant Period, as detailed above, the prices of the Company's securities were artificially inflated as a direct result of Defendants' misrepresentations and omissions regarding the Company.  When the truth about the Company was partially revealed to the market beginning in January 2002 and continuing throughout the Relevant Period, the

inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant damages to Plaintiff.

668.    A chart depicting the Company's stock price during the Relevant Period is attached hereto as Exhibit F.  The price of Tyco's common stock was at $31.00 on the first day of the Relevant Period (December 13, 1999).  Thereafter, while Defendants repeatedly failed to disclose material information, the price steadily rose and stayed in the $50s for much of the Relevant Period - - reaching a Relevant Period high of $59.76 on December 5, 2001.  On January 29, 2002, the day after the Walsh payment was disclosed in the Company's 2002 Proxy Statement, Tyco's shares fell from $42 to $33.65, reducing the company's market capitalization - - according to Tyco - - by almost $17 billion in one day.  Subsequently, as the Tyco Defendants fought off attacks on the credibility of the Company's financial statements and the integrity of its management, the price of Tyco common stock slid down to $20 per share.  Subsequently, on June 3, 2002 Tyco shares fell $5.90 to close at $16.05 on news that Defendant Kozlowski (i) was the target of a criminal investigation being undertaken by the New York District Attorney into possible violations of state sales tax laws, and (ii) was resigning as the CEO of Tyco.  Finally, on June 7, 2002, Tyco stock fell to a six-year low, down $4.50 to $10.10 per share, on news that: (i) the Manhattan DA's office and the SEC broadened their investigations beyond Kozlowski to determine if Tyco executives used the company's cash to buy art and homes; (ii) S&P and Moody's reduced Tyco's debt to lowest investment-grade rating (just above junk bond status), forcing Tyco to repay at least $530 million in debt; (iii) the sale of CIT was delayed by the SEC while its fraud investigation continues; and (iv) Tyco confirmed that it was launching its own "comprehensive internal investigation" into Kozlowski's and other executives' use of company funds.

## XII. APPROPRIATENESS OF GROUP PLEADING
## AS TO THE INDIVIDUAL DEFENDANTS

669.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Individual Defendants identified above.  Each of the Individual Defendants, by virtue of his high-level-position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest level and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition as alleged herein.  The Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein (including SEC filings, press releases, and other publications), were aware of or recklessly disregarded that materially false or misleading statements were being issued regarding the Company, and nonetheless approved or ratified these statements in violation of the federal securities laws.

670.     As officers, directors, and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, earnings, management, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual

Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

671.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications concerning Tyco that are complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and the omissions thereto, and were aware of their materially false and misleading nature.  Because of their positions with Tyco, each of the Individual Defendants had access to adverse undisclosed information about Tyco's business prospects and financial condition and performance as particularized herein, and knew (or recklessly disregarded) that these adverse facts rendered the statements complained of herein materially false and misleading.

672.     The Individual Defendants, because of their positions of control and authority as officers and controlling persons of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period.  Each of these Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of these Defendants is responsible for the accuracy of the public reports, releases, and statements detailed herein and is therefore primarily liable for the representations contained therein.

## XIII.     THE INDIVIDUAL DEFENDANTS' CONTROL OVER TYCO

673.     The Individual Defendants were at all relevant times during the Relevant Period controlling persons of Tyco within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.  Because of the Individual Defendants' positions with the Company,

they had access to undisclosed adverse information about its business, operations, balance sheets, accounting policies, operational trends, financial condition, and present and future business prospects through, among other ways, access to internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the board and committees thereof, and through reports and other information provided to them in connection therewith.

674. By virtue of their roles as members of the Board and/or as the Company's highest-ranking executives, Defendants Kozlowski, Swartz, and Walsh were "control persons" of Tyco as that term is utilized in § 20(a) of the Exchange Act and § 15 of the Securities Act.

675. Defendant Kozlowski was able to exercise control over Tyco's operations because he was the Company's highest-ranking executive. As a result, Kozlowski served as the Company's primary voice in all press releases and interviews and actively participated in the day-to-day management of Tyco's affairs. He was also principally responsible for making decisions regarding the compensation received by Tyco's officers, including himself and the other Individual Defendants.

676. Defendant Swartz was able to exercise control over Tyco's operations because he was the Company's highest-ranking financial officer at the time Plaintiff purchased Tyco securities. As a result, he was intimately involved in all aspects of the day-to-day management of Tyco's operations and the misrepresentations and omissions concerning the Company's operations, financial results, and compensation plans that are the subject of Plaintiff's claims. Swartz also prepared the Company's false and misleading financial statements, participated in the drafting of the Company's financial disclosures, supervised and drafted material portions of

the Company's SEC filings, and signed certain of the SEC filings described herein.

677.     As Tyco's "lead director," Walsh served as the primary liaison between Tyco's management and the Company's independent directors.  Walsh also served as a member of the Board's Corporate Governance, Nominating, and Compensation Committees.  Through these various positions, Walsh was actively involved in the management of Tyco and had the ability to exercise control over Tyco's operations.

### XIV.     THE INDIVIDUAL DEFENDANTS' USE OF ANALYSTS AS A CONDUIT TO DISSEMINATE FALSE AND MISLEADING INFORMATION ABOUT TYCO

678.     The Individual Defendants provided guidance to securities analysts and used misleading information to the securities markets.  Tyco was followed by securities analysts employed by brokerage firms that throughout the Relevant Period reported information provided to them by the Individual Defendants and made recommendations concerning the Company's securities based on the information provided by the Individual Defendants.

679.     Prior to and during the Relevant Period, it was the Company's frequent practice to have its top officers and key members of its management team, including the Individual Defendants, communicate regularly with securities analysts at the firms identified above (among others) on a regular basis to discuss, among other things, the Company's financial results, and to provide detailed guidance to these analysts with respect to the Company's business.  These communications included, but were not limited to, conference calls, meetings, analyst briefings, and investor conferences where the Individual Defendants discussed relevant aspects of the Company's operations and financial prospects on, among others, the following dates: January 18, 2000, April 18, 2000, June 28, 2000, July 19, 2000, October 24, 2000, November 14, 2000, January 17, 2001, March 13, 2001, April 18, 2001, May 30, 2001, July 18, 2001, August 3, 2001, September 11, 2001, October 18, 2001, November 15, 2001, January 15, 2002, January 22, 2002,

February 6, 2002, February 13, 2002, February 26, 2002, March 5, 2002, March 12, 2002, March 19, 2002, April 2, 2002, April 25, 2002, April 30, 2002, May 16, 2002, and June 7, 2002.  The Individual Defendants knew that by participating in these regular and direct communications with analysts, the Company disseminated information to the investing community, and that investors relied and acted on such information by purchasing and selling the Company's securities.

680.    Many of the analyst reports issued during the Relevant Period were remarkably similar or reported substantially the same facts after meetings with the Company.  This confirms that the information contained in analyst reports came from Tyco and the Individual Defendants.

681.    The Individual Defendants engaged in the above-referenced communications with analysts to cause or encourage them to issue favorable reports concerning Tyco, and used these communications to present the operations and prospects of Tyco to the marketplace in a falsely favorable light to artificially inflate the market price of Tyco securities.  Tyco also endorsed the reports of analysts, adopted them as its own, and placed its imprimatur on them as well as on the projections, forecasts, and statements contained therein, as set forth in more detail below. Despite their duty to do so, the Individual Defendants failed to correct these statements during the Relevant Period.

682.    The investment community, and in turn investors, relied and acted on the information communicated in these written reports that recommended that investors purchase Tyco securities.  The Individual Defendants manipulated and inflated the market price of Tyco securities by falsely presenting to analysts, through regular meetings, and during both telephonic and written communications, the prospects of the Company, as well as by failing to disclose the true adverse information about the Company that was known only to them.

## XV.　　NEW JERSEY RICO ALLEGATIONS

683.　　Plaintiff brings claims against all Tyco Defendants pursuant to the New Jersey RICO Statute, N.J.S.A. 2C:41-1, *et seq.*　Through the misconduct described in detail above, the Tyco Defendants engaged in a pattern of racketeering activity, as that term is defined in N.J.S.A. 2C:41-1.　Plaintiff was damaged as a proximate result of Defendants' schemes, and the Tyco Defendants are liable therefore, under the New Jersey RICO Act, as alleged below.

### A.　　Tyco Defendants' Pattern of Racketeering Conduct

684.　　The predicate acts constituting the Tyco Defendants' pattern of racketeering activity shared common purposes, results, participants, victims, and methods.　In addition, as set forth above, they were carried out during an extended period of time and were interrelated by distinguishing characteristics and were not disconnected or isolated acts.　They were oriented toward common goals, objectives and schemes, including (i) the artificial and fraudulent inflation of Tyco's reported earnings; (ii) the artificial and fraudulent inflation of Tyco's stock price; (iii) Tyco's acquisition of other companies, in part, through the exchange of its artificially and fraudulently priced stock for the ownership of these companies; (iv) enabling Tyco to compensate its employees with the artificially and fraudulently inflated stock; and (v) the enrichment of Kozlowski, Swartz, and Walsh through unauthorized compensation and financial benefits.

685.　　Each Defendant under this count committed at least two predicate acts of racketeering conduct during the Relevant Period, which lasted from at least 1997 to at least 2002.

### 1.　　Theft and Violations of Chapter 20
of Title 2C of the New Jersey Statutes

686.　　The Individual Defendants engaged in theft and theft by deception, in violation of N.J.S.A. 2C:20-3 and -4, by wrongfully and intentionally obtaining millions of dollars of income

and property from Tyco to which they knew they were not lawfully entitled. As is set forth at length above, in violation of N.J.S.A.2C:20-4, Defendants concealed their wrongful activities through, among other things, their misleading accounting practices, and created and reinforced numerous false impressions regarding illicit income and financial benefits that they received. The Individual Defendants also prevented others from acquiring information that would affect their judgment of the particular transactions involved, failed to correct false impressions that they had created or reinforced with regard to those transactions and failed to correct false impressions held by Tyco's shareholders, even though they knew that such impressions influenced Tyco's shareholders, and even though, as employees, officers and/or directors of Tyco, they stood in a fiduciary relationship to the company and its shareholders, including Plaintiff. Such actions constitute racketeering activity under N.J.S.A. 2C:41-la. (l)(n).

687. The Individual Defendants engaged in theft and theft by deception by, among other means, engaging in schemes (i) to abuse the Company's "relocation loans" program and KEL Programs; (ii) to pay themselves secret, unapproved bonuses; (iii) the payment of the secret Walsh finder's fee; (iv) selling stock to the Company at artificially inflated prices; and (v) other fraudulent schemes detailed herein in Section(s) V.A and V.B detailing Defendants' looting of the Company.

688. The Individual Defendants substantially assisted, cooperated, and participated with one another in the perpetration of these thefts by orchestrating them and by aiding and abetting in their concealment through improper and misleading accounting practices and misrepresentations and omissions contained in Tyco's disclosures to shareholders and SEC filings.

### 2. Fraudulent Practices and Violations of Chapter 21 of Title 2C of the New Jersey Statutes

689. As is set forth more fully above, the Individual Defendants also engaged in various fraudulent practices for both self-enrichment and to artificially inflate the market price of Tyco stock and assisted one another in the perpetration of their fraud. Such actions are alleged more fully above, and in the RICO causes of action alleged herein, and include the fraudulent concealment of "relocation" loans, the unauthorized Walsh bonus, the TyCom Bonus (which was improperly concealed by being accounted for, in part, as an offering expense and booked against two reserve accounts), the ADT acquisition bonuses (also improperly offset against the unrelated gain accrued by Tyco on the disposition of the ADT Automotive business), the improper undervaluation of Flag Telecom stock in order to accelerate vesting of shares of restricted Tyco stock owned by Kozlowski and Swartz, the concealment of Kozlowski's abuse of the KEL Program loans in Tyco's SEC filings, the concealment of Belnick's side agreement guaranteeing an annual cash bonus at least equal to one-third of Kozlowski's, the concealment of Belnick's year 2000 compensation in Tyco's 2001 Proxy Statement and other SEC filings, the concealment of the true terms of Belnick's Retention Agreement, the concealment of income received by Kozlowski and Swartz through improper transactions with Tyco and Tyco's payment of various personal expenses incurred by them. Such actions constitute "fraudulent practices" under N.J.S.A. 2C:41-la.(l)(o).

690. In addition, as is set forth more fully in the RICO causes of action alleged herein, such actions were intended to constitute false statements of material fact or omissions of material fact, to be relied upon by Tyco's shareholders, including Plaintiff, were reasonably relied upon by Tyco's shareholders, including Plaintiff insofar as, had they known the truth, they would have sold or not purchased their Tyco stock in light of, at the very least, the rampant and manifest

corruption of the Individual Defendants and the Company's inadequate oversight of the Individual Defendants. Such acts of fraudulent concealment constitute racketeering activity under N.J.S.A. 2C:41 -la.(l)(o).

691. As set forth more fully above, Tyco also engaged in fraudulent disclosures and accounting practices in order to artificially inflate its earnings and the market price of its stock. Such actions constitute "fraudulent practices" and racketeering activity under N.J.S.A. 2C:41 - la.(l)(o).

692. In addition, as is set forth more fully above and in the RICO causes of action, such actions constituted racketeering activity under N.J.S.A. 2C:41-la.(l)(o). Both the Individual Defendants and Tyco made numerous false and misleading written statements, in the form of press releases, Proxy Statements, Annual Reports and disclosure filings, for the purpose of promoting the sale of securities and omitted information required by law to be disclosed in written documents relating to said securities, in violation of N.J.S.A.2C:2 1-7(i). Such actions constitute racketeering activity under N.J.S.A.2C:41-la. (l)(o).

### 3. Use of Tyco to Further and Promote Criminal Objects

693. The Individual Defendants purposely and knowingly used, controlled, and operated Tyco for the furtherance and promotion of numerous criminal objects, in violation of N.J.S.A.2C:21-9(c). Such actions included the thefts and fraudulent practices set forth in more detail above. Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(l)(o).

### 4. Securities Violations

694. As set forth at length herein, the Tyco Defendants committed fraud in the offering, sale, and purchase of securities. Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(l)(p). In particular, as is alleged in detail herein, the Tyco Defendants

violated § 10(b) of the Exchange Act and Sections 11 and 12 of the Securities Act; and the Individual Defendants violated Sections 20(a) and 20A of the Exchange Act and Section 15 of the Securities Act.

695.     In addition, the Tyco Defendants offered, purchased, or sold securities in violation of N.J.S.A. 49:3-7 1, as is alleged more fully above and in the RICO Counts alleged herein, by offering and selling those shares (i) by employing devices, schemes and artifices to defraud; and (ii) by engaging in acts, practices, and courses of business that operated as a fraud and deceit, and, with respect to the Individual Defendants, by virtue of their status as control persons and as officers or directors of Tyco.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-la. (l)(p).

### 5.    Mail and Wire Fraud

696.     Defendants committed mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and § 1343, respectively.  Among other things, the Tyco Defendants committed wire fraud by causing numerous documents to be filed with the SEC, knowing that they contained materially false and misleading statements using the SEC's EDGAR system.  The Tyco Defendants also committed mail fraud by causing the numerous materially false and misleading disclosures contained in Press Releases, Proxy Statements, and Annual Reports, as set forth above, to be mailed to Tyco's shareholders.  In addition, Tyco's policy was to mail SEC filings to any shareholder or potential investor who requested them.  As set forth above, those filings contained materially false and misleading statements.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(2).

697.     These acts of wire fraud and mail fraud were made with the knowledge, approval or acquiescence of each of the Tyco Defendants.

698.     In addition, in connection with the insider sales of the Tyco stock owned by the

Individual Defendants set forth above, the Defendants made telephonic or wire instructions to initiate the sales on or about the dates of such sales. When giving those instructions, the Defendants failed to disclose adverse material information about Tyco that was in their possession. With respect to each of these transactions, the Individual Defendants caused the proceeds of the sales to be transferred to them by wire or other electronic means. Though they knew that these proceeds were generated through fraudulent means, the Individual Defendants failed to disclose said adverse material information.

699. The Individual Defendants engaged in such conduct in order to enrich themselves at the expense of Tyco investors, including Plaintiff. Each of the instructions to sell shares in Tyco and transfers of the proceeds of those sales to the Individual Defendants constitutes a separate act of wire fraud and of fraud in the offering, sale, or purchase of securities. Such actions constitute racketeering activity under N.J.S.A. 2C:41-la.(2) and under N.J.S.A. 2C:41-la.(l)(p).

**B.     Tyco Defendants' Violations of the New Jersey RICO Act**

700. The Tyco Defendants violated the New Jersey RICO Act in a number of ways, which are set forth more fully below.

701. By way of summary, the Tyco Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of two distinct enterprises as defined herein, which were engaged in or whose activities affected commerce or trade in New Jersey, through a pattern of racketeering activity, as set forth in the previous sections. In connection therewith, among other things, (i) the Individual Defendants' embezzlement was effectuated and concealed, (ii) Tyco's reported earnings were fraudulently increased, and (iii) the market price of Tyco's stock was artificially and fraudulently inflated. Such activities violated N.J.S.A. 2C:41-2(c).

702. In addition, using income derived from racketeering activity and/or through a

pattern of racketeering activity, Tyco and/or an association in fact of Tyco and the Individual Defendants acquired and/or acquired control over numerous other business entities, including but not limited to ADT Automotive, Flag Telecom, Carlisle Plastics, U.S. Surgical Corp., Keystone International, Inc., Raychem Corp., Mallinckrodt and CIT (collectively "the Acquired Companies Enterprises"), each of which constituted enterprises under N.J.S.A. 2C:41-1c, and which engaged in commerce or trade in New Jersey. Such actions violated N.J.S.A. 2C:41-2(a) and (b).

703. Tyco's acquisitions of said entities contributed to and perpetuated the artificial and fraudulent inflation of the price of Tyco's stock via the acquisitions scheme set forth in Section V.A. The acquisitions were part of Tyco's false method of increasing earnings, as is described more fully above, through accounting machinations to artificially inflate Tyco's earnings in the post-acquisition periods.

704. Not only was the fraudulent increase in the market price of its stock a benefit per se to Tyco, but Tyco also benefited from the fraudulent increase in the market price of its stock because the stock was used by the Company to fund various activities that served Tyco's interests, including, among other things: (i) using the stock to acquire other companies; and (ii) compensating officers and employees with stock and stock options the value of which were artificially and fraudulently inflated.

705. The Individual Defendants benefited from these activities because (i) their embezzlement was concealed; (ii) their ability to continue pillaging Tyco was preserved; (iii) they were enriched by the fraudulent and artificial inflation in the price of Tyco stock due to their ownership of shares of Tyco stock; and (iv) the fraudulent inflation of Tyco's ostensible earnings entitled the Individual Defendants to enhanced compensation based on Tyco's compensation

incentives program.

**C.** **Plaintiff's Injuries Arising From Tyco Defendants'**
**Violations of the New Jersey RICO Act**

706. Plaintiff was injured by the Tyco Defendants' violations of the New Jersey RICO

Act because such violations resulted in, preserved, and perpetuated the artificial and fraudulent

inflation of the market price of Tyco stock that Plaintiff purchased, acquired, or held during the

Relevant Period.

707. Plaintiff was injured by Tyco's investments in various other enterprises because

they contributed to and perpetuated the artificial inflation of the price of Tyco stock owned or

purchased by Plaintiff and contributed to the false impression that Tyco's strategy of pursuing

earnings growth through acquisitions was more successful than it actually was. The Tyco

Defendants' violations of the New Jersey RICO Act directly caused injury to Plaintiff because,

among other things, they caused Plaintiff to tender shares of stock owned by Plaintiff in

Mallinckrodt, CIT Group, Scott Technologies, and Sensormatic in exchange for shares of falsely

inflated Tyco stock in connection with Tyco's acquisitions of these entities. Plaintiff suffered

significant losses as a result of these violations.

708. Plaintiff would not have purchased their shares of Tyco stock at the prices at

which they were purchased, would have sold its Tyco stock without suffering the massive losses

that they eventually suffered or would otherwise have avoided those losses if the Tyco

Defendants had not engaged in the conduct alleged herein.

## XVI.  CAUSES OF ACTION

### COUNT I
### (AGAINST TYCO, KOZLOWSKI, SWARTZ, WALSH, AND PWC FOR VIOLATION
### OF SECTION 10(B) OF THE 1934 ACT AND RULE 10B-5)

709. Plaintiff repeats and realleges each and every allegation above as if set forth in

full herein.

710.    This Count is brought by Plaintiff against Defendants Tyco, Kozlowski, Swartz, Walsh, and PwC for violations of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

711.    During the Relevant Period, Defendants carried out a scheme, plan, and course of conduct that was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiff; (ii) artificially inflate and maintain the market price of Tyco securities; and (iii) cause Plaintiff to purchase or otherwise acquire Tyco securities at inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

712.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and/or acquirers of the Company's stock in an effort to maintain artificially high market prices for Tyco securities in violation of Section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

713.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R § 210.01 *et*

*seq.*) and S-K (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including truthful, complete, and accurate information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

714.    Defendants, individually and in concert, by the use of means and instrumentalities of interstate commerce and/or the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial results, businesses, operations, and prospects as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct as alleged herein, in an effort to assure investors of Tyco's earnings, assets, revenues, expenses, and the accuracy of the Company's financial reporting of performance, which included the making of, or the participation in the making of, untrue statements of material facts and omissions to state the material facts necessary in order to make the statements made about the Company's financial and business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein.

715.    The Individual Defendants' primary liability arises from the following facts: (i) they were high-level executives and directors of the Company during the Relevant Period and were members of the Company's management team; (ii) by virtue of their responsibilities and activities as senior officers of the Company, they were privy to and participated in the drafting, reviewing, and/or approving the misleading statements, omissions, releases, reports, and other public representations of and about Tyco, and/or signed the Company's public flings with the SEC, which public filings contained the allegedly materially misleading statements and

omissions; (iii) they knew or had access to the material adverse non-public information about the financial results of Tyco which were not disclosed; and (iv) they were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

716.     Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein; or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Tyco's accounting irregularities and the Undisclosed Acquisitions from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' statements throughout the Relevant Period, if they did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

717.     As a result of the dissemination of the materially false and misleading information and/or Defendants' failure to disclose material facts, as set forth herein, the market price of Tyco securities was artificially inflated at all times during the Relevant Period.  In ignorance of the fact that the market price of Tyco's publicly-traded securities was artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and the truth of any representations made to appropriate agencies as to the investing public, at the times at which any statements were made; and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by such

Defendants during the Relevant Period, Plaintiff purchased or otherwise acquired for value Tyco securities during the Relevant Period at artificially high prices and was damaged as the truth regarding Tyco emerged to the market.

718.    At the time of such misstatements and omissions, Plaintiff was ignorant of their falsity, and believed them to be true.  Had Plaintiff and the marketplace known of the true financial condition of the Company, which was not disclosed by Defendants, Plaintiff would not have purchased or otherwise acquired Tyco securities during the Relevant Period, or, if Plaintiff had purchased or otherwise acquired such securities during the Relevant Period, Plaintiff would not have done so at artificially inflated prices.

719.    By virtue of the foregoing, the Defendants named in this count violated Section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

720.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages.

## COUNT II
### (AGAINST KOZLOWSKI, SWARTZ, AND WALSH
### FOR VIOLATION OF SECTION 20(a) OF THE 1934 ACT)

721.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

722.    This Count is brought by Plaintiff against Defendants Kozlowski, Swartz, and Walsh for violation of Section 20(a) of the 1934 Act, 15 U.S.C. § 78t.

723.    Each of the Individual Defendants acted as a controlling person of Tyco within the meaning of Section 20(a) of the 1934 Act, as alleged herein.  By virtue of their executive positions, and/or position on the Company's Board of Directors, each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff

contend are materially false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

724.    In particular, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, especially by virtue of their senior positions, and exercised the same.

725.    As set forth above, Tyco and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons of Tyco, each of the Individual Defendants is liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff suffered damages.

### COUNT III
### (AGAINST KOZLOWSKI, SWARTZ, AND WALSH
### FOR VIOLATION OF SECTION 20A OF THE 1934 ACT)

726.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

727.    This Claim is brought against the Defendants Kozlowski, Swartz, and Walsh by Plaintiff for violation of Section 20A of the 1934 Act, 15 U.S.C. § 78t-1. As set forth in the chart attached as Exhibit G, Plaintiff purchased Tyco common stock contemporaneously with sales of Tyco stock by the Defendants named in this count.

728.    By virtue of their positions as senior insiders of Tyco, the Individual Defendants were in possession of material, non-public information about the Company at the time of their

sales of Tyco stock to Plaintiff at artificially inflated prices.

729.	By virtue of their participation in the scheme to defraud investors described herein, and their sales of stock while in possession of material, non-public information about the adverse information detailed herein, the Individual Defendants violated the Exchange Act and applicable rules and regulations thereunder.

730.	Plaintiff, which purchased shares of Tyco stock contemporaneously with the sales of Tyco stock by the Individual Defendants: (i) suffered substantial damages in that Colorado PERA paid artificially inflated prices for Tyco stock as a result of the securities law violations described herein; and (ii) would not have purchased Tyco stock at the prices Plaintiff paid, or at all, if it had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements.

731.	The Defendants are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## COUNT IV
## (AGAINST ALL DEFENDANTS FOR VIOLATION OF
## SECTION 11 OF THE 1933 ACT)

732.	This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k, against all Defendants.

733.	This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

734.	The following registration statements and prospectuses (the "Registration Statements/Prospectuses") were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above:

- Form S-4 relating to a proposed merger between Mallinckrodt Inc. and a subsidiary of

Tyco, dated July 12, 2000;

- Form S-4/A, dated August 9, 2000;

- Prospectus relating to the proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco, dated August 11, 2000;

- Form S-3 for the registration of $4,657,500,000 in Liquid Yield Option Notes due 2020, dated December 8, 2000;

- Form S-3/A, amending the 12/8/00 S-3, dated December 15, 2000;

- Prospectus relating to the registration of $4,657,500,000 in Liquid Yield Option Notes due 2020, dated December 19, 2000;

- Form S-4 relating to Tyco's proposed offer to issue 9,415,481 shares of Tyco stock upon consummation of the merger with Scott Technologies, Inc., dated February 23, 2001;

- Form S-4/A and a Prospectus relating to the proposed merger between Scott Technologies, Inc. and Tyco, dated March 30, 2001;

- Form S-4 relating to a proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), a direct wholly-owned subsidiary of Tyco, dated March 29, 2001;

- Amendment No. 1 to Form S-4, dated April 13, 2001;

- Prospectus relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. 3 XIX (NV), dated April 24, 2001;

- Post-Effective Amendment No. 1 to Form S-4 relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), dated May 24, 2001;

- Form S-4 relating to a proposed merger between Sensormatic Electronics Corporation and a subsidiary of Tyco, dated August 24, 2001;

- Form S-4/A, amending the 8/24/01 S-4, dated September 13, 2001; and

- Prospectus with the SEC relating to the offer of Tyco Acquisition Corp. XXIV (NV), a wholly-owned subsidiary of Tyco, to exchange common shares of Tyco for each outstanding share of common stock of Sensormatic Electronics Corporation, dated September 25, 2001.

735. The Company is the registrant for these offerings. Defendants named herein

signed and/or were otherwise responsible for the contents and dissemination of the Registration

Statements/Prospectuses.

736.    PwC consented to the inclusion of its audit reports in the Registration Statements/Prospectuses, and to being named therein as an expert.

737.    As issuer of the shares, Tyco is strictly liable to Plaintiff for the misstatements and omissions.

738.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements/Prospectuses were true and without omissions of any material facts and were not misleading.

739.    Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the Plaintiff that were contained in the Registration Statements/Prospectuses, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

740.    Plaintiff acquired Tyco shares issued pursuant to and/or traceable to the Registration Statements/Prospectuses.

741.    Plaintiff has sustained damages.  The value of Tyco shares has declined substantially subsequent to and due to Defendants' violations.

742.    At the time Colorado PERA acquired Tyco shares, Plaintiff was without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered such facts or wrongful conduct.  Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed its Complaint.  Less than three years elapsed

from the time that the securities upon which this Count is brought were bona fide offered to the public to the time Plaintiff filed its Complaint.

## COUNT V
## (AGAINST TYCO, KOZLOWSKI, SWARTZ, AND WALSH FOR VIOLATION OF SECTION 12(a)(2) OF THE 1933 ACT)

743.    This Count is brought on behalf of Plaintiff pursuant to Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 78l(b), against the Defendants Tyco, Kozlowski, Swartz, and Walsh.

744.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

745.    The Defendants in this count were sellers, offerors, and/or solicitors of sales of the shares offered pursuant to the Registration Statements/Prospectuses.

746.    The Registration Statements/Prospectuses contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Defendants' actions of solicitation included participating in the preparation of the materially false and misleading Registration Statements/Prospectuses.

747.    The Defendants owed to Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements/Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Registration Statements/Prospectuses as set forth above.

748.    Plaintiff purchased or otherwise acquired Tyco shares pursuant to or traceable to the defective Registration Statements/Prospectuses.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the

Registration Statements/Prospectuses.

749.    Plaintiff offers to tender to the Defendants those Tyco securities that Plaintiff continues to own in return for the consideration paid for those securities together with interest thereon.

750.    By reason of the conduct alleged herein, the Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the 1933 Act.  Accordingly, Plaintiff who holds Tyco shares purchased or acquired pursuant to or traceable to Registration Statements/Prospectuses has the right to rescind and recover the consideration paid for Tyco shares and, hereby elects to rescind and tenders their Tyco shares to the Defendants sued herein. Plaintiff is entitled to rescissory damages for Tyco securities it has sold.

751.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action.  Less than one year elapsed from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## COUNT VI
## (AGAINST KOZLOWSKI, SWARTZ, AND WALSH
## FOR VIOLATION OF SECTION 15 OF THE 1933 ACT)

752.    This Count is brought by Plaintiff against the Defendants Kozlowski, Swartz, and Walsh for violation of Section 15 of the 1933 Act, 15 U.S.C. § 77o.

753.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

754.    Each of the Defendants was a control person of Tyco by virtue of their positions as directors and/or as senior officers of Tyco.  The Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Tyco.

755.    Each of the Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the 1933 Act alleged in Counts IV and V above, based on their having signed or participated in the preparation and/or dissemination of the Registration Statements/Prospectuses or having otherwise participated in the process that allowed the offerings to be successfully completed.

### COUNT VII
### (AGAINST TYCO FOR VIOLATIONS OF N.J.S.A. 2C;41-2(a))

756.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

757.    Tyco is a liable person under N.J.S.A. 2C:41-2(a) because Tyco received income derived from a pattern of racketeering activity and used and invested that income in the acquisition of numerous enterprises engaged in or whose activities affected commerce or trade.

758.    As is set forth above, Tyco purchased Acquired Companies Enterprises, each of which constitutes an enterprise under N.J.S.A. 2C:41-lc, using, in part, Tyco stock whose market price was artificially and fraudulently inflated as a result of a pattern of racketeering activity, including the fraudulent accounting practices, misrepresentations, material omissions and securities violations effectuated by the Tyco Defendants.  The enterprises acquired by Tyco engaged in and/or their activities affected interstate commerce.

759.    Tyco's acquisitions of said entities contributed to and perpetuated the artificial inflation of the price of Tyco's stock because said acquisitions were part of Tyco's purported but false method of increasing earnings as set forth in Section V.A.1.

760.    Not only was the fraudulent increase in the market price of its stock a benefit *per se* to Tyco, but Tyco also benefitted from the fraudulent increase in the market price of its stock because the stock was used by the Company to fund various activities that served Tyco's interests, including, among other things:  (i) continuing to use the stock to acquire other

companies and (ii) compensating officers and employees with stock and stock options the value of which was artificially and fraudulently inflated.

761.    Plaintiff was injured by Tyco's investments in these enterprises because they contributed to and perpetuated the artificial inflation of the market price of Tyco stock owned or purchased by Plaintiff and contributed to the false impression that Tyco's strategy of pursuing earnings growth through acquisitions was more successful than it actually was.  In addition, Plaintiff tendered shares of stock owned by Colorado PERA in Mallinckrodt, Scott Technologies, CIT, and Sensormatic in exchange for shares of falsely inflated Tyco stock in connection with Tyco's acquisitions of these entities.

762.    Colorado PERA would not have purchased all or some of its shares of Tyco stock at the prices at which it purchased, would have sold its Tyco stock without suffering the massive losses that it eventually suffered or would otherwise have avoided those losses if Tyco had not engaged in the conduct described above.

763.    Colorado PERA was injured by the afore-stated conduct and said conduct proximately caused Colorado PERA's injuries for the reasons previously stated.

### COUNT VIII
### (AGAINST TYCO FOR VICARIOUS LIABILITY
### IN VIOLATION OF N.J.S.A. 2C:41-2(a))

764.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

765.    The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(a).  The Individual Defendants invested or used income derived, directly or indirectly, from a pattern of racketeering activity (i) in other companies, (ii) Tyco, and/or (iii) an association in fact of Tyco and the Individual Defendants whose purpose was to artificially and fraudulently inflate the market price of Tyco's stock.  Each of the said entities constituted enterprises engaged in or whose activities affected commerce or trade.

766. Tyco benefitted from said investment and/or use of income derived, directly or indirectly, from a pattern of racketeering activity.

767. The Individual Defendants' racketeering activities and use of the income derived therefrom were carried out in the scope of the Individual Defendants' employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

768. Tyco intended that the racketeering activities take place, that the income derived from said activities be used or invested as aforesaid; was reckless or failed to exercise reasonable care with respect to the Individual Defendants' racketeering activities; and/or Tyco knew or should have known of the Individual Defendants' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation, and defalcation, and could reasonably have foreseen the risk of harm created by the Individual Defendants, from which qualities of the Individual Defendants Plaintiff's losses arose.

769. Tyco failed to take measures to prevent or remedy the fraud. For instance, Tyco's Board of Directors failed to correct Defendant Kozlowski's false statements to investors stating that the Board of Directors had approved the Company's payment of $20 million to Walsh as part of the CIT acquisition as set forth in Section V.B.6. Given the size of the Company's stock price drop on that date, and Kozlowski's clear response in a Company press release, the Board of Directors either knew or was reckless in not knowing that Kozlowski's statements were false and misleading and an attempt to conceal the criminal nature of the payment to Walsh.

770. Similarly, an article in the December 27, 2002 edition of *The Wall Street Journal* shows that Tyco's outside counsel and certain of the Company's Board of Directors knew in early 2000 that the Company had serious accounting problems and that corporate funds were

being misused by the Company's senior executives, including Kozlowski and Walsh. Because the Audit Committee is charged under its charter with supervising Tyco's litigation, including the SEC's investigation of Tyco's financial statements, the Company's Audit Committee either knew or should have known about those adverse facts as well. *The Wall Street Journal* article states:

> Newly discovered e-mails written by attorneys at Tyco International Ltd.'s former outside law firm reveal that they knew about personal use of corporate funds by former Tyco Chairman L. Dennis Kozlowski and a host of accounting problems at the company in early 2000.
>
> The e-mails - written by Wilmer, Cutler & Pickering partners Lewis Liman and William McLucas - have been obtained by the Manhattan district attorney's office and the Securities and Exchange Commission in their continuing investigation into Tyco and some of its former top executives, according to people familiar with the matter. Part of the SEC's probe involves whether the conglomerate and Wilmer Cutler withheld relevant information that would have helped the SEC in an informal inquiry it launched in 1999 into Tyco's accounting practices ....

771. One e-mail mentioned in *The Wall Street Journal* article, a March 23, 2000 communication from a Wilmer Cutler partner to Tyco's General Counsel Belnick, states: "There are payments to a woman whom the folks in finance describe to be Dennis's girlfriend [now wife, Karen Mayo]. I do not know Dennis's situation, but this is an embarrassing fact."

772. In addition, a May 25, 2000 e-mail from another Wilmer Cutler partner to Belnick states, "We have found issues that will likely interest the SEC . . . creativeness is employed in hitting the forecasts. . . ."

773. The same document acknowledges that "[t]here is also a bad letter from the Sigma people just before the acquisition confirming that they were asked to hold product shipment just before the closing…." In addition, Wilmer partner McLucas stated that the company's financial reports suggest "something funny which is likely apparent if any decent

accountant looks at this."

774. The facts set forth in *The Wall Street Journal* articles were verified by McLucas in his testimony in Belnick's criminal trial. McLucas acknowledged the use of cookie jar reserves by Tyco in his testimony. In addition, he authenticated a May 2000 e-mail sent to Belnick during the course of McLucas's work on the SEC's investigation in which McLucas told Belnick that Tyco needed to change certain accounting practices that McLucas considered worrisome, particularly the use of accounting reserves to meet projected financial results.

775. With reference to that practice, the e-mail stated, "The cost of this kind of fooling around can destroy a corporate franchise, and it's all so these guys can squeeze a couple of more pennies" out of earnings. The e-mail further stated, "If we escape this process without a crippling broadside, the toughest challenge here seems to me to involve how one changes the culture."

776. Tyco's Audit Committee and Board of Directors also either knew or were reckless in not knowing of the foregoing facts. Once Tyco's counsel began an inquiry concerning the compensation paid to the Company's officers (including Walsh and Kozlowski), counsel determined in short order that these officers had engaged in the fraudulent schemes to inflate their compensation that are alleged herein. It should have been equally easy for the Audit Committee Defendants, particularly with the assistance of the PwC Defendants, to learn the same information. This is particularly true in light of facts then known to the members of the Audit Committee and Board of Directors.

777. According to a September 24, 2002 Associated Press article, the Tyco Board's Compensation Committee was also apprized of several of the improper relocation loans taken by the Company's officers, including Kozlowski and Walsh. And, minutes from the February 21,

2002 Tyco Compensation Committee meeting specifically mention improper loans to Kozlowski ($18.8 million) and Swartz ($7 million).

778.    PwC has also claimed in public statements that it raised questions with Tyco's management concerning the propriety of the compensation paid Tyco's officers.  For example, PwC LLP spokesman David Nestor was quoted in a January 3, 2003 article in *The New York Times* article as stating, "We did not know that the disclosure was wrong.  We raised questions about it, went to the company and were told that the disclosure was appropriate."

779.    Tyco, its counsel, and its Board of Directors, either knew or were grossly reckless in ignoring facts that demonstrated the existence of fraudulent conduct long before Tyco disclosed the Individual Defendants' misconduct.

780.    Despite red flags known to them, the members of the Audit Committee, the Compensation Committee, and others at Tyco failed to investigate: (i) the propriety of the loans made to the Company's officers, including the Individual Defendants; (ii) the adequacy of Tyco's disclosures concerning the Individual Defendants' compensation; and (iii) the Individual Defendants' self-dealing transactions.

781.    Further, Tyco was motivated to conceal the depth of the Company's accounting fraud by the cash crunch that affected Tyco following the revelation of the criminal conduct undertaken by Kozlowski, Swartz, Walsh, and others.  By claiming that the Company had not engaged in systemic accounting improprieties, Tyco was able to complete a $6 billion refinancing in January of 2003.  Without that refinancing, the persistent market rumors that Tyco would be forced to file for bankruptcy could well have become a reality.

782.    Plaintiff was injured by the conduct of the Individual Defendants and of Tyco, and said conduct proximately caused Plaintiff's injuries for the reasons previously stated.

## COUNT IX
## (AGAINST TYCO FOR LIABILITY UNDER N.J.S.A. 2C:41-2(b))

783.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

784.     Tyco is a liable person under N.J.S.A. 2C:41-2(b).  Tyco acquired and/or maintained control over numerous other enterprises through a pattern of racketeering activity.  As set forth above, Tyco purchased the Acquired Companies Enterprises that constitute enterprises under N.J.S.A. 2C:41-1c, which were engaged in or whose activities affected commerce or trade, using, in part, Tyco stock whose market value was artificially and fraudulently inflated as a result of the Tyco Defendants' pattern of racketeering activity.

785.     Tyco's acquisitions of said entities contributed to and perpetuated the artificial inflation of the market price of Tyco's stock because said acquisitions were part of Tyco's purported but false method of increasing earnings.  As is described more fully above, said acquisitions were "spring-loaded" through accounting machinations to artificially inflate Tyco's earnings in the post-acquisition periods.

786.     Plaintiff was injured by Tyco's investments in these enterprises because they contributed to and perpetuated the artificial inflation of the market price of Tyco stock owned or purchased by Plaintiff and because they contributed to the false impression that Tyco's strategy of pursuing earnings' growth through acquisitions was more successful than it actually was.

787.     In addition, Plaintiff tendered shares of stock owned by Plaintiff in Mallinckrodt, CIT, Scott Technologies, and Sensormatic in exchange for shares of falsely inflated Tyco stock in connection with Tyco's acquisitions of these entities.

788.     Plaintiff would not have purchased all or some their shares of Tyco stock at the prices at which they were purchased, would have sold their Tyco stock without suffering the massive losses that they eventually suffered or would otherwise have avoided those losses if

Tyco had not engaged in the conduct described above.

789.     Plaintiff was injured by the afore-stated conduct and said conduct proximately caused Plaintiff's injuries for the reasons previously stated.

<strong>COUNT X</strong><br>
<strong>(AGAINST TYCO AND THE INDIVIDUAL DEFENDANTS AS AN<br>
ASSOCIATION IN FACT FOR VIOLATIONS OF N.J. S.A. 2C:41-2(b))</strong>

790.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

791.     Tyco and the Individual Defendants, as an association in fact, are liable persons under N.J.S.A. 2C:41-2(b). Tyco and the Individual Defendants as an association in fact acquired and/or maintained control over numerous other enterprises through a pattern of racketeering activity as set forth more fully in the preceding Count.

792.     The acquisitions of and maintenance of control over said entities contributed to and perpetuated the artificial inflation of the market price of Tyco's stock as is described more fully above.

793.     Plaintiff was injured by the afore-stated conduct and said conduct proximately caused Plaintiff's injuries for the reasons previously stated.

<strong>COUNT XI</strong><br>
<strong>(AGAINST THE INDIVIDUAL DEFENDANTS FOR LIABILITY<br>
UNDER N.J.S.A. 2C:41-2(b))</strong>

794.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

795.     The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(b). The Individual Defendants caused Tyco to acquire and/or maintain control over numerous other enterprises through a pattern of racketeering activity.  As set forth above, Tyco purchased the Acquired Companies Enterprises that constitute enterprises under N.J.S.A. 2C:41-1c, which were engaged in or whose activities affected commerce or trade, using, in part, Tyco stock whose market value was artificially and fraudulently inflated as a result of the pattern of racketeering

activity carried out by Defendants.

796. Said conduct contributed to and perpetuated the artificial inflation of the market price of Tyco's stock because said acquisitions were part of the purported but false method of increasing Tyco's earnings. In addition, as described more fully above, said acquisitions were "spring-loaded" through accounting machinations to artificially inflate Tyco's earnings in the post-acquisition periods.

797. Plaintiff was injured by the aforestated conduct, and said conduct proximately caused Plaintiff's injuries for the reasons previously stated.

### COUNT XII
### (AGAINST TYCO FOR VICARIOUS LIABILITY UNDER N.J.S.A. 2C:41-2(b))

798. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

799. The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(b). As is set forth above, the Individual Defendants caused to be acquired and/or maintained the Acquired Companies Enterprises through a pattern of racketeering activity using, in part, Tyco stock whose market value was artificially and fraudulently inflated as a result of the pattern of racketeering activity carried out by Defendants. The Acquired Companies Enterprises constitute enterprises under N.J.S.A. 2C:41-1c, which were engaged in or whose activities affected commerce or trade.

800. The Individual Defendants' racketeering activities and use thereof to cause the acquisition of and maintain control over said enterprises were carried out in the scope of the Individual Defendants' employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

801. Tyco intended that the racketeering activities take place and that, through them,

said enterprises be acquired; Tyco was reckless or failed to exercise reasonable care with respect to the Individual Defendants' racketeering activities and the acquisition of said enterprises through those activities; and/or Tyco knew or should have known of the Individual Defendants' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation and defalcation, and could reasonably have foreseen the risk of harm created by the Individual Defendants in causing said entities to be acquired and in maintaining control over said entities, and Plaintiff's losses arose from those qualities of the Individual Defendants.

## COUNT XIII
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR LIABILITY UNDER N.J.S.A. 2C:41-2(c))

802.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

803.     The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(c). These Defendants conducted and participated in Tyco's affairs through a pattern of racketeering activity. Tyco constitutes an enterprise under N.J.S.A. 2C:41-1c. and, during the Relevant Period, was engaged in and its activities affected trade or commerce. The Individual Defendants were employed by or associated with Tyco.

804.     As is set forth above, the Individual Defendants conducted or participated, directly or indirectly, in the conduct of Tyco's affairs through a pattern of racketeering activity. Among other things, the Individual Defendants engaged in fraudulent accounting practices, and fraudulent misrepresentations and omissions in connection with the offering, purchase and sale of Tyco stock and securities law violations that constituted a pattern of racketeering activity under N.J.S.A. 2C:41-1. In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

805.     As is set forth more fully above, the Individual Defendants benefited from the conduct of Tyco's affairs through a pattern of racketeering activity. Further, in concealing their

own defalcations and in effectuating fraudulent accounting manipulations, the Individual Defendants were not simply engaged in carrying out their normal corporate functions.

806. Plaintiff was injured by the aforesaid pattern of racketeering activity as a result of Plaintiff's ownership and acquisition of Tyco stock.

## COUNT XIV
### (AGAINST ALL TYCO DEFENDANTS FOR LIABILITY UNDER N.J.S.A. 2C:41-2(c))

807. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

808. The Tyco Defendants are liable persons under N.J.S.A. 2C:41-2(c). Defendants conducted and participated, through a pattern of racketeering activity, in the affairs of an enterprise comprised of an association in fact of Tyco and the Individual Defendants. During the Relevant Period, said enterprise was engaged in and its activities affected trade or commerce. All of the Defendants were associated with said association in fact.

809. As is set forth above, the Tyco Defendants conducted or participated, directly or indirectly, in the conduct of the association in fact's affairs through a pattern of racketeering activity. In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

810. For the reasons set forth more fully above, this pattern of racketeering activity benefited all of the Tyco Defendants.

811. Plaintiff was injured by the aforesaid pattern of racketeering activity as a result of Plaintiff's ownership and acquisition of Tyco stock.

## COUNT XV
### (AGAINST ALL TYCO DEFENDANTS AS AN ASSOCIATION IN FACT FOR LIABILITY UNDER N.J.S.A. 2C:41-2(c))

812. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

813. The Tyco Defendants constituted an association in fact that is a liable person

under N.J.S.A. 2C:41-2(c). This association in fact conducted and participated in Tyco's affairs through a pattern of racketeering activity. Tyco constitutes an enterprise under N.J.S.A. 2C:41-1c. and, during the Relevant Period, was engaged in and its activities affected trade or commerce. The association in fact was associated with Tyco.

814. As is set forth above, the association in fact conducted or participated, directly or indirectly, in the conduct of Tyco's affairs through a pattern of racketeering activity. In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

815. As is set forth more fully above, all of the Tyco Defendants, operating as an association in fact, benefited from the conduct of Tyco's affairs through a pattern of racketeering activity.

816. Further, in concealing their own defalcations and in effectuating fraudulent accounting manipulations, the Individual Defendants were not simply engaged in carrying out their normal corporate functions.

817. Plaintiff was injured by the aforesaid pattern of racketeering activity as a result of Plaintiff's ownership and acquisition of Tyco stock.

## COUNT XVI
### (AGAINST TYCO FOR VICARIOUS LIABILITY UNDER N.J.S.A. 2C:41-2(c))

818. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

819. The Individual Defendants are liable persons under N.J.S.A. 2C:41-2(c). These Defendants conducted and participated in Tyco's affairs through a pattern of racketeering activity. In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

820. Tyco constitutes an enterprise under N.J.S.A. 2C:41-1c. and, during the Relevant Period, was engaged in and its activities affected trade or commerce. The Individual Defendants

were employed by and/or associated with Tyco during the Relevant Period.

821.     Plaintiff was injured by the aforesaid pattern of racketeering activity as a result of Plaintiff's ownership and acquisition of Tyco stock.

822.     The Individual Defendants' racketeering activities, and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs, were carried out in the scope of the Individual Defendants' employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

823.     Tyco intended that the Individual Defendants' racketeering activities, and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs, take place; Tyco was reckless or failed to exercise reasonable care with respect to the Individual Defendants' racketeering activities and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs; and/or Tyco knew or should have known of the Individual Defendants' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation and defalcation, and could reasonably have foreseen the risk of harm created by the Individual Defendants, and Plaintiff's losses arose from those qualities of the Individual Defendants.

## COUNT XVII
## (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF N.J.S.A. 2C:41-2(d))

824.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

825.     The Tyco Defendants agreed with one another that they would engage in the violations of the New Jersey RICO Act as set forth in the previous Counts of this Complaint. The Tyco Defendants, along with the other co-conspirators, agreed to assist one another in the planning and/or commission of said violations.  The Tyco Defendants agreed to the commission

of numerous predicate acts of racketeering in connection therewith.

826. PwC agreed to assist and did assist the Individual Defendants in perpetrating thefts by providing clean audit opinions with respect to accounting statements that fraudulently concealed the thefts. According the SEC, as found in its August 13, 2003 filing instituting public cease-and-desist proceedings against PwC partner Richard P. Scalzo, PwC was aware of but failed to require Tyco to properly account for and/or disclose: (i) the improper bonus payments in connection with the TyCom IPO, the ADT Automotive divestiture and the Flag Telecom transaction; (ii) the $20 million CIT payment to Walsh; (iii) the improper relocation loans; (iv) the improper KEL Program loans; and (v) Tyco's use of post-period adjustments to off-set charges so that Tyco could make its earnings forecasts.

827. As a direct and proximate result of the Tyco Defendants' assistance of one another in connection with the violations of the New Jersey RICO Act alleged above, Plaintiff was injured.

## XVII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment:

A. Awarding compensatory damages and/or recission as appropriate against Defendants and each of them, in favor of Plaintiff for damages sustained as a result of Defendants' wrongdoing together with interest thereon;

B. Awarding prejudgment interest;

C. Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

D. Awarding Plaintiff treble damages;

E. Awarding Plaintiff its costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees, and experts' fees; and

F.       Awarding such other and further relief as may be just and proper.

## XVIII.       JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

## XIX.       VERIFICATION AND CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I am authorized to file this verification on behalf of Colorado PERA.  I verify that I have reviewed the complaint and the facts set forth in it are true and correct to the best of my knowledge, information, and belief.  I am providing this verification on behalf of Colorado PERA as the facts set forth herein have been established through an investigation conducted by counsel.

I certify that the matter in controversy is not the subject of any other action, arbitration, or administrative proceeding, pending or contemplated, except as follows:  the allegations in this matter are related to the matters at issue in (1) In re Tyco International Ltd. Securities Litigation, MDL Docket No. 02-1335-B pending in the United States District Court for the District of New Hampshire; (2) Franklin Mutual Advisors, LLC, et al. v. Tyco Int'l Ltd., et al., Case No. 07-CV-04575-WJM-MF (D.N.J.); Teacher Retirement System of Texas, et al. v. Tyco Int'l Ltd., et al., Case No. 07-CV-05704-WJM-MF (D.N.J.); Federated American Leaders Fund, Inc. et al. v. Tyco Intl Ltd., et al., Case No. 2:08-cv-00478-WJM-MF (D.N.J); Nuveen Balanced Municipal and Stock Fund, et al. v. Tyco Int'l Ltd., et al., Case No. 08-CV-00518-WJM-MF (D.N.J.); and Blackrock Global Allocation Fund, Inc., et al. v. Tyco International Ltd., et al., Case No. 2:08-cv-00519-WJM-MF (D.N.J.).

Dated:  July 11, 2008                                      Respectfully submitted,

                                                           **ENTWISTLE & CAPPUCCI LLP**

_____/s/_____

Andrew J. Entwistle
Johnston de F. Whitman, Jr.
Richard W. Gonnello
280 Park Avenue, 26th Floor West
New York, NY  10017
Telephone:  (212) 894-7200
Fax:  (212) 894-7272